IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **In re:** ) | Chapter 11 |
| ) | |
| **LINC USA GP,** *et al.* [1] ) | Case No. 16-32689 (DRJ) |
| ) | |
| Debtors. ) | (Joint Administration Requested) |

### DECLARATION OF JUDE ROLFES
### IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Jude Rolfes, state as follows:

#### I. INTRODUCTION

1.  I am the Vice President–Corporate Development for Linc USA GP, Linc Energy Finance (USA), Inc., Diasu Holdings, LLC, Diasu Oil & Gas Company, Inc., Linc Alaska Resources, Inc., Linc Energy Petroleum (Louisiana), L.L.C., Linc Energy Petroleum (Wyoming), Inc., Linc Energy Resources, Inc., Linc Energy Operations, Inc., Linc Gulf Coast Petroleum, Inc., and Paen Insula Holdings, LLC (together, the "Debtors"). I am familiar with the Debtors' day-to-day operations, business affairs, books and records. I have worked for the Debtors since 2011 and have served as Vice President–Corporate Development since June 2015. I am above 18 years of age and I am competent to testify.

2.  I submit this declaration (the "Declaration") to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of (i) the Debtors' voluntary petitions for relief under chapter 11 of the Bankruptcy Code filed on [May 29, 2016] (the "Petition Date") and (ii) the relief, in the

---

[1] The Debtors in these chapter cases, along with the last four digits of each Debtor's federal tax identification number, are: Linc Energy Finance (USA), Inc. (6684); Linc USA GP (5234); Linc Energy Resources, Inc. (9613); Linc Gulf Coast Petroleum, Inc. (6790); Linc Energy Petroleum (Louisiana), LLC (1074); Linc Alaska Resources, LLC (2362); Paen Insula Holdings, LLC (1681); Linc Energy Petroleum (Wyoming), Inc. (9859); Diasu Holdings, LLC (9626); Diasu Oil & Gas Company, Inc. (8926); and Linc Energy Operations, Inc. (5806).

#5102130.8

form of motions, that the Debtors have requested of the Court (the "First Day Motions").  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management and other of the Debtors' advisors and employees, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' assets, liabilities, operations and financial condition.  I am authorized to submit this Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## II. PRELIMINARY STATEMENT

4. Beginning in 2012, the Debtors set out on an aggressive drilling program related to their Gulf Coast and Alaskan properties.  The Debtors made sizeable expenditures in pursuit of that program, and as a result the Debtors' cash position was especially vulnerable to the recent decline in oil prices.  In 2015, facing an April 2016 interest payment of approximately $6,000,000 on the Debtors' First Lien Notes, and $18,000,000 on the Debtors' Second Lien Notes, neither of which the Debtors would be able to satisfy, the Debtors entered into negotiations with their lenders to reach an agreed restructuring and recapitalization.  Unfortunately, the Debtors were not able to effectuate a reorganization outside of chapter 11.  However, an ad hoc group of holders of over 75% of the value of the Debtors' First Lien Notes has agreed to support the Debtors' use of cash collateral and debtor in possession financing in furtherance of a liquidating chapter 11 proceeding.  Faced with the impending expiration of the thirty day grace period related to the April 2016 interest payments, the Debtors file these chapter 11 cases to further an orderly sale process within these chapter 11 proceedings and maximize the value of the Debtors' assets for their creditors.

#5102130.8

## III. DEBTORS' HISTORY AND BUSINESS OPERATIONS

5. Together, the Debtors operate an independent oil and gas exploration and production business with a primary focus on conventional onshore and shallow state water properties along the Gulf Coast of Texas and properties in the Powder River Basin of Wyoming. The Debtors, through their majority owned subsidiary, Renaissance Umiat, LLC (which is not a Debtor), also own oil and gas properties in the Umiat field on Alaska's North Slope.

6. The Debtors are ultimately owned by Linc Energy Ltd., an Australian corporation established in the year 2000, shares of which were listed on the Singapore Stock Exchange. Linc Energy Ltd. entered into voluntary administration in Australia on April 15, 2016.

7. The corporate relationship among the Debtors is displayed in the business organizational chart attached hereto as **Exhibit A**.

### A. Gulf Coast Assets

8. The Debtors' Gulf Coast assets are owned by Debtor Linc Gulf Coast Petroleum, Inc. ("Linc Gulf Coast"). As of the Petition Date, Linc Gulf Coast's properties cover approximately 15,521 net acres and include 150 producing wells over 13 active fields. The location of Linc Gulf Coast's oil and gas assets are described in the following chart:



9. The Linc Gulf Coast properties are conventional oil plays, characterized by salt domes or geological structures related to deep-seated salt movement that have been a significant source of oil production since the turn of the twentieth century.

