## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **LINC USA GP,** *et al.* [1] | ) | **Case No. 16-32689 (DRJ)** |
| | ) | |
| Debtors. | ) | **(Jointly Administered)** |

### NOTICE OF FILING OF ASSET PURCHASE
### AGREEMENT FOR SALE OF WYOMING ASSETS

**PLEASE TAKE NOTICE** that pursuant to the *Order Approving Bidding Procedures and Protections; Approving Procedures for the Assumption and Assignment of Contracts and Leases; Scheduling Bidding Deadline, Auction Date, and Sale Hearing Date; and Approving Form and Notice Thereof* [Dkt. No. 205] (the "Bidding Procedures Order")[2], the debtors and debtors in possession (together, the "Debtors") conducted an auction (the "Auction") on August 23, 2016, at 10:00 a.m. (CT) in the Houston offices of Bracewell LLP, 711 Louisiana Street, Suite 2300, Houston, Texas 77002 for the Debtors' Gulf Coast Assets, Wyoming Assets, and Alaska Assets (each, a "Lot").

**PLEASE TAKE FURTHER NOTICE** that at the conclusion of the Auction, the Debtors determined in their reasonable business judgment after consultation with the Official Committee of Unsecured Creditors, the DIP Lenders, and the Prepetition Lenders that Big Muddy Opportunities, LLC ("Big Muddy" or the "Successful Bidder") submitted the highest and best Qualifying Bid for the Lot of the Debtors' Wyoming Assets with a cash bid of $1,900,000 (the "Successful Bid"). *See* Dkt. No. 308.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are: Linc Energy Finance (USA), Inc. (6684); Linc USA GP (5234); Linc Energy Resources, Inc. (9613); Linc Gulf Coast Petroleum, Inc. (6790); Linc Energy Petroleum (Louisiana), LLC (1074); Linc Alaska Resources, LLC (2362); Paen Insula Holdings, LLC (1681); Linc Energy Petroleum (Wyoming), Inc. (9859); Diasu Holdings, LLC (9626); Diasu Oil & Gas Company, Inc. (8926); and Linc Energy Operations, Inc. (5806).
[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that the Debtors and the Successful Bidder have executed the *Asset Purchase Agreement, Dated as of August 29, 2016, by and among Linc Energy Operations, Inc., and Linc Energy Petroleum (Wyoming), Inc., as Sellers, and Big Muddy Opportunities, LLC, as Buyer* (the "Asset Purchase Agreement"), attached hereto as **Exhibit A** (Exhibits, Schedules and Disclosure Schedules to come).

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Bidding Procedures Order, a hearing will be held before the Honorable David R. Jones of the United States Bankruptcy Court for the Southern District of Texas on August 31, 2016, at 2:00 p.m. (CT), at which the Debtors will seek entry of an order approving and authorizing, among other things, the sale of the Wyoming Assets to the Successful Bidder in accordance with the terms of the Asset Purchase Agreement between the Debtors and the Successful Bidder.

Respectfully Submitted,

**BRACEWELL LLP**

By: */s/ Jason G. Cohen*
      Jason G. Cohen
      Texas Bar No. 24050435
      Jason.Cohen@bracewelllaw.com
      William A. (Trey) Wood III
      Texas Bar No. 21916050
      Trey.Wood@bracewelllaw.com
      711 Louisiana, Suite 2300
      Houston, Texas 77002
      Telephone: (713) 223-2300
      Facsimile: (713) 221-1212

**COUNSEL FOR THE DEBTORS AND DEBTORS IN POSSESSION**

#5296470

## **EXHIBIT A**

**Asset Purchase Agreement**

#5296470

*Execution Version*

ASSET PURCHASE AGREEMENT

DATED AS OF AUGUST 29, 2016

BY AND AMONG

LINC ENERGY PETROLEUM (WYOMING), INC.

AND LINC ENERGY OPERATIONS, INC.

AS SELLERS

AND

BIG MUDDY OPPORTUNITIES, LLC

AS BUYER

TABLE OF CONTENTS

## ARTICLE 1

### DEFINITIONS

| | | |
|---|---|---|
| 1.1 | Definitions. | 1 |
| 1.2 | Other Definitions and Interpretive Matters. | 20 |

## ARTICLE 2

### PURCHASE AND SALE

| | | |
|---|---|---|
| 2.1 | Purchase and Sale | 21 |
| 2.2 | Excluded Assets | 24 |
| 2.3 | Assumed Liabilities | 25 |
| 2.4 | Excluded Liabilities | 27 |
| 2.5 | Assigned Contracts and Cure Costs | 28 |
| 2.6 | Assignment of Seller Oil and Gas Assets Subject to Consent Requirements. | 29 |
| 2.7 | Further Assurances | 30 |

## ARTICLE 3

### PURCHASE PRICE

| | | |
|---|---|---|
| 3.1 | Purchase Price | 30 |
| 3.2 | Good Faith Deposit | 30 |

## ARTICLE 4

### CLOSING

| | | |
|---|---|---|
| 4.1 | Closing Date | 31 |
| 4.2 | Payment on the Closing Date | 31 |
| 4.3 | Buyer's Deliveries | 31 |
| 4.4 | Sellers' Deliveries | 32 |

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF SELLERS

| | | |
|---|---|---|
| 5.1 | Organization and Good Standing | 33 |
| 5.2 | Authority; Validity; Consents | 34 |
| 5.3 | No Conflict | 34 |
| 5.4 | Material Contracts; Leases and Mineral Interests | 34 |
| 5.5 | Permits; Surface Rights | 35 |

| 5.6 | Wells; Equipment | 36 |
| 5.7 | Imbalances | 37 |
| 5.8 | AFEs | 37 |
| 5.9 | Non-Consent Operations | 37 |
| 5.10 | Hedging | 37 |
| 5.11 | Preferential Purchase Rights; Other Rights | 37 |
| 5.12 | Suspense Funds | 37 |
| 5.13 | Intellectual Property | 37 |
| 5.14 | Taxes | 38 |
| 5.15 | Legal Proceedings | 39 |
| 5.16 | Labor Matters | 39 |
| 5.17 | Employee Benefits | 40 |
| 5.18 | Sufficiency of Oil and Gas Assets; Casualties | 41 |
| 5.19 | Compliance with Laws | 41 |
| 5.20 | Environmental Matters | 41 |
| 5.21 | [Reserved] | 42 |
| 5.22 | Certain Regulation | 42 |
| 5.23 | Insurance and Bonds | 42 |
| 5.24 | Sellers as Debtor in Possession; no Trustee | 42 |
| 5.25 | Affiliate Transactions | 42 |
| 5.26 | Brokers or Finders | 42 |

## ARTICLE 6

### REPRESENTATIONS AND WARRANTIES OF BUYER

| 6.1 | Organization and Good Standing | 43 |
| 6.2 | Authority; Validity; Consents | 43 |
| 6.3 | No Conflict | 43 |
| 6.4 | Availability of Funds | 44 |
| 6.5 | Litigation | 44 |
| 6.6 | Brokers or Finders | 44 |
| 6.7 | Business Use, Bargaining Position, Representation | 44 |

## ARTICLE 7

### ACTIONS PRIOR TO THE CLOSING DATE

| 7.1 | Access and Reports | 44 |
| 7.2 | Operations Prior to the Closing Date | 46 |
| 7.3 | Commercially Reasonable Efforts | 48 |
| 7.4 | Bankruptcy Court Approval | 48 |
| 7.5 | Bankruptcy Filings | 49 |
| 7.6 | Commitment Letters | 49 |

# ARTICLE 8

## ADDITIONAL AGREEMENTS

| | | |
|---|---|---|
| 8.1 | Taxes | 50 |
| 8.2 | Allocation of Purchase Price | 52 |
| 8.3 | Bulk Sales | 52 |
| 8.4 | Reserved | 52 |
| 8.5 | Adequate Assurance and Performance; Security Arrangements | 52 |
| 8.6 | Employee Matters | 53 |
| 8.7 | Post-Closing Books and Records and Personnel | 55 |
| 8.8 | No Other Representations or Warranties; Disclaimers | 56 |
| 8.9 | Casualty | 57 |
| 8.10 | Successor Operator | 58 |
| 8.11 | Preferential Purchase Rights | 58 |
| 8.12 | Avoidance Action | 59 |
| 8.13 | Purchase Price Adjustment at Closing; Closing Statement | 59 |
| 8.14 | Initial Adjustment at Closing | 60 |
| 8.15 | Adjustment Post-Closing | 60 |

# ARTICLE 9

## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

| | | |
|---|---|---|
| 9.1 | Accuracy of Representations | 62 |
| 9.2 | Sellers' Performance | 62 |
| 9.3 | No Order | 62 |
| 9.4 | Sellers' Deliveries | 62 |
| 9.5 | Sale Order | 62 |

# ARTICLE 10

## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE

| | | |
|---|---|---|
| 10.1 | Accuracy of Representations | 63 |
| 10.2 | Buyer's Performance | 63 |
| 10.3 | No Order | 63 |
| 10.4 | Buyer's Deliveries | 63 |
| 10.5 | Sale Order | 63 |

# ARTICLE 11

## TERMINATION

| | | |
|---|---|---|
| 11.1 | Termination Events | 63 |
| 11.2 | Effect of Termination | 64 |

## ARTICLE 12

### TITLE AND ENVIRONMENTAL MATTERS

| 12.1 | NORM | 65 |
| 12.2 | Sole Remedies for Title Matters | 65 |
| 12.3 | Sole Remedies for Environmental Matters | 65 |

## ARTICLE 13

### GENERAL PROVISIONS

| 13.1 | Survival | 66 |
| 13.2 | Confidentiality | 66 |
| 13.3 | Public Announcements | 66 |
| 13.4 | Notices | 67 |
| 13.5 | Waiver, Waiver of Damages | 68 |
| 13.6 | Entire Agreement; Amendment | 68 |
| 13.7 | Assignment | 68 |
| 13.8 | Severability | 69 |
| 13.9 | Expenses | 69 |
| 13.10 | Time of Essence | 69 |
| 13.11 | Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver | 69 |
| 13.12 | Counterparts | 70 |
| 13.13 | Parties in Interest; No Third Party Beneficiaries | 70 |
| 13.14 | Non-Recourse | 70 |
| 13.15 | Disclosure Schedules; Materiality | 70 |
| 13.16 | WAIVER OF TEXAS DECEPTIVE TRADE PRACTICES – CONSUMER PROTECTION ACT | 71 |
| 13.17 | Injunctive Relief | 71 |

## ANNEX 1

### TITLE MATTERS

| Section 1.1 | Title | 75 |
| Section 1.2 | Notices of Title Defects and Title Benefits; Defect Adjustments | 75 |
| Section 1.3 | Limitations on Applicability | 80 |

iv

SCHEDULES

Schedule 2.2(h)          Excluded Leases and Excluded Mineral Interests
Schedule 2.2(i)          Excluded Contracts
Schedule 2.2(j)          Excluded Surface Interests
Schedule 2.5(b)          Executory Contracts and Cure Costs
Schedule 2.6             Required Consents
Schedule 7.2             Operations Prior to the Closing Date
Schedule 8.2             Allocated Values
Schedule 8.5(c)          Security Arrangements

DISCLOSURE SCHEDULES

Disclosure Schedule 5.3          No Conflicts
Disclosure Schedule 5.4(a)       Material Contracts
Disclosure Schedule 5.4(b)       Assigned Leases
Disclosure Schedule 5.4(c)       Advance Payments
Disclosure Schedule 5.5          Permits
Disclosure Schedule 5.6(b)       Operated Wells
Disclosure Schedule 5.6(c)       Plugging and Abandonment
Disclosure Schedule 5.6(d)       Payout Balances
Disclosure Schedule 5.7          Imbalances
Disclosure Schedule 5.8          AFEs
Disclosure Schedule 5.11         Preferential Purchase Rights
Disclosure Schedule 5.12         Suspense Funds
Disclosure Schedule 5.13         Intellectual Property
Disclosure Schedule 5.14         Taxes
Disclosure Schedule 5.15         Legal Proceedings
Disclosure Schedule 5.16(a)      Employees
Disclosure Schedule 5.16(b)      Service Providers
Disclosure Schedule 5.17(a)      Benefit Plans
Disclosure Schedule 15.7(b)      Benefit Plans Exceptions
Disclosure Schedule 5.18         Sufficiency of Oil and Gas Assets
Disclosure Schedule 5.19         Compliance with Laws
Disclosure Schedule 5.20         Environmental Matters
Disclosure Schedule 5.23         Insurance and Bonds
Disclosure Schedule 5.25         Affiliate Transactions

EXHIBITS

Exhibit A          Assigned Leases and Interests
Exhibit B          Wells
Exhibit C          Assigned Midstream Assets
Exhibit D          Assigned Equipment
Exhibit E          Assigned Contracts
Exhibit F          Assigned Surface Interests
Exhibit G          Form of Assumption Agreement
Exhibit H          Form of Assignment
Exhibit I          Form of Deed

ANNEXURES

Annex 1          Title Matters

### ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "*Agreement*"), dated as of August 29, 2016 (the "*Execution Date*"), is by and among **Linc Energy Petroleum (Wyoming), Inc**., a Delaware corporation ("*Company*"), and **Linc Energy Operations, Inc**., a Delaware corporation (together with Company, each a "*Seller*" and collectively "*Sellers*"), and **Big Muddy Opportunities, LLC**, a New York limited liability company ("*Buyer*"). Capitalized terms used but not otherwise defined herein have the meanings set forth in Article 1. Sellers and Buyer are sometimes referred to collectively herein as the "*Parties*" and individually as a "*Party*".

### RECITALS

WHEREAS, Sellers, are engaged in the business of utilizing the Oil and Gas Assets for the purpose of onshore oil and natural gas exploration, development, production, gathering, processing and transportation in the State of Wyoming (the "*Business*");

WHEREAS, Sellers are debtors and debtors in possession under title 11 of the United States Code, 11 U.S.C. §§101, et seq. (the "*Bankruptcy Code*"), and filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on May 29, 2016 (the "*Petition Date*") in the United States Bankruptcy Court for the Southern District of Texas (the "*Bankruptcy Court*"), where Sellers' bankruptcy cases are being jointly administered under Case No. 16-32689 (collectively, the "*Bankruptcy Case*");

WHEREAS, subject to the terms and conditions set forth herein, Buyer has agreed to purchase, and Sellers have agreed to sell, the Seller Oil and Gas Assets which are substantially all of the assets used or held for use by Sellers in conducting the Business, free and clear of all Encumbrances (other than Permitted Encumbrances), in exchange for the Purchase Price and the assumption of the Assumed Liabilities, in accordance with Sections 105(a), 363 and 365 of the Bankruptcy Code; and

WHEREAS, Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court;

NOW, THEREFORE, in consideration of the premises, the mutual promises herein made, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE 1

### DEFINITIONS

1.1  Definitions.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"*Accrued PTO*" has the meaning set forth in **Section 8.6(f)**.

"***Accounting Referee***" has the meaning set forth in **Section 8.15**.

"***Action***" means any legal action, suit or arbitration, or any inquiry, proceeding or investigation, by or before any Governmental Authority.

"***AFEs***" has the meaning set forth in **Section 5.8**.

"***Affiliate***" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Act.

"***Agreement***" has the meaning set forth in the introductory paragraph.

"***Allocated Value***" has the meaning set forth in **Section 8.2**.

"***Asset Owner***" has the meaning set forth within the defined term Defensible Title.

"***Asset Taxes***" means all real estate, ad valorem, property, excise, severance, production or similar Taxes, but not franchise, income or similar Taxes.

"***Assigned Contracts***" has the meaning set forth in **Section 2.1(b)(viii)**.

"***Assigned Equipment***" has the meaning set forth in **Section 2.1(b)(v)**.

"***Assigned Leases***" has the meaning set forth in **Section 2.1(b)(i)**.

"***Assigned Leases and Interests***" has the meaning set forth in **Section 2.1(b)(i)**.

"***Assigned Mineral Interests***" has the meaning set forth in **Section 2.1(b)(i)**.

"***Assigned Midstream Assets***" has the meaning set forth in **Section 2.1(b)(iv)**.

"***Assigned Surface Interests***" has the meaning set forth in **Section 2.1(b)(ix)**.

"***Assignment***" means the Assignment, Bill of Sale and Conveyance substantially in the form attached hereto as **Exhibit H** and covering all of the Seller Oil and Gas Assets, an original master counterpart of which shall be executed by all Sellers and Buyer, and separate original counterparts of which shall be executed by the applicable Sellers and Buyer for each Borough, County and Parish in which any of the Seller Oil and Gas Assets are located and shall be filed in such Boroughs, Counties and Parishes; *provided that* such form may be modified by Buyer to comply with the specific recording requirements of any applicable Legal Requirements in the jurisdiction in which the Seller Oil and Gas Assets are located.

"***Assumed Liabilities***" has the meaning set forth in **Section 2.3**.

"***Assumption Agreement***" has the meaning set forth in **Section 2.3**.

"***Avoidance Actions***" means any and all claims for relief of Sellers under chapter 5 of the Bankruptcy Code.

2

"***Bankruptcy Case***" has the meaning set forth in the recitals.

"***Bankruptcy Code***" means Title 11 of the United States Code, Sections 101 *et seq*.

"***Bankruptcy Court***" has the meaning set forth in the recitals.

"***Benefit Plans***" means (i) all "employee benefit plans", as defined in section 3(3) of ERISA (whether or not such plan is subject thereto), (ii) all employment, consulting or other individual compensation Contracts, and (iii) all bonus or other incentive, equity or equity-based compensation, deferred or other compensation, profit sharing, pension, change-in-control, severance pay, separation, retention, sick leave, vacation pay, day or dependent care, salary continuation, disability, hospitalization, medical, life insurance, retiree healthcare, retiree life insurance, other retirement, scholarship, legal services, cafeteria, life, health, accident, disability, workers' compensation, paid time off, fringe benefit or other insurance or employee benefit programs, plans, policies or arrangements, whether written or oral, single employer, multiemployer or multiple employer, or whether for the benefit of a single individual or more than one individual, as to which any Seller or any of its ERISA Affiliates contributes, has an obligation to contribute, or has any Liability, contingent or otherwise, with respect to, or otherwise provides to, any current or former Employee or Service Provider.

"***Bidding Procedures Order***" means an Order of the Bankruptcy Court dated July 13, 2016 approving the bidding procedures annexed as an exhibit thereto and providing related relief.

"***Business***" has the meaning set forth in the recitals.

"***Business Day***" means any day that is not a Saturday, a Sunday or other day of the year on which national banking institutions in New York City are open to the public for conducting business and are not required or authorized to close.

"***Buyer***" has the meaning set forth in the introductory paragraph.

"***Buyer Employer***" has the meaning set forth in **Section 8.6(b)**.

"***Casualty***" means any loss, damage, or destruction of or to any Oil and Gas Assets for any reason occurring after the Execution Date and prior to the Closing, including any act of God, fire, explosion, collision, earthquake, windstorm, flood, terrorism, or other casualty or condemnation taking under the right of eminent domain, but excluding any loss, damage, or destruction as a result of depreciation, ordinary wear and tear, and any change in condition of the Oil and Gas Assets for production of Hydrocarbons through normal depletion (which exclusion shall include the watering-out of any Well, collapsed casing, sand infiltration of any Well, or other reservoir changes relating to production issues).

"***Central Prevailing Time***" means the prevailing time (i.e., Standard Time or Daylight Savings Time) on any given day in the Central Time Zone.

"***Closing***" has the meaning set forth in **Section 4.1**.

"**Closing Date**" means the date and time as of which the Closing occurs as set forth in **Section 4.1**.

"**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Commitment Letters**" has the meaning set forth in **Section 7.6**.

"**Confidentiality Agreement**" has the meaning set forth in **Section 13.2**.

"**Contract**" means any written agreement, contract, obligation, promise or undertaking, other than a Lease or an assignment (or other conveyance documents) constituting Sellers' chain of title, that is legally binding.

"**Contract Notice**" has the meaning set forth in **Section 2.5(c)**.

"**Copyrights**" means all United States and foreign copyright rights in any original works of authorship, whether registered or unregistered, including all copyright registrations and applications.

"**Cure Costs**" has the meaning set forth in **Section 2.5(a)**.

"**Cure Period**" has the meaning set forth in **Section 1.2(c)** of **Annex I**.

"**Debtors**" means the debtors in the Bankruptcy Case.

"**Deeds**" means the deed substantially in the forms attached hereto as **Exhibit I** and covering all of the Assigned Mineral Interests, separate original counterparts of which shall be executed by the applicable Sellers and Buyer for each Borough, County and Parish in which any of the Assigned Mineral Interests are located and shall be filed in such Boroughs, Counties and Parishes; *provided that* such form may be modified by Buyer to comply with the specific recording requirements of any applicable Legal Requirements in the jurisdiction in which the Assigned Mineral Interests are located.

"**Defensible Title**" means such title of the applicable Seller (the applicable "**Asset Owner**") which, as of the Execution Date and immediately prior to Closing, subject to Permitted Encumbrances:

(a)    with respect to a Well or Assigned Lease entitles such Asset Owner to receive and retain throughout the productive life of such Oil and Gas Asset a Net Revenue Interest not less than the Net Revenue Interest set forth for such Oil and Gas Asset in **Exhibit A** or **Exhibit B**, as applicable;

(b)    with respect to a Well obligates such Asset Owner to bear, throughout the productive life of such Oil and Gas Asset and the plugging and abandonment thereof, a Working Interest not more than the Working Interest set forth for such Oil and Gas Asset in **Exhibit B**, except for any increase to the extent accompanied by at least a

4

proportionate increase in such Asset Owner's Net Revenue Interest for such Oil and Gas Asset; and

(c)      with respect to an Assigned Lease, such Lease entitles such Asset Owner to not less than the number of Net Acres set forth for such  Lease in **Exhibit A**.

"*Designation Deadline*" means 5:00 p.m., Central Prevailing Time, on the date that is five (5) Business Days prior to the Closing Date or such later date as Buyer and Sellers shall mutually agree and as the Bankruptcy Court may authorize.

"*Disputed Title Matter*" has the meaning set forth in **Annex 1**.

"*DTPA*" has the meaning set forth in **Section 13.16**.

"*Effective Time*" means 12:01 a.m. Central Prevailing Time on June 1, 2016.

"*Employee*" means any employee of any Seller related to the Business.

"*Encumbrance*" means any charge, lien, claim, cause of action, mortgage, lease, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, right of setoff, successor liability, easement, servitude, restrictive covenant, encroachment, encumbrance, third party interest or other restriction or limitation of any kind.

"*Environmental Defect*" means any condition of, in, on or under any of the Oil and Gas Assets (other than with respect to NORM) that either (i) requires monitoring, reporting, removal, restoration, remediation or resolution under applicable Environmental Laws or (ii) if known by a federal or state regulatory agency of competent jurisdiction, would reasonably be expected to cause such federal or state regulatory agency to assert that the Oil and Gas Asset requires monitoring, reporting, removal, restoration, remediation or resolution under applicable Environmental Laws; *provided, however*, that no such conditions on any individual Property shall be deemed to be or constitute an Environmental Defect if the costs associated to remedy all conditions on such Property in the aggregate do not exceed, in Sellers' reasonable estimate, $25,000.

"*Environmental Laws*" means any federal, state, or local Legal Requirement relating to the prevention of pollution, protection of health or the environment or natural resources, restoration of environmental quality, or Releases of or exposure to Hazardous Substances or the handling, generation, treatment, transportation, storage, use, arrangement for disposal or disposal, manufacture, distribution, formulation, packaging or labeling of Hazardous Substances, including the following federal statutes and the regulations promulgated thereunder: the Comprehensive Environmental Response, Compensation and Liability Act of 1980; the Emergency Planning and Community Right-To-Know Act; the Resources Conservation and Recovery Act; the Clean Air Act; the Clean Water Act; the Safe Drinking Water Act; the Oil Pollution Act; the Toxic Substances Control Act; the Hazardous Materials Transportation Act; the Federal Insecticide, Fungicide, and Rodenticide Act; and the regulations promulgated pursuant thereto and analogous State and local Legal Requirements.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*ERISA Affiliate*" means any entity that, together with any Seller, may be treated as a single employer under section 4001 of ERISA or section 414 of the Code.