10. Per its latest internal reserve report, as of January 1, 2016, Linc Gulf Coast had estimated proved reserves of 5.6 million barrels of oil and 3.4 billion cubic feet of natural gas. For the month ending April 30, 2016, Linc Gulf Coast assets were producing an average of 2,200 gross barrels of oil equivalent per day.

B. **Wyoming Assets**

11.     The Debtors' assets in Wyoming are owned by Linc Energy Petroleum (Wyoming), Inc. ("Linc Wyoming") and encompass 27,821 net acres and 31 wells across 3 fields in the Powder River Basin, located as follows:



12.     At Linc Wyoming's request, Ryder Scott Company, L.P. issued a reserve report on July 20, 2015, as of June 30, 2015, stating that Linc Wyoming had estimated proved reserves of 551,000 barrels of oil. The Debtors are evaluating an enhanced oil recovery strategy for the Linc Wyoming assets, using carbon dioxide injection to increase oil displacement efficiency.

C. **Alaska Assets**

13.     Linc Alaska Resources, LLC ("Linc Alaska") owns, through its majority owned subsidiary Renaissance Umiat, LLC, approximately 18,540 net acres within the National Petroleum Reserve of Alaska near Umiat, Alaska, located as follows:



14. Based on a Ryder Scott report dated December 7, 2015, Linc Alaska's acreage is estimated to contain probable reserves of 99 million barrels of oil. The Umiat field is considered to be one of the few remaining undeveloped light oil reservoirs in North America. Once developed, the Debtors expect that the Linc Alaska assets could provide peak production of 30,000 barrels of oil per day. As part of the development phase, the Debtors have drilled and completed two test wells in the Umiat field.

D. **Operations**

15. The oil and gas properties owned by the Debtors are operated by the affiliated debtor Linc Energy Operations, Inc. ("Linc Energy Operations"), pursuant to that certain Amended and Restated Management Agreement dated October 12, 2012 (as amended, the "Management Agreement"), by and between Linc Energy Operations and each of the other Debtors. Under the Management Agreement, Linc Energy Operations manages all of the Debtors' properties, and employs all personnel engaged in such operations, and contracts with all of the third party vendors supplying the goods and services required by these operations. Linc

#5102130.8

Energy Operations is reimbursed by the Debtors for the actual cost and expense of operations, plus a management fee equal to 15% of such reimbursable costs, up to a maximum of $1.5 million per year.

16. The Debtors sell their Gulf Coast oil production to Shell Trading (US) Company and Gulfmark Energy, Inc. and sell their Gulf Coast natural gas production to TEXLA Energy Management, Inc.. The Debtors sell their Wyoming oil production to Rocky Mountain Crude Oil Marketing LLC.

### IV.  EVENTS LEADING TO CHAPTER 11 FILING

17. As the price of oil began its decline in late 2014, the Debtors actively adjusted their priorities to better withstand the downturn. First, the Debtors discontinued their drilling program and initiated a low capital expenditure program by which they sought to minimize capital expenditures by selecting well reworks, well recompletions and new well drilling based on a rigorous economic analysis. Second, the Debtors set out to improve operating efficiencies, which resulted in a 44% reduction in lease operating expenses and a total operating cost below $30.00/net barrel of oil equivalent. However, as 2015 progressed, the decline in oil prices continued, with the WTI benchmark price dropping from approximately $93 a barrel as of September 15, 2014 to below $35 a barrel as of March 1, 2016.

18. The precipitous decline in oil prices has hurt all producers, but has been particularly devastating to the Debtors because of the monies expended conducting an aggressive drilling program on their Gulf Coast properties prior to 2015, drilling 21 wells in 2012, 33 wells in 2013, and 12 wells in 2014. The high costs of drilling coupled with the severe drop in oil prices, has greatly diminished the anticipated return on these wells. During 2015, as described above, the Debtors selected wells for their limited 3 well drilling program on a risked economic analysis. Unfortunately, the wells drilled by the Debtors were not as successful as anticipated,

#5102130.8

and in one case, geologic conditions were encountered which considerably added to the cost of the operation.