"*ERISA Affiliate Liability*" means any actual or contingent Liability of any Seller or its ERISA Affiliates under or in respect of any employee benefit plan pursuant to any statute or regulation that imposes Liability on a "controlled group" or similar basis as a result of being an ERISA Affiliate or successor prior to the Closing Date with respect to any other Person.

"*Excluded Assets*" has the meaning set forth in **Section 2.2**.

"*Excluded Contracts*" means those Contracts described on **Schedule 2.2(i)** and (except for the Assigned Contracts, the Assigned Leases and Interests, and the Assigned Surface Interests) all other Contracts to which any Seller is a party.

"*Excluded Employee Liabilities*" means each of the following:

(a)     any and all Liabilities arising out of, relating to or resulting from any Action or Proceeding with respect to any current or former Employee or Service Provider, based on facts occurring prior to or as of the Closing (even if not known until after the Closing), including relating to his/her employment or services, or termination of employment or services, with any Seller or any of its Affiliates, including as a result of the consummation of the transactions contemplated by this Agreement;

(b)     any and all actual or contingent Liabilities under, arising out of, relating to or resulting from any Benefit Plans;

(c)     any ERISA Affiliate Liability;

(d)     any and all Liabilities to provide continuation coverage pursuant to COBRA under any plan that is a "group health plan" (as defined in section 5000(b)(1) of the Code) with respect to a COBRA qualifying event that occurs prior to or on the Closing Date (or, if later, the date such Employee becomes a Transferred Employee);

(e)     any and all Liabilities resulting from or relating to the misclassification of any Person performing services for or on behalf of any Seller prior to the Closing as an independent contractor rather than as an employee; and

(f)     any and all other Liabilities arising out of, relating to or resulting from any current, former or prospective Employees (including Inactive Employees and whether or not any such Employee becomes a Transferred Employee (including any Employee who does not accept an offer of employment with Buyer)) or Service Providers, based on facts occurring prior to or as of the Closing (even if not known until after the Closing), including with respect to their employment or engagement, potential employment or engagement, or termination of employment or engagement with any Seller or any of its Affiliates.

"*Excluded Leases*" means those Leases described on **Schedule 2.2(h)**.

"*Excluded Liabilities*" has the meaning set forth in **Section 2.4**.

"*Excluded Mineral Interests*" means those Mineral Interests described on **Schedule 2.2(h)**.

"*Excluded Surface Interests*" means those Surface Interests described on **Schedule 2.2(j)**.

"*Execution Date*" has the meaning set forth in the introductory paragraph.

"*Executory Contract*" means any executory Contract related to the Business to which one or more Sellers is a party.

"*Final Order*" means an Action taken or Order issued by the applicable Governmental Authority as to which:  (i) no request for stay of the Action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the Action or Order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed; (iii) the Governmental Authority does not have the Action or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the Action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"*Final Settlement Statement*" has the meaning set forth in **Section 8.15**.

"*Financing*" has the meaning set forth in **Section 7.6**.

"*GAAP*" means generally accepted accounting principles in the United States, applied throughout the specified period and the immediately prior comparable period in a manner consistent with Sellers' historical accounting policies.

"*Geological and Geophysical Information*" means all Sellers' proprietary and (to the extent transferable without payment of a fee or other penalty to any third party) non-proprietary geophysical, seismic and related technical data, including data, core and fluid samples and other engineering, geological and/or geophysical studies (including seismic data, studies, analyses, interpretations and information), and other similar information and records, in each case relating to the Properties.

"*Good Faith Deposit*" has the meaning set forth in **Section 3.2**.

"*Governing Document*" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs.  For example, the "Governing Documents" of a corporation would be its certificate of incorporation and bylaws, the "Governing Documents" of a limited partnership would be its certificate of

formation and its limited partnership agreement and the "Governing Documents" of a limited liability company would be its certificate of formation and its limited liability company agreement or operating agreement.

"***Governmental Authority***" means any government or governmental or regulatory body thereof, or political subdivision thereof, or any agency, authority, department, commission, board, bureau, official or instrumentality of such body, whether foreign, federal, tribal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator thereof (public or private) of competent jurisdiction.

"***Governmental Authorization***" means any approval, consent, license, permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"***Hazardous Substance***" means petroleum and its byproducts, asbestos and any other material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" or otherwise regulated under any Environmental Law or for which Liability can be imposed under any Environmental Law.

"***Hedge Contracts***" means any agreement with respect to any futures contract, forward contract, commodity swap agreement, commodity option agreement, or other similar agreement or arrangement in respect of Hydrocarbons purchased, used, produced, processed or sold by a Person and designed to protect such Person against fluctuations in Hydrocarbon prices.

"***Hydrocarbons***" means oil, gas, minerals, casinghead gas, coalbed methane, and other gaseous and liquid hydrocarbons, or any combination of the foregoing, sulfur extracted from hydrocarbons, and all other Lease substances.

"***Imbalances***" means over-production or under-production or over-deliveries or under-deliveries with respect to Hydrocarbons produced from or allocated to the Properties regardless of whether such over-production or under-production or over-deliveries or under-deliveries arise at the wellhead, pipeline, gathering system, transportation system, processing plant, or other location, including any imbalances under gas balancing or similar agreements, imbalances under production handling agreements, imbalances under processing agreements, imbalances under the Assigned Leases and Interests, and imbalances under gathering or transportation agreements.

"***Inactive Employee***" means Employees who are on an employer-approved leave of absence on the Closing Date as a result of military service, pregnancy or parental leave, disability leave, medical leave, jury duty or any other leave provided under applicable Legal Requirements.

"***Indebtedness***" of any Person means, without duplication, (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all carry obligations, all conditional sale

obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities arising in the ordinary course of business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) any accrued interest, premiums, penalties, breakages, "make whole amounts" and other obligations relating to the foregoing that would be payable in connection with the repayment of the foregoing; (vi) all obligations of the type referred to in clauses (i) through (v) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vii) all obligations of the type referred to in clauses (i) through (vi) of other Persons secured by any Encumbrance on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"*Intellectual Property*" means all intellectual property, including all Copyrights, Patents, Trademarks, industrial designs, trade secrets, proprietary know-how and confidential business information owned, used or licensed by any Asset Owner and used or held for use in conducting the Business.

"*IRS*" means the Internal Revenue Service.

"*Knowledge*" means (i) with respect to Sellers, the actual knowledge of any of the following individuals: Michael Mapp, Jude Rolfes, Geoff MacKenzie and Tony Lagera, and (ii) with respect to Buyer, the actual knowledge of Ari Bernstein or Michael Bernstein.

"*Labor Laws*" means Legal Requirements relating to employment, employment standards and practices, employment of minors, employment discrimination, employee classification, immigration, workplace health and safety, labor relations, tax withholding, wages, hours, family and medical and other leave of absence, workplace insurance or pay equity.

"*Lease*" means any existing oil and gas lease, oil, gas and mineral lease, sublease, and other Hydrocarbon leasehold interest, whether or not producing, and the leasehold estates created thereby, including working interests, net revenue interests, overriding royalty interests, carried interests, rights of recoupment, options, reversionary interests, convertible interests, and rights to reassignment.

"*Legal Requirement*" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

"*Liability*" mean any debt, loss, claim (including "claim" as defined in the Bankruptcy Code), damage, demand, Tax, fine, judgment, penalty, liability, expense, commitment or obligation (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third party claims.

"**_Material Adverse Effect_**" means any change, event, condition, circumstance or occurrence (regardless of whether such event, change, effect, condition,  circumstance or occurrence constitutes a breach of any representation, warranty or covenant of Sellers hereunder) that individually or in the aggregate (taking into account all other such changes, events, conditions, circumstances and occurrences) has had, or would be reasonably likely to have, (i) a material adverse change in or material adverse effect on the Oil and Gas Assets or the Business or the value thereof, in each case taken as a whole, or (ii) the effect of preventing or materially delaying the consummation of the transactions contemplated by this Agreement, but in the case of the foregoing clause (i), excluding (a) any event, change, effect, condition, circumstance or occurrence to the extent that it results from or arises out of (1) the commencement or pendency of the Bankruptcy Case, (2) changes in Legal Requirements (other than with respect to changes caused by any Bankruptcy Court decision affecting the Bankruptcy Case), GAAP and other accounting rules to the extent occurring after the Execution Date; (3) any Casualty event, (4) any action required by this Agreement to be taken or that is taken at the request of Buyer, or (5) the execution and delivery of this Agreement or the announcement thereof or consummation of the transactions contemplated hereby; (b) any change or effect generally applicable to the industries and markets applicable to the Business or to economic or political conditions or the securities or financial markets in any country or region; and (c) any event that is not within the reasonable control of the Parties, including, without limitation, any outbreak or escalation of hostilities or war, any act of terrorism or any act of God, flood, drought, earthquake or other natural disaster.

"**_Material Contracts_**" means the following Contracts to which any Seller is a party and that pertains to any of the Seller Oil and Gas Assets or as to which any portion of any such Asset Owner's Oil and Gas Assets is subject:

(a)     any Contract that can reasonably be expected to result in aggregate payments by or revenues to Sellers, collectively or to Buyer (assuming such Contract is assumed by Buyer as an Assigned Contract) of more than $250,000 during the current or any subsequent fiscal year (based solely on the terms thereof and without regard to any expected increase in volumes or revenues);

(b)     Hydrocarbon purchase and sale, exchange, marketing, compression, gathering, transportation, processing, refining, and similar Contracts (in each case) that are not terminable without penalty on sixty (60) days or less notice (including any Contract providing for volumetric or monetary commitments or indemnification therefor or for dedication of future production);

(c)     any Contract to sell, lease, farmout, or otherwise dispose of or encumber any interest in any of the Oil and Gas Assets after the Execution Date, other than conventional rights of reassignment arising in connection with an Asset Owner's surrender or release of any of the Oil and Gas Assets (except where any such right of reassignment has been triggered prior to the Closing);

(d)     any Contract that is a drilling contract, disposal contract, injection contract, or similar Contract, and any Contract that would obligate Buyer (assuming such Contract is assumed by Buyer as an Assigned Contract), excluding operations required to maintain

any Lease, to drill additional wells or conduct other material development operations after the Closing;

(e)     any Contract that constitutes a non-competition agreement or any agreement that purports to restrict, limit, or prohibit the manner in which, or the locations in which, Sellers conduct business, including areas of mutual interest;

(f)     any Contract providing for any call upon, option to purchase, or similar rights with respect to any of the Oil and Gas Assets or to the production therefrom or the processing thereof, or is a dedication of production or otherwise requires production to be transported, processed, or sold in a particular fashion;

(g)     any Contract that constitutes a joint or unit operating agreement;

(h)     any Contract that constitutes a farmout agreement, partnership agreement, participation agreement, joint venture agreement, or similar Contract;

(i)     any Contract that is a Hedge Contract;

(j)     any Contract that requires the posting of a security deposit, letter of credit, performance bond or surety;

(k)     any Contract that is a collective bargaining agreement;

(l)     any Contract under which any Seller has continuing material indemnification obligations to any Person or under which any Seller is required to assume any Liability, other than those entered into in the ordinary course of business consistent with past practice;

(m)     any Contract involving any resolution or settlement of any actual or threatened Proceeding which imposes material continuing obligations on any Seller that is not fully covered by insurance or which will not have been fully performed prior to the Closing Date;

(n)     any Contract that constitutes a lease under which a Seller is the lessor or the lessee of real or personal property, which lease cannot be terminated by such Seller upon thirty (30) days or less notice;

(o)     any Contract that is a seismic or other geophysical acquisition or sharing agreement or license; and

(p)     any Contract between a Seller and another Seller or any Affiliate of another Seller.

"***Mineral Interests***" means all mineral fee interests, non-leasehold mineral rights, and mineral servitudes, and including all royalty interests, nonparticipating royalty interests, overriding royalty interests, net profit interests, production payments, executive rights, and,

without limiting the foregoing, other rights of whatever nature, whether legal or equitable, whether vested or contingent.

"*Multiemployer Plan*" means a plan as defined in section 3(37) of ERISA or section 4001(a)(3) of ERISA.

"*Net Acres*" means (a) as calculated separately with respect to each Lease, (i) the number of gross acres of land covered by such  Lease, multiplied by (ii) the lessor's undivided interest in the Hydrocarbons in the lands covered by such Lease, multiplied by (iii) the applicable Asset Owner's undivided interest in such  Lease; *provided*, *however*, if items (ii) and (iii) vary as to different areas of such lands covered by such Lease, a separate calculation shall be performed with respect to each such area, and (b) as calculated separately with respect to each Mineral Interest, (i) the number of gross acres of land covered by such Mineral Interest, multiplied by (ii) the applicable Asset Owner's undivided interest in the Hydrocarbons in the lands covered by such Mineral Interest (provided that if item (ii) varies as to different areas of such lands covered by such Mineral Interest, a separate calculation shall be performed with respect to each such area).

"*Net Revenue Interest*" means, with respect to any well or Lease, the applicable Asset Owner's interest in and to the Hydrocarbons produced and saved or sold from or allocated to such Oil and Gas Asset after giving effect to all royalties, overriding royalties, nonparticipating royalties, net profits interests, production payments, carried interests, reversionary interests and other burdens on, measured by or payable out of production therefrom.

"*NORM*" means naturally occurring radioactive materials.

"*Offered Employees*" has the meaning set forth in **Section 8.6(b)**.

"*Oil and Gas Assets*" means the Seller Oil and Gas Assets.

"*Operating Expenses*" means all operating expenses and capital expenditures incurred in the ownership, development, operation, use and maintenance of the Oil  and Gas Assets, including, without limitation, all Asset Taxes and Lease rental and maintenance costs, net profit payments, royalties, overriding royalties and other similar burdens incurred in connection with the Leases or the production and sale of Hydrocarbons therefrom.  Operating Expenses that are paid periodically shall be prorated based on the number of days in the applicable period falling before the Effective Time, or after the Effective Time, as applicable.

"*Order*" means any award, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Governmental Authority.

"*Ordinary Course of Business*" means the ordinary course of business in compliance with applicable Legal Requirements, consistent with past custom and practice (including with respect to quantity and frequency), and consistent with prudent oilfield practices.

"*Outside Date*" has the meaning set forth in **Section 11.1(c)**.

 "*Party*" or "*Parties*" means, individually or collectively, Buyer and Sellers.

"**_Patents_**" means United States and foreign patents and patent applications, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals and patent disclosures related thereto.

"**_Paying Party_**" has the meaning set forth in **Section 8.1(c)**.

"**_Payout Balance_**" has the meaning set forth in **Section 5.6(d)**.

"**_Permits_**" has the meaning set forth in **Section 2.1(b)(vi)**.

"**_Permitted Encumbrances_**" means any of the following:

(a)     any rights, obligations, or duties reserved to or vested in any municipality or other Governmental Authority to: (i) control or regulate any Oil and Gas Asset in any manner including all applicable Legal Requirements, (ii) purchase, condemn, expropriate, or recapture any Oil and Gas Asset, or (iii) designate a purchaser of any Oil and Gas Asset;

(b)     the terms and conditions of (with respect to the Properties) all Assigned Contracts but only to the extent that they do not, either individually or in the aggregate, (i) operate to reduce the applicable Net Revenue Interest in a Well or Assigned Lease below that shown in **Exhibit A** or **Exhibit B**, as applicable, (ii) operate to increase the applicable Working Interest in a Well above that shown in **Exhibit B** without a proportionate increase in the applicable Net Revenue Interest in such Well, or (iii) adversely affect in any material respect the operation or use of the affected Oil and Gas Assets as currently operated and used;

(c)     easements, rights-of-way, servitudes, permits, surface leases, and other similar rights on, over, or in respect of any of the Oil and Gas Assets, as long as any such encumbrances, individually or in the aggregate, do not interfere in any material respect with the operation or use of the affected Oil and Gas Assets as currently operated and used;

(d)     rights of a common owner of any interest in rights-of-way, permits or easements held by Sellers and such common owner as tenants in common or through common ownership;

(e)     all royalties, overriding royalties, production payments, net profits interests, reversionary interests, and other similar burdens with respect to a Property if the net cumulative effect of all such burdens does not operate to reduce the applicable Net Revenue Interest in a Well or Assigned Lease below that shown in **Exhibit A** or **Exhibit B**, as applicable, or increase the applicable Working Interest in a Well above that shown in **Exhibit B** without a proportionate increase in the applicable Net Revenue Interest in such Well;

(f)     defects or irregularities of title (i) based solely on lack of information in an Asset Owner's files, (ii) as to which the relevant statute(s) of limitations or prescription would bar any attack or claim against such Asset Owner's title, (iii) arising out of lack of

13

corporate authorization or a variation in corporate name, unless Buyer provides affirmative evidence of a superior claim of title as a result of such failure or omission, (iv) consisting of the failure to recite marital status or omissions of heirship proceedings in documents, unless Buyer provides affirmative evidence of a superior claim of title as a result of such failure or omission, or (v) resulting from lack of survey, unless a survey is expressly required by applicable Legal Requirements;

(g)     liens or other Encumbrances for Taxes not yet due and payable or which are being contested in good faith by appropriate proceedings;

(h)     materialman's, mechanic's, repairman's, employee's, contractor's, operator's, and other similar liens or Encumbrances arising in the ordinary course of business for payments not yet delinquent that are inchoate and have not been perfected pursuant to law or that are contained in joint operating agreements or similar agreements covering the Oil and Gas Assets or which are being contested in good faith by appropriate proceedings;

(i)     all rights to consent or approval by, required notices to, filings with, or other actions by, Governmental Authorities in connection with the conveyance of the Assigned Leases and Interests, if the same are customarily sought and received after the Closing;

(j)     preferential rights to purchase and consents to assignment and similar agreements triggered by the transaction contemplated herein;

(k)     the terms and conditions of the Assigned Leases but only to the extent that they do not, either individually or in the aggregate, operate to reduce the applicable Net Revenue Interest in a Well or Assigned Lease below that shown in **Exhibit A** or **Exhibit B**, as applicable, or increase the applicable Working Interest in a Well above that shown in **Exhibit B**, without a proportionate increase in the applicable Net Revenue Interest in such Well;

(l)     mortgage lien on the lessor's interest under an Assigned Lease unless such lien is in default or is the subject of foreclosure proceedings;

(m)     any maintenance of uniform interest provision in an operating agreement if waived by the party or parties having the right to enforce such provision or if the violation of such provision would not give rise to the unwinding of the sale of the affected Seller Oil and Gas Asset from the applicable Seller to Buyer;

(n)     decreases in the Net Revenue Interest of an Asset Owner with respect to any Assigned Lease or Well below those shown in **Exhibit A** or **Exhibit B**, as applicable, (i) in connection with those operations in which an Asset Owner or its successors or assigns may from and after the Execution Date, elect in accordance with the terms hereof to be a non-consenting co-owner, (ii) resulting from the establishment or amendment from and after the Execution Date of drilling and spacing units, pooling orders or pooled units, unitization agreements, communitization agreements, or other units, or (iii)

required to allow other working interest owners to make up past underproduction or pipelines to make up past under deliveries;

(o)     increases in the Working Interest of an Asset Owner with respect to any Well above that shown in **Exhibit B** resulting from contribution requirements with respect to defaulting co-owners under applicable operating agreements;

(p)     conventional rights of reassignment obligating the applicable Asset Owner to reassign its interest in any portion of the Assigned Leases and Interests to a third party, if such right has not been triggered and is only triggered when Buyer expressly indicates its intention to release or abandon such interest prior to the expiration of the primary term or other termination of such interest;

(q)     Title Defects waived by Buyer; and

(r)     any Encumbrances that will be released by the Sale Order or otherwise discharged at Closing.

"*Person*" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"*Petition Date*" has the meaning set forth in the recitals.

"*Phase I Environmental Site Assessment*" means a Phase I environmental property assessment of the Oil and Gas Assets that satisfies the assessment requirements set forth under the current ASTM International Standard Practice for Environmental Site Assessments (Designation E1527-13).

"*Preferential Purchase Right*" means any right or agreement that enables any Person to purchase or acquire any Seller Oil and Gas Asset or any interest therein or portion thereof as a result of or in connection with the execution or delivery of this Agreement or the consummation of the transactions contemplated hereby.

"*Preliminary Settlement Statement*" means that certain statement provided by Sellers to Buyer pursuant to **Section 8.14**, as amended (if applicable) prior to Closing, setting forth initial adjustments to the Base Purchase Price made at Closing.

"*Proceeding*" means any Action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"*Properties*" has the meaning set forth in **Section 2.1(b)(ii)**.

"*Purchase Price*" has the meaning set forth in **Section 3.1**.

"*Reimbursing Party*" has the meaning set forth in **Section 8.1(c)**.

"**_Records_**" has the meaning set forth in **Section 2.1(b)(xii)**.

"**_Release_**" means any past or present spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the environment (including the abandonment or discharging of barrels, containers and other closed receptacles containing any Hazardous Substance).

"**_Representative_**" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"**_Required Consent_**" means a consent by a third party to the assignment or transfer of any Seller Oil and Gas Asset that is set forth on **Schedule 2.6**.

"**_Sale Order_**" means an Order of the Bankruptcy Court, in form and substance approved by Buyer (such approval not to be unreasonably withheld or conditioned so long as the Order is not inconsistent with, and does not limit the rights and protections of Buyer under this Agreement) pursuant to, _inter alia_, Sections 105, 363 and 365 of the Bankruptcy Code (i) authorizing and approving, _inter alia_, the sale of the Seller Oil and Gas Assets to Buyer on the terms and conditions set forth herein, free and clear of all Encumbrances and Liabilities (other than Permitted Encumbrances and Assumed Liabilities) to the extent permissible under Section 363(f) of the Bankruptcy Code, (ii) authorizing and approving the assumption and assignment of the Assigned Contracts and the Assigned Leases to Buyer, (iii) containing a finding that Buyer has acted in "good faith" within the meaning of, and is entitled to the protections of, Section 363(m) of the Bankruptcy Code, (iv) containing a finding that this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions, (v) containing a finding that Sellers and Buyer have not engaged in any conduct that would cause or permit this Agreement to be avoidable under Section 363(n) of the Bankruptcy Code, (v) providing that this Agreement and the transactions contemplated hereby may, subject to the terms set forth herein, be specifically enforced against and binding upon, and not subject to rejection or avoidance by any Seller or their respective estates or any chapter 7 or chapter 11 trustee of Sellers or other representative of their respective estates, (vi) providing that the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the breach thereof, (vii) providing that neither Buyer nor any of its Affiliates shall be deemed a successor in interest to Sellers, and (viii) providing that, upon Buyer's payment of the consideration provided hereunder, Sellers shall have received fair and reasonably equivalent value for the Seller Oil and Gas Assets**.**

"**_Securities Act_**" means the Securities Act of 1933, as amended.

"**_Security Arrangements_**" has the meaning set forth in **Section 8.5(c)**.

"**_Seller Party_**" means each of Sellers, their respective Affiliates and the former, current or future equity holders and Representatives of each of the foregoing.

"**_Seller Oil and Gas Assets_**" has the meaning set forth in **Section 2.1(b)**.

"**_Seller_**" and "**_Sellers_**" has the meaning set forth in the introductory paragraph.

16

"*Sellers' Obligations*" has the meaning set forth in **Section 8.5(c)**.

"*Service Provider*" means any individual engaged to provide services to any of the Sellers, pursuant to a consulting or other independent contractor relationship, directly related to the performance of the Sellers' Business.

"*Straddle Periods*" has the meaning set forth in **Section 8.1(b)**.

"*Subsidiary*" means any entity with respect to which a specified Person directly or indirectly (through one or more intermediaries) has the power, through the direct or indirect ownership of securities or otherwise, to elect a majority of the directors or similar managing body.

"*Surface Interests*" means all surface fee interests, surface leases, subsurface leases, rights-of-way, water rights, licenses and easements applicable to, or used or held in connection with the Business or the ownership, operation, maintenance or repair of, or the production, gathering, treatment, processing, storing, sale or disposal of Hydrocarbons or produced water from, the Properties together with all surface fee interests in the lands covered by any Assigned Leases excluding any surface use agreements and other surface or subsurface rights agreements.