19.     Additionally, at its Umiat field, between 2013 and 2014, Linc Alaska expended approximately $120 million in conducting an appraisal program, which included drilling two wells for the purposes of demonstrating the potential of the Alaska properties and securing a joint venture partner.  Although the results of the appraisal program were favorable, in the current environment the Debtors have been unable to locate a suitable partner and have been unable to recover any of the expended drill costs, other than the costs recovered through the State of Alaska's tax rebate program.  These expenditures, combined with lower production revenues, have significantly impacted the Debtors' financial position.

20.     Following an in-depth strategic review of their assets and operations in late 2014 and early 2015, the Debtors concluded that they would need to rationalize their asset portfolio and add new assets with better economic profiles.  However, notwithstanding these initiatives, and with interest payments totaling approximately $22,000,000 due on their Notes (defined below) on April 30, 2015, it became clear that the Debtors' capital structure prevented them from rationalizing their portfolio through sales and acquisitions and that, under the circumstances, the Debtors' capital structure was unsustainable.  In response, the Debtors retained and Bracewell LLP to help chart a path forward.

21.     After failing to make the April 2015 interest payments on the Notes when due and considering at length the appropriateness of satisfying that past due interest payment and the upcoming October 31, 2015 interest payment, in May 2015, Linc USA GP and Linc Energy Finance, as Issuers under the applicable Indentures (defined below) sought and obtained the support of Noteholders (via a support agreement) to amend both the First Lien Indenture and the

Second Lien Indenture (both as defined below) in order to facilitate the payment of the past due April 2015 interest prior to the expiration of the applicable grace period under each Indenture. Under the support agreement, Linc Energy Ltd., Linc USA GP's parent, agreed to make a capital contribution to Linc USA GP in an amount sufficient to make the interest payments on the Notes that were due but not paid on April 30, 2015. On May 28, 2015, promptly following the receipt of such capital contribution, Linc USA GP made the past due April 2015 interest payments, together with interest on such interest, to the holders of the Notes. Also pursuant to the support agreement, the Issuers sought and obtained the consent of the holders of the First Lien Notes and the Second Lien Notes to amend the terms of the Notes and the Indentures, among other matters, (i) to permit the Issuers to pay all or part of the interest on the Second Lien Notes due on October 31, 2015 and, subject to certain conditions, April 30, 2016, by issuing additional Second Lien Notes in a principal amount equal to such interest or increasing the principal amount of the outstanding Second Lien Notes rather than paying such interest in cash and (ii) to provide for the application of the net proceeds of assets sales to the mandatory redemption of the First Lien Notes and thereafter to the mandatory redemption of the Second Lien Notes (collectively, the "Amendments"). The amendments became effective on June 30, 2015. The Debtors later satisfied the October 31, 2015 interest payments on the Second Lien Notes by increasing the principal amount of the outstanding Second Lien Notes by $16,562,500.

22.     By making their interest payments, the Debtors were afforded the opportunity to attempt to negotiate a broader restructuring and recapitalization in a coordinated manner that would best maximize value and avoid the filing of a chapter 11 case without a developed restructuring framework in hand. To facilitate that restructuring, the Debtors contacted their major Noteholders and engaged in negotiations. The Debtors engaged Sandler O'Neill +

Partners, L.P. to assist in this process. The Debtors proposed various restructuring alternatives based on the receipt of an equity infusion from Linc Energy, Ltd. the Debtors' ultimate parent, which would be new third party capital in the form of debt and/or equity. This proposal contemplated a significant deleveraging, together with the infusion of new capital that would permit the parent company to sustain the reorganized business through a potentially prolonged period of depressed oil and gas prices. Unfortunately, after months of diligence and negotiations this proposal did not come to fruition and on April 15, 2016, the Debtors' ultimate parent, Linc Energy Ltd., entered into voluntary administration in Australia.

23. The Debtors continued in discussions with their lenders, while also exploring third party alternatives to restructure their balance sheets. Eventually, an ad hoc group of holders of First Lien Notes formed and through negotiations proposed to support cash collateral use and debtor in possession financing in furtherance of a coordinated sale process within a chapter 11 proceeding. With no other options and facing a May 30, 2016 expiration of the grace period related to their missed April 30, 2016 interest payments of $6,000,000 on the Debtors' First Lien Notes, and $18,000,000 on the Debtors' Second Lien Notes, the Debtors' filed these chapter 11 cases in order to preserve the value of businesses and potential value to unsecured creditors.