"*Suspense Funds*" means proceeds of production and interest in respect of any of the Oil and Gas Assets that are payable to third parties and are being held in suspense by any Seller as the operator of such Oil and Gas Assets.

"*Tax*" or "*Taxes*" (and with correlative meaning, "*Taxable*" and "*Taxing*") means (i) all federal, state, local or foreign taxes, charges, levies, fees, imposts, assessments or similar governmental charges, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, premium, profits, windfall profits, environmental (including taxes under section 59A of the Code), customs duties, inventory, capital stock, license, withholding, payroll, employment, social security, escheat, unclaimed property, unemployment, excise, severance, stamp, occupation, property, transfer, registration, alternative or add-on minimum and estimated taxes; (ii) all interest, penalties, fines, assessments, additions to tax or additional amounts imposed by any Governmental Authority in connection with any item described in clause (i); and (iii) any liability in respect of the items described in clauses (i) and (ii) payable by reason of successor, transferee or other liability, operation of law, Treasury Regulations under section 1502 of the Code, or by contract, indemnity or otherwise.

"*Tax Allocation*" has the meaning set forth in **Section 8.2**.

"*Tax Return*" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes, including any claims for refunds of Taxes and any amendments, schedules, attachments or supplements of any of the foregoing.

"*Title Arbitrator*" has the meaning set forth in **Annex 1**.

"*Title Assets*" has the meaning set forth in **Annex 1**.

17

"*Title Benefit*" means any right, circumstance or condition that operates to (A) increase the Net Revenue Interest of Sellers in any Well above that shown on **Exhibit B** without causing a greater than proportionate increase in the Working Interest of Sellers above that shown on **Exhibit B** (B) increase the Net Revenue Interest of Sellers in any Assigned Lease above the Net Revenue Interest set forth for such Oil and Gas Asset in **Exhibit A**; (C) decrease the Working Interest of Sellers in any Well below that shown on **Exhibit B**, without causing a decrease in the Net Revenue Interest of Sellers shown on **Exhibit B** that is proportionate to or greater than the decrease in applicable Working Interest for such Well; or (D) increase the number of Net Acres of Sellers for any Assigned Leases above the amount of Net Acres as shown for such Assigned Leases on **Exhibit A**.

"*Title Benefit Amount*" has the meaning set forth in **Annex 1**.

"*Title Claim Date*" has the meaning set forth in **Annex 1**.

"*Title Defect*" means any Encumbrance, charge obligation or defect that causes the Sellers with respect to any of their respective Title Assets, not to have Defensible Title to such Title Assets; *provided*, *however*, that, notwithstanding the foregoing, the following shall not be considered Title Defects:

(a)      references to a document that is not in Sellers' files; or references to an unrecorded document to which neither Sellers nor any of its Affiliates is a party and which is dated earlier than January 1, 2000 or an unrecorded document for which Buyer has constructive or inquiry notice by virtue of a reference to such unrecorded document in a recorded document, if no claim has been made under or attacking such unrecorded documents within the last five years;

(b)      defects based on failure to record leases issued by any state or federal governmental body, or any assignments of such leases, in the real property, conveyance or other records of the county in which the Property is located and defects solely based on Tax assessment records, Tax payment records, or similar records (or the absence of such records);

(c)      defects based on a gap in Sellers' chain of title (i) occurring forty (40) years or more prior to the Effective Time or (ii) occurring less than forty (40) years prior to the Effective Time unless such gap described in this subpart (ii) is affirmatively shown to exist in such records by an abstract of title, title opinion or landman's title chain (which documents shall be included in the notice of Title Defect) and has resulted in another party's superior claim of title and Seller cannot provide to Buyer curative documents with respect thereto that would be accepted by a reasonably prudent operator;

(d)      defects as a consequence of cessation of production, insufficient production, failure to report production or report production timely, or failure to conduct operations on any of the Assigned Leases held by production, or lands pooled, communitized or unitized therewith, except to the extent that a

claim for termination has been made by a lessor or other third party and Buyer is able to affirmatively establish (by means other than merely a lack of available production records) that such matter occurred and that it has given rise to a right of the lessor or other third party to terminate the underlying lease (which documentation shall be included in the notice of Title Defect);

(e) defects based on a legal description that includes the lessor's mineral estate but describes a tract of land larger than that owned by the lessor;

(f) defects arising out of prior oil and gas leases relating to the Assigned Leases or lands covered thereby that are not surrendered of record, or defects resulting from failure to record releases of liens, production payments or mortgages that have expired by their own terms or the enforcement of which are barred by applicable statutes of limitation;

(g) the absence of any lease amendment or consent by any royalty interest or mineral interest holder authorizing the pooling of any leasehold interest, royalty interest or mineral interest; and

(h) defects or irregularities in title which for a period of at least ten (10) years prior to the Effective Time have not resulted in any Proceeding initiated by, or any written notice delivered to Seller from, any third party asserting a superior claim of title or otherwise attacking Seller's title.

"*Title Deductible*" has the meaning set forth in **Annex 1**.

"*Title Defect Amount*" has the meaning set forth in **Annex 1**.

"*Title Threshold*" has the meaning set forth in **Annex 1**.

"*Trademarks*" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress and trade names, Internet domain names and any other similar designations of source of goods or services, whether registered or unregistered, and registrations and pending applications to register the foregoing, and all goodwill related to or symbolized by the foregoing.

"*Transaction Documents*" means this Agreement and any other agreements, instruments or documents entered into between the Parties pursuant to this Agreement.

"*Transfer Taxes*" has the meaning set forth in **Section 8.1(a)**.

"*Transfer Date*" has the meaning set forth in **Section 8.6(c)**.

"*Transferred Employees*" has the meaning set forth in **Section 8.6(b)**.

"*Treasury Regulations*" means the United States Treasury regulations promulgated under the Code.

"***WARN Act***" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, any similar Legal Requirement and the rules and regulations thereunder.

"***Wells***" has the meaning set forth in **Section 2.1(b)(ii)**.

"***Working Interest***" means, with respect to any Well identified on **Exhibit B** the interest (expressed as a percentage or a decimal) that is burdened with the obligation to bear and pay costs and expenses of maintenance, development and operations for that Well, but without regard to the effect of any royalties, overriding royalties, nonparticipating royalties, net profits interests, and other burdens on, measured by or payable out of production therefrom.

"***Wyoming Business***" has the meaning set forth in the recitals.

1.2     Other Definitions and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period (or if any other date specified in this Agreement for giving any notice or taking any action) is a day other than a Business Day, then the period (or date) in question shall end on (or be deemed to be) the next succeeding Business Day.

Dollars.  Any reference in this Agreement to $ means United States dollars.

Exhibits/Schedules/Disclosure Schedules.  All Exhibits, Schedules and Disclosure Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit, Schedule or Disclosure Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender includes all genders, and words imparting only the singular number include the plural and vice versa.

Headings.  The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "***Section***" or "***Article***" are to the corresponding Section or Article of this Agreement unless otherwise specified.

Herein.  Words such as "***herein***," "***hereof***" and "***hereunder***" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

Including.  The word "*including*" or any variation thereof means "*including, without limitation,*" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    No Strict Construction.  Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE 2

### PURCHASE AND SALE

2.1    Purchase and Sale.

(a)    Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Sellers shall (and each of Sellers shall cause each other applicable Seller to) sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer (and/or to its assignees pursuant to **Section 13.7**), and Buyer shall purchase and accept (and/or cause such designees to purchase and accept) from Sellers, free and clear of all Encumbrances and Liabilities (other than Permitted Encumbrances and Assumed Liabilities), all of the Seller Oil and Gas Assets.

(b)    The "*Seller Oil and Gas Assets*" means all right, title and interest of Sellers in, to and under the following assets, properties, rights and interests, LESS AND EXCEPT the Excluded Assets:

(i)    (1) all Leases (other than the Excluded Leases), including the Leases described on **Exhibit A** attached hereto (collectively, the "*Assigned Leases*"), (2) all Mineral Interests (other than the Excluded Mineral Interests), including the Mineral Interests described on **Exhibit A** attached hereto (collectively, the "*Assigned Mineral Interests*"), and (3) all rights and interests in, under or derived from all spacing, pooling, unitization and communitization agreements, declarations and orders in effect with respect to any of the Assigned Leases or Assigned Mineral Interests or lands covered thereby, and the units created by any of those agreements, declarations or orders (collectively, together with the Assigned Leases and Assigned Mineral Interests, the "*Assigned Leases and Interests*");

(ii)    all oil, gas, water, disposal, observation, injection and other wells located on the Assigned Leases and Interests, whether producing, non-producing, shut-in, or temporarily abandoned, including those described on **Exhibit B** (collectively, the "*Wells*", and together with the Assigned Leases and Interests, the "*Properties*");

21

(iii)    all Hydrocarbons produced from or attributable to the Properties after the Effective Time, all Hydrocarbon inventories from or attributable to the Properties that are in storage as of the Effective Time, and all proceeds attributable thereto;

(iv)    all facilities, tank batteries, lease access and custody transfer units, metering facilities, interconnections and other flow lines, pipelines, taps, meters, gauges, gathering systems, cathodic protection equipment, Hydrocarbon treating and processing systems and facilities, central processing equipment, field separators, liquids extractors, tools, and other personal property owned or held for use in the gathering, treating, storing, compressing, processing or transporting Hydrocarbons on and from the Properties, including those described on **Exhibit C** (collectively, the "***Assigned Midstream Assets***");

(v)    all field offices, buildings, yards, equipment, machinery, fixtures tractors, mowers, trailers, vehicles and other tangible personal property and improvements (other than the Wells and the Assigned Midstream Assets) located on, used or held for use or obtained in connection with the ownership or operation of the Properties, including tanks, boilers, plants, buildings, field offices and other structures, fixtures, injection facilities, saltwater disposal facilities, compressors and other compression facilities (whether installed or not), pumping units, machinery, power and other utility lines, roads, computer and automation equipment, telecommunications equipment, field radio telemetry and associated frequencies and licenses, pressure transmitters, central processing equipment, tools, spare parts, warehouse stock, all vehicles and other rolling stock (and all equipment used in connection with such rolling stock, including safety equipment, special tools, dynamometers, hand tools and fluid level equipment), and all other appurtenances, improvements, facilities materials, supplies, machinery, equipment, furniture, fixtures and other personal property located on any property owned or leased by Sellers or used or held for use in the Business or obtained in connection with the ownership, maintenance or operation of the Properties, including the items described on **Exhibit D** (collectively, the "***Assigned Equipment***");

(vi)    all pipes, casing, tubing, tubulars, fittings, and other spare parts, supplies, tools, and materials located on, used or held for use on or held as inventory in connection with the ownership or operation of the Properties and Assigned Equipment;

(vii)    to the extent transferable pursuant to applicable Legal Requirements, all governmental (whether federal, state or local) permits, licenses, authorizations, franchises, grants, easements, variances, exceptions, consents, certificates, approvals and related instruments or rights of any Governmental Authority or other third party, and any writ, judgment, decree, award, order, injunction or similar order, writ, ruling, directive or other requirement of any Governmental Authority (in each such case whether preliminary or final) required of any Seller for the ownership, operation or use of the Properties, Assigned Midstream Assets or Assigned Equipment (collectively, the "***Permits***");

(viii)    the Contracts listed on **Exhibit E** attached hereto, as such Exhibit may be subsequently amended by Buyer pursuant to **Section 2.5** (collectively, the "***Assigned Contracts***");

22

(ix) all Surface Interests (other than Excluded Surface Interests), including those described on **Exhibit F** attached hereto (collectively, the "***Assigned Surface Interests***");

(x) all Geological and Geophysical Information;

(xi) all claims, refunds, abatements, variances, allocations, causes of action, claims for relief, choses in action, insurance policies and benefits and rights to proceeds thereunder, rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, warranties, guarantees, counter-claims, cross-claims and defenses of any Seller, in each case, solely to the extent attributable to any period of time after the Effective Time (subject to **Section 8.9**) and except to the extent related to any Excluded Assets or Excluded Liabilities;

(xii) all information, books, databases, files, records and data (whether in written or electronic format) relating to any Seller Oil and Gas Assets or to any Assumed Liabilities except for (A) records that any Seller is prohibited from disclosing or transferring under any applicable Legal Requirement, (B) information entitled to legal privilege, including attorney work product and attorney client communications (except for title opinions, which shall be included in the Records), and (C) economic projections and records of offers from, or negotiations with, Buyer or third parties with respect to any proposed transfer of any of the Seller Oil and Gas Assets and economic analyses associated therewith, including, subject to the exceptions set forth above in clauses (A), (B) and (C), all: (1) reservoir, land, operation, production, engineering, marketing, gathering, transportation and other files and records, including all lease records, well records, division order records, property ownership reports and files, contract files and records, well files, title records (including abstracts of title, title opinions and memoranda, and title curative documents), correspondence, production records, prospect files and other prospect information, supplier lists and files, customer lists and files, regulatory files, environmental and health and safety files (excluding employee medical records), and Asset Tax and financial accounting records and (2) data including proprietary and non-proprietary engineering, geological, geophysical and seismic data, files and records (but only to the extent transferable without material restriction (including a material restriction against assignment without prior consent), other than restrictions that are unenforceable under the Bankruptcy Code or that are removed by the Sale Order), inclusive of maps, logs, core analysis, formation tests, cost estimates, studies, plans, prognoses, surveys and reports, and including raw data and any interpretive data or information relating to the foregoing, and any other proprietary data in the actual possession or control of any Seller or which any Seller has the right to obtain (either without the payment of money or delivery of other consideration or unduly burdensome effort or, upon Buyer's written election, at Buyer's expense) and relating to the ownership, operation, development, maintenance or repair of, or the production, gathering, treatment, processing, storing, sale or disposal of Hydrocarbons or produced water from, the Seller Oil and Gas Assets; provided, that if any Records can only be assigned to Buyer with a fee or penalty owed to any third party, Sellers shall have no obligation to bear such fee or penalty (collectively, the "***Records***");

(xiii) subject to **Section 8.13(a)**, all trade credits, accounts receivable, note receivables, take or pay amounts receivable, other receivables, and prepayments

23

attributable to the Seller Oil and Gas Assets, with respect to any period of time after the Effective Time; and

(xiv)    all Suspense Funds and, with respect to the Properties, all Imbalances, in each case, existing as of the Closing Date.

2.2    Excluded Assets.

Notwithstanding the foregoing, the Seller Oil and Gas Assets shall not include, and there is excepted, reserved and excluded from the transaction contemplated hereby, the following (collectively, the "**_Excluded Assets_**"):

(a)    the Purchase Price delivered to Sellers pursuant to this Agreement;

(b)    all cash and cash equivalents (excluding the Suspense Funds existing as of the Closing Date), including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits and deposits to utilities, suppliers and other Service Providers, in each case, existing as of the Closing Date;

(c)    all trade credits, accounts receivable, note receivables, take or pay amounts receivable, and other receivables and prepayments attributable to the Oil and Gas Assets with respect to any period of time prior to the Effective Time;

(d)    all Hydrocarbons produced from or attributable to the Properties prior to the Effective Time (other than Hydrocarbon inventories from or attributable to the Properties that are in storage on the Effective Time), and all proceeds attributable thereto;

(e)    any shares of capital stock or other equity interest of any Seller or any of Sellers' Subsidiaries or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Seller or any of Sellers' Subsidiaries;

(f)    all minute books, stock ledgers, corporate seals and stock certificates of Sellers;

(g)    all (i) corporate, financial, Tax, and legal records of any Seller that relates to such Seller's Business generally (excepting the same to the extent relating to the Assumed Liabilities and/or the Seller Oil and Gas Assets) and (ii) books, records and files that relate solely to any Excluded Assets;

(h)    all Excluded Leases and all Excluded Mineral Interests;

(i)    all Excluded Contracts;

(j)    all Excluded Surface Interests;

(k)    all rights to any refunds of Taxes (or other related costs or expenses) that are borne by or the responsibility of any Seller or attributable to any Tax asset of any Seller;

(l)   any refunds due to any Seller by a third party for any overpayment of rentals, royalties, excess royalty interests or production payments attributable to the Seller Oil and Gas Assets to the extent attributable to any period of time prior to the Effective Time or any Excluded Liabilities;

(m)   subject to **Section 8.9**, all insurance policies and rights to proceeds thereunder;

(n)   all Permits and pending applications therefor solely to the extent related to any other Excluded Asset;

(o)   all prepayments, good faith and other bid deposits submitted by any third party under the terms of the Bidding Procedures Order;

(p)   subject to **Section 8.9**, to the extent relating to any period of time prior to the Effective Time or to any Excluded Assets or Excluded Liabilities (and not to any Seller Oil and Gas Assets and/or Assumed Liabilities), all claims, refunds, abatements, variances, allocations, causes of action, claims for relief, choses in action, rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, counter-claims, cross-claims and defenses of any Seller;

(q)   all rights, claims or causes of action by or in the right of Seller against any current or former director or officer of Seller;

(r)   the Avoidance Actions;

(s)   subject to **Section 8.9**, all claims and causes of action of any Seller arising from acts, omissions, or events, or damage to or destruction of Property occurring prior to the Effective Time;

(t)   any documents withheld or not transferred pursuant to the exceptions set forth in **Section 2.1(xii)**;

(u)   all Hedge Contracts and Indebtedness of Sellers;

(v)   any rights, claims or causes of action of Sellers under this Agreement or any other Transaction Document and

(w)   any Oil and Gas Assets that are excluded pursuant to **Annex 1**, if any.

2.3   Assumed Liabilities.

Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer shall execute and deliver to Sellers the Assumption Agreement in the form attached hereto as **Exhibit G** (the "*Assumption Agreement*") pursuant to which Buyer shall assume and agree to discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), only the following Liabilities of Sellers (except to the extent

constituting any Liabilities specifically described in **Sections 2.4(a)** through **2.4(m)**) and no other Liabilities (collectively, the "***Assumed Liabilities***"):

(a)    Assigned Contracts.  All of Sellers' Liabilities under the Assigned Contracts and Assigned Leases and Interests, whether such Liabilities arise prior to, at, or after the Effective Time, except such Liabilities that are satisfied or discharged by payment of Cure Costs (including, for the avoidance of doubt, any Assigned Contracts for which the Cure Costs were set at $0.00 and approved as such by virtue of the Sale Order or such other order authorizing the assumption by Sellers and assignment to Buyer of such Assigned Contracts).

(b)    Remediation, Plugging and Abandonment.  All of Sellers' Liabilities (1) under applicable Environmental Laws to restore the surface of the Properties or to bring the Properties into compliance with applicable Environmental Laws and (2) to properly plug and abandon and decommission Wells, Assigned Equipment and Assigned Midstream Assets, in each case, whether such Liabilities arise prior to, on, or after the Effective Time.

(c)    Assigned Surface Interests. All of the Sellers' Liabilities under the Assigned Surface Interests to the extent such Liabilities arise after the Effective Time.

(d)    Cure Costs.  All Cure Costs.

(e)    Operating Expenses.   All Operating Expenses to the extent attributable to the ownership, operation, use, or maintenance of any of the Oil and Gas Assets from and after the Effective Time.

(f)    Suspense Funds.  All of Sellers' Liabilities in connection with the Suspense Funds which are paid over to Buyer, but excluding any and all penalties and interest related to such Suspense Funds accruing prior to the Closing.

(g)    Imbalances.   All over-production and under-delivery Imbalances with respect to the Properties as of the Closing Date.

(h)    Transfer Taxes.  All Transfer Taxes.

(i)    Buyer Taxes. All Asset Taxes that are the responsibility of Buyer pursuant to **Section 8.1(b)**.

(j)    COBRA.  Any obligation to make COBRA continuation coverage (within the meaning of section 4980B of the Code and the Treasury Regulations thereunder) available to all "M&A qualified beneficiaries" (within the meaning of Treasury Regulations §54.4980B-9, Q&A-4) with respect to the transactions contemplated hereby that is allocated to Buyer under Treasury Regulations §54.4980B-9, Q&A-8.

(k)    Other Oil and Gas Assets. To the extent not already described in Sections 2.3(a) through (j) above, all Liabilities arising from, related to, or associated with the ownership, operation, use, or maintenance of any of the Oil and Gas Assets after the Effective Time.

The assumption by Buyer of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

2.4     Excluded Liabilities.

Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of Sellers, and Sellers shall retain and be solely and exclusively liable with respect to, the following Liabilities of Sellers, excluding only the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "***Excluded Liabilities***"):

(a)     all Liabilities under Hedge Contracts of Sellers;

(b)     all Indebtedness of any Seller; all guarantees of third party obligations by Sellers and reimbursement obligations to guarantors of Sellers' obligations or under letters of credit; and all Liabilities of Sellers to any owner or former owner of capital stock or warrants, or holder of Indebtedness;

(c)     all Operating Expenses to the extent attributable to the ownership, operation, use, or maintenance of any of the Oil and Gas Assets prior to the Effective Time;

(d)     all Taxes of the Sellers, other than (i) Transfer Taxes, (ii) Asset Taxes that are the responsibility of Buyer pursuant to **Section 8.1(b)**, and (iii) Operating Expenses to the extent attributable to the ownership, operation, use, or maintenance of any of the Oil and Gas Assets from and after the Effective Time;

(e)     all Actions and Proceedings set forth on **Disclosure Schedule 5.15**;

(f)     all Excluded Employee Liabilities;

(g)     all Liabilities under the WARN Act with respect to Employees who do not become Transferred Employees or, with respect to Transferred Employees, Liabilities that arise prior to or as of the Closing;

(h)     except for (i) Cure Costs and (ii) Operating Expenses to the extent attributable to the ownership, operation, use, or maintenance of any of the Oil and Gas Assets from and after the Effective Time, all Liabilities attributable to, arising out of or in connection with, or that are based upon accounting for, failure to pay or the incorrect payment to any royalty owner, overriding royalty owner, working interest owner or other interest holder under the Properties insofar as the same are attributable to periods and Hydrocarbons produced prior to the Effective Time;

(i)     all Liabilities attributable to, arising out of or in connection with, or that are based upon (1) the negligence, gross negligence or willful misconduct of any Seller or any Affiliate of a Seller as operator of any of the Oil and Gas Assets, (2) property damage or bodily injury, illness or death arising out of, incident to or in connection with operations on any of the Oil and Gas Assets prior to the Effective Time, (3) disposal or transportation of any Hazardous Substances from the Oil and Gas Assets prior to the Effective Time, or (4) obligations

or liabilities of any Seller to any of its Affiliates (other than Operating Expenses to the extent attributable to the ownership, operation, use, or maintenance of any of the Oil and Gas Assets from and after the Effective Time);

(j)     all Liabilities under, arising out of or related to any of the Excluded Assets;

(k)     all Liabilities consisting of legal, accounting, financial advisory, valuation, investment banking and other third party advisory or consulting fees and expenses incurred by or on behalf of any Seller in connection with or arising from the Bankruptcy Case or the transactions contemplated by this Agreement or the other Transaction Documents;

(l)     all Liabilities existing prior to the filing of the Bankruptcy Case that are dismissed under the Bankruptcy Case; and

(m)    all Liabilities and obligations of any Seller under this Agreement and the other Transaction Documents.

2.5     Assigned Contracts and Cure Costs.

(a)     At the Closing (or, if the applicable Assigned Contract or Assigned Lease and Interest is not assigned to Buyer at Closing pursuant to the terms of **Section 2.6** or **Section 8.11**, then at the time of the assignment of such Assigned Contract or Assigned Lease and Interest to Buyer, if ever), Buyer shall pay, pursuant to Section 365 of the Bankruptcy Code and the Sale Order, any and all cure and reinstatement costs or expenses that are required to be paid under sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts and Assigned Leases and Interests (the "***Cure Costs***").  For the avoidance of doubt, (i) Buyer shall pay all Cure Costs in cash at Closing, (ii) the Cure Costs are separate and apart from, and in addition to, the Purchase Price and, (iii) Buyer shall not be required to make any payment of Cure Costs for, and shall not assume any Liabilities with respect to, any Contract that is not an Assigned Contract.