## V. CAPITAL STRUCTURE[2]

### A. Indentures

24. Linc USA GP and Linc Energy Finance (USA), Inc. are issuers (the "Issuers") of two indentures, as follows:

> (a) the Indenture dated as of August 13, 2014, among the Issuers, the non-Issuer Debtors other than Linc Energy Operations (the "Guarantors") and The Bank of New York Mellon Trust Company, N.A., as Trustee and

---

[2] This Affidavit contains a summary only and is not intended to alter the actual terms of the Indentures. In the event there is a discrepancy between the terms in this Affidavit and the terms of the Indentures, the Indentures control.

#5102130.8

        Collateral Agent (the "Trustee"), as amended and supplemented by the Supplemental Indenture dated as of June 30, 2015 (such Indenture, as so amended and supplemented, the "First Lien Indenture") pursuant to which were issued $125,000,000 aggregate principal amount of 9⅝% First Lien Senior Secured Notes due 2017 (the "First Lien Notes"), and

(b)    the Indenture dated as of October 12, 2012, among the Issuers, the Guarantors and the Trustee, as amended and supplemented by the Supplemental Indenture dated as of August 13, 2014 and the Second Supplemental Indenture dated as of June 30, 2015 (such Indenture, as so amended and supplemented, the "Second Lien Indenture" and, together with the First Lien Indenture, the "Indentures") pursuant to which were issued $265,000,000 aggregate principal amount of 12½% Senior Secured Notes due 2017, which principal amount was later increased by $18,550,000 in connection with the October 2015 interest payment (the $265,000,000 in notes, together with the $18,550,000 increase in principal amount, are referred to as the "Second Lien Notes" and, together with the First Lien Notes, the "Notes").

25.    The entire principal amount—$408,550,000—is currently outstanding under the Indentures. The obligations under the First Lien Indenture and First Lien Notes and the Second Lien Indenture and Second Lien Notes are secured by a first and second lien, respectively, on substantially all of the assets of the Debtors (other than Linc Energy Operations, which is not a Guarantor), including (i) all oil and gas leases and interests owned by the Debtors (other than Linc Energy Operations) (ii) all liquid or gaseous hydrocarbons accruing to or produced from the leases and interests described in the foregoing clause, (iii) all proceeds of the foregoing, and (iv) the membership interests of the non-Debtor Renaissance Umiat, LLC held by the Debtor Linc Alaska Resources, LLC.

26.    The priorities between the lenders under the First Lien Indenture and the Second Lien Indenture are governed by that certain Amended and Restated Intercreditor Agreement ("Intercreditor Agreement"), dated August 13, 2014, between The Bank of New York Mellon Trust Company, N.A., not in its individual capacity, but solely in its capacity as trustee and collateral agent under the First Lien Indenture and The Bank of New York Mellon Trust

Company N.A., not in its individual capacity, but solely in its capacity as trustee and collateral agent under the Second Lien Indenture.

### B. Other Obligations

(i) Trade Debt

27. In the ordinary course of producing oil and gas from its properties, the Debtors have historically obtained goods and services from over 300 vendors. As of the Petition Date, the Debtors estimate that they owed approximately $5.8 million to their vendors.

(ii) Royalty Obligations

28. As of the Petition Date, the Debtors had approximately 2600 royalty owners in pay status, including certain insiders of the Debtors such as the Debtors' employees and executives. As of the Petition Date, the Debtors held an aggregate of approximately $61,000 in suspense for the benefit of various royalty owners whose title was uncertain for the prepetition period.

## VI.  FIRST DAY MOTIONS

**Emergency Motion Pursuant to Rule 1015 of the Federal Rules of Bankruptcy Procedure Requesting Joint Administration of Chapter 11 Cases**

29. The Debtors anticipate that, during the course of these cases, it will be necessary to file numerous motions and applications, as well as other pleadings and documents, seeking relief on behalf of all Debtors. To accomplish this as efficaciously as possible, the Debtors seek joint administration of their cases under the Linc USA GP case. The Debtors respectfully submit that joint administration of their chapter 11 cases is in the best interests of their estates, creditors, and other parties-in-interest and will further the interests of judicial economy and administrative expediency by, among other things, obviating the need to: (i) file duplicate motions, (ii) enter duplicate orders, and (iii) forward unnecessary, duplicate notices and other documents to

#5102130.8

creditors and other parties-in-interest, which actions would cause the Debtors' estates to incur unnecessary costs and expenses.