(b)     **Schedule 2.5(b)** sets forth each Executory Contract which relates to the Seller Oil and Gas Assets and Sellers' good faith estimate of the amount of the Cure Costs payable in respect of each such Executory Contract (and if no Cure Cost is estimated to be payable in respect of any particular Executory Contract, the amount of such Cure Cost designated for such Contract shall be "$0.00").

(c)     At any time prior to the Designation Deadline, Buyer shall have the right, which may be exercised in Buyer's sole discretion, to provide written notice to Sellers (each such notice, a "***Contract Notice***") of Buyer's election to designate any Executory Contract (including any Contract that is an Assigned Contract immediately before such designation) (1) as an Excluded Contract, and upon such designation such Contract shall constitute an Excluded Contract and, if applicable, shall cease to constitute an Assigned Contract or (2) to the extent not already rejected, as an Assigned Contract and upon such designation such Contract shall constitute an Assigned Contract and shall cease to constitute an Excluded Contract.  If, at any time after the Designation Deadline, the Cure Costs fixed by the Bankruptcy Court for any Assigned Contract are (i) greater than the amount set forth on the initial schedule of Cure Costs

28

filed by Sellers with the Bankruptcy Court prior to the Designation Deadline and (ii) are not consented to by Buyer, then Buyer shall be permitted, no later than two (2) Business Days after entry of an order by the Bankruptcy Court setting such Cure Costs, to provide Sellers a Contract Notice of Buyer's election to revoke its designation of any such Contract as an Assigned Contract and thereupon such Contract shall be deemed to be an Excluded Contract for all purposes of this Agreement.  The Parties shall amend **Schedule 2.2(i)** and **Exhibit E** to reflect changes made pursuant to this **Section 2.5(c)**.

(d)    If Buyer exercises its rights in **Section 2.5(c)** above to designate a Contract, including a Contract that was an Assigned Contract immediately before such designation, as an Excluded Contract, there shall be no reduction in the Purchase Price as a result of such designation or change in designation.

2.6    Assignment of Seller Oil and Gas Assets Subject to Consent Requirements.

(a)    Within three (3) Business Days after the Sale Order is entered, Sellers shall send letters seeking the Required Consents.  Except as provided in **Section 2.6(b)**, this Agreement shall not constitute an agreement to assign or transfer and shall not effectuate the assignment or transfer of any Seller Oil and Gas Asset if such Seller Oil and Gas Asset is subject to an unobtained Required Consent. Sellers and Buyer shall use their commercially reasonable efforts to obtain all such Required Consents; provided, however, neither Sellers nor Buyer will be obligated to pay any consideration or initiate any Proceedings to obtain any such Required Consent.  Each Seller Oil and Gas Asset affected by a Required Consent that is not obtained prior to Closing shall, at the option of Buyer, be held back from the Seller Oil and Gas Assets conveyed at Closing without reduction to the Purchase Price, subject to the following provisions of this **Section 2.6(a)**.  If any of the Seller Oil and Gas Assets is not conveyed at Closing due to failure to obtain a Required Consent, then (1) Sellers shall, following the Closing, at Buyer's sole expense and subject to any approval of the Bankruptcy Court that may be required, reasonably cooperate with Buyer to provide to Buyer the benefits thereof in some other manner (including the exercise of the rights of Sellers thereunder or the subcontracting, sub-licensing, or sub-leasing thereof) and (2) such Seller Oil and Gas Asset shall be conveyed to Buyer within ten (10) Business Days after such Required Consent has been obtained, waived or otherwise satisfied or after Buyer otherwise so requests, whichever occurs earlier.  Except for Required Consents, if any consents to the assignment of any Seller Oil and Gas Asset are not obtained prior to Closing, such Seller Oil and Gas Asset shall nevertheless be sold and conveyed to Buyer at the Closing. Notwithstanding the foregoing, nothing in this **Section 2.6(a)** shall (x) require Sellers to make any expenditure or incur any obligation on their own or on behalf of Buyer, or (y) prohibit any Seller from ceasing operations or winding up its affairs following the Closing.

(b)    The provisions of **Section 2.6(a)** shall only apply with respect to those Seller Oil and Gas Assets that are subject to consents to assignment (including Required Consents) and that cannot be acquired by Buyer free and clear of such consents to assignment (including Required Consents) pursuant to the Bidding Procedures Order, the Sale Order or the Bankruptcy Code.

2.7    Further Assurances.

From time to time following the Closing, the Sellers and Buyer shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate (a) to assure fully to Buyer and its respective successors or assigns, all of the Seller Oil and Gas Assets and properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement, (b) to assure fully to each Seller and its Affiliates and their successors and assigns, the assumption of the Assumed Liabilities by Buyer under this Agreement, and (c) to otherwise make effective the transactions contemplated hereby; *provided*, *however*, nothing in this **Section 2.7** shall require Buyer or any of their respective Affiliates to assume any Liabilities other than the Assumed Liabilities. Notwithstanding the foregoing, nothing in this **Section 2.7** shall prohibit any Seller from ceasing operations or winding up its affairs following the Closing.

# ARTICLE 3

## PURCHASE PRICE

3.1    Purchase Price.

The purchase price for the purchase, sale, assignment and conveyance of Sellers' right, title and interest in, to and under the Seller Oil and Gas Assets shall consist of the following (collectively, as adjusted as provided in **Section 8.13** hereof, the "***Base Purchase Price***"):

(a)    Cash in an amount equal to $1,507,500.00; and

(b)    Buyer shall assume the Assumed Liabilities.

Notwithstanding the foregoing, the Base Purchase Price shall be adjusted as provided in **Section 8.13** hereof (as adjusted, the "***Purchase Price***"). The cash component of the Purchase Price shall be delivered by Buyer as set forth in **Section 4.2**.

3.2    Good Faith Deposit.

(a)    As required by the terms of the Bidding Procedures Order, Buyer has submitted to the Sellers a cash deposit (the "***Good Faith Deposit***") in the amount of ten percent (10%) of the Base Purchase Price.  The Good Faith Deposit shall be held and disbursed by Sellers in accordance with the terms of this Agreement and in accordance with any requirements of the Bankruptcy Court.

(b)    If the Closing of the sale of the Oil and Gas Assets by Sellers to Buyer pursuant to this Agreement is not consummated solely because of a breach of this Agreement by Buyer resulting in termination pursuant to **Section 11.1(c)** or **Section 11.1(f)**, then, in such event, Sellers shall have the right to retain the Good Faith Deposit, free of any claims by Buyer thereto, as liquidated damages due to the difficulty of ascertaining actual damages with any certainty and, to the fullest extent permitted by applicable Law, the Good Faith Deposit,

together with any interest or other earnings thereon, shall be Sellers' sole and exclusive remedy with respect to such breach by Buyer notwithstanding any provision to the contrary contained in **Article 11** or elsewhere in this Agreement.

(c)     If this Agreement is terminated for any reason other than a breach of this Agreement by Buyer resulting in termination pursuant to **Section 11.1(c)** or **Section 11.1(f)**, Buyer shall be reimbursed the Good Faith Deposit, together with any interest or other earnings thereon.

## ARTICLE 4

### CLOSING

4.1     Closing Date.

Upon the terms and subject to the conditions hereof, the closing of the purchase and sale of the Seller Oil and Gas Assets and the assumption of the Assumed Liabilities contemplated hereby (the "***Closing***") shall take place at 10:00 a.m., Central Prevailing Time, at the offices of Bracewell LLP located at 711 Louisiana St Suite 2300, Houston, Texas 77002, within twenty-one (21) calendar days after the entry of the Sale Order. The date and time at which the Closing actually occurs is hereinafter referred to as the "***Closing Date***".

4.2     Payment on the Closing Date.

Subject to satisfaction or, if permissible, waiver of the conditions set forth in **Article 9** and **Article 10**, at the Closing, Buyer shall pay, or cause to be paid at Closing, the cash component of the Purchase Price, less the Good Faith Deposit, by wire transfer of immediately available funds to an account specified in writing by the Sellers prior to the Closing Date

4.3     Buyer's Deliveries.

At the Closing, and subject to the simultaneous performance by each of the Sellers of their obligations under **Section 4.4**, Buyer shall deliver or cause to be delivered to Sellers (or such other Persons where so designated):

(a)     the cash consideration referenced in **Section 3.1(a)** to the Sellers in accordance with **Section 4.2**;

(b)     the Cure Costs in accordance with **Section 2.5(a)**;

(c)     the Assumption Agreement, duly executed by an authorized officer of Buyer;

(d)     the Assignments, duly executed by an authorized officer of Buyer and in recordable form;

(e)     the Deeds, duly executed by an authorized officer of Buyer and in recordable form;

(f)     assignments and conveyances in form required by federal, state or tribal agencies for the assignment of any federal, state or tribal Seller Oil and Gas Assets, duly executed by an authorized officer of Buyer, and in sufficient duplicate originals to allow recording in all appropriate offices;

(g)     letters-in-lieu of transfer orders (prepared by Sellers and in form reasonably acceptable to Buyer) directed to purchasers of the Hydrocarbons from the Oil and Gas Assets and other remitters of production revenues directing them to make payment to Buyer following the Closing, duly executed by an authorized officer of Buyer;

(h)     with respect to Properties operated by any Seller, change of operator forms and other similar forms required by state regulatory authorities, prepared by Sellers and duly executed by Buyer;

(i)     the certificates of Buyer to be received by Sellers pursuant to **Sections 10.1** and **10.2**;

(j)     a counterpart of the Preliminary Settlement Statement executed by Buyer; and

(k)     evidence (including evidence of satisfaction of all applicable bonding or insurance requirements) as Sellers may reasonably request demonstrating that Buyer is qualified with the applicable Governmental Authorities and pursuant to any applicable operating agreement to succeed Sellers as the owners and, where applicable, the operator of the Oil and Gas Assets.

4.4     Sellers' Deliveries.

At the Closing, and subject to the simultaneous performance by Buyer of its obligations under **Section 4.3**, Sellers shall deliver to Buyer:

(a)     the Assumption Agreement, duly executed by an authorized officer of each Seller;

(b)     the Assignments, duly executed by an authorized officer of each applicable Seller and in recordable form;

(c)     the Deeds, duly executed by an authorized officer of each applicable Seller and in recordable form;

(d)     assignments and conveyances in form required by federal, state or tribal agencies for the assignment of any federal, state or tribal Seller Oil and Gas Assets, duly executed by an authorized officer of each applicable Seller, and in sufficient duplicate originals to allow recording in all appropriate offices;

(e)     letters-in-lieu of transfer orders (prepared by Sellers and in form reasonably acceptable to Buyer) directed to purchasers of the Hydrocarbons from the Oil and

Gas Assets and other remitters of production revenues directing them to make payment to Buyer following the Closing, duly executed by an authorized officer of each applicable Seller;

(f)     with respect to Properties operated by any Seller, change of operator forms and other similar forms required by state regulatory authorities, prepared by Sellers and duly executed by each applicable Seller;

(g)     copies of all Required Consents that were obtained by Sellers;

(h)     a certified copy of the Sale Order;

(i)     from each Seller, the certificates to be received by Buyer pursuant to **Sections 9.1** and **9.2**;

(j)     a counterpart of the Preliminary Settlement Statement executed by Sellers;

(k)     certificates from each Seller that such Seller is not a foreign person within the meaning of section 1445(f)(3) of the Code, which certificates shall set forth all information required by, and otherwise be executed in accordance with, Treasury Regulations section 1.1445-2(b)(2);

(l)     all electronic copies of the Records that are maintained by or in the control of any Seller, and, promptly following Closing and in any event no later than ten (10) Business Days following Closing, Sellers shall make available to Buyer all originals of the Records; *provided however*, that Sellers shall be entitled to retain any originals of the Records that are required to be retained as a result of the Bankruptcy Case, for such period of time sufficient to allow all matters under the Bankruptcy Case to be finally determined; and

(m)     all other deeds, endorsements, assignments and other instruments of conveyance and transfer, in form and substance reasonably acceptable to Buyer, as may be necessary, to convey and assign the Seller Oil and Gas Assets to Buyer and vest title therein in Buyer (in each case free and clear of all Encumbrances other than Permitted Encumbrances), and such additional documents customary in similar transactions as might be reasonably requested by Buyer and are reasonably required to consummate the transactions contemplated by this Agreement.

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as disclosed in the Disclosure Schedules attached hereto, Sellers represent and warrant the following to Buyer:

5.1     Organization and Good Standing.

Each Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  Each Seller has the requisite corporate

power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.  Sellers are duly qualified or licensed to do business and are in good standing in each jurisdiction where the character of their business or the nature of their properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

      5.2     <u>Authority; Validity; Consents</u>.

Each Seller has, subject to requisite Bankruptcy Court approval, the requisite corporate, partnership, or limited liability company power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which such Seller is a party and to consummate the transactions contemplated hereby and thereby, and, subject to requisite Bankruptcy Court approval, the execution, delivery and performance of this Agreement and such other Transaction Documents by such Seller and the consummation by such Seller of the transactions contemplated herein and therein have been duly and validly authorized by all requisite corporate, partnership, or limited liability company action.  This Agreement has been duly and validly executed and delivered by each Seller and each other Transaction Document required to be executed and delivered by a Seller at the Closing will be duly and validly executed and delivered by such Seller at the Closing.  Subject to requisite Bankruptcy Court approval, this Agreement and the other Transaction Documents constitute, with respect to each Seller that is party thereto, the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as such enforceability is limited by general principles of equity.

      5.3     <u>No Conflict</u>.

Other than as set forth in **Disclosure Schedule 5.3**, and except for any notices, filings and consents required in connection with the consummation of the transactions contemplated hereby, upon obtaining requisite Bankruptcy Court approval, the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Sellers under (a) any Permit, Lease, or Material Contract by which it or any material Oil and Gas Asset is bound, (b) the Governing Documents of any Seller, (c) subject to entry of the Sale Order, any applicable Order or Legal Requirement.

      5.4     <u>Material Contracts; Leases and Mineral Interests</u>.

      (a)    **Disclosure Schedule 5.4(a)** lists all Material Contracts in effect as of the Execution Date which relate to the Seller Oil and Gas Properties.  Sellers have made available to Buyer true and exact copies from Sellers' Records, of each Material Contract listed on **Disclosure Schedule 5.4(a)**.  Sellers have made available to Buyer true and exact copies from Sellers' Records, of each Material Contract listed on Disclosure Schedule 5.4(a).  Subject to the Orders of the Bankruptcy Court and the payment of any Cure Costs, and except as separately described on **Disclosure Schedule 5.4(a)**, (i) to Sellers' Knowledge, each such Material Contract is a valid and binding agreement of those Asset Owners that are party thereto, enforceable in

accordance with its terms against such Asset Owners, and against each other party thereto; and (ii) the Sellers have performed in all material respects, and, to the Knowledge of Sellers, each other party thereto has performed in all material respects, each term, covenant and condition of each such Material Contract required to be performed.  No written notice of default or breach has been received or delivered by any Seller under any such Material Contract, the resolution of which is currently outstanding.  No currently effective written notices have been received by any Seller of the exercise of any premature termination, price redetermination, market-out, shut-in or curtailment of or under any such Material Contracts.

(b)   To Sellers' Knowledge, **Exhibit A** lists all Leases and Mineral Interests in which any Seller owns or holds an interest as of the Execution Date.  Sellers have made available true and exact copies from Sellers' Records, of each such Assigned Lease. Except as set forth on **Disclosure Schedule 5.4(b)**, (i) no Asset Owner nor, to Sellers' Knowledge, any other Person is in default under any such Assigned Lease and no event has occurred that, with notice or lapse of time or both, would constitute a default by any Asset Owner or, to Sellers' Knowledge, by any other Person under any such Assigned Lease, (ii) no party to any such Assigned Lease or any successor to the interest of such party has filed or threatened in writing to file any action to terminate, cancel, rescind or procure judicial reformation of any such Assigned Lease, and (iii) Sellers have timely paid or caused to be paid all rentals, delay rentals, shut-in royalties, royalties, overriding royalties, and other burdens due by any Asset Owners with respect to the Properties, except (1) to the extent Sellers were specifically directed not to pay such amounts by the Bankruptcy Court and (2) amounts being held in suspense, in accordance with applicable Legal Requirements and Contracts, as a result of returned mail, checks not negotiated, or title issues, in circumstances that do not provide any third party a right to terminate the applicable Lease.

(c)   Except as set forth on **Disclosure Schedule 5.4(c)**, no Asset Owner is obligated by virtue of any "take or pay" payment, advance payment or other similar payment (other than customary gas balancing arrangements and for the rights of any lessor to take free gas under the terms of the relevant Lease for its use on the lands covered thereby) to deliver Hydrocarbons, or proceeds from the sale thereof, attributable to the Properties at some future time without receiving payment therefor at or after the time of delivery.

5.5   Permits; Surface Rights.

Other than as set forth in **Disclosure Schedule 5.5**, the Permits held by Sellers constitute all material permits, licenses, authorizations, franchises, grants, easements, variances, exceptions, consents, certificates, approvals and related instruments or rights issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority and which are necessary and sufficient to permit ownership and operation of the Properties and the Business as presently owned and operated by Sellers and each is in full force and effect and has been duly and validly issued and there are no Proceedings pending, or to the Knowledge of the Sellers, threatened in writing, that are reasonably expected to result in the revocation, cancellation, suspension or modification of any such Permits. There are no Proceedings pending or, to the Knowledge of Sellers, threatened in writing, with respect to any alleged failure to have all or any material Permits required in connection with the operation of the Business as currently conducted or in connection with the ownership or operation of the Oil and Gas Assets.

35

The Assigned Surface Interests constitute all rights of way, easements, surface use rights, water rights, licenses and authorizations necessary to access, own and operate the Properties as currently accessed, owned and operated by Sellers in the Ordinary Course of Business, and the respective Asset Owners have maintained in full force and effect all, and are not in breach or violation of any, Assigned Surface Interests.  **Exhibit F** sets forth a true and complete list of all material Surface Interests owned or held by any Seller in connection with the Business.

5.6     Wells; Equipment.

(a)     **Exhibit B** sets forth a true and complete list of all currently producing Wells owned or leased by Sellers in connection with the Business.  All Wells drilled by Sellers have been drilled and completed at locations, and within the limits, permitted by all applicable Leases, Contracts, and pooling, spacing or unit agreements.  No Well is subject to penalties on allowables after the Execution Date because of any overproduction or any other violation of Legal Requirements.   The Wells, Assigned Midstream Assets, and Assigned Equipment have been maintained in satisfactory operating condition and are capable of being used in the operation in the manner in which they have historically been operated without present need for repair or replacement except in the Ordinary Course of Business.   All currently producing Wells are in an operable state of repair adequate to maintain normal operations in accordance with past practices, ordinary wear and tear excepted, and, without limiting the foregoing, to Sellers' Knowledge, do not contain junk, fish, or other obstructions which could reasonably be expected to materially interfere with drilling, completion, and recompletion, stimulation, or other operations on, with respect to, or affecting the ownership or operation of the Oil and Gas Assets.

(b)     **Disclosure Schedule 5.6(b)** indicates the Wells  in which any Seller is the operator of as of the Execution Date.  To the Knowledge of the Sellers, there is no pending vote, or any outstanding request for a vote (whether written or oral), to have any Seller removed as operator of any of the Wells for which any Seller is currently designated as the operator.

(c)     Except as set forth on **Disclosure Schedule 5.6(c)**, to Sellers' Knowledge, there are no Wells, platforms, pits, or other facilitates or equipment located on the Properties that (i) are obligated by any Legal Requirements to be plugged, dismantled, closed or abandoned or that are currently subject to exceptions to a requirement to plug and/or abandon issued by a Governmental Authority or (ii) have been plugged, dismantled, closed or abandoned in a manner that does not comply in all respects with applicable Leases, Contracts and Legal Requirements.

(d)     **Disclosure Schedule 5.6(d)** contains a list, which is complete and accurate, of the status of the Payout Balance, as of the date stated therein, for each of the Wells.  "***Payout Balance***" means the status, as of the date of the calculations, of the recovery by a Seller or third party of a cost amount specified in the contract relating to a well out of the revenue from such well where the Net Revenue Interest of a Seller therein will be reduced.

5.7     Imbalances.

All Imbalances relating to the Oil and Gas Assets are reflected in **Disclosure Schedule 5.7** as of the date stated therein.

5.8     AFEs.

**Disclosure Schedule 5.8** contains a list, true and correct as of the date set forth therein, of (a) all authorities for expenditures (collectively, "**AFEs**") for capital expenditures with respect to the Oil and Gas Assets that have been proposed by any Person having authority to do so (including internal AFEs of Sellers not delivered to third parties) and (b) all other commitments of Sellers to make expenditures in respect of the ownership of or any operation on or with respect to the Oil and Gas Assets, in each case as to (a) and (b), in an amount, individually, in excess of $100,000.

5.9     Non-Consent Operations.

Neither Seller has declined to participate in any operation or activity proposed with respect to the Properties that could result in its interest in the Properties becoming subject to a penalty or forfeiture as a result of such election not to participate in such operation or activity, except to the extent reflected in the Net Revenue Interest and Working Interest for such Properties set forth in **Exhibit A** and **Exhibit B**, as applicable.

5.10    Hedging.

There are no Hedge Contracts of any Seller or otherwise with respect to the sale of Hydrocarbons from the Oil and Gas Assets that are or will be binding on the Oil and Gas Assets or Buyer at any time on or after the Closing Date.

5.11    Preferential Purchase Rights; Other Rights.

Except as set forth on **Disclosure Schedule 5.11**, there are no (a) Preferential Purchase Rights applicable to the transactions contemplated by this Agreement and (b) tag along rights, drag along rights, co-sale rights or similar rights applicable to the transactions contemplated by this Agreement.

5.12    Suspense Funds.

**Disclosure Schedule 5.12** sets forth a list, true and correct as of the date set forth therein, of all Suspense Funds and the names of the parties to whom such funds are owed.

5.13    Intellectual Property.

Neither Seller owns any Intellectual Property related to or used in connection with the ownership or operation of the Oil and Gas Assets.  Except as set forth on **Disclosure Schedule 5.13** or as would not reasonably be expected to have, individually or in the aggregate, a material adverse impact on the Business, the conduct of the Business does not infringe or otherwise violate any Intellectual Property or other proprietary rights of any other Person, and

there is no action pending or, to the Knowledge of Sellers, threatened, alleging any such infringement or violation or challenging Sellers' rights in or to any of their respective Intellectual Property and, to the Knowledge of Sellers, there is no existing fact or circumstance that would reasonably be expected to give rise to such action.