**Notice of Designation as Complex Chapter 11 Bankruptcy Cases**

30. The Debtors believe that these cases qualify for treatment as complex cases. As of the Petition Date, the Debtors have aggregate assets of more than $10 million and aggregate liabilities of more than $30 million. There are over 50 parties in interest in the case. As a result, the Debtors have a significant need for simplification of noticing and hearing procedures to reduce delays and expenses.

**Emergency Motion for an Order (i) Authorizing Continued Use of Existing Business Forms and Records, (ii) Authorizing Maintenance of Existing Corporate Bank Accounts and Cash Management System, and (iii) Waiving the Requirements of 11 U.S.C. § 345(b)**

31. Prior to commencing these cases, in the ordinary course of their businesses, the Debtors used a cash management system (the "Cash Management System") to efficiently collect, transfer, and disburse funds generated by their business operations.

32. The Debtors respectfully request authority to maintain their bank accounts and the Cash Management System in accordance with their usual and customary practices to ensure a smooth transition into chapter 11 with minimal disruption to operations. The Debtors also request authority to close any of their bank accounts if, in the exercise of their business judgment, the Debtors determine that such action is in the best interest of their estates.

33. In order to conduct their postpetition business, the Debtors need to be able to issue checks to vendors, service providers, and others. Additionally, their bank accounts are maintained with financial institutions that are financially stable. In this regard, the Debtors maintain accounts at Frost Bank, Key Bank, Prosperity Bank and Wells Fargo. Requiring a change in the Debtor's current cash management system would likely result in a loss of revenue

for a period of time, would be costly, and would likely be disruptive to the timely payment of the vendors and other third parties providing the services critical to continued production of the Debtors' wells, which in turn could subject leases to forfeiture, ultimately, to the detriment of the Debtors' reorganization efforts.

**Emergency Motion to Authorize Payment of Prepetition Taxes and Related Obligations and Continue Such Payments Postpetition**

34. The Debtors seek authority, but not direction, to pay pre-petition property taxes, federal, state, and local severance taxes, employee related taxes, and all other applicable taxes to the respective taxing authorities. This request is without prejudice to the Debtors' right to contest any amounts of taxes on any ground they deem appropriate. The failure to pay taxes could disrupt the Debtors' operations and reorganization efforts, to the detriment of their estates and creditors.

**Emergency Motion for Order (I) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment**

35. The Debtors' request authority to make adequate assurance payments to utility companies currently providing or which will provide services to the Debtors, prohibiting such utility companies from altering, refusing, or discontinuing services on account of the Debtors' bankruptcy filing or the non-payment of pre-petition amounts owed, and establishing certain procedures for resolving utility company requests for additional assurance of payment. Numerous companies provide the Debtor with electricity, telephone, and internet services that are necessary for the continued operation of the Debtors' businesses. As of the Petition Date, no defaults or arrearages with any utility company exists and upon information and belief, no outstanding amounts are owed to any utility provided. The Debtors estimate that their aggregate

#5102130.8

monthly utility usage is approximately $105,000.00.  The Debtors' require uninterrupted utility service to effectively operate and maintain the value of their businesses, for the ultimate benefit of their creditors.  The Debtors' cannot operate their business without utility services.  Therefore, any interruption of their utility services for substantially disrupt the Debtors' operations and ability to successfully reorganize.

**Emergency Motion for Order (I) Authorizing Debtors to (A) Pay Prepetition Wages and Salaries to Employees and (B) Pay Prepetition Benefits and to Continue Benefit Programs in the Ordinary Course, and (II) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests**

36.   Linc Energy Operations has 44 employees collectively; as follows:

Wyoming Oil & Gas:  2

Texas Oil & Gas:  3

Texas Information Technology:  1

Alaska Oil & Gas:  1

Finance:  4

Legal:  1

Texas Geology:  1

Texas Engineering:  1

Texas Land:  3

Texas Procurement:  1

Texas Business Development:  1

Texas Human Resources and Administration:  2

Texas Oil & Gas Field:  23

37.   The Debtors seek authority to pay any pre-petition wages due to their employees, whether accrued or currently due and payable, any pre-petition employee benefit obligations,

#5102130.8

including the Debtors' prepetition severance program, and continue paying such fees and obligations post-petition. The Debtors request this relief to reduce any potential hardship to their employees and maintain the morale of their essential workforce through the Debtors' bankruptcy cases. Assuming the Debtors' are granted authority to use Cash Collateral, the Debtors will have sufficient funds to pay all requested amounts as and when due.