     5.14   Taxes.

Except as set forth on **Disclosure Schedule 5.14**:

    (a)  all federal and other material Tax Returns required to be filed with respect to any of the Oil and Gas Assets, have been properly prepared and timely filed, and all such Tax Returns (including information provided therewith or with respect to thereto) are true, complete and correct in all material respects;

    (b)  Sellers have fully and timely paid or caused to be paid all Taxes shown as due on any Tax Return and all other material Taxes or, to the extent any such Taxes are not yet due, such Taxes have been accrued and fully provided for in accordance with GAAP or will be provided for when required under GAAP on Sellers' financial statements;

    (c)  no audit or other proceeding by any Governmental Authority is pending or, to the Knowledge of Sellers, threatened with respect to any Taxes due by or with respect to Sellers or with respect to any of the Oil and Gas Assets;

    (d)  no written notice has been received from any Governmental Authority of any intention to assert any deficiency or claim for additional Taxes against Sellers or with respect to any of the Oil and Gas Assets;

    (e)  no written claim has been received from any Governmental Authority in a jurisdiction where Sellers do not file Tax Returns that they are or may be subject to taxation by that jurisdiction;

    (f)  all deficiencies for Taxes asserted or assessed with respect to any of the Oil and Gas Assets have been fully and timely paid, settled or properly reflected in Sellers financial statements;

    (g)  there are no outstanding agreements extending or waiving the statutory period of limitations applicable to any claim for, or the period for the collection or assessment or reassessment of, Taxes with respect to the Oil and Gas Assets for any taxable period and no request for any such waiver or extension is currently pending;

    (h)  Sellers have each withheld from their respective employees, independent contractors, creditors, stockholders and third parties, as applicable, and timely paid to the appropriate Governmental Authority proper and accurate amounts in compliance with all Tax withholding and remitting provisions of applicable Legal Requirements and have each complied with all Tax information reporting provisions of all applicable Legal Requirements, other than immaterial failures in compliance and information reporting;

(i)     there are no Encumbrances for Taxes upon the assets or properties of Sellers, including the Oil and Gas Assets, other than Permitted Encumbrances;

(j)     none of the Oil and Gas Assets is subject to any tax partnership agreement or provisions requiring a partnership income tax return to be filed under Subchapter K of Chapter 1 of Subtitle A of the Code or any similar state statute;

5.15     Legal Proceedings.

Except for the Bankruptcy Case and as set forth on **Disclosure Schedule 5.15**, (a) there are no Proceedings pending or, to Sellers' Knowledge, threatened in writing against any Seller with respect to or that affect any of the Oil and Gas Assets or the Business or that involve or relate to any of the transactions contemplated by this Agreement or the other Transaction Documents, (b) there is no investigation, proceeding, charge or audit pending, of which Sellers have received written notice, or to Sellers' Knowledge threatened in writing, before or by any Governmental Authority with respect to any Oil and Gas Assets or the Business; (c) there has been no settlement or other similar agreement or Order with respect to the ownership or operation of the Oil and Gas Assets or the Business that is or could reasonably be expected to be material; and (d) Sellers have not received any written notice or claim for tort or violation of any applicable Legal Requirement, or an investigation thereof with respect to their ownership or operation of the Oil and Gas Assets or the Business.

5.16     Labor Matters.

(a)     **Disclosure Schedule 5.16(a)** sets forth a true, correct and complete list as of the Execution Date of all Employees, including each Employee's (i) name, (ii) legal employer, (iii) job title or function, (iv) job location, (v) salary or wage rate, (vi) bonus, commission or incentive compensation accrued in 2016, (vii) date of hire, (viii) exempt v. non-exempt status, (ix) full-time v. part-time status, (x) temporary or regular status and (xi) active or leave status.  Except as set forth on **Disclosure Schedule 5.16(a)**, no Employee is located outside the jurisdiction of the United States.

(b)     **Disclosure Schedule 5.16(b)** sets forth a true, correct and complete list of all Service Providers, including each such Person's (i) name, (ii) function or services provided, (iii) job location, and (iv) current compensation structure.  Sellers are, and for the past six (6) years have been, in compliance in all material respects with all applicable Labor Laws for all Employees and Service Providers.  Except as set forth on **Disclosure Schedule 5.16(b)**, there is no pending, nor, to the Knowledge of Sellers, threatened, Proceeding reasonably likely to give rise to a material Liability asserting that any Seller has committed an unfair labor practice, act of discrimination or other similar complaints with respect to any Employee or Service Provider.

(c)     No Seller is party to any labor, collective bargaining, union and similar Contracts with respect to any Employee or Service Provider.  No collective bargaining or any other labor-related Contract with any labor union or labor organization is currently being negotiated by any Seller with respect to any Employee or Service Provider.  There is no pending or, to the Knowledge of Sellers, threatened organized effort or demand for recognition or certification or attempt to organize the Employees by any labor organization.  During the past six

39

(6) years, there have been no strikes, slow-downs, work stoppages, other labor disturbance or other concerted action by any union or other group of employees or other persons against or involving any Seller nor is any such strike, slow-down, work stoppage, other labor disturbance or other concerted action by any union or other group of employees, to the Knowledge of Sellers, threatened in writing against or involving any Seller.

(d)     There has been no "mass layoff" or "plant closing" (as defined by the WARN Act) with respect to Sellers in the past ninety (90) days.  Sellers have not incurred any Liability under the WARN Act that remains unpaid or unsatisfied.

(e)     With respect to any Service Provider performing services prior to or as of the Closing, no Seller has any Liability with respect to any misclassification of such Service Provider as an independent contractor rather than as an employee (within the meaning of the Fair Labor Standards Act of 1938, as amended), or with respect to such Service Provider's status as a leased employee.

5.17     Employee Benefits.

(a)     **Disclosure Schedule 5.17(a)** sets forth a true, correct and complete list of each material Benefit Plan.

(b)     Except as set forth on **Disclosure Schedule 5.17(b)**, each Benefit Plan has been established and administered in accordance with its terms and in material compliance with the applicable provisions of ERISA, the Code and all other applicable Legal Requirements.

(c)     No Seller or any of its ERISA Affiliates sponsor, maintain, contribute to or have any Liability in respect of, or have in the past six (6) years sponsored, maintained, contributed to or had any Liability in respect of, any defined benefit pension plan (as defined in Section 3(35) of ERISA) or plan subject to section 412 of the Code or Section 302 of ERISA.

(d)     No Benefit Plan is a Multiemployer Plan, and none of Sellers nor their ERISA Affiliates have at any time in the past six (6) years maintained or contributed to, or had any Liability in respect of, any Multiemployer Plan.  No Benefit Plan is a "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA.

(e)     None of the execution and delivery of this Agreement, the other Transaction Documents, or the consummation of the transactions contemplated by this Agreement would reasonably be expected to (either alone or in combination with another event) result in (i) severance pay or any increase in severance pay upon any termination of employment after the date of this Agreement, (ii) any payment, compensation or benefit becoming due, or increase in the amount of any payment, compensation or benefit due, to any current or former Employee or Service Provider, (iii) the acceleration of the time of payment or vesting or result in any funding (through a grantor trust or otherwise) of compensation or benefits or (iv) the payment of any amount that could, individually or in combination with any other such payment, constitute an "excess parachute payment," as defined in Section 280G(b)(1) of the Code.

5.18    Sufficiency of Oil and Gas Assets; Casualties.

Except as set forth on **Disclosure Schedule 5.18**, (a) the Oil and Gas Assets constitute all of the material assets and rights necessary to conduct the Business and own and operate the Oil and Gas Assets, as presently conducted, owned and operated by Sellers, and (b) to the Knowledge of the Sellers, since the Petition Date, there has been no Casualty affecting any of the Oil and Gas Assets or the Business in any material respect which has not subsequently been or is in the process of being repaired, replaced or restored.

5.19    Compliance with Laws.

Except as otherwise specifically directed by the Bankruptcy Court or as set forth on **Disclosure Schedule 5.19**, (a) to the Knowledge of Sellers, Sellers have at all times owned and operated the Oil and Gas Assets and conducted the Business and, during the period that Sellers owned the Oil and Gas Assets and any third party operated such Oil and Gas Assets, such third party operator has during such period operated such Oil and Gas Assets, in each case, in compliance in all material respects with all Orders, Permits and Legal Requirements (other than Environmental Laws) applicable to Sellers, the Oil and Gas Assets or the Business, except for prior instances of non-compliance that have been fully and finally resolved to the satisfaction of all Governmental Authorities with jurisdiction over such matters, and (b) neither Sellers nor any of their Representatives have received in the past twenty-four (24) months any written notice from a Governmental Authority or third party alleging that Sellers or the Business is not in compliance in any material respect with any Order, Permit or Legal Requirement (other than Environmental Law) applicable to Sellers, the Oil and Gas Assets or the Business.

5.20    Environmental Matters.

Except as set forth on **Disclosure Schedule 5.20**, (a) to Sellers' Knowledge, there are no Environmental Defects on or affecting any of the Properties, (b) except for any noncompliance that has been remediated in accordance with applicable Environmental Law, to the Knowledge of Sellers, Sellers have at all times operated the Oil and Gas Assets and conducted the Business and, during the period that Sellers owned the Oil and Gas Assets and any third party operated any such Oil and Gas Assets, such third party operated the Oil and Gas Assets, in each case, in material compliance with all applicable Environmental Laws and all permits required thereunder or issued pursuant thereto; (c) to Sellers' Knowledge, there are no Proceedings pending or threatened in writing before any Governmental Authority with respect to Seller's ownership or operation of the Properties alleging material violations of Environmental Laws, or claiming material remediation obligations under applicable Environmental Laws, and no Seller has received any written notice of any alleged or actual material violation or non-compliance with any Environmental Law or of material non-compliance with the terms or conditions of any environmental permits, arising from, based upon, associated with or related to the Properties or the ownership or operation thereof; and (d) Seller has provided Buyer access to complete and true copies of all final written environmental reports, studies and notices prepared by any third party on behalf of, or delivered by a Governmental Authority to, any Seller with respect to any of the Properties that identify or allege any Environmental Defect on or affecting any of the Properties.   All matters with respect to Environmental Laws or any other environmental matter are dealt with exclusively by this **Section 5.20**.

5.21   [Reserved].

5.22   Certain Regulation.

None of the Oil and Gas Assets are subject to the jurisdiction of the Federal Energy Regulatory Commission under the Natural Gas Act (15 U.S.C. section 717, et seq.) or under the Natural Gas Policy Act of 1978 (15 U.S.C. section 3301).

5.23   Insurance and Bonds.

**Disclosure Schedule 5.23** sets forth a true and complete list of all material insurance policies of Sellers which insure the Business or any of the Oil and Gas Assets, and a true and complete list of all letter of credit, guarantees, surety bonds and performance bonds required to be obtained under terms of the material Permits or Material Contracts of the Sellers (other than as a result of the Bankruptcy Case) or provided by Sellers in connection with the Business.  Other than as disclosed on **Disclosure Schedule 5.23**, all such insurance policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing have been timely paid, and no notice of cancellation or termination has been received with respect to any such insurance policy.

5.24   Sellers as Debtor in Possession; no Trustee.

From the Petition Date through the Execution Date, Sellers have been at all times in their Bankruptcy Case debtors in possession pursuant to section 1107 of the Bankruptcy Code, and no trustee or examiner has been appointed in the Bankruptcy Case.

5.25   Affiliate Transactions.

Except as set forth on **Disclosure Schedule 5.25**, no current or, to the Knowledge of the Sellers, former director, officer, employee, Affiliate or Representative of Sellers (nor any spouse or child of any of such Persons, or any trust, partnership or corporation in which any of such Persons has a material economic interest) (a) owns any property, assets, interests and rights, tangible or intangible, that is an Oil and Gas Asset or that is otherwise material to the conduct of the Business as currently conducted, (b) has filed or otherwise has any Proceeding against the Business, or (c) except pursuant to any Benefit Plan,  is a party to or the beneficiary of any Contract with the Business.

5.26   Brokers or Finders.

Sellers have not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable, and Sellers shall indemnify and hold harmless Buyer from any claims with respect to any such fees or commissions.

## ARTICLE 6

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows:

6.1     Organization and Good Standing.

Buyer is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of New York.  Buyer has, or will have at Closing, the requisite power and authority to own or lease and to operate and use the Oil and Gas Assets.

6.2     Authority; Validity; Consents.

Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated herein have been duly and validly authorized by all requisite limited liability company or corporate actions in respect thereof.  This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a Party will be duly and validly executed and delivered by Buyer, as applicable, at the Closing. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except in each case as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights and remedies generally, or general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).  Buyer is not or will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a Party or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, have a Material Adverse Effect on Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.3     No Conflict.

The execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) any agreement, indenture, or other instrument to which it is bound, (b) the Governing Documents of Buyer, (c) any Order or (d) any Legal Requirement.

6.4     Availability of Funds.

As of the Closing, Buyer will have sufficient cash in immediately available funds (without giving effect to any unfunded financing, regardless of whether any such financing is committed) to pay the Purchase Price, all costs, fees and expenses to be paid by Buyer that are necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents, and assume the Assumed Liabilities.

6.5     Litigation.

There are no Proceedings pending or, to the Knowledge of Buyer, threatened, that would have a Material Adverse Effect on Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.6     Brokers or Finders.

Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which any Seller is or will become liable, and Buyer shall hold harmless and indemnify Sellers from any claims with respect to any such fees or commissions.

6.7     Business Use, Bargaining Position, Representation.

Buyer is purchasing the Seller Oil and Gas Assets for commercial or business use and has knowledge and experience in financial and business matters that enables it to evaluate the merits and the risks of a transaction such as this. Buyer is not in a significantly disparate bargaining position with Sellers and is represented by legal counsel.

## ARTICLE 7

### ACTIONS PRIOR TO THE CLOSING DATE

7.1     Access and Reports.

(a)     Subject to applicable Legal Requirements, upon receipt of written notice from Buyer of any such activities no less than two (2) Business Days in advance, Sellers shall (and shall cause their Subsidiaries to) afford Buyer's Representatives reasonable access from and after the Execution Date, during normal business hours until one (1) Business Day prior to the Closing Date, to their Employees, Properties, Contracts and Records and, during such period, Sellers shall furnish promptly to Buyer all information concerning the Oil and Gas Assets and the Business as may reasonably be requested; *provided, however*, such access shall not interfere with the Ordinary Course of Business or the operation of the Oil and Gas Assets and Business and Sellers shall have the option to have, at all times during such entry, Buyer's Representatives accompanied by at least one Representative of Sellers.  All such information to which Buyer receives access or is provided pursuant to this **Section 7.1** shall be governed by the terms of the Confidentiality Agreement.  No investigation pursuant to this **Section 7.1** or by

44

Buyer or its Representatives at any time prior to or following the Execution Date shall affect or be deemed to modify any representation or warranty made by the Sellers herein.

(b)     From and after the execution of this Agreement until one (1) Business Day prior to the Closing Date, Buyer shall have the right to conduct a Phase I Environmental Site Assessment and, in the sole discretion of the Buyer, a review of the compliance with Environmental Laws, of the Oil and Gas Assets.  During Sellers' regular hours of business and after providing Sellers with written notice of any such activities no less than two (2) Business Days in advance, and subject to the permission of any other third party whose permission is legally required (which Sellers shall use reasonable efforts, without any obligation to incur costs, to secure), Buyer and its authorized Representatives shall be permitted to enter upon the Oil and Gas Assets, inspect the same, and generally conduct visual, non-invasive tests, examinations, and investigations as Buyer desires; *provided, however*, that such entry shall not interfere with the Ordinary Course of Business or operation of the Oil and Gas Assets and Sellers shall have the option to have, at all times during such entry, Buyer's Representatives accompanied by at least one Representative of Sellers.   No sampling or other invasive inspections of the Oil and Gas Assets may be conducted without Sellers' prior written consent, which shall not be unreasonably withheld.  The withholding of consent to sampling or any other invasive inspection by Sellers shall be deemed reasonable if the need for such sampling or invasive testing was not indicated from a visual inspection or, based on the Phase I Environmental Site Assessment, such sampling or invasive testing would not be necessary to determine the existence and/or magnitude of an Environmental Defect.  Sellers will have the right, which they may exercise at their sole discretion, to (i) observe such investigation and (ii) promptly receive a copy of all results, analyses, reports, and reviews, except for such information for which Buyer has an attorney-client privilege.  All information obtained or reviewed by Buyer shall be governed by the terms of the Confidentiality Agreement.

(c)     This **Section 7.1** shall not require Sellers to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of Sellers, is reasonably likely to result in any violation of any Legal Requirement or any Contract to which any Seller is a party or cause any privilege (including attorney-client privilege) that Sellers would be entitled to assert to be lost with respect to such information and such loss of such privilege could in Sellers' good faith judgment (after consultation with counsel, which may be in-house counsel) adversely affect in any material respect Sellers' position in any pending or, what Sellers believes in good faith (after consultation with counsel, which may be in-house counsel) could be, future litigation or (ii) if Sellers, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto; *provided*, *however*, in the case of clause (i), the Parties shall cooperate in seeking to find a way to allow disclosure of such information to the extent doing so (A) would not (in the good faith belief of the Sellers (after consultation with counsel, which may be in-house counsel)) be reasonably likely to result in the violation of any such Legal Requirement or be reasonably likely to cause such privilege to be undermined with respect to such information or (B) could reasonably (in the good faith belief of the Sellers (after consultation with counsel, which may be in-house counsel)) be managed through the use of customary "clean-room" arrangements pursuant to which non-employee Representatives of Buyer could be provided access to such information.

(d)    The information provided pursuant to this **Section 7.1** shall (prior to Closing) be used by Buyer solely for the purpose of the transactions contemplated by this Agreement, and such information shall be kept confidential by Buyer and Sellers in accordance with, and Buyer and Sellers shall otherwise abide by and be subject to the terms and conditions of, the Confidentiality Agreement.

(e)    **BUYER SHALL DEFEND, RELEASE, INDEMNIFY AND HOLD HARMLESS EACH SELLER PARTY FROM AND AGAINST ANY AND ALL LIABILITIES THAT ANY BUYER REPRESENTATIVE MAY ASSERT AGAINST ANY SELLER BASED UPON INJURY TO PERSON, INCLUDING DEATH, OR TO PROPERTY, ARISING IN ANY MANNER WHATSOEVER FROM ANY INSPECTION BY BUYER OR ANY OF ITS REPRESENTATIVES OF THE OIL AND GAS ASSETS AND ACCESS BY BUYER OR ANY BUYER REPRESENTATIVE TO THE OIL AND GAS ASSETS, <u>WHETHER OR NOT BASED UPON STRICT LIABILITY OR CAUSED BY THE SOLE OR CONCURRENT NEGLIGENCE (WHETHER ACTIVE OR PASSIVE) OF ANY SELLER PARTY, UNLESS SUCH INJURY WAS OCCASIONED BY THE GROSS NEGLIGENCE OR INTENTIONAL TORT OF ANY SELLER PARTY</u>.**

7.2    <u>Operations Prior to the Closing Date</u>.

Sellers covenant and agree that, except (u) as required by the Bankruptcy Court, (v) as expressly contemplated by this Agreement (including, without limitation, payment of unpaid Taxes included in **Disclosure Schedule 5.14**), (w) as disclosed in **Schedule 7.2**, (x) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed) or (y) as otherwise required by Legal Requirements, after the Execution Date and prior to the Closing Date:

(a)    Sellers shall:

(i)    maintain and operate, or cause to be maintained and operated, in the Ordinary Course of Business the Oil and Gas Assets in their present condition;

(ii)    pay or cause to be paid all bonuses and rentals, royalties, overriding royalties, shut-in royalties, and minimum royalties and development and Operating Expenses, and other payments incurred with respect to the Oil and Gas Assets operated by any Seller except (A) royalties held in suspense as a result of title issues and that do not give any third party a right to cancel an interest in any Oil and Gas Assets operated by any Seller, and (B) expenses or royalties being contested in good faith, unless the nonpayment of such contested expenses or royalties could result in the termination of an Assigned Lease and Interest, in which case Sellers will notify Buyer and obtain Buyer's approval prior to withholding such payment;

(iii)    maintain their books, accounts and records in the Ordinary Course of Business;

(iv)    file all material Asset Tax Tax Returns and pay or deposit all material Asset Taxes on a timely basis in the Ordinary Course of Business;

(v)    maintain the Wells, Assigned Midstream Assets, Assigned Equipment, and other personal property comprising part of the Oil and Gas Assets operated by any Seller in the Ordinary Course of Business, subject to ordinary wear and tear;

(vi)      use commercially reasonable efforts to (A) retain Employees who are in good standing and are necessary to conduct the Business as it is currently being conducted and (B) maintain their relationships with and preserve the goodwill of their key Service Providers;

(vii)      maintain insurance coverage on the Oil and Gas Assets presently furnished by nonaffiliated third parties in the amounts and of the types presently in force;

(viii)      maintain all Permits, approvals, bonds and guaranties, in each case, to the extent material, affecting the Oil and Gas Assets in the Ordinary Course of Business, and make all filings that Sellers are required to make under applicable Legal Requirements with respect to the Oil and Gas Assets; and

(ix)      give written notice to Buyer as soon as practicable, but in any event within two (2) Business Days of Sellers acquiring Knowledge, of (1) the receipt or delivery by Sellers of any written notice with respect to any material breach of any Assigned Lease and Interest, Assigned Contract or any applicable Legal Requirements, (2) receipt or delivery by Sellers of any written claim for damages or any Proceeding initiated by or against a Seller or its Affiliates with respect to the Oil and Gas Assets, (3) receipt by Sellers of any refusal or rejection to grant a Required Consent or exercise of a Preferential Purchase Right, or (4) any material election that a Seller is required to make under any Assigned Contract or with respect to any Property, specifying the nature and time period associated with such election.

(b)      No Seller shall:

(i)      Abandon any Oil and Gas Asset (except any abandonment of Leases to the extent any such Leases terminate pursuant to their terms);

(ii)      commence, propose, or agree to participate in any single operation with respect to the Properties with an anticipated cost for which any Seller shall be responsible in excess of $100,000, except for emergency operations, operations scheduled on **Disclosure Schedule 5.8** or **Schedule 7.2**, or operations required by any Governmental Authority or the Bankruptcy Court;

(iii)      (1) terminate, cancel, or materially amend or modify any Permit, Assigned Surface Interest, Assigned Contract, or Assigned Lease and Interest , (2) enter into any Contract that, if such agreement, contract or commitment had been entered into prior to the Execution Date, would be required to be listed in **Schedule 5.4(a)**; (3) relinquish voluntarily its position as operator with respect to any Property; (4) become a non-consenting party to any operation with respect to the Properties; or (5) waive, compromise or settle any material claim or right involving the Oil and Gas Assets;

(iv)      sell, lease, encumber, or otherwise dispose of all or any portion of any Oil and Gas Assets, except sales of Hydrocarbons in the Ordinary Course of Business;

(v)      (1) make, change or rescind any material Tax election or (2) make, change or rescind a material Tax reporting practice or policy, file any amended Tax Return, enter into any closing agreement, settle any material Tax claim or assessment, surrender any right to claim a material refund of Taxes, or take any other similar action relating to the filing of any Tax Return or the payment of any Tax that is material in nature;

(vi)      (1) grant to any Employee or Service Provider any increase in compensation except in the Ordinary Course of Business and as specifically set forth in detailed schedules to be provided to and to be approved by Buyer, (2) grant or increase any severance, retention, change-of-control or similar payments to any current or former Employee or Service Provider, or (3) adopt, establish, enter into, amend, terminate or increase the benefits under any Benefit Plan or other employee benefit, plan, practice, program, policy or Contract, in any case other than as may be required by the terms of such Benefit Plan or other Contract or as may be required by applicable Legal Requirements;

(vii)      merge or consolidate any Seller with any other Person or acquire any business or equity interests or any other Person; or

(viii)      enter into any agreement or commitment to take, or otherwise permit or consent to, any action prohibited by this **Section 7.2(b)**.

7.3      Commercially Reasonable Efforts.

Sellers, on the one hand, and Buyer, on the other hand, shall use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using commercially reasonable efforts to accomplish the following: (i) the taking of all reasonable acts necessary to cause the conditions precedent set forth in **Article 9** and **Article 10** to be satisfied, (ii) the obtaining, at the earliest practicable date, of all necessary Governmental Authorizations and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority, and (iii) the execution or delivery of any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

7.4      Bankruptcy Court Approval.

(a)      Sellers and Buyer acknowledge that this Agreement and the sale of the Seller Oil and Gas Assets and the assumption and assignment of the Assigned Contracts and the Assigned Leases and Interests are subject to Bankruptcy Court approval.  Sellers and Buyer acknowledge that (i) to obtain such approval, Sellers must demonstrate that they have taken reasonable steps to obtain the highest and otherwise best offer possible for the Seller Oil and Gas Assets, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and (ii) Buyer must provide adequate assurance of future performance under the to-be-assigned Leases and Executory Contracts.

(b)     In the event an appeal is taken or a stay pending appeal is requested from the Sale Order, Sellers shall promptly notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay. Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.

(c)     From and after the date of execution of this Agreement and prior to the Closing or the termination of this Agreement in accordance with **Section 11.1**, Sellers shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order or this Agreement.