**Emergency Motion for Order Authorizing Debtors to (A) Remit Royalty and Working Interest Payments to Royalty and Working Interest Holders and (B) Continue Such Payments Post-Petition in the Ordinary Course of Business**

54.     The Debtors seek authority to make all payments due to royalty interest owners and working interest owners (collectively, the "Royalty Owners") in the normal course of business, regardless of whether such royalty is due for production before or after the Petition Date. The Debtor's oil and gas leases are the foundation of their business and the failure to pay or continue to pay amounts owed to Royalty Owners would result in an increased risk of liens, litigation, or other actions by the Royalty Owners. This would burden the Debtors' assets, diminish their value, and distract the Debtors' from their ultimate goal of reorganization. Further, the payment of royalties is essential to preserving the value of the Debtors' oil and gas leases and ensuring the successful sale of the Debtors' assets and businesses.

**Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 anad 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)**

55.     The Debtors have an immediate need to use the Cash Collateral of the First and Second Lien Noteholders and obtain up to $10 million of postpetition financing ("DIP Financing") on a priming and superpriority basis from the DIP Lenders, which consist of various lenders under the First Lien Indenture. Without the use of this Cash Collateral and the DIP

#5102130.8

Financing, the Debtors will not be able to pay the costs and expenses of operating their business, including but not limited to payments to Linc Energy Operations under the Management Agreement to permit Linc Energy Operations to make payments to third parties on behalf of the other Debtors, and other costs that arise in the ordinary course of the Debtors' business and in the administration of these bankruptcy cases.  As of the Petition Date, the Debtors do not have sufficient unencumbered cash to fund their business operations and pay present operating expenses.  If the Debtors are unable to gain access to the DIP Facility and obtain authority to use Cash Collateral as working capital in the operation of their business, the Debtors will be unable to meet basic operation expenses, which would have a devastating effect on the value of the Debtors' business and other assets and, ultimately, the Debtors' ability to successfully reorganize.  Therefore, the Debtors face immediate and irreparable harm if they are not granted authority to access DIP Financing and use Cash Collateral in accordance with the motion and interim order.

56.     The interim order protects any interest of the First and Second Lien Noteholders in the Cash Collateral by providing them adequate protection to the extent of the aggregate diminution in the value of Cash Collateral by maintaining the going concern value of the collateral; providing a postpetition replacement lien to the extent of their valid, perfected prepetition liens and security interests in such Cash Collateral, as described in the Cash Collateral motion; and providing a superpriority claim, as described in the Cash Collateral motion.  As such, any interest of First and Second Lien Noteholders in the Cash Collateral is adequately protected through the terms of the interim order.

57.     Accordingly, the Debtors request authority to obtain DIP Financing and use the Cash Collateral on an interim basis in accordance with the proposed interim budget and interim

#5102130.8

order attached to the DIP Financing and Cash Collateral motion, set a final hearing on the Debtor's request to obtain DIP Financing and use Cash Collateral, and provide adequate protection to First and Second Lien Noteholders in accordance with the terms of the interim order.

**Emergency Motion for Order Authorizing Implementation of Certain Notice Procedures Under Bankruptcy Code § 105(a) and Bankruptcy Rules 1015(c) and 9007**

58.     The Debtors seek permission to implement certain notice procedures including creation and maintenance of a master service list; creation of a consolidated creditor matrix; and procedures for providing notice to other parties in interest.

**Emergency Application for Entry of Order Authorizing the Retention and Appointment of Kurtzman Carson Consultants LLC as Notice, Claims and Balloting Agent**

59.     The Debtors seek authority to employ Kurtzman Carson Consultants LLC ("KCC") as their claims, notice and balloting agent. The retention of KCC is most effective and efficient manner of noticing the numerous creditors and parties in interest of the filing of these chapter 11 cases and other developments related thereto. KCC is a bankruptcy administrator that specializes in providing comprehensive chapter 11 administrative services including noticing, claims processing, balloting, and other related services critical to the effective administration of chapter 11 cases. KCC has developed efficient and cost-effective methods to properly handle the voluminous mailings associated with the noticing, claims processing, and balloting portions of chapter 11 cases to ensure the orderly and fair treatment of creditors, equity security holders, and all parties in interest.

## VII. CONCLUSION

60. Approval of the First Day Motions is in the best interest of the Debtors, their estates and their creditors.

61. I have reviewed this Declaration and hereby declare under penalty of perjury that the foregoing is true and correct and within my own personal knowledge.

Executed this 25th day of May, 2016.

_____
Jude Rolfes
Vice President – Corporate Development