7.5     Bankruptcy Filings.

(a)     Sellers shall file the form of the Sale Order for entry with the Bankruptcy Court prior to August 31, 2016.  Subject to **Section 7.4**, Sellers shall pursue diligently the entry of the Sale Order.  Buyer agrees that it shall promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer of the Assigned Contracts and Assigned Leases and Interests, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  In the event that the entry of the Sale Order is appealed or a stay pending appeal is sought, Sellers shall oppose the appeal or the stay pending appeal and seek the dismissal of any appeal (including a petition for certiorari, motion for rehearing, re-argument, reconsideration or revocation).  Notwithstanding the foregoing, any resulting changes to this Agreement or any other Transaction Document or resulting material changes to the Sale Order shall be subject to the approval of Buyer in its reasonable discretion. Sellers shall (i) provide Buyer with drafts of any and all other pleadings and proposed orders to be filed or submitted in connection with this Agreement and the transactions contemplated hereby, and such pleadings and proposed orders shall be in form and substance reasonably acceptable to Buyer and (ii) make reasonable efforts to consult and cooperate with Buyer regarding any discovery taken in connection with seeking entry of the Sale Order (including any depositions).

(b)     Sellers acknowledge and agree, and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising Liabilities and Encumbrances of, against or created by Sellers or their bankruptcy estates, shall be fully released from and with respect to the Seller Oil and Gas Assets, which shall be transferred to Buyer free and clear of all Liabilities and Encumbrances except for Assumed Liabilities and Permitted Encumbrances.

7.6     Commitment Letters.  Concurrently with the execution of this Agreement, Buyer has delivered to Sellers true and complete, fully-executed copies of documentation, including all exhibits, schedules, annexes and amendments to such documentation in effect as of such date of delivery (the "***Commitment Letters***"), pursuant to which and subject to the terms and conditions thereof each of the parties thereto (other than Buyer), has agreed and committed

49

to provide to Buyer the debt and/or equity financing set forth therein ("*Financing*"). As of the Closing Date, the Commitment Letters shall have not been amended, restated or otherwise modified or waived subsequent to the date of delivery to Sellers and the respective commitments contained in the Commitment Letters shall have not been withdrawn, modified or rescinded in any respect.  There shall be no conditions precedent to the funding of the full amount of the Financing, other than as expressly set forth in the Commitment Letters.  There shall be no other agreements, side letters or arrangements that would permit the parties to the Commitment Letters to reduce the amount of the Financing or that would otherwise affect the availability of the Financing.  The Commitment Letters provide Buyer with binding financial commitments that, when funded at Closing, will provide it with sufficient funds to pay the Purchase Price and to pay any other amounts required to be paid by it in connection with the consummation of the transactions contemplated by this Agreement.  On or before the Closing Date, Buyer shall take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and obtain the Financing (a) on the terms and conditions described in the Commitment Letters, or (b) pursuant to any other alternative financing arrangement in an amount not less than the amount covered by the Commitment Letters.  If the Financing described above becomes unavailable to Buyer for any reason, Buyer shall be required to seek alternative financing, which shall comply with the requirements of this Section 7.6.

## ARTICLE 8

### ADDITIONAL AGREEMENTS

8.1     Taxes.

(a)     Any transfer, documentary, sales, use, stamp, registration and other similar non-income Taxes, and all conveyance fees, recording charges and other similar fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement (collectively, the "*Transfer Taxes*") shall be borne by Buyer.  Sellers and Buyer shall use commercially reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Seller Oil and Gas Assets from any Transfer Taxes, including under Section 1146(a) of the Bankruptcy Code.  Buyer will, at its own expense, file all necessary Tax Returns and other documentation with respect to all Transfer Taxes, and, if required by Legal Requirements, the Parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation

(b)     Sellers shall retain responsibility for, and shall bear and pay, all Asset Taxes based upon operation or ownership of the Oil and Gas Assets or the production of Hydrocarbons or the receipt of proceeds therefrom assessed with respect to the Oil and Gas Assets due and payable for (i) any period ending prior to the Effective Time and (ii) the portion of any Straddle Period ending prior to the Effective Time, in each case, other than Asset Taxes for which a reduction to the Base Purchase Price was made under **Section 8.14** or **Section 8.15**.  Buyer shall bear and pay all Asset Taxes assessed with respect to the Oil and Gas Assets for (i) any taxable period beginning on or after the Effective Time and (ii) the portion of any Straddle Period beginning on or after the Effective Time, in each case, other than Asset Taxes for which an increase to the Base Purchase Price was made under **Section 8.14** or **Section 8.15**. For purposes of allocation between the Parties of Asset Taxes assessed with respect to the Oil and

Gas Assets that are payable with respect to any Tax periods beginning before and ending after the Effective Time ("***Straddle Periods***"), the portion of any such Taxes that are attributable to the portion of the Straddle Period that ends prior to the Effective Time shall (i) in the case of such Asset Taxes that are based upon or related to income or receipts or imposed on a transactional basis such as severance or production taxes, be allocated based on revenues from sales occurring before the Effective Time (which shall be Sellers' responsibility) and from and after the Effective Time (which shall be Buyer's responsibility); and (ii) in the case of other Asset Taxes, be allocated pro rata per day between the period prior to the Effective Time (which shall be Sellers' responsibility) and the period from and after the Effective Time (which shall be Buyer's responsibility). For purposes of clause (i) of the preceding sentence, any exemption, deduction, credit or other item that is calculated on an annual basis shall be allocated pro rata per day between the period ending prior to the Effective Time and the period from and after the Effective Time. At the Closing, Asset Taxes with respect to each Asset for the applicable Straddle Period shall be prorated in accordance with the foregoing provisions based on the Asset Tax assessment for such Oil and Gas Asset for such Straddle Period, if available, or if otherwise, based on the Asset Taxes paid with respect to such Asset during the preceding Tax period.  With respect to any not yet delinquent Taxes relating to a Tax year ending after the Closing Date, Buyer will assume responsibility for the actual payment of all such Taxes to the applicable Governmental Authority.  With respect to any Taxes relating to a Straddle Period or other pre-Closing Tax Period that are delinquent as of the Closing Date, the amount of which is known and not subject to dispute, Buyer shall pay the delinquent amount of such Taxes directly to the applicable Governmental Authority at the Closing.

(c)     Sellers, on the one hand, or Buyer, on the other hand, as the case may be (the "***Reimbursing Party***"), shall provide reimbursement for any Tax paid by the other (the "***Paying Party***") all or a portion of which is the responsibility of the Reimbursing Party in accordance with the terms of this **Section 8.1** or which represents an overpayment for Taxes by the Paying Party. Within a reasonable time prior to the payment of any such Tax, the Paying Party shall give notice to the Reimbursing Party of the Tax payable and the Paying Party's and Reimbursing Party's respective Liability therefor, although failure to do so will not relieve the Reimbursing Party from its Liability hereunder except to the extent the Reimbursing Party is prejudiced thereby.

(d)     Buyer and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Oil and Gas Assets (including access to books and records and Tax Returns and related working papers dated before Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer of any federal, state or local business Tax credits or incentives that Buyer may qualify for in any of the jurisdictions in which any of the Oil and Gas Assets are located; *provided*, *however*, that neither Buyer nor any Seller shall be required to disclose the contents of its income Tax Returns to any Person.  Any expenses incurred in furnishing such information or assistance pursuant to this **Section 8.1(d)** shall be borne by the Party requesting it.

8.2     Allocation of Purchase Price.

The Base Purchase Price shall be allocated among the Oil and Gas Assets as set forth in **Schedule 8.2** hereto, and the portion of the Purchase Price allocated to each Oil and Gas Asset is referred to herein as the "***Allocated Value***" of such Oil and Gas Asset. Sellers and Buyer agree to be bound by the Allocated Values set forth in **Schedule 8.2** for purposes of this Agreement. Sellers and Buyer further agree that for the purpose of making the requisite filings under Section 1060 of the Code, and the regulations thereunder, the purchase price as determined for federal income tax purposes shall be allocated among the Oil and Gas Assets in a manner consistent with the Allocated Values, as set forth on **Schedule 8.2** (the "***Tax Allocation***"). Sellers and Buyer each agree to report, and to cause their respective Affiliates to report, the federal, state and local income and other Tax consequences of the transactions contemplated herein, and in particular to report the information required by Section 1060(b) of the Code, and to jointly prepare Form 8594 (Asset Acquisition Statement under Section 1060 of the Code) as promptly as possible following the Closing Date and in a manner consistent with the Tax Allocation as revised to take into account subsequent adjustments to the purchase price as determined for applicable purposes, and shall not take any position inconsistent therewith in any Tax return, refund claim, litigation, investigation, or otherwise, unless required to do so by any Legal Requirement after notice to and discussions with the other Party, or with such other Party's prior consent; provided, however, that nothing contained herein shall prevent Buyer or Sellers from settling any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of the Tax Allocation, and neither Buyer nor Sellers shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Authority challenging the Tax Allocation.

8.3     Bulk Sales.

Buyer and Sellers hereby waive compliance with all "bulk sales," "bulk transfer" and similar Legal Requirements that may otherwise be applicable with respect to the sale and transfer of any or all of the Seller Oil and Gas Assets to Buyer.

8.4     Reserved.

8.5     Adequate Assurance and Performance; Security Arrangements.

(a)     Buyer shall provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer of the Assigned Contracts and the Assigned Leases and Interests.  Buyer and Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts and the Assigned Leases and Interests, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's and Sellers' employees and Representatives available to testify before the Bankruptcy Court.

(b)     Buyer shall pay, perform or satisfy the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with their respective terms.

(c)     Without limiting the provisions of **Section 8.5(a)** and **Section 8.5(b)**, Buyer acknowledges that the bonds, surety bonds, letters of credit, guarantees, and/or cash deposits, set forth on **Schedule 8.5(c)** (collectively the "*Security Arrangements*") have been provided by Sellers and/or its Affiliates to secure the payment and/or performance of certain obligations related to the Oil and Gas Assets. Buyer acknowledges that Sellers have no duty to maintain any Security Arrangements after the Closing. To the extent Sellers and/or any of their Affiliates have any obligations pursuant to any Security Arrangement or have pledged or otherwise provided any property that secures any such Security Arrangement (collectively, the "*Sellers' Obligations*"), Buyer shall take such actions, prior to Closing, as are necessary to cause the Sellers' Obligations and the Security Arrangements to be released and terminated, and any of Sellers' property pledged or otherwise provided to secure such Security Arrangements returned to the Sellers, concurrent with the Closing.

8.6     Employee Matters.

(a)     Sellers shall promptly update the list of Employees made available to Buyer pursuant to **Disclosure Schedule 5.16(a)** to reflect any and all employment hirings or terminations occurring prior to the Closing Date (it being understood that Sellers will inform Buyer in writing of the termination of employment or services of an Employee following the Execution Date).  In addition, Sellers shall provide Buyer no later than five (5) Business Days following the Closing Date a true, correct and complete list of any and all employment losses (within the meaning of the WARN Act) incurred during the ninety (90) day period prior to the Closing Date.

(b)     Sellers shall provide Buyer, upon execution of this Agreement, with access to the Employees at times and in a manner requested by Buyer and reasonably acceptable to Sellers, and with information reasonably requested by Buyer with respect to compensation and benefits of the Employees.  Buyer may, without any obligation, offer (or may cause one of its Affiliates to offer) employment to any of the Employees as it shall determine in its sole discretion and on such terms and conditions as it shall determine in its sole discretion (the "*Offered Employees*"). All such Employees, if any, who (i) are offered employment from Buyer or one of its Affiliates (the "*Buyer Employer*"), (ii) accept such offer of employment from the Buyer Employer and (iii) commence employment with the Buyer Employer shall be referred to herein as the "*Transferred Employees*."  Unless a written acceptance of an offer of employment is required by applicable Labor Laws, an Offered Employee who is actively at work with the Buyer Employer as of the Closing Date and continues employment shall be deemed to have accepted the offer of employment from the Buyer Employer, unless such Offered Employee specifically declines such offer of employment.

(c)     The employment of each Transferred Employee with the Buyer Employer shall commence immediately upon the Closing and shall be deemed, for all purposes, consistent with applicable Legal Requirements and except as otherwise expressly provided herein, to have occurred with no interruption or break in service and no termination of employment; *provided, however*, that any Inactive Employee who accepts an offer of employment from the Buyer Employer shall not be considered a Transferred Employee unless and until such Inactive Employee returns to active status pursuant to the following sentence, and notwithstanding anything herein to the contrary, Buyer and its Affiliates shall only be

responsible for Liabilities relating to the Inactive Employee from and after the date such Inactive Employee becomes a Transferred Employee.  The employment of any Inactive Employee with the Buyer Employer shall be effective upon his or her return to active work, provided that the Inactive Employee reports to work with the Buyer Employer within fifteen (15) days after the end of any such approved leave and, to the extent permitted by applicable Legal Requirements, in no event later than one hundred twenty (120) days following the Closing Date, and, as of such date, such Inactive Employee shall be a Transferred Employee.  The date that an Employee becomes a Transferred Employee shall be referred to herein as the "***Transfer Date***."  Each Transferred Employee shall be hired on an "at will" basis unless otherwise agreed by Buyer.

(d)  Sellers shall terminate, or shall cause to be terminated, the employment of all Transferred Employees effective as of the Closing or, with respect to any Inactive Employee who becomes a Transferred Employee after the Closing Date in accordance with **Section 8.6(c)**, upon their return to active work with the Buyer Employer.  Subject to, and effective as of, the Closing, Sellers hereby waive and release each of the Transferred Employees from any and all contractual, common law or other restrictions enforceable by Sellers and their respective Affiliates on the employment, activities or other conduct of such individuals after their termination of employment with the Sellers except with respect to obligations related to confidentiality and trade secrets.  Prior to the Closing Date, and to the extent necessary to implement this sentence, Sellers shall cause to be taken all actions as may be reasonably required to amend any Benefit Plan and take or cause to be taken all other action as may be reasonably required to provide that severance, separation or other similar payments (other than payments from a qualified Benefit Plan) shall not be payable to any Transferred Employee on account of such Employee's termination of employment with Sellers and its Affiliates and no Transferred Employee shall be entitled to receive any such payments under any Benefit Plan or otherwise.

(e)  Pursuant to the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 320, (i) Buyer and the applicable Sellers shall report on a predecessor/successor basis as set forth therein, (ii) the applicable Sellers will not be relieved from filing a Form W-2 with respect to any Transferred Employees for any tax period ending immediately prior to the Closing Date and the tax year including the Closing Date with respect to the portion of such year that such Transferred Employee was employed by such Sellers and their Affiliates, and (iii) Buyer will undertake to file (or cause to be filed) a Form W-2 for each such Transferred Employee with respect to the portion of the year during which such Transferred Employees are employed by Buyer that includes the Closing Date, excluding the portion of such year that such Transferred Employee was employed by the applicable Seller and its Affiliates.

(f)  With respect to any accrued but unused vacation, paid time-off or similar benefits ("***Accrued PTO***") to which any Transferred Employee is entitled pursuant to the vacation policy or other arrangement applicable to such Transferred Employee immediately prior to the Closing, Buyer Employer shall either (i) credit such Transferred Employee with such Accrued PTO under Buyer Employer's applicable paid time-off policy following the Closing Date in accordance with such policy (including any terms relating to rollover and forfeiture of Accrued PTO) or (ii) pay or cause Sellers to pay (with reimbursement from Buyer) any or all of the value of such Accrued PTO to such Transferred Employee in cash; *provided, however*, if clause (i) is not permitted under Legal Requirements or if Legal Requirements require Sellers to

54

cash out such Accrued PTO upon or in connection with Seller's termination of such Transferred Employee's employment, Buyer shall pay or cause Sellers to pay Accrued PTO (with reimbursement from Buyer) in accordance with clause (ii).

(g)    In compliance with the WARN Act, if applicable, Sellers shall provide notices to all Employees and any other individual or entity (including governmental or other entities) with respect to any employment losses with respect to the transactions contemplated hereby. Sellers shall have responsibility for any Liability under the WARN Act with respect to Employees who do not become Transferred Employees or, with respect to Transferred Employees, Liabilities that arise prior to or as of the Closing. For all periods of time prior to, on and after the Closing Date, Buyer shall have no responsibility for any Liability under the WARN Act with respect to Employees who do not become Transferred Employees.

(h)    Nothing herein, express or implied, shall confer upon any other Persons (including any current or former employee or contractor of the Sellers, Buyer or any of their respective Affiliates) any rights or remedies hereunder, including any right to employment or continued employment for any specified period or continued participation in any Benefit Plan or other benefit plan, or any nature or kind whatsoever under or by reason of this Agreement. Nothing herein restricts or precludes the right of Buyer to terminate the employment of any Transferred Employee.  Buyer and Sellers agree that the provisions contained herein are not intended to be for the benefit of or otherwise be enforceable by, any third party, including any current or former Employee or Service Provider.

(i)    Buyer and Sellers agree that the responsibility and obligation to make COBRA continuation coverage (within the meaning of section 4980B of the Code and the Treasury Regulations thereunder) available to all "M&A qualified beneficiaries" (within the meaning of Treasury Regulations §54.4980B-9, Q&A-4) with respect to the transactions contemplated hereby shall be allocated in accordance with Treasury Regulations §54.4980B-9, Q&A-8.

8.7    Post-Closing Books and Records and Personnel.

At Closing, Sellers will make available to Buyer all electronic copies of the Records that are maintained by or in the control of any Seller, and, promptly following Closing and in any event no later than ten (10) Business Days following Closing, Sellers shall make available to Buyer all originals of the Records; *provided, however*, that Sellers shall be entitled to retain any originals of the Records that are required to be retained as a result of the Bankruptcy Case, for such period of time sufficient to allow all matters under the Bankruptcy Case to be finally determined.  Subject to the foregoing, Sellers shall be entitled to retain a copy of the Records delivered to Buyer.  For one (1) year after the Closing Date (or such longer period as may be required by any Governmental Authority or ongoing claim), (a) Buyer shall not destroy or dispose of any material Records received hereunder and (b) Buyer shall allow Sellers (including, for clarity, any trust established under a chapter 11 plan of Sellers or any other successors of Sellers) and any of their Representatives reasonable access during normal business hours, at Sellers' sole expense and upon reasonable advance notice, to all Records included in the Oil and Gas Assets and in the possession or control of Buyer, for purposes relating to the Bankruptcy Case, the wind-down of the operations of Sellers, the functions of any such trusts or

successors, or other reasonable business purposes, and Sellers (including any such trust or successors) and such Representatives shall have the right to make copies of any Records.

8.8    No Other Representations or Warranties; Disclaimers.

(a)    **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN THIS AGREEMENT AND IN THE TRANSACTION DOCUMENTS, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER AND DISCLAIM ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO BUYER (INCLUDING ANY OPINION, INFORMATION, OR ADVICE THAT MAY HAVE BEEN PROVIDED TO BUYER BY ANY RESPECTIVE AFFILIATE OR REPRESENTATIVE OF ANY SELLER OR BY ANY INVESTMENT BANK OR INVESTMENT BANKING FIRM, ANY PETROLEUM ENGINEER OR ENGINEERING FIRM, SELLERS' COUNSEL, OR ANY OTHER AGENT, CONSULTANT, OR REPRESENTATIVE OF ANY SELLER). WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN THIS AGREEMENT AND IN THE TRANSACTION DOCUMENTS, SELLERS EXPRESSLY DISCLAIM AND NEGATE ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, RELATING TO (A) THE TITLE TO ANY OF THE OIL AND GAS ASSETS, (B) THE CONDITION OF THE OIL AND GAS ASSETS (INCLUDING ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS), IT BEING DISTINCTLY UNDERSTOOD THAT THE OIL AND GAS ASSETS ARE BEING SOLD "AS IS," "WHERE IS," AND "WITH ALL FAULTS AS TO ALL MATTERS," (C) ANY INFRINGEMENT BY SELLERS OF ANY PATENT OR PROPRIETARY RIGHT OF ANY THIRD PARTY, (D) ANY INFORMATION, DATA, OR OTHER MATERIALS (WHETHER WRITTEN OR ORAL) FURNISHED TO BUYER BY OR ON BEHALF OF SELLERS (INCLUDING, IN RESPECT OF ANY SEISMIC DATA, THE EXISTENCE OR EXTENT OF HYDROCARBONS OR THE MINERAL RESERVES, THE RECOVERABILITY OF SUCH RESERVES, ANY PRODUCT PRICING ASSUMPTIONS, AND THE ABILITY TO SELL HYDROCARBON PRODUCTION AFTER THE CLOSING), AND (E) THE PRESENCE OR ABSENCE OF ANY ENVIRONMENTAL DEFECT AT OR AFFECTING ANY OF THE OIL AND GAS ASSETS AND ANY POTENTIAL LIABILITY ARISING FROM OR RELATED TO THE OIL AND GAS ASSETS.**

(b)    Buyer acknowledges and affirms that it has made, or will have made as of Closing, its own independent investigation, analysis, and evaluation of the transactions contemplated hereby and the Oil and Gas Assets (including Buyer's own estimate and appraisal of the extent and value of Sellers' Hydrocarbon reserves attributable to the Oil and Gas Assets and an independent assessment and appraisal of the environmental risks associated with the acquisition of the Oil and Gas Assets).  Buyer acknowledges that in entering into this Agreement, it has relied only on the aforementioned investigation and the express representations and warranties of Sellers contained in this Agreement and the Transaction Documents.  Buyer hereby

56

irrevocably covenants to refrain from, directly or indirectly, asserting any claim, or commencing, instituting, or causing to be commenced, any Proceeding of any kind against Sellers or their Affiliates or Subsidiaries, alleging facts contrary to the foregoing acknowledgment and affirmation.

        8.9    <u>Casualty</u>.

        (a)    If, after the Execution Date and prior to the Closing, any part of the Seller Oil and Gas Assets suffers a Casualty or if any part of the Seller Oil and Gas Assets is taken in condemnation or under the right of eminent domain or if proceedings for such purposes are pending or threatened, Sellers shall promptly give Buyer written notice of such occurrence, including reasonable particulars with respect thereto, and this Agreement shall remain in full force and effect notwithstanding any such destruction, taking, proceeding, or threat.

        (b)    With regard to a Casualty or condemnation occurring after the Execution Date and prior to the Closing, Buyer may elect to exclude the affected Seller Oil and Gas Assets from this Agreement, without a reduction to the Purchase Price, and the affected Seller Oil and Gas Assets shall be treated as Excluded Assets for all purposes under this Agreement.

        (c)    Unless the Seller Oil and Gas Assets affected by a Casualty are excluded pursuant to **Section 8.9(b)**, (i) at the Closing, the Seller Oil and Gas Assets affected by a Casualty or condemnation shall be included in the Closing, and (ii) Buyer's recourse with respect to a condemnation or Casualty shall be limited to the proceeds of Sellers' applicable insurance coverage actually recovered by Sellers in respect thereof or other sums paid to Sellers by third parties (or an assignment of claims related thereto), including any condemnation awards, which proceeds or other sums shall be payable to Buyer only upon or after the Closing of the transactions contemplated hereby.  Sellers shall have no other liability or responsibility to Buyer with respect to a condemnation or Casualty **EVEN IF SUCH CASUALTY SHALL HAVE RESULTED FROM OR SHALL HAVE ARISEN OUT OF THE SOLE OR CONCURRENT NEGLIGENCE, FAULT, OR VIOLATION OF A LEGAL REQUIREMENT (BUT NOT THE WILLFUL MISCONDUCT OF SELLERS OR ANY SELLER PARTIES)** and there shall be no adjustment to Purchase Price.

        (d)    With respect to any such Casualty or condemnation, unless the affected Seller Oil and Gas Assets are excluded pursuant to **Section 8.9(b)**, (i) no insurance or condemnation proceeds shall be committed or applied by any Seller to repair, restore or replace a lost, damaged, destroyed or taken portion of the Seller Oil and Gas Assets if the cost to repair, restore or replace a lost, damaged, destroyed or taken portion of the Seller Oil and Gas Assets is projected to exceed $100,000, (ii)  to the extent such proceeds are not committed or applied by any such Seller prior to the Closing Date in accordance with this **Section 8.9(d)**, Sellers shall at the Closing pay to Buyer all sums paid to Sellers by reason of such Casualty or condemnation, less any reasonable costs and expenses incurred by Sellers in collecting such proceeds, (iii) in addition and to the extent such proceeds have not been committed or applied by Sellers in accordance with this **Section 8.9(d)**, in such repair, restoration, or replacement, Sellers shall transfer to Buyer, at the Closing, without recourse against Sellers, all of the right, title, and interest of Sellers in and to any unpaid insurance or condemnation proceeds arising out of such

loss, damage, destruction or taking, less any reasonable costs and expenses incurred by Sellers in collecting such proceeds, and (iv) any such funds that have been committed by Sellers for repair, restoration or replacement as aforesaid shall be paid by Sellers for such purposes or, at Sellers' option, delivered to Buyer.

       8.10    <u>Successor Operator</u>.

       Sellers shall use their commercially reasonable efforts to support Buyer's efforts to be appointed or to have a designee appointed under the applicable joint operating agreements and Permits as the operator of those Oil and Gas Assets that any Seller currently operates. Notwithstanding the foregoing, Sellers make no representations or warranties to Buyer as to the transferability of operatorship of any Oil and Gas Assets which any Seller currently operates. Rights and obligations associated with operatorship of the Oil and Gas Assets are governed by operating agreements or similar agreements and will be determined in accordance with the terms of such agreements.

       8.11    <u>Preferential Purchase Rights</u>.

       (a)    Within two (2) Business Days after the Sale Order is entered, Sellers shall deliver to each holder of a Preferential Purchase Right a notice that is in material compliance with the contractual provisions applicable thereto, offering to sell to each such holder the applicable Oil and Gas Assets subject to such Preferential Purchase Right in exchange for an amount not less than the Allocated Value of such Oil and Gas Asset, or, alternatively, seeking such holder's consent to the assignment of the applicable Oil and Gas Assets to Buyer; it being understood and agreed by the Parties that Sellers shall not be obligated to make any payments or undertake obligations in connection with the obtaining of such consents. If, following the Sale Order, Buyer discovers a Preferential Purchase Right that is not set forth on **Disclosure Schedule 5.11**, Buyer may, at its option, provide a written notice to Sellers of such Preferential Purchase Right, and Sellers shall deliver a written notice as described in the immediately preceding sentence to the holder of such Preferential Purchase Right.

       (b)    If, as of the Closing, a holder of a Preferential Purchase Right has elected to exercise its Preferential Purchase Right with respect to the Seller Oil and Gas Assets to which its Preferential Purchase Right applies, then (i) each of the Seller Oil and Gas Assets affected by such Preferential Purchase Right shall be held back from the Seller Oil and Gas Assets conveyed at Closing, without reduction to the Purchase Price, (ii) such Seller Oil and Gas Assets shall thereafter be Excluded Assets (except as otherwise provided in the following sentence), and (iii) at Closing or the consummation of the purchase and sale of such Seller Oil and Gas Assets with the holder of such Preferential Purchase Right, whichever is later, if Sellers receive any proceeds generated from the exercise of such Preferential Purchase Right, Sellers shall pay (or shall cause such holder to pay) to Buyer all such proceeds.  If for any reason after Closing, the purchase and sale of such Seller Oil and Gas Assets is not or cannot be consummated with the holder of such Preferential Purchase Right and Sellers are permitted after Closing (including, without limitation, pursuant to the Sale Order) to transfer such Seller Oil and Gas Assets to Buyer pursuant to the terms of such Preferential Purchase Right, then the Seller Oil and Gas Assets affected by such Preferential Purchase Right will be conveyed to Buyer at a subsequent Closing to be held within ten (10) Business Days thereafter, at which subsequent

closing Sellers shall assign, transfer and convey to Buyer, and Buyer shall acquire and accept from Sellers, such Seller Oil and Gas Assets pursuant to the terms of this Agreement. Notwithstanding the foregoing, nothing in this **Section 8.11(b)** shall prevent any Seller from ceasing operations or winding up its affairs following the Closing.

(c)     All Seller Oil and Gas Assets for which any applicable Preferential Purchase Right (i) has been waived, (ii) as to which the period to exercise the applicable Preferential Purchase Right has expired without the exercise thereof, or (iii) has not been exercised or waived and the time for exercising such Preferential Purchase Right has not expired, in each case, prior to Closing shall be transferred to Buyer at Closing pursuant to the provisions of this Agreement.  With respect to any Preferential Purchase Right described in **Section 8.11(c)(iii)** above, in the event the holder thereof exercises such Preferential Purchase Right after Closing to consummate the purchase of the Seller Oil and Gas Asset(s) to which such Preferential Purchase Right applies, Buyer shall comply with the terms of such Preferential Purchase Right and shall be entitled to, and such holder shall pay to Buyer, all of the proceeds generated from the exercise of such Preferential Purchase Right.

(d)     The provisions of this **Section 8.11** shall only apply with respect to those Seller Oil and Gas Assets that are subject to Preferential Purchase Rights and that cannot be acquired by Buyer free and clear of such Preferential Purchase Rights pursuant to the Sale Order or the Bankruptcy Code.

8.12     Avoidance Action.

During the Bankruptcy Case, Sellers shall not commence, assign, convey or abandon any Avoidance Actions against any of Sellers' ordinary course vendors, contract counterparties, contractors and other suppliers of services related to the Business without the consent of Buyer.

8.13     Purchase Price Adjustment at Closing; Closing Statement.

(a)     The Base Purchase Price shall be increased by the following (without duplication): (i) an amount equal to the value of all Hydrocarbons attributable to the Oil and Gas Assets in pipelines or in tanks upstream of the transfer point where such Hydrocarbons are sold, in each case, as of the Effective Time, such value to be based upon the applicable sales contract price in effect as of the Effective Time (or if no such contract is in effect, the market value of such Hydrocarbons in the applicable area as of the Effective Time), less (1) amounts payable as royalties, overriding royalties and other burdens upon, measured by or payable with respect to such Hydrocarbons and (2) Taxes deducted by the purchaser of such Hydrocarbons; (ii) an amount equal to the aggregate amount of all Operating Expenses which are properly paid by or on behalf of Sellers, and are attributable to the period after the Effective Time; (iii) the amount of all Asset Taxes prorated to Buyer in accordance with **Section 8.1(b)** which are paid by or on behalf of Sellers; (iv) to the extent not reimbursed prior to the Closing, the aggregate amount of costs and expenses paid by a Seller on behalf of any third party with respect to an Oil and Gas Asset and billed by such Seller as operator of such Oil and Gas Asset on and after the Effective Time (for the avoidance of doubt, Buyer shall be responsible for the collection of such amount

from and after the Closing) and (iv) any other increase to the Purchase Price expressly provided elsewhere in this Agreement or agreed upon by Buyer and Sellers.

(b)    The Base Purchase Price shall be decreased by the following (without duplication): (i) the amount of any proceeds actually received by Sellers and not paid to Buyer from the sale of Hydrocarbons, produced from and after the Effective Time, from the Oil and Gas Assets (net of royalties, overriding royalties and other burdens upon, measured by or payable with respect to such Hydrocarbons; and Taxes deducted by the purchaser of such Hydrocarbons); (ii) any other net proceeds from or attributable to the Oil and Gas Assets from and after the Effective Time received by Sellers and not paid to Buyer; (iii) an amount equal to the aggregate amount of all Operating Expenses which are (A) not attributable to any Assumed Liabilities, (B) properly paid by or on behalf of Buyer, (C) not subject to reimbursement to Buyer pursuant to a joint interest billing and (D) attributable to the period prior the Effective Time; (iv) the amount of all Asset Taxes prorated to Sellers in accordance with **Section 8.1(b)** that have not been paid prior to Closing; (v) the amount of the Suspense Funds, and (vi) any other decrease to the Purchase Price expressly provided elsewhere in this Agreement or agreed upon by Buyer and Sellers.

(c)    The Base Purchase Price will be adjusted upward or downward, as applicable, in accordance with **Section 1.2** of **Annex 1**.

8.14    Initial Adjustment at Closing.

At least five (5) days before the Closing Date, Sellers shall provide to Buyer a statement showing its computations, calculated in good faith, of the amount of the adjustments provided for in **Section 8.13** above. Buyer and Sellers shall attempt to agree upon such adjustments prior to Closing, provided that if agreement is not reached, Sellers' computation shall be used at Closing, subject to further adjustment under **Section 8.15** below. If the amount of adjustments so determined which would result in a credit to Buyer exceed the amount of adjustments so determined which would result in a credit to Sellers, Buyer shall receive a Base Purchase Price reduction at Closing for the amount of such excess, and if the converse is true, then the amount to be paid by Buyer to Sellers at Closing shall be increased by the amount of such excess.

8.15    Adjustment Post-Closing.

On or before (i) if no Disputed Title Matters exist, thirty (30) days after Closing or (ii) if Disputed Title Matters exist, twenty (20) days after submission of such Disputed Title Matters to a Title Arbitrator, Buyer and Sellers, shall review any information that is then available pertaining to the adjustments provided for in **Section 8.13**, determine if any other Purchase Price adjustments should be made in addition to those made at Closing, and make any such adjustments by appropriate payments from Sellers to Buyer or from Buyer to Sellers, as applicable.  If the Parties fail to agree on adjustments within such period, either Party may, within five (5) Business Days after the end of such period, submit such disputed items to dispute resolution pursuant to this **Section 8.15** by delivering written notice thereof to the other Party (a "***Dispute Notice***"), and promptly thereafter submitting the disputed items to PricewaterhouseCoopers or another nationally-recognized, United States-based independent

public accounting firm on which the Parties mutually agree in writing (the "***Accounting Referee***"); *provided, however*, that the Accounting Referee shall not have performed any material work for any Party or their respective Affiliates within three (3) years of the date hereof. If PricewaterhouseCoopers is unable or unwilling to serve as the Accounting Referee and the Parties are unable to agree upon the designation of a Person or entity as substitute Accounting Referee, then Sellers or Buyer, or any of them, may in writing request the Bankruptcy Court to appoint a substitute Accounting Referee; *provided that* such Person or entity so appointed shall be a national or regional accounting firm with no prior material relationships with Sellers or Buyer or their respective Affiliates and shall have experience in auditing companies engaged in oil and gas exploration and development activities. Any unresolved final Purchase Price adjustments that are not the subject of a timely delivered Dispute Notice shall be deemed waived by the Parties, which waiver shall be final and binding on the Parties and the subject matter thereof shall not be subject to further review or audit.  Not later than five (5) Business Days after appointment of the Accounting Referee, each Party shall provide the Accounting Referee, with a simultaneous copy to the other Party, a single written statement of its position on the adjustment dispute in question, together with any supporting material that such Party desires to furnish.  The Parties shall direct the Accounting Referee to resolve the dispute within twenty (20) days after submission of the matters in dispute. The Accounting Referee shall act as an expert for the limited purpose of determining the specific disputed matters submitted by either Party and may not award damages, penalties, or attorneys' fees to either Party with respect to any matter. Sellers and Buyer shall share equally the Accounting Referee's costs, fees and expenses. The final settlement statement, whether as agreed between the Parties or as determined by a decision of the Accounting Referee (the "***Final Settlement Statement***"), shall be binding on, and non-appealable by, the Parties and not subject to further review or audit. Payment by Buyer or Sellers, as applicable, for any outstanding amounts on the Final Settlement Statement shall be made within five (5) Business Days after the date on which all disputes in respect of the Final Settlement Statement are finally resolved (whether by agreement of the Parties or pursuant to the Accounting Referee's decision). During the period between Closing and the point in time when such post-closing adjustment has been agreed, resolved or waived pursuant to this **Section 8.15**, each Party shall, on a monthly basis, pay over to the other Party any revenue received by it (net of related expenses) with respect to the Oil and Gas Assets which is owed to the other Party as set forth in **Section 8.13** above and such payments shall be considered in making such post-closing adjustment. Should any additional adjustments be required after such adjustments thereunder are concluded, such adjustments shall be made by appropriate payments from Buyer to Sellers or from Sellers to Buyer, *provided, however,* in no event shall any adjustments (x) be made beyond sixty (60) days after the Closing Date or (y) prevent any Seller from ceasing operations or winding up its affairs following the Closing.

## ARTICLE 9

### CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

9.1     Accuracy of Representations.

The representations and warranties of Sellers set forth in this Agreement shall be true and correct in all respects on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing (*provided that* representations and warranties which are confined to a specified date need only be true and correct as of such date); *provided, however*, that in the event of one or more breaches of or inaccuracies in the representations and warranties of Sellers set forth in this Agreement, the condition set forth in this **Section 9.1** shall be deemed satisfied unless the effect of all such breaches of or inaccuracies in such representations and warranties taken together results in a Material Adverse Effect.  Buyer shall have received a certificate of Sellers to such effect signed by duly authorized officers of Sellers.

9.2     Sellers' Performance.

The covenants and agreements that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects (except that those covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions shall have been duly performed and complied with in all respects).  Buyer shall have received a certificate of Sellers to such effect signed by duly authorized officers of Sellers.

9.3     No Order.

No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or could cause any of such transactions to be rescinded following the Closing.

9.4     Sellers' Deliveries.

Sellers shall have delivered or caused to be delivered, or shall be ready, willing and able to deliver, each of the deliveries required pursuant to **Section 4.4**.

9.5     Sale Order.

The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be in full force and effect and shall not be subject to a stay pending appeal.

## ARTICLE 10

**CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE**

Sellers' obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

10.1    Accuracy of Representations.

The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects (except that those representations and warranties which are qualified as to materiality or similar expressions shall be true and correct in all respects) as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (*provided that* representations and warranties which are confined to a specified date need only be true and correct as of such date).  Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer of Buyer.

10.2    Buyer's Performance.

The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects (except that those covenants and agreements that are qualified as to materiality or similar expressions shall have been duly performed and complied with in all respects).  Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer of Buyer.

10.3    No Order.

No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and which has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or could cause any of such transactions to be rescinded following the Closing.

10.4    Buyer's Deliveries.

Buyer shall have delivered or caused to be delivered, or shall be ready, willing and able to deliver, each of the deliveries required pursuant to **Section 4.3**.

10.5    Sale Order .

The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be in full force and effect and shall not be subject to a stay pending appeal.

## ARTICLE 11

### TERMINATION

11.1    Termination Events.

Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing:

(a)    by either Sellers or Buyer, if a Governmental Authority issues a final, non-appealable ruling or Order prohibiting the transactions contemplated hereby where such ruling or Order was not requested, encouraged or supported by any of Sellers or Buyer;

(b)     by mutual written consent of Sellers and Buyer;

(c)     by either Sellers or Buyer, if the Closing shall not have occurred by 5:00 p.m. Central Prevailing Time on October 31, 2016 (the "*Outside Date*"); *provided*, *however*, (i) Buyer shall be permitted to terminate this Agreement pursuant to this **Section 11.1(c)** only if Buyer is not itself in material breach of any of its representations, warranties, covenants and agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions), and (ii) Sellers shall be permitted to terminate this Agreement pursuant to this **Section 11.1(c)** only if none of the Sellers are themselves in material breach of any of their representations, warranties, covenants or agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions);

(d)     by either Party, if the Bankruptcy Court enters an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by Sellers under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Case;

(e)     by Buyer in the event of any breach by Sellers of any of Sellers' agreements, covenants, representations or warranties contained herein and where such breach (i) results or will result in the failure of a condition set forth in **Section 9.1** or **Section 9.2** to be satisfied and (ii) has not been cured by the earlier of (A) fifteen (15) Business Days after the giving of written notice thereof by Buyer to Sellers (which notice shall specify the nature of such breach and be given as promptly as practicable) or (B) the Outside Date; *provided*, *however*, that Buyer shall not be permitted to terminate this Agreement pursuant to this **Section 11.1(e)** if Buyer is itself in material breach of any of its representations, warranties, covenants or agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions); or

(f)     by Sellers in the event of any breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein and such breach (i) would result in the failure of a condition set forth in **Section 10.1** or **Section 10.2** to be satisfied and (ii) has not been cured by the earlier of (A) fifteen (15) Business Days after the giving of written notice thereof by Sellers to Buyer (which notice shall specify the nature of such breach and be given as promptly as practicable) and (B) the Outside Date; *provided*, *however*, that Sellers shall not be permitted to terminate this Agreement pursuant to this **Section 11.1(f)** if any Seller is itself in material breach of any of Sellers' representations, warranties, covenants or agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions).

11.2     Effect of Termination.

Subject to **Section 3.2**, in the event of termination of this Agreement by Buyer or Sellers pursuant to this **Article 11**, all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party.  The provisions of this

**Section 11.2**, along with **Section 7.1** (and, to the extent applicable to the interpretation or enforcement of such provisions, **Article 1** and **Article 13**), shall expressly survive the termination of this Agreement.

## ARTICLE 12

### TITLE AND ENVIRONMENTAL MATTERS

12.1   NORM.

BUYER ACKNOWLEDGES THAT THE OIL AND GAS ASSETS HAVE BEEN USED FOR EXPLORATION, DEVELOPMENT AND PRODUCTION OF HYDROCARBONS AND WATER AND THAT THERE MAY BE PETROLEUM, PRODUCED WATER, WASTES OR OTHER MATERIALS LOCATED ON, UNDER OR ASSOCIATED WITH THE OIL AND GAS ASSETS. EQUIPMENT AND SITES INCLUDED IN THE OIL AND GAS ASSETS MAY CONTAIN NORM. NORM MAY AFFIX OR ATTACH ITSELF TO THE INSIDE OF WELLS, MATERIALS AND EQUIPMENT AS SCALE, OR IN OTHER FORMS; THE WELLS, MATERIALS AND EQUIPMENT LOCATED ON OR INCLUDED IN THE OIL AND GAS ASSETS MAY CONTAIN NORM AND OTHER WASTES OR HAZARDOUS SUBSTANCES/MATERIALS; AND NORM CONTAINING MATERIAL AND OTHER WASTES OR HAZARDOUS SUBSTANCES/MATERIALS MAY HAVE BEEN BURIED, COME IN CONTACT WITH THE SOIL OR OTHERWISE BEEN DISPOSED OF ON OR AROUND THE OIL AND GAS ASSETS. SPECIAL PROCEDURES MAY BE REQUIRED FOR THE REMEDIATION, REMOVAL, TRANSPORTATION OR DISPOSAL OF WASTES, ASBESTOS, HAZARDOUS SUBSTANCES/MATERIALS, INCLUDING HYDROGEN SULFIDE GAS AND NORM FROM THE OIL AND GAS ASSETS. FROM AND AFTER THE CLOSING, BUYER SHALL ASSUME RESPONSIBILITY FOR THE CONTROL, STORAGE, HANDLING, TRANSPORTING AND DISPOSING OF OR DISCHARGE OF ALL MATERIALS, SUBSTANCES AND WASTES FROM THE OIL AND GAS ASSETS (INCLUDING PRODUCED WATER, HYDROGEN SULFIDE GAS, DRILLING FLUIDS, NORM AND OTHER WASTES) IN A SAFE AND PRUDENT MANNER AND IN ACCORDANCE IN ALL MATERIAL RESPECTS WITH ALL APPLICABLE ENVIRONMENTAL LAWS.

12.2   Sole Remedies for Title Matters.

THE PARTIES SHALL COMPLY IN ALL RESPECTS WITH THE PROVISIONS OF ANNEX 1 OF THIS AGREEMENT AND HEREBY AGREE THAT BUYER'S RIGHTS AND REMEDIES UNDER ANNEX 1 REPRESENT BUYER'S SOLE AND EXCLUSIVE RIGHTS AND REMEDIES WITH RESPECT TO, AND BUYER HEREBY WAIVES AND DISCLAIMS ANY AND ALL RIGHTS AND REMEDIES AGAINST SELLERS WITH RESPECT TO, ANY TITLE DEFECT OR ANY OTHER DEFECT IN TITLE OR OTHER TITLE MATTER, INCLUDING ANY ENCUMBRANCE, WITH RESPECT TO ANY OIL AND GAS ASSETS, AND BUYER MAY NOT CLAIM ANY FACT, CIRCUMSTANCE OR MATTER THAT WOULD CONSTITUTE A TITLE DEFECT AS THE BASIS FOR ANY OTHER REDRESS UNDER THIS AGREEMENT OR OTHERWISE.

12.3   Sole Remedies for Environmental Matters.

EXCEPT FOR BUYER'S RIGHTS UNDER SECTION 11.1(E) IN THE EVENT OF ANY BREACH OR INACCURACY OF AN EXPRESS REPRESENTATION OR WARRANTY OF SELLERS' CONTAINED IN THIS AGREEMENT, BUYER WAIVES ANY AND ALL RIGHTS AND REMEDIES

AGAINST SELLERS WITH RESPECT TO ANY ENVIRONMENTAL DEFECT OR OTHER CONDITION OR CIRCUMSTANCE OF OR WITH RESPECT TO THE OIL AND GAS ASSETS AND RELATING TO ENVIRONMENTAL LAWS, THE RELEASE OF HAZARDOUS SUBSTANCES INTO THE ENVIRONMENT OR PROTECTION OF THE ENVIRONMENT OR PUBLIC HEALTH AND BUYER MAY NOT CLAIM ANY FACT, CIRCUMSTANCE OR MATTER THAT WOULD CONSTITUTE AN ENVIRONMENTAL DEFECT AS THE BASIS FOR ANY OTHER REDRESS UNDER THIS AGREEMENT OR OTHERWISE.

## ARTICLE 13

### GENERAL PROVISIONS

13.1    Survival.

All covenants and agreements contained in this Agreement or any other Transaction Document which by their terms are to be performed in whole or in part, or which prohibit actions, at or subsequent to the Closing shall survive the Closing hereunder until the expiration of the applicable statute of limitations or for such shorter period explicitly specified therein, and each Party hereto shall be liable to the other after the Closing for any breach thereof. Subject to the following sentence, all other covenants and agreements contained in this Agreement, and all representations and warranties contained in this Agreement or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate, including any Actions for damages in respect of any breach thereof. Notwithstanding anything to the contrary the indemnity obligations set forth in **Section 5.26**, **Section 6.6**, and **Section 7.1(e)** and the representation and warranties set forth in **Section 5.26** and **Section 6.6**, in each case, shall survive the Closing indefinitely. Notwithstanding the foregoing, nothing in this **Section 13.1** shall prohibit any Seller from ceasing operations or winding up its affairs following the Closing.

13.2    Confidentiality.

The Parties agree that the confidentiality agreement entered into by them and their Affiliates, dated August 18, 2016 (the "*Confidentiality Agreement*"), shall continue in full force and effect notwithstanding the execution and delivery by the Parties of this Agreement; *provided*, *however*, that (a) disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto shall not constitute a breach of such Confidentiality Agreement, and (b) disclosures permitted under this Agreement shall not constitute a breach of such Confidentiality Agreement. If the Closing should occur, the confidentiality restrictions on Buyer contained in this Agreement as well as those contained in the Confidentiality Agreement shall terminate, except to the extent covering any Excluded Assets.

13.3    Public Announcements.

Unless otherwise required by applicable Legal Requirement or by obligations of Buyer or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange (and excluding disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto shall not constitute a

breach of such Confidentiality Agreement), Buyer, on the one hand, and Sellers, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld or delayed).

13.4    Notices.

All notices, consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by email (with read receipt requested, with the receiving Party being obligated to respond affirmatively to any read receipt requests delivered by the other Party), (c) received by the addressee, if sent by a delivery service (prepaid, receipt requested) or (d) received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses and representatives (if applicable) set forth below (or to such other addresses and representatives as a Party may designate by notice to the other Parties):

(i)   If to Sellers, then to:

> LINC USA GP
> 1829 East Winfree
> Baytown, TX 77523
> Attention: Michael Mapp

with a copy (which shall not constitute notice) to:

> Bracewell LLP
> 711 Louisiana St
> Houston, TX 77002
> Attention: Jason Cohen

(ii)   If to Buyer:

> BIG MUDDY OPPORTUNITIES, LLC
> 425 Madison Ave, 19th Floor
> New York, NY 10017

with a copy (which shall not constitute notice) to:

> Stein Law,
> 5909 Peachtree Dunwoody Rd
> Suite 800
> Atlanta GA 30342

with a copy (which shall not constitute notice) to:

Reiss Eisenpress LLP
C/O Stephen Friedman
425 Madison Avenue, 11th Fl.
New York, New York 10017-1110

13.5    Waiver, Waiver of Damages.

Neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege shall preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by applicable law, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand. **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NO PARTY SHALL BE LIABLE TO THE OTHER FOR SPECIAL, INDIRECT, EXEMPLARY OR PUNITIVE DAMAGES ARISING OUT OF, ASSOCIATED WITH, OR RELATING TO THIS AGREEMENT (INCLUDING LOSS OF PROFIT OR BUSINESS INTERRUPTIONS, HOWEVER SAME MAY BE CAUSED) AND THE PARTIES HEREBY WAIVE ALL CLAIMS FOR ANY SUCH DAMAGES.**

13.6    Entire Agreement; Amendment.

This Agreement (including the Schedules and the Exhibits) and the other Transaction Documents supersede all prior agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to their subject matter.  This Agreement may not be amended except by a written agreement executed by all of the Parties.

13.7    Assignment.

This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party); *provided*, *however*, that Buyer shall be permitted, upon prior notice to Sellers, to assign all or part of its rights and/or obligations hereunder to one or more of its Affiliates, and each such assignee shall be deemed to be a Buyer for all purposes under the Transaction Documents to the extent of the rights and obligations so assigned to such assignee. No assignment of any obligations hereunder shall relieve the Parties hereto (including the assigning Party) of any such obligations.  Upon any such permitted assignment, the references in this Agreement to the Sellers or Buyer shall also apply to any such assignee unless the context otherwise requires.

13.8    Severability.

The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

13.9    Expenses.

Whether or not the transactions contemplated by this Agreement are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby.

13.10   Time of Essence.

Time shall be of the essence with respect to all time periods and notice periods set forth in this Agreement.

13.11   Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    EXCEPT TO THE EXTENT THE MANDATORY PROVISIONS OF THE BANKRUPTCY CODE APPLY, THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY IN SUCH STATE WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OR CHOICE OF LAWS OR ANY OTHER LAW THAT WOULD MAKE THE LAWS OF ANY OTHER JURISDICTION OTHER THAN THE STATE OF TEXAS APPLICABLE HERETO.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court or the rights and remedies with respect to Disputed Title Matters in **Section 1.2(i)** of **Annex 1**, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding; *provided*, *however*, that, if the Bankruptcy Case is closed, all Actions and Proceedings arising out of or relating to this Agreement shall be heard and determined in a Texas state court or a federal court sitting in Houston, Texas, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action or Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding.  The Parties consent to service of process by mail (in accordance with **Section 13.4**) or any other manner permitted by law.

(c)   EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LEGAL REQUIREMENTS, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR ANY OTHER AGREEMENT CONTEMPLATED HERETO AND THERETO OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

13.12   Counterparts.

This Agreement and any amendment hereto may be executed in one or more counterparts, and by the different Parties in separate counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by facsimile or other electronic means (including portable document format send via email) shall be as effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

13.13   Parties in Interest; No Third Party Beneficiaries.

This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.  This Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

13.14   Non-Recourse.

Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against the Parties hereto, and then only with respect to the specific obligations set forth herein or therein.  Other than the Parties hereto, no other party shall have any liability or obligation for any of the representations, warranties, covenants, agreements, obligations or Liabilities of any party under this Agreement, the other Transaction Documents, or any other agreement contemplated hereto and thereto or of or for any Proceeding based on, in respect of, or by reason of, the transactions contemplated hereby or thereby (including the breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Legal Requirements or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a Party hereto or another Person or otherwise.

13.15   Disclosure Schedules; Materiality.

The inclusion of any matter in any Disclosure Schedule shall be deemed to be an inclusion in all other Disclosure Schedules to the extent that such disclosure is sufficient to

70

identify the matter to which such disclosure is responsive and reasonably apparent on its face, but inclusion therein shall not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement.  The disclosure of any particular fact or item in any Disclosure Schedule shall not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

13.16  **WAIVER OF TEXAS DECEPTIVE TRADE PRACTICES – CONSUMER PROTECTION ACT.**

**BUYER EXPRESSLY ACKNOWLEDGES AND RECOGNIZES THAT THE PRICE FOR WHICH SELLERS HAVE AGREED TO SELL THE SELLER OIL AND GAS ASSETS AND PERFORM THEIR RESPECTIVE OBLIGATIONS UNDER THE TERMS OF THIS AGREEMENT HAS BEEN PREDICATED UPON THE INAPPLICABILITY OF THE TEXAS DECEPTIVE TRADE PRACTICES - CONSUMER PROTECTION ACT, TEX. BUS. & COM. CODE § 17.41 *ET SEQ.* (THE "*DTPA*"), OR ANY SIMILAR STATUTE, AND THE WAIVER OF THE DTPA, AND ANY SIMILAR STATUTE, BY BUYER, SET FORTH IN THIS <u>SECTION 13.16</u>.  BUYER'S RIGHTS AND REMEDIES WITH RESPECT TO THIS TRANSACTION AND WITH RESPECT TO ALL ACTS OR PRACTICES OF SELLERS, PAST, PRESENT, OR FUTURE, IN CONNECTION WITH THIS TRANSACTION SHALL BE GOVERNED BY LEGAL PRINCIPLES OTHER THAN THE DTPA, OR ANY SIMILAR STATUTE OF ANY JURISDICTION THAT MAY BE APPLICABLE TO THE TRANSACTIONS CONTEMPLATED HEREBY.  BUYER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES THE APPLICABILITY OF THE DTPA, OR ANY SIMILAR STATUTE, TO THIS TRANSACTION AND ANY AND ALL RIGHTS, DUTIES, OR REMEDIES THAT MIGHT BE IMPOSED BY THE DTPA, OR ANY SIMILAR STATUTE.**

13.17  <u>Injunctive Relief</u>.

(a)  Subject to **<u>Section 3.2(b)</u>**, the Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement or the other Transaction Documents (as applicable) were not performed in accordance with their specific terms or were otherwise breached, and that damages pursuant to Legal Requirements may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement or the other Transaction Documents (as applicable), and, accordingly, any Party shall be entitled to injunctive relief to prevent any such breach, and to specifically enforce the terms and provisions of this Agreement or the other Transaction Documents (as applicable), including without limitation specific performance of such covenants, promises or agreements or an order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement or the other Transaction Documents (as applicable).  The rights set forth in this **<u>Section 13.17</u>** shall be in addition to any other rights which a Party may have pursuant to Legal Requirements or in equity with respect to this Agreement or the other Transaction Documents (as applicable).

(b)  Subject to **Section 13.17(c)**, the Parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement or the other Transaction Documents (as applicable) by Buyer or Sellers, as applicable, and to specifically enforce the terms and provisions of this Agreement or the other Transaction Documents (as applicable) to prevent breaches or threatened breaches of,

or to enforce compliance with, the respective covenants and obligations of Buyer or Sellers, as applicable, under this Agreement or the other Transaction Documents (as applicable) all in accordance with the terms of this **Section 13.17**.

(c)    Notwithstanding the foregoing, nothing in this **Section 13.17** shall prohibit any Seller from ceasing operations or winding up its affairs following the Closing.

[*Signature page follows.*]

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the Execution Date.

**SELLERS:**

LINC ENERGY PETROLEUM (WYOMING), INC

By: _____
Name: Michael Mapp
Title: President


LINC ENERGY OPERATIONS, INC.

By: _____
Name: Michael Mapp
Title: President – Oil & Gas Division

**BUYER:**

**Big Muddy Opportunities, LLC**

By: _____
Name: Ari Bernstein
Title: Manager

## ANNEX 1

## TITLE MATTERS

Section 1.1    Title.  The rights and remedies of Buyer set forth in this **Annex 1** shall be Buyer's sole and exclusive rights and remedies with respect to any defect or deficiency in title with respect to the Oil and Gas Assets, including, without limitation, with respect to the applicable Asset Owner's title to (a) the Wells shown on **Exhibit B** and (b) Assigned Leases listed on **Exhibit A** (collectively, the "***Title Assets***").  Capitalized terms used, but not defined, in this **Annex 1** shall have the meanings ascribed to such terms in the Agreement to which this **Annex 1** is attached.

Section 1.2    Notices of Title Defects and Title Benefits; Defect Adjustments.

(a)    To assert a Title Defect, Buyer must deliver a claim notice or notices to Sellers on or before 5:00 p.m. local time in Houston, Texas on the date that is fourteen (14) days following the date that the Sale Order is entered (the "***Title Claim Date***"); *provided* that Buyer agrees to use reasonable efforts to provide Sellers with periodic (but in no event less frequently than once every three (3) Business Days during the period prior to the Title Claim Date) updates in writing concerning the progress of Buyer's title due diligence.  Each  notice of Title Defect shall be in writing and shall include:

(i)    a reasonably detailed description of the alleged Title Defect;

(ii)    the Title Asset affected by such Title Defect;

(iii)    the Allocated Value of the Title Asset subject to the alleged Title Defect; and

(iv)    the amount by which Buyer reasonably believes the Allocated Value of the applicable Title Asset is reduced by the alleged Title Defect and the computations and information upon which Buyer's belief is based.; and

(v)    copies of all supporting documentation available to Buyer that are reasonably necessary for Seller to verify the existence of the alleged Title Defect.

Buyer shall be deemed to have waived all defects or deficiencies or other matters regarding title to the Oil and Gas Assets of which Sellers have not been given valid written notice by Buyer in accordance with this **Section 1.2(a)** on or before the Title Claim Date.

(b)    Should Buyer discover any Title Benefit on or before the Title Claim Date, Buyer shall deliver to Sellers on or before the Title Claim Date a written notice including:

(i)    a description of the Title Benefit;

(ii)    the Title Asset affected by such Title Benefit;

(iii)    the Allocated Value of the Title Asset subject to such Title Benefit; and

(iv)    the amount by which the Buyer reasonably believes the Allocated Value of the applicable Title Asset is increased by the Title Benefit, and the computations and information upon which Buyer's belief is based.

Sellers shall have the right, but not the obligation, to deliver to Buyer a similar notice on or before the Title Claim Date with respect to each Title Benefit discovered by Sellers. Sellers shall be deemed to have waived all Title Benefits of which no Party has given notice as provided in this **Section 1.2(b)** on or before the Title Claim Date, except to the extent Buyer has failed to give a written notice which it was obligated to give under this **Section 1.2(b)**.  If Sellers deliver such notice to Buyer, Sellers shall provide Buyer copies of all documentation available to Sellers supporting Sellers' asserted Title Benefits.

(c)    Sellers shall have the right, but not the obligation, to attempt, at Sellers's sole cost, to cure or remove, on or before 5:00 p.m. local time in Houston, Texas on the date that is seven (7) days after the Closing Date (the "*Cure Period*"), any Title Defects of which Sellers have been timely advised by Buyer in accordance with **Section 1.2(a)**.  No reduction shall be made in the Base Purchase Price with respect to a Title Defect for purposes of Closing if Sellers have provided notice at least three (3) Business Days prior to the Closing Date of Sellers' intent to attempt to cure the Title Defect.  If the Title Defect is not cured as agreed by Sellers and Buyer or if Sellers and Buyer cannot agree, and it is determined by the Title Arbitrator that such Title Defect is not cured at the end of the Cure Period, the adjustment to the Base Purchase Price required under this **Annex 1** shall be made pursuant to **Section 8.13(c)** and **Section 8.15** of the Agreement.  Sellers's election to attempt to cure a Title Defect shall not constitute a waiver of Sellers' right to dispute the existence, nature or value of, or cost to cure, the Title Defect.

(d)    With respect to each Title Asset affected by Title Defects reported under **Section 1.2(a)**, the Base Purchase Price shall be reduced by an amount (the "*Title Defect Amount*") equal to the reduction in the Allocated Value for such Title Asset caused by such Title Defects, as determined pursuant to **Section 1.2(g)**.  Notwithstanding the foregoing provisions of this **Section 1.2(d)**: (i) no reduction shall be made in the Base Purchase Price with respect to any Title Defect that is cured under **Section 1.2(c)** above; and (ii) with respect to any Title Asset affected by a Title Defect, if the Title Defect Amount attributable to such Title Defect is equal to or greater than fifty percent (50%) of the Allocated Value for such Title Asset,  then Sellers shall have the option, in their sole discretion, to exclude and retain the entirety of such Title Asset, together with all associated Oil and Gas Assets, in which event the Base Purchase Price shall be reduced by an amount equal to the Allocated Value of such Title Asset and such associated Oil and Gas Assets.

(e)    With respect to each Title Asset affected by Title Benefits reported under **Section 1.2(b)** (or which Buyer should have reported under **Section 1.2(b)**), the Base Purchase Price shall be increased by an amount (the "*Title Benefit Amount*") equal to the increase in the Allocated Value for such Title Asset caused by such Title Benefits, as determined pursuant to **Section 1.2(h)**.

(f)     This **Annex 1** shall be the exclusive right and remedy of Buyer with respect to any defect or deficiency in title with respect to any Oil and Gas Asset.  In this regard and notwithstanding anything to the contrary in this **Annex 1** or in the Agreement, if a Title Defect results from any matter which could also result in the breach of any representation or warranty of Sellers as set forth in **Article 5** of the Agreement, then Buyer shall only be entitled to assert such matter prior to the Title Claim Date as a Title Defect to the extent permitted by this **Annex 1** and shall be precluded from also asserting such matter as the basis of the breach of any such representation or warranty.  Except as provided in this **Annex 1**, Buyer releases, remises and forever discharges Sellers and its current and former Affiliates and all such Person's stockholders, officers, directors, employees, agents, advisors and representatives from any and all suits, legal or administrative proceedings, claims, demands, damages, losses, costs, liabilities, interest or causes of action whatsoever, in law or in equity, known or unknown, which Buyer might now or subsequently may have, based on, relating to or arising out of, any Title Defect or other deficiency in title to any Oil and Gas Asset.

(g)     The Title Defect Amount resulting from a Title Defect shall be determined as follows:

(i)     if Buyer and Sellers agree on the Title Defect Amount, that amount shall be the Title Defect Amount;

(ii)     if the Title Defect is an Encumbrance or other charge which is undisputed and liquidated in amount, then the Title Defect Amount shall be the lesser of (A) the amount necessary to be paid to remove the Title Defect from the applicable Asset Owner's interest in the affected Title Asset, and (B) the Allocated Value of such Title Asset;

(iii)     if the Title Defect represents a discrepancy between (A) the Net Revenue Interest for any Well or Assigned Lease owned by the applicable Asset Owner and (B) the Net Revenue Interest stated for such Well or Assigned Lease on **Exhibit A** or **Exhibit B**, then the Title Defect Amount shall be the product of the Allocated Value of such Well or Assigned Lease multiplied by a fraction, the numerator of which is the Net Revenue Interest decrease for such Well or Assigned Lease as applicable, and the denominator of which is the Net Revenue Interest stated for such Well, or Assigned Lease on **Exhibit A** or **Exhibit B**, provided that if the Title Defect does not affect the Well or Assigned Lease throughout the entire productive life of the Well, or Assigned Lease the Title Defect Amount determined under this **Section 1.2(g)(iii)** shall be reduced to take into account the applicable time period only;

(iv)     if the Title Defect is a failure of the applicable Asset Owner to have title to the number of Net Acres set forth for any Assigned Lease as listed in **Exhibit A**, the Title Defect Amount shall be the product of the Allocated Value of such Assigned Lease multiplied by a fraction, (A) the numerator of which is the difference between (1) the number of Net Acres set forth on **Exhibit A** for such Lease and (2) the actual number of Net Acres owned by the applicable Asset Owner in the Lease and (B) the denominator of which is the number of Net Acres set forth on **Exhibit A** for such Assigned Lease;

(v)      if the Title Defect represents an obligation, encumbrance, burden or charge upon or other defect in title to the affected Title Asset of a type not described in subsections (i), (ii), (iii) or (iv) above, the Title Defect Amount shall be determined by taking into account the Allocated Value of the Title Asset so affected, the portion of the applicable Asset Owner's interest in the Title Asset affected by the Title Defect, the legal effect of the Title Defect, the potential economic effect of the Title Defect over the life of the affected Title Asset, the values placed upon the Title Defect by Buyer and Sellers, the age of the factual matters causing or constituting the alleged Title Defect, the probability that title failure will occur with respect to any Title Defect that represents only a possibility of title failure, and such other factors as are necessary to make a proper evaluation;

(vi)      notwithstanding anything to the contrary in this **Annex 1**, (A) an individual claim for a Title Defect for which a valid claim notice is given prior to the Title Claim Date shall only generate an adjustment to the Base Purchase Price under this **Annex 1** if the Title Defect Amount with respect thereto exceeds Two Hundred and Fifty Thousand dollars ($250,000) (the "***Title Threshold***"), (B) the aggregate Title Defect Amounts attributable to the effects of all Title Defects upon any given Title Asset shall not exceed the Allocated Value of such Title Asset and (C) there shall be no adjustment to the Base Purchase Price for Title Defects unless and until the aggregate Title Defect Amounts of all Title Defects that are entitled to an adjustment under **Section 1.2(g)(vi)(A)** and for which valid claim notices were timely delivered exceed four percent (4%) of the Base Purchase Price (the "***Title Deductible***"), and then only to the extent that such aggregate Title Defect Amounts exceed the Title Deductible;

(vii)      if a Title Defect is reasonably susceptible of being cured (regardless of whether Sellers elect to cure such Title Defect pursuant to **Section 1.2(c)**), the Title Defect Amount determined under **Section 1.2(g)(iii)**, **(iv)** and **(v)** shall not be greater than the amount that can reasonably be shown by Sellers to be the cost and expense of curing such Title Defect; and

(viii)      the Title Defect Amount with respect to a Title Defect shall be determined without duplication of any costs or losses included in another Title Defect Amount hereunder, or for which Buyer otherwise receives credit in the calculation of the Purchase Price.

(h)      The Title Benefit Amount for any Title Benefit shall be: (i) in the case of a Title Benefit affecting a Well  or Assigned Lease that represents an increase in the Net Revenue Interest held by the applicable Asset Owner in such Well, or Assigned Lease above the Net Revenue Interest shown for such Well or Assigned Lease on **Exhibit A** or **Exhibit B**, as applicable, the product of the Allocated Value of the affected Well or Assigned Lease multiplied by a fraction, the numerator of which is the increase of the Net Revenue Interest of the applicable Asset Owner in such Well or Assigned Lease above the Net Revenue Interest shown for such Well or Assigned Lease on **Exhibit A** or **Exhibit B**, as applicable, and the denominator of which is the Net Revenue Interest stated for such Well or Assigned Lease on **Exhibit A** or **Exhibit B**, as applicable, and (ii) in the case of a Title Benefit affecting a Assigned Lease that represents an increase in the number of Net Acres covered by such Assigned Lease above the number of Net

Acres set out with respect to such Assigned Lease on **Exhibit A**, the product of (A) the difference between (1) the actual number of Net Acres owned by the applicable Asset Owner in such Assigned Lease and (2) the number of Net Acres set forth on **Exhibit A** for such Assigned Lease and (B) a fraction, (1) the numerator of which is the Allocated Value of such Assigned Lease and (2) the denominator of which is the number of Net Acres set forth on **Exhibit A** for such Assigned Lease or (iii) if the Title Benefit represents a right, circumstance or condition of a type not described in subsections (i) or (ii) of this **Section 1.2(h),** the Title Benefit Amount shall be determined by taking into account the Allocated Value of the Title Asset so affected, the portion of the applicable Asset Owner's interest in the Title Asset affected by the Title Benefit, the legal effect of the Title Benefit, the potential economic effect of the Title Benefit over the life of the affected Title Asset, the values placed upon the Title Benefit by Buyer and Sellers, the age of the factual matters causing or constituting the alleged Title Benefit, and such other factors as are necessary to make a proper evaluation, provided further that, in each case above, if the Title Benefit does not affect a Title Asset throughout the entire life of the Title Asset, the Title Benefit Amount determined under this **Section 1.2(h)** shall be reduced to take into account the applicable time period only.  Notwithstanding anything to the contrary in this Annex 1 and without limitation of **Section 1.2(e)**, an individual claim for a Title Benefit which is reported under **Section 1.2(b)** (or which Buyer should have reported under **Section 1.2(b)** prior to the Title Claim Date shall only generate an adjustment to the Base Purchase Price under this Annex 1 if the Title Benefit Amount with respect thereto exceeds the Title Threshold.

(i)       Sellers and Buyer shall attempt to agree on the existence of any alleged Title Defects or Title Benefits and/or the corresponding Title Defect Amounts and Title Benefit Amounts with respect thereto by the date that is three (3) Business Days prior to the Closing Date.  If Sellers and Buyer are unable to agree by that date, then subject to **Section 1.2(c)**, Sellers's good faith estimate shall be used to determine the adjustments to the Base Purchase Price and the amount of the Purchase Price to be paid at Closing pursuant to **Section 8.13** of the Agreement, and the Title Defects, Title Benefits, Title Defect Amounts and Title Benefit Amounts in dispute, together with any disputes as to whether any Title Defects have been cured in accordance with **Section 1.2(c)** (each a "*Disputed Title Matter*") shall be exclusively and finally resolved pursuant to this **Section 1.2(i)**.  On or before 5:00 p.m. local time in Houston, Texas on the date that is the fifth (5th) Business Day following the Cure Period, Buyer shall submit any and all remaining Disputed Title Matters to a title attorney with at least 10 years' experience in oil and gas titles in the state or other jurisdiction in which the Title Assets in question are located as selected by mutual agreement of Buyer and Sellers or absent such agreement during the specified five (5) Business Day period, by the Houston, Texas office of the American Arbitration Association (the "*Title Arbitrator*").  Buyer shall be deemed to have waived any Disputed Title Matters which it fails to submit to the Title Arbitrator during the time periods called for in this **Section 1.2(i)**.  The Title Arbitrator shall not have worked as an employee or outside counsel for either Party or any of their Affiliates during the five (5) year period preceding the arbitration or have any financial interest in the dispute.  In connection with the engagement of the Title Arbitrator, each of Sellers and Buyer shall execute such engagement, indemnity and other agreements as the Title Arbitrator shall reasonably require as a condition to such engagement.  The arbitration proceeding shall be held in Houston, Texas and shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association, to the extent such rules do not conflict with the terms of this **Section 1.2(i)**.  Each Party shall each present to the Title Arbitrator, with a simultaneous copy to the other Party, a

single written statement of its position on each Disputed Title Matter in question, together with a copy of this Agreement and any supporting material that such Party desires to furnish, not later than the fifth (5th) Business Day after appointment of the Title Arbitrator.  The Title Arbitrator's determination shall be made within twenty (20) days after submission of the matters in dispute and shall be final and binding upon the Parties, without right of appeal.   In making his determination, the Title Arbitrator shall be bound by the rules set forth in this **Annex 1** and may consider such other matters as in the opinion of the Title Arbitrator are necessary or helpful to make a proper determination.   Additionally, the Title Arbitrator may consult with and engage disinterested third Persons to advise the arbitrator, including title attorneys from other states and petroleum engineers.   The Title Arbitrator shall act as an expert for the limited purpose of determining the specific Disputed Title Matters submitted pursuant to this **Section 1.2(i)** and may not award damages, interest, penalties or attorneys' fees to any Party with respect to any matter.  Sellers and Buyer shall each bear its own legal fees and other costs of presenting its case before the Title Arbitrator with respect to any Disputed Title Matters.  Buyer shall bear one-half of the costs and expenses of the Title Arbitrator and the arbitration proceedings and Sellers shall be responsible for the remaining one-half of such costs and expenses.

    Section 1.3 <u>Limitations on Applicability</u>.   The right of Buyer or Sellers to assert a Title Defect or Title Benefit, respectively, under this Agreement shall terminate on the Title Claim Date; provided there shall be no termination of Buyer's or Sellers' rights under **Section 1.2** of this Annex 1 with respect to any bona fide Title Defect or Title Benefit claim properly reported on or before the Title Claim Date.

## EXHIBITS, SCHEDULES AND DISCLOSURE SCHEDULES

To come.