**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **LINC USA GP.,** *et al.* | ) | Case No. 16-32689 (DRJ) |
| | ) | |
| **Debtors.**[1] | ) | (Jointly Administered) |

**JOINT PLAN OF LIQUIDATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**BRACEWELL LLP**

Jason G. Cohen
Texas Bar No. 24050435
Jason.Cohen@bracewelllaw.com
William A. (Trey) Wood III
Texas Bar No. 21916050
Trey.Wood@bracewelllaw.com
711 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713) 223-2300
Facsimile: (713) 221-1212


*Counsel to Debtors and Debtors in Possession*

Dated: December 19, 2016

---

[1] The debtors in possession in these chapter cases, along with the last four digits of each debtor in possession's federal tax identification number, are: Linc Energy Finance (USA), Inc. (6684); Linc USA GP (5234); Linc Energy Resources, Inc. (9613); Linc Gulf Coast Petroleum, Inc. (6790); Linc Energy Petroleum (Louisiana), LLC (1074); Linc Alaska Resources, LLC (2362); Paen Insula Holdings, LLC (1681); Linc Energy Petroleum (Wyoming), Inc. (9859); Diasu Holdings, LLC (9626); Diasu Oil & Gas Company, Inc. (8926); and Linc Energy Operations, Inc. (5806).

# TABLE OF CONTENTS

**Page**

**ARTICLE I**

**DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND OTHER REFERENCES.................................1**

| | | |
|---|---|---|
| Section 1.01. | Defined Terms ....................................................................1 |
| Section 1.02. | Rules of Interpretation ....................................................13 |
| Section 1.03. | Computation of Time ......................................................14 |
| Section 1.04. | Governing Law ................................................................14 |
| Section 1.05. | Reference to Monetary Figures.......................................14 |
| Section 1.06. | Reference to the Debtors.................................................14 |

**ARTICLE II**

**TREATMENT OF UNCLASSIFIED CLAIMS .................................................14**

| | |
|---|---|
| Section 2.01. | Administrative Claims ....................................................14 |
| Section 2.02. | Professional Claims .........................................................15 |
| Section 2.03. | U.S. Trustee Fees .............................................................16 |
| Section 2.04. | Priority Tax Claims..........................................................16 |

**ARTICLE III**

**CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS .......................................................................................................16**

| | |
|---|---|
| Section 3.01. | Classification....................................................................16 |
| Section 3.02. | Treatment .........................................................................17 |
| Section 3.03. | Additional Provisions Regarding Unimpaired Claims .................20 |
| Section 3.04. | Intercompany Claims .......................................................20 |

**ARTICLE IV**

**ACCEPTANCE OR REJECTION OF THIS PLAN .......................................20**

| | |
|---|---|
| Section 4.01. | Acceptance by an Impaired Class ...................................20 |
| Section 4.02. | Elimination of Vacant Classes ........................................20 |
| Section 4.03. | Nonconsensual Confirmation...........................................20 |

**ARTICLE V**

**IMPLEMENTATION OF THIS PLAN .............................................................21**

| | |
|---|---|
| Section 5.01. | Deemed Consolidation.....................................................21 |
| Section 5.02. | Operations Between Confirmation Date and Effective Date .........21 |
| Section 5.03. | Creditor Trust...................................................................22 |
| Section 5.04. | Sources of Cash for Plan Distributions...........................23 |
| Section 5.05. | Miscellaneous Alaska Assets...........................................23 |
| Section 5.06. | Release of Bonds..............................................................23 |
| Section 5.07. | Claims Reserve Holdback................................................24 |
| Section 5.08. | Corporate Existence; Officers and Directors ..................24 |
| Section 5.09. | Corporate Action..............................................................25 |
| Section 5.10. | Preservation of Causes of Action Not Expressly Released ..........25 |
| Section 5.11. | Release of Liens................................................................26 |
| Section 5.12. | Cancellation of Securities and Notes Against the Debtors ............26 |

## TABLE OF CONTENTS (CONT'D)

**Page**

Section 5.13.    General Settlement of Claims .......................................................27
Section 5.14.    Section 1146(a) Exemption...........................................................27

**ARTICLE VI**
**TREATMENT OF EXECUTORY CONTRACTS AND LEASES............................27**
Section 6.01.    Rejection of Executory Contracts and Unexpired Leases.............27
Section 6.02.    Treatment of Assumed Executory Contracts and Unexpired
Leases; Assignment .........................................................................28
Section 6.03.    Effect of Confirmation Order on Assumption/Rejection...............28
Section 6.04.    Cure of Defaults and Objections to Assumption ..........................29
Section 6.05.    Rejection Damages Claims and Objections to Rejection .............29
Section 6.06.    Preexisting Obligations Under Executory Contracts and
Unexpired Leases.............................................................................29
Section 6.07.    Modifications, Amendments, Supplements, Restatements
or Other Agreements........................................................................30
Section 6.08.    Reservation of Rights.......................................................................30

**ARTICLE VII**
**PROVISIONS GOVERNING DISTRIBUTIONS.................................................30**
Section 7.01.    Method of Distributions...................................................................30
Section 7.02.    Delivery of Distributions .................................................................31
Section 7.03.    Amount of Distributions ..................................................................31
Section 7.04.    Special Provision Relating to Distributions to Holders of
Allowed First Lien Note Claims .....................................................31
Section 7.05.    No Fractional or De Minimis Distributions ...................................31
Section 7.06.    Undeliverable Distributions.............................................................32
Section 7.07.    Time Bar to Cash Payments.............................................................32
Section 7.08.    Means of Cash Payments .................................................................32
Section 7.09.    Foreign Currency Exchange Rates...................................................33
Section 7.10.    Setoffs ..............................................................................................33
Section 7.11.    Claims Paid or Payable by Third Parties .......................................33

**ARTICLE VIII**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS .................................33**
Section 8.01.    Objections to Claims........................................................................33
Section 8.02.    Objection Deadline ..........................................................................34
Section 8.03.    Estimation of Claims........................................................................34
Section 8.04.    No Distributions on Disputed Claims..............................................34
Section 8.05.    Disputed Claims Reserves from GUC Trust Assets ......................35
Section 8.06.    Reduction of Claims.........................................................................35
Section 8.07.    Recoupment .....................................................................................35

**ARTICLE IX**
**CONDITIONS PRECEDENT TO CONFIRMATION AND**
**CONSUMMATION OF THIS PLAN....................................................................35**

ii

## TABLE OF CONTENTS (CONT'D)

Section 9.01.              Conditions Precedent to Confirmation............................................35
Section 9.02.              Conditions Precedent to the Effective Date...................................36
Section 9.03.              Effect of Non-Occurrence of Conditions to Confirmation or
      Conditions Precedent to the Effective Date........................................................36
Section 9.04.              Waiver of Conditions Precedent ...................................................37

**ARTICLE X**
      **EFFECT OF CONFIRMATION OF THIS PLAN**....................................................**37**
Section 10.01.            Certain Releases by the Debtors....................................................37
Section 10.02.            Certain Voluntary Releases by Holders of Claims .......................38
Section 10.03.            Exculpation ...................................................................................39
Section 10.04.            Permanent Injunction ....................................................................39
Section 10.05.            Term of Injunctions or Stay ..........................................................40
Section 10.06.            Integral to Plan..............................................................................40
Section 10.07.            Binding Effect................................................................................40
Section 10.08.            Asset Purchase Agreements...........................................................41
Section 10.09.            Creditors Committee Challenge Rights .........................................41

**ARTICLE XI**
      **MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN ............41**
Section 11.01.            Modification of this Plan ...............................................................41
Section 11.02.            Revocation or Withdrawal this Plan ..............................................41

**ARTICLE XII**
      **RETENTION OF JURISDICTION**.................................................................................**42**
**ARTICLE XIII**
      **MISCELLANEOUS PROVISIONS**...................................................................................**43**
Section 13.01.            Tax Returns....................................................................................43
Section 13.02.            Compliance with Tax Requirements..............................................44
Section 13.03.            Allocations.....................................................................................44
Section 13.04.            Additional Documents ...................................................................44
Section 13.05.            Successors and Assigns..................................................................45
Section 13.06.            Reservation of Rights.....................................................................45
Section 13.07.            Exclusivity Period..........................................................................45
Section 13.08.            Notices ...........................................................................................45
Section 13.09.            Entire Agreement ...........................................................................46
Section 13.10.            Plan Supplement Exhibits ..............................................................46
Section 13.11.            Severability ....................................................................................46
Section 13.12.            Request for Expedited Tax Review ................................................46
Section 13.13.            Dissolution of the Creditors Committee ........................................46
Section 13.14.            No Admissions ...............................................................................47
Section 13.15.            Substantial Consummation ............................................................47

Linc USA GP; Linc Energy Finance (USA), Inc.; Linc Energy Operations, Inc.; Linc Energy Resources, Inc.; Linc Gulf Coast Petroleum, Inc.; Linc Energy Petroleum (Wyoming), Inc.; Paen Insula Holdings, LLC; Linc Alaska Resources, LLC; and Linc Energy Petroleum (Louisiana), LLC hereby respectfully propose the following joint plan of liquidation. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters. There are other agreements and documents, which have been or will be filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as exhibits, the Plan Supplement or otherwise. All such agreements, documents, exhibits and the Plan Supplement are incorporated into and are made a part herein as if fully set forth herein.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND OTHER REFERENCES

### Section 1.01.  Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form in this Plan:

1. "Ad Hoc Noteholder Group" means the *ad hoc* group of First Lien Noteholders, as identified in that certain *Verified Statement of the Ad Hoc Group of First Lien Noteholders pursuant to Bankruptcy Rule 2019*, filed on June 14, 2016 [Dkt. No. 103], as the same may be amended from time to time.

2. "Administrative Claim" means a Claim under section 503(b) of the Bankruptcy Code, and referred to in section 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) Claim(s) under section 503(b)(9) of the Bankruptcy Code, (b) any actual and necessary costs and expenses of preserving the Estate(s), (c) any actual and necessary costs and expenses of operating the Debtors' businesses after the Petition Date, (d) all Professional Claims, (e) any fees or charges assessed against the Estates under section 1930 of chapter 123 of title 28 of the United States Code, (f) all postpetition taxes of the Debtors, and (g) all other Claim(s) entitled to administrative expense status pursuant to a Final Order of the Bankruptcy Court, in each case relating to the period from the Petition Date through and including the Effective Date but not beyond (but excluding any Intercompany Claims).

3. "Administrative Claims Bar Date" means the first day that is thirty (30) days after the Effective Date (or such date(s) otherwise ordered by the Bankruptcy Court).

4. "Affiliate" (and, with a correlative meaning "affiliated") means, with respect to any Person, any Person who would be an "affiliate" pursuant to section 101(2) of the Bankruptcy Code, as well as any direct or indirect subsidiary of such Person, and any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with such first Person. As used in this definition, "control" (including with correlative meanings, "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies

of such Person (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

5. "<u>Alaska Assets</u>" means Linc Alaska Resources, LLC's 97.5% ownership of Renaissance Umiat, LLC as of the Petition Date, including Renaissance Umiat, LLC's ownership of oil and gas leases covering approximately 18,450 net acres within the National Petroleum Reserve of Alaska.

6. "<u>Allowed</u>" means, as to a Claim, or applicable portion thereof, (a) that has been listed in the Schedules (and thereafter continues to be listed in any subsequently filed amended versions of such Schedules) as liquidated in amount and not Disputed or contingent and for which no contrary Proof of Claim has been filed, (b) where a Proof of Claim was timely and properly filed by the applicable deadline under the Bar Date Notice as to which (i) such Claim is not Disputed, or (ii) an objection has been interposed and such Claim has been allowed, in whole or in part, by a Final Order or by the agreement of the holder of such Claim, on the one hand, and the Debtors or the Creditor Trust, as applicable, on the other, or (c) that has been allowed under any Final Order, whether or not such Claim was scheduled or is the subject of a filed Proof of Claim; <u>provided</u>, <u>however</u>, that any Claims allowed solely for the purpose of voting to accept or reject this Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed" hereunder. Unless otherwise specified herein or pursuant to a Final Order of the Bankruptcy Court, "Allowed" shall not include interest, fees, or charges for the period on and after the Petition Date. When used in this Plan or the Disclosure Statement with respect to the timing of distributions, "Allowed" means on the date a Claim has been allowed or as soon as reasonably practicable thereafter.

7. "<u>Archrock Lien Escrow</u>" means Cash in the amount of $170,000.00 held in trust for the benefit of Archrock Partners Operating, L.L.C. in accordance with the Gulf Coast Sale Order.

8. "<u>Asset Purchase Agreements</u>" means: (a) the *Asset Purchase Agreement Dated as of August 27, 2016, By and Among Linc USA GP, Linc Energy Operations, Inc. and Linc Gulf Coast Petroleum, Inc., as Sellers, and Torrent Gulf Coast LLC, as Buyer*; (b) the *Asset Purchase Agreement, Dated as of August 29, 2016, By and Among Linc Energy Operations, Inc. and Linc Energy Petroleum (Wyoming), Inc., as Sellers, and Big Muddy Opportunities, LLC, as Buyer*; and (c) the *Asset Purchase Agreement Dated as of August 29, 2016 By and Among Linc Alaska Resources, LLC as Seller, and Arctic Acquisition, Inc., as Buyer, and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent Under the Pre-Petition First Lien Senior Indenture*.

9. "<u>Assets</u>" means all tangible and intangible assets of every kind and nature of the Debtors and their respective Estates, including, without limitation, all Causes of Action (except those released by this Plan, the Confirmation Order or other Final Order) and all proceeds thereof, existing as of the Effective Date.

10. "<u>Avoidance Actions</u>" means any and all Causes of Action that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under Chapter 5 of the Bankruptcy Code, including under sections 502, 510, 542, 544, 545, and 547 through and

including 553 of the Bankruptcy Code, or similar avoidance or fraudulent transfer actions under applicable non-bankruptcy law.

11. "Ballot" means each of the ballots distributed to each holder of an Impaired Claim that is entitled to vote to accept or reject this Plan and on which such holder is to indicate, among other things, acceptance or rejection of this Plan.

12. "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the Petition Date, together with all amendments and modifications thereto that are subsequently made applicable to the Chapter 11 Cases.

13. "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or such other court having jurisdiction over the Chapter 11 Cases.

14. "Bankruptcy Rules" means: (a) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under section 2075 of title 28 of the United States Code; (b) the applicable Local Rules of Bankruptcy Practice and Procedure of the Bankruptcy Court; and (c) any general or specific chamber rules or procedures, or standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, and each of the foregoing together with all amendments and modifications thereto that are subsequently made and as applicable to the Chapter 11 Cases.

15. "Bar Date Notice" means the *Notice of Deadlines for the Filing of Proofs of Claim, Including Requests for Payment Pursuant to Section 503(b)(9) of the Bankruptcy Code* [Dkt. No. 158].

16. "Cash" means the legal tender of the U.S. or the equivalent thereof, including bank deposits and checks.

17. "Causes of Action" means any and all claims, actions, causes of action (including Avoidance Actions), suits, debts, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims of the Debtors and their Estates, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, that are or may be pending on the Effective Date or commenced after the Effective Date against any Entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order, unless otherwise waived or released pursuant to this Plan, the Confirmation Order, a Final Order or by the Debtors.

18. "Chapter 11 Cases" means the chapter 11 cases of the Debtors pending before the Bankruptcy Court as Case Nos. 16-32689 (DRJ) through 16-32699 (DRJ), jointly administered for procedural purposes only under the lead Case No. 16-32689 (DRJ).

19. "Claim" means any "claim" against the Debtors as defined in section 101(5) of the Bankruptcy Code.

20. "Claims and Solicitation Agent" means Kurtzman Carson Consultants, LLC.

21. "Claims Objection Deadline" means the last day for filing objections to Claims, other than Administrative Claims and Professional Claims, which day shall be: (a) the later of one hundred eighty (180) days after the (i) Effective Date or (ii) filing of a Proof of Claim; or (b) such other date as the Bankruptcy Court may order. The filing of a motion to extend the Claims Objection Deadline shall automatically extend the Claims Objection Deadline until a Final Order is entered on such motion. In the event that such motion to extend the Claims Objection Deadline is denied, the Claims Objection Deadline shall be the later of the then-current Claims Objection Deadline (as previously extended, if applicable) or forty-five (45) days after the Bankruptcy Court's entry of an order denying the motion to extend the Claims Objection Deadline.

22. "Claims Register" means the official register of Claims maintained by the Claims and Solicitation Agent.

23. "Claims Reserve Holdback" means the portion of Gulf Coast Sale Proceeds held back from the initial distribution of Gulf Coast Sale Proceeds made to the Prepetition Noteholders (which amount includes the Archrock Lien Escrow), as detailed in the Stipulation, that remains as of the Effective Date and from which Allowed Holdback Claims and pre-Effective Date U.S. Trustee fees shall be paid, and from which the Wind Down Costs shall be funded. In the event the funds deposited in the Claims Reserve Holdback are insufficient to fund the amounts required pursuant to this Plan, the Prepetition Noteholders shall fund any shortfall from the initial distribution of Gulf Coast Sale Proceeds in accordance with the Stipulation, from the Wyoming Sale Proceeds, or from such other source as the Prepetition Noteholders determine.

24. "Class" means a category of holders of Claims or Equity Interests under section 1122(a) of the Bankruptcy Code.

25. "Collateral" means any property or interest in property of the Estates subject to a Lien, not otherwise subject to avoidance under the Bankruptcy Code, to secure the payment or performance of a Claim.

26. "Confirmation" means entry by the Bankruptcy Court of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021

27. "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

28. "Confirmation Hearing" means the hearing before the Bankruptcy Court under section 1128 of the Bankruptcy Code.

29. "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and

substance acceptable to the Debtors, the Creditors Committee and the Ad Hoc Noteholder Group, and which may be combined with the Disclosure Statement Order.

30.     "Consummation" means the occurrence of the Effective Date.

31.     "Creditor" means "creditor" as defined in section 101(10) of the Bankruptcy Code.

32.     "Creditor Trust" means the trust established under Section 5.03 herein.

33.     "Creditor Trust Agreement" means the agreement setting forth the terms and conditions governing the Creditor Trust, in substantially the form included in the Plan Supplement.

34.     "Creditor Trust Assets" means all of the Assets transferred to the Creditor Trust on the Effective Date, including, without limitation: (a) the GUC Trust Assets; (b) the Noteholder Trust Assets; (c) the Causes of Action; (d) the Miscellaneous Assets; (e) the Claims Reserve Holdback; and (f) all other Cash of the Debtors, including the Unencumbered Cash.

35.     "Creditor Trust Beneficiaries" has the meaning set forth in Section 5.03 herein.

36.     "Creditor Trust Initial Administrative Funding" means the first $100,000 from the First Lien LEO Bond Distribution, which $100,000 may be used to fund administrative expenses of the Creditor Trust.

37.     "Creditor Trustee" means the Person selected by the Ad Hoc Noteholder Group and designated in the Creditor Trust Agreement to administer the Creditor Trust, whose identity shall be disclosed in the Plan Supplement. For the avoidance of doubt, the Creditor Trustee may serve as the Distribution Agent.

38.     "Creditors Committee" means the statutory official committee of unsecured creditors appointed in the Chapter 11 Cases from time to time.

39.     "Cure Costs" means any and all amounts, costs or expenses that must be paid or actions that must be performed pursuant to sections 365 and 1123 of the Bankruptcy Code in connection with the assumption or assignment of each of the Executory Contracts and Unexpired Leases pursuant to the Confirmation Order.

40.     "Debtors" means: Linc USA GP; Linc Energy Finance (USA), Inc.; Linc Energy Operations, Inc.; Linc Energy Resources, Inc.; Linc Gulf Coast Petroleum, Inc.; Linc Energy Petroleum (Wyoming), Inc.; Paen Insula Holdings, LLC; Linc Alaska Resources, LLC; and Linc Energy Petroleum (Louisiana), LLC.  Diasu Holdings, LLC and Diasu Oil & Gas Company, Inc. are not proponents of this Plan and consequently are not included in the definition of "Debtors."

41.     "DIP Agent" means Cantor Fitzgerald Securities, as DIP Agent under the DIP Credit Agreement.

42.     "DIP Credit Agreement" means that certain $10 million Superpriority Debtor in Possession Credit and Guaranty Agreement dated as of May 31, 2016, as approved by the Bankruptcy Court by Final Order dated July 11, 2016 [Dkt. No. 196].

43.     "DIP Lenders" means the lenders under the DIP Credit Agreement.

44.     "Disclosure Statement" means the *[Proposed] Disclosure Statement for the Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code*, dated December [19], 2016 [Dkt. No. [•]], including all exhibits and schedules thereto, as the same may be altered, amended, modified or supplemented from time to time.

45.     "Disclosure Statement Order" means the *Order (A) Granting Conditional Approval of Adequacy of Disclosure Statement (B) Approving Solicitation Materials and Procedures, (C) Approving Plan Confirmation Schedule, (D) Setting a Consolidated Hearing on Final Approval of Disclosure Statement and Confirmation of Debtors' Joint Chapter 11 Plan of Liquidation and (E) Granting Related Relief*, entered by the Bankruptcy Court on [•], 2017 [Dkt. No. [•]], which order shall be in form and substance acceptable to the Debtors, the Creditors Committee and the First Lien Noteholders and which may be combined with the Confirmation Order.

46.     "Disputed" means any Claim, or any portion thereof, that: (a) is listed on the Schedules as unliquidated, disputed, or contingent, which dispute has not been withdrawn, resolved or overruled by a Final Order; (b) is the subject of an objection or request for estimation filed in the Bankruptcy Court and which objection or request for estimation has not been withdrawn, resolved or overruled by a Final Order of the Bankruptcy Court; or (c) is otherwise disputed by the Debtors or the Creditor Trustee, as applicable, in accordance with applicable law; provided, however, that for purposes of determining the status (i.e., Allowed or Disputed) of a particular Claim prior to the Claims Objection Deadline, any such Claim that has not been previously allowed or disallowed by Final Order of the Bankruptcy Court or Plan shall be deemed a Disputed Claim unless such Claim is specifically identified hereunder or otherwise by the Debtors or the Creditor Trustee, as applicable, as being an Allowed Claim.

47.     "Distribution Agent" means the Creditor Trustee, or any Entity(ies) chosen by the Debtors or the Creditor Trustee, as applicable, which Entity(ies) may include the Claims and Solicitation Agent, to make or to facilitate distributions required by this Plan.

48.     "Distribution Record Date" means the record date for purposes of making distributions under this Plan on account of Allowed Claims, which date shall be the Confirmation Date or such other date designated in the Confirmation Order.

49.     "Effective Date" means the date on which all conditions precedent to the occurrence of the Effective Date set forth in Section 9.02 herein have been satisfied or waived in accordance with Section 9.04 herein. When used in this Plan or the Disclosure Statement with respect to the timing of distributions, "Effective Date" means "on the Effective Date or as soon as reasonably practicable thereafter."

50.     "Entity" means a natural person, corporation, limited liability company, association, partnership (whether general or limited), joint venture, proprietorship, estate, trust,

Governmental Unit or any other individual or entity, whether acting in an individual, fiduciary, representative or other capacity, including the U.S. Trustee, within the meaning of section 101(15) of the Bankruptcy Code.

51.     "Equity Interest" means all issued, unissued, authorized, or outstanding shares of stock, membership interests, and other ownership interests of an Entity, together with any warrants, options, or contract rights to purchase or acquire such interests at any time.

52.     "Estate(s)" means the bankruptcy estate(s) of the Debtors created on the Petition Date pursuant to sections 301 and 541 of the Bankruptcy Code.

53.     "Exculpated Parties" means each of: (a) the Debtors; (b) the Creditor Trustee; (c) the Creditors Committee; (d) the Ad Hoc Noteholder Group and its members; (e) the Prepetition Noteholders; (f) the Indenture Trustees; (g) the DIP Agent; (h) the DIP Lenders; and (j) in each case, their predecessors, successors and assigns, current and former affiliates, subsidiaries, funds, portfolio companies, management companies, current and former officers, directors, professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents and other representatives (each solely in their capacity as such).

54.     "Executory Contract" means a contract to which one or more of the Debtors are party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

55.     "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

56.     "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, which has been entered on the docket, and that has not been stayed, reversed, modified or amended and as to which the time to file an appeal, a motion for re-hearing, re-argument or reconsideration or a petition for writ of certiorari has expired or been waived by the Debtors or the Creditor Trustee, as applicable, and as to which no appeal, petition for certiorari, or other proceedings for re-argument, reconsideration or re-hearing are then pending; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

57.     "First Lien Indenture" means the Indenture dated as of August 30, 2014, among the Issuers, the non-Issuer Debtors other than Linc Energy Operations, Inc. and the Bank of New York Mellon Trust Company, N.A. as trustee and collateral agent, as amended and supplemented by the Supplemental Indenture, dated as of June 30, 2015, pursuant to which were issued $125,000,000 aggregate principal amount of 9.625% First Lien Notes.

58.     "First Lien Indenture Trustee" means The Bank of New York Mellon Trust Company, N.A. as indenture trustee pursuant to the First Lien Indenture.

59.     "First Lien LEO Bond Distribution" means 50% of the proceeds recovered from the LEO Bonds, from which the Creditor Trust Initial Administrative Funding will be funded.

60.     "First Lien Note Claim" means any Claim arising from or related to the First Lien Indenture.

61.     "First Lien Notes" means those 9.625% first lien senior secured notes due 2017 issued pursuant to the First Lien Indenture.

62.     "First Lien Noteholders" means those "Noteholders" under (and as defined in) the First Lien Indenture.

63.     "First Lien Trust Initial Distribution" means the initial $100,000 distributed from the proceeds of the Creditor Trust Assets (other than proceeds from the LEO Bonds), to be paid to holders of Allowed First Lien Note Claims as reimbursement of the Creditor Trust Initial Administrative Funding.

64.     "General Unsecured Claim" means a Claim that is not an Administrative Claim, Allowed First Lien Note Claim, Allowed Second Lien Note Claim, Intercompany Claim, Other Priority Claim, Other Secured Claim, Priority Tax Claim or Professional Claim.

65.     "Governmental Unit" has the meaning set forth in section 101(27) of the Bankruptcy Code.

66.     "GUC Earmarked Funds" means the $950,000 Cash distribution to holders of Allowed General Unsecured Claims, to be paid from the Cash proceeds of the Creditor Trust Assets on or as soon as practicable after the Effective Date.

67.     "GUC LEO Bond Distribution" means 50% of the proceeds recovered from the LEO Bonds.

68.     "GUC Trust Assets" means, collectively: (a) the GUC Earmarked Funds; (b) the GUC LEO Bond Distribution; and (c) 40% of the proceeds of the Remaining Creditor Trust Assets.

69.     "GUC Trust Interests" means the interests of holders of Allowed General Unsecured Claims in the Creditor Trust, specifically the right to the GUC Trust Assets.

70.     "Gulf Coast Assets" means the leases previously owned by Linc Gulf Coast Petroleum, Inc. as of the Petition Date, covering approximately 15,521 net acres and including 150 producing wells in 13 active fields.

71.     "Gulf Coast Sale Order" means the *Order (A) Authorizing and Approving (I) the Asset Purchase Agreement for the Gulf Coast Assets; (II) the Sale of the Debtors' Gulf Coast Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (III) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (B) Granting Related Relief* [Dkt. No. 347].

72.     "Gulf Coast Sale Proceeds" means the net proceeds from the sale of the Gulf Coast Assets.

73.    "Holdback Claims" mean, collectively, all Administrative Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims and Professionals Claims, which Claims, to the extent Allowed, shall be paid with Cash in the Claims Reserve Holdback.

74.    "Impaired" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

75.    "Indenture Trustees" means the First Lien Indenture Trustee and the Second Lien Indenture Trustee.

76.    "Intercompany Claim" means any Claim(s) held by a Debtor against another Debtor.

77.    "Issuers" means Linc USA GP and Linc Energy Finance (USA) Inc., as issuers of the First Lien Notes and Second Lien Notes.

78.    "LEO Bonds" means those performance bonds, and the proceeds of such bonds, for which Linc Energy Operations, Inc. is the principal. For the avoidance of doubt, the LEO Bonds shall not include the proceeds held by Linc Energy Operations, Inc. related to the Performance Bond No. RLB0007036, dated March 30, 2004, by and between Diasu Oil & Gas Company, Inc. as "Principal," RLI as "Surety," and Amoco Production Company as "Obligee."

79.    "Lien" means "lien" within the meaning of section 101(37) of the Bankruptcy Code.

80.    "Miscellaneous Alaska Assets" means the unencumbered Assets owned by Linc Energy Operations, Inc. and used in the operations of Linc Alaska Resources, LLC, which Assets were not transferred to Arctic Acquisition, Inc. pursuant to the *Asset Purchase Agreement Dated as of August 29, 2016 By and Among Linc Alaska Resources, LLC as Seller, and Arctic Acquisition, Inc., as Buyer, and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent Under the Pre-Petition First Lien Senior Indenture*, but that the Ad Hoc Noteholder Group has identified for transfer to Malamute.

81.    "Miscellaneous Assets" means the Debtors' remaining non-Cash Assets, including, without limitation, certain underground coal gasification equipment located in Alaska and Wyoming, certain unencumbered miscellaneous equipment relating to the Debtors' oil and gas operations, and Equity Interests owned by Linc USA GP in the non-Debtor Linc Clean Energy, Inc. For the avoidance of doubt, the Miscellaneous Assets shall not include the Miscellaneous Alaska Assets.

82.    "Non-LEO Bond Distribution" means 100% of the distribution of proceeds of Non-LEO Bonds.

83.    "Non-LEO Bonds" means those certain performance bonds for which the principal is a Debtor other than Linc Energy Operations, Inc., which performance bonds shall be released and the proceeds thereof treated as the Assets of the relevant Debtor principal.

84.    "Noteholder Trust Assets" means, collectively: (a) the First Lien LEO Bond Distribution, (b) the First Lien Trust Initial Distribution, (c) the Non-LEO Bond Distribution, (d) the Remaining Claims Holdback, and (e) 60% of the proceeds of the Remaining Creditor Trust Assets.

85.    "Noteholder Trust Interests" means the interests of holders of Allowed First Lien Note Claims in the Creditor Trust, specifically the right to the Noteholder Trust Assets.

86.    "Other Priority Claim" means a Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code (other than an Administrative Claim or a Priority Tax Claim).

87.    "Other Secured Claim" means a Secured Claim that is senior in priority to the First Lien Note Claims and Second Lien Note Claims.

88.    "Person" means "person" within the meaning of section 101(41) of the Bankruptcy Code.

89.    "Petition Date" means May 29, 2016, the date on which each of the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

90.    "Plan" means this *Debtors' Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code* (as it may be altered, amended, modified or supplemented from time to time).

91.    "Plan Supplement" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan, which shall be in form and substance acceptable to the Debtors, the Creditors Committee and the Ad Hoc Noteholder Group, and which shall be filed in the Chapter 11 Cases no later than ten (10) days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, as may be amended or supplemented by additional documents filed in the Chapter 11 Cases prior to the Effective Date.

92.    "Prepetition Noteholder Deficiency Claims" means the deficiency claims, classified as General Unsecured Claims, of the holders of Allowed First Lien Note Claims and Allowed Second Lien Note Claims.

93.    "Prepetition Noteholders" means the First Lien Noteholders and the Second Lien Noteholders.

94.    "Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

95.    "Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in that Class.

96.    "Professional" means a Person or Entity: (a) employed in the Chapter 11 Cases in accordance with sections 327, 328 or 1103 of the Bankruptcy Code pursuant to a Final Order and to be compensated for services rendered from the Petition Date through and including the

Effective Date, but not beyond, pursuant to sections 327 through 331 or 1103 of the Bankruptcy Code; or (b) for which compensation and reimbursement of expenses has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

97.     "Professional Claim" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation and reimbursement of expenses incurred from the Petition Date through and including the Effective Date under sections 327, 328, 330, 331, 503(b), 1103 or 1129(a)(4) of the Bankruptcy Code.

98.     "Professional Claims Bar Date" means the date that is thirty (30) days after the Effective Date.

99.     "Proof of Claim" means a proof of Claim filed in Chapter 11 Cases in a manner consistent with the Bar Date Notice.

100.     "Rejection Damages Claim" means a Claim for damages arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to sections 365 or 1123 of the Bankruptcy Code.

101.     "Released Parties" means each of: (a) the Debtors; (b) the Creditor Trustee; (c) the Creditors Committee; (d) the Ad Hoc Noteholder Group and its members; (e) the Prepetition Noteholders; (f) the Indenture Trustees; (g) the DIP Agent; (h) the DIP Lenders; and (j) in each case, their predecessors, successors and assigns, professionals, advisors, accountants, attorneys, investment bankers, and consultants, and in the case of (b) through (h), their current and former affiliates, subsidiaries, funds, portfolio companies, management companies, employees, agents, directors and officers, and other representatives (each solely in their capacity as such). For the avoidance of doubt, the Debtors' directors and officers are not included in the definition of "Released Parties."

102.     "Releasing Parties" means each holder of a Claim against the Debtors that (a) is Unimpaired pursuant to this Plan and therefore is deemed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (b) receives and returns a Ballot indicating an election not to opt out of the releases provided in Section 10.02 herein.

103.     "Remaining Claims Holdback" means the funds remaining from the Claims Reserve Holdback, if any, after final distributions have been made to all Allowed Holdback Claims.

104.     "Remaining Creditor Trust Assets" means the Creditor Trust Assets, if any, other than (a) Cash required to pay Allowed Holdback Claims, (b) the First Lien LEO Bond Distribution, (c) the First Lien Trust Initial Distribution, (d) the GUC Earmarked Funds, (e) the GUC LEO Bond Distribution, (f) the Non-LEO Bond Distribution, (g) the Remaining Claims Holdback; and (h) the Wind Down Costs.

105.     "Schedule of Assumed Executory Contracts and Unexpired Leases" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors and assigned to the Creditor Trust pursuant to this Plan, including any Cure Costs related thereto, in

the form filed as part of the Plan Supplement, as the same may be amended, modified or supplemented from time to time.

106.   "Schedules" means the schedules of assets and liabilities, the list of holders of Equity Interests and the statements of financial affairs and such other documents filed by the Debtors under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments pursuant to Bankruptcy Rule 1009 and modifications thereto through the Confirmation Date.

107.   "Second Lien Indenture" means that indenture dated as of October 12, 2012, among the Issuers, the non-Issuer Debtors other than Linc Energy Operations, Inc., and the Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent, as amended and supplemented by the Supplemental Indenture dated as of August 13, 2014 and the Second Supplemental Indenture dated as of June 30, 2015, pursuant to which were issued $265,000,000 aggregate principal amount 12.50% Second Lien Notes, which principal amount was later increased by $18,550,000 in connection with the October 2015 interest payment.

108.   "Second Lien Indenture Trustee" means Delaware Trust Company as trustee under the Second Lien Indenture.

109.   "Second Lien Note Claim" means any Claim arising from or related to the Second Lien Indenture.

110.   "Second Lien Notes" means the 12.50% senior secured notes due 2017 issued pursuant to the Second Lien Indenture.

111.   "Second Lien Noteholders" means those "Noteholders" under (and as defined in) the Second Lien Indenture.

112.   "Secured Claim" means a Claim: (a) secured by a Lien on property of the Estate to the extent of the value of such property; or (b) subject to a valid right of setoff to the extent of the amount subject to valid setoff pursuant to section 553 of the Bankruptcy Code.

113.   "Stipulation" means the *So Ordered Stipulation Amending Final DIP Order* filed with the Bankruptcy Court on November 22, 2016 [Dkt. No. 428], and subsequently entered by the Bankruptcy Court on December 5, 2016 [Dkt. No. 442].

114.   "U.S." means the United States of America.

115.   "U.S. Trustee" means the United States Trustee for the Southern District of Texas.

116.   "Undeliverable Distribution" means any distribution under this Plan on account of an Allowed Claim to a holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Distribution Agent of an intent to accept a particular distribution; (c) responded to the Distribution Agent's requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

117.     "<u>Unencumbered Cash</u>" means the Debtors' Cash or Cash equivalents that are not subject to any Lien, claim or encumbrance.

118.     "<u>Unexpired Lease</u>" means an unexpired lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

119.     "<u>Unimpaired</u>" means a Class of Claims in a Debtor that is not Impaired.

120.     "<u>Voting Deadline</u>" means 4:00 p.m. CST on [•], 2017, or such other date approved by the Bankruptcy Court.

121.     "<u>Wind Down Costs</u>" means the reasonable expenses necessary to fund post-Effective Date professional fees and U.S. Trustee fees pursuant to Sections 2.02(c) and 2.03 herein, wind down the Chapter 11 Cases, and dissolve the Debtors, as agreed among the Debtors, the Creditors Committee and the Ad Hoc Noteholder Group.

122.     "<u>Wyoming Assets</u>" means the oil and gas leases previously owned by Linc Energy Petroleum (Wyoming), Inc. as of the Petition Date, covering 27,821 net acres and 31 wells across 3 fields in the Powder River Basin.

123.     "<u>Wyoming Sale Proceeds</u>" means the net proceeds from the sale of the Wyoming Assets.

**Section 1.02.  Rules of Interpretation**

For purposes herein, the following rules of interpretation apply: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections herein or hereto; (e) the words "herein" and "hereto" refer to this Plan in its entirety rather than to any particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of, or to affect, the interpretation herein; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

### Section 1.03.  Computation of Time

Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed herein.

### Section 1.04.  Governing Law

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to conflict-of-laws principles; provided that the corporate or limited liability company governance matters shall be governed by the laws of the state of incorporation or formation of the applicable Entity.

### Section 1.05.  Reference to Monetary Figures

All references in this Plan to monetary figures refer to currency of the U.S.

### Section 1.06.  Reference to the Debtors

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors mean the Debtors or specific Debtor, as applicable, to the extent context requires.

## ARTICLE II
## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims (including Professional Claims) and Priority Tax Claims are not classified and thus are excluded from the Classes of Claims and Equity Interests set forth in ARTICLE III herein. These unclassified Claims are treated as follows:

### Section 2.01.  Administrative Claims

(a)     Treatment

Unless the holder and the Debtors, in consultation with the Ad Hoc Noteholder Group or, after the Effective Date, the Creditor Trustee agree to a different treatment, each holder of an Administrative Claim (other than an Administrative Claim that is a Professional Claim or a Claim for fees payable pursuant to 28 U.S.C. § 1930(a)) as of the Effective Date shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, the amount of such Allowed Administrative Claim, in Cash from the Claims Reserve Holdback on or as soon as practicable after the latest of (i) the Effective Date, (ii) the date that is fourteen (14) days after the date such Claim is Allowed, (iii) the date such Allowed Administrative Claim becomes due and payable in the ordinary course of business in accordance with the terms, and subject to the conditions, of any agreements governing, instruments evidencing, or other documents relating to, the applicable transaction giving rise to such Allowed Administrative

14

Claim, if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business, or (iv) such other date as may be agreed upon in writing by the holder of such Claim and the Debtors.

      (b)    <u>Administrative Claims Bar Date</u>

Holders of Administrative Claims (other than Professional Claims or Claims for fees payable pursuant to 28 U.S.C. § 1930(a)) shall file any request for allowance and payment of Administrative Claims no later than thirty (30) days after the Effective Date or otherwise be forever barred, estopped, and enjoined from asserting such Claims against the Debtors' respective Estates and property, the Creditor Trust, a Distribution Agent, or otherwise, and such Administrative Claims shall be deemed discharged and released as of the Effective Date. The Creditor Trustee shall have thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Administrative Claims Bar Date to review and object to such Administrative Claims before a hearing for determination of allowance of such Administrative Claims.

**Section 2.02.  Professional Claims**

      (a)    <u>Treatment</u>

The Bankruptcy Court shall determine the Allowed amounts of the Professional Claims after notice and hearing in accordance with the procedures established by the Bankruptcy Code and any order of the Bankruptcy Court in the Chapter 11 Cases. The Creditor Trust shall pay Professional Claims in full, in Cash from the Claims Reserve Holdback in the amount Allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) fourteen (14) days following the date on which the order related to any such Allowed Professional Claim is entered, or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Professional Claim and the Creditor Trustee.

      (b)    <u>Professional Claims Bar Date</u>

Holders of Professional Claims shall file with the Bankruptcy Court any request for allowance and payment of such Professional Claims no later than thirty (30) days after the Effective Date or otherwise be forever barred, estopped, and enjoined from asserting such Claims against the Debtors, their respective Estates and property, the Creditor Trust, a Distribution Agent, or otherwise, and such Professional Claims shall be deemed discharged as of the Effective Date. The Creditor Trustee and other parties in interest shall have thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Professional Claims Bar Date to review and object to such Professional Claims before a hearing for determination of allowance of such Professional Claims.

Notwithstanding anything to the contrary herein, this Section 2.02 shall not apply to any fees and expenses (including attorney's fees and fees for other retained professionals, advisors and consultants) of the Ad Hoc Noteholder Group and the First Lien Indenture Trustee, which shall be paid pursuant to the Stipulation and the First Lien Indenture.

      (c)      <u>Post-Effective Date Professional Fees</u>

From and after the Effective Date, the Creditor Trust shall pay in Cash the reasonable legal fees and expenses incurred by the Creditor Trust's professionals incurred in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court. For the avoidance of doubt, following the Effective Date any requirement that a professional comply with sections 327 through 331 of the Bankruptcy Code in seeking compensation for services rendered after such date shall terminate.

**Section 2.03.  U.S. Trustee Fees**

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid in full in Cash by the Debtors (before the Effective Date) or the Creditor Trustee (on and after the Effective Date) for each quarter (including any fraction therein) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

**Section 2.04.  Priority Tax Claims**

To the extent not previously paid during the Chapter 11 Cases, unless the holder agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release and discharge of such Claim, payment in full in Cash from the Claims Reserve Holdback on or as soon as practicable after the latest of the (a) the Effective Date; (b) the date that is fourteen (14) days after the date such Claim is Allowed; or (c) such other date as may be agreed upon in writing by the holder of such Claim and the Debtors, or, after the Effective Date, the Creditor Trustee.

# ARTICLE III
# CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

**Section 3.01.  Classification**

This Plan is styled as a joint plan among all Debtors. The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, Confirmation and distribution pursuant to this Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

Claims (other than those listed in ARTICLE II herein, which are not required to be classified pursuant to section 1123(a)(1) of the Bankruptcy Code) against and Equity Interests in each of the Debtors are classified as follows:

| Class | Claim or Equity Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |

| Class | Claim or Equity Interest | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | First Lien Note Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Note Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Equity Interests | Impaired | Deemed to Reject |

**Section 3.02.  Treatment**

(a)    Class 1 (Other Priority Claims)

   (i)    *Classification*: Class 1 consists of Other Priority Claims.

   (ii)    *Treatment*: Unless the holder and the Debtors, in consultation with the Ad Hoc Noteholder Group or, after the Effective Date, the Creditor Trustee agree to a different treatment, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Claim, the amount of such Allowed Other Priority Claim in Cash from the Claims Reserve Holdback on or as soon as practicable after the latest of (a) the Effective Date, (b) the date that is fourteen (14) days after the date such Claim is Allowed, or (c) such other date as may be agreed upon in writing by the holder of such Claim.

   (iii)    *Voting*: Class 1 is Unimpaired and presumed to accept this Plan. The holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject this Plan.

(b)    Class 2 (Other Secured Claims)

   (i)    *Classification*: Class 2 consists of Other Secured Claims.

   (ii)    *Treatment*: Unless the holder and the Debtors, in consultation with the Ad Hoc Noteholder Group or, after the Effective Date, the Creditor Trustee agree to a different treatment, each holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Claim, either (A) the amount of such Allowed Other Secured Claim in Cash from the Claims Reserve Holdback on or as soon as practicable after the latest of (x) the Effective Date; (y) the date that is fourteen (14) days after the date such Claim is Allowed; or (z) such other date as may be agreed upon in writing by the holder of such Claim, or (B) the return of the applicable Collateral in satisfaction of the Allowed amount of such Other Secured Claim. Upon satisfaction of such Allowed Claim as set forth herein, the Liens securing such Other Secured Claim shall be deemed released.

17

(iii)    *Voting*: Class 2 is Unimpaired and presumed to accept this Plan. The holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject this Plan.

(c)    Class 3 (First Lien Note Claims)

(i)    *Classification*: Class 3 consists of First Lien Note Claims.

(ii)    *Treatment*: The First Lien Note Claims shall be Allowed in the aggregate principal amount of $125,000,000 plus accrued and unpaid interest as of the Petition Date, plus, to the extent the following are payable in accordance with the First Lien Indenture, fees and expenses (including any prepayment fees and professional fees and expenses), penalties, premiums and other obligations incurred in connection with the First Lien Note Claims, plus, to the extent applicable, any adequate protection claims or other claims as provided for in the Stipulation; provided, however, that upon the occurrence of the Effective Date, the First Lien Adequate Protection Claim (as defined in the DIP Facility) shall be deemed waived pursuant to this Plan. Prior to the Effective Date, the outstanding amount of the Allowed First Lien Note Claims was reduced by (i) a partial payment in the amount of $22,315,759 made in respect of such claims pursuant to the Stipulation and (ii) a credit bid of $80,000,000 to purchase the Alaska Assets pursuant to the applicable Asset Purchase Agreement. Unless the holder agrees to a different treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, the remaining balance of such Claim, each holder of an Allowed First Lien Note Claim, on or as soon as practicable after the Effective Date, shall receive its Pro Rata share of:

a.    100% of the Gulf Coast Sale Proceeds less the Claims Reserve Holdback, to the extent not previously distributed to the First Lien Noteholders pursuant to the Stipulation;

b.    100% of the Wyoming Sale Proceeds; and

c.    the Noteholder Trust Interests, pursuant to which each holder shall be entitled to receive from the Creditor Trust its Pro Rata share of the Noteholder Trust Assets when and as such assets are available for distribution in accordance with the terms of the Creditor Trust Agreement; provided that the Debtors shall distribute as much of the Noteholder Trust Assets to such holders on the Effective Date as is monetized and available for distribution, except for the Creditor Trust Initial Administrative Funding.

For the purpose of distribution pursuant to the treatment described in this Section 3.02(c)(ii), the Pro Rata share for each holder of an Allowed First Lien Note Claim will be a fraction, expressed as a percentage, (x) the

numerator of which is the outstanding principal amount of First Lien Notes held by such holder, and (y) the denominator of which is the aggregate outstanding principal amount of all outstanding First Lien Notes.

    (iii)    *Voting*: Class 3 is Impaired. The holders of Class 3 First Lien Note Claims are entitled to vote to accept or reject this Plan.

(d)    <u>Class 4 (Second Lien Note Claims)</u>

    (i)    *Classification*: Class 4 consists of Second Lien Note Claims.

    (ii)    *Treatment*: In exchange for the compromises reflected herein, including recoveries provided to holders of Class 3 First Lien Note Claims, each Allowed Second Lien Note Claim is deemed satisfied, compromised, settled, and released in full on the Effective Date.

    (iii)    *Voting*: Class 4 is Impaired. The holders of Class 4 Second Lien Note Claims are entitled to vote to accept or reject this Plan.

(e)    <u>Class 5 (General Unsecured Claims)</u>

    (i)    *Classification:* Class 5 consists of General Unsecured Claims.

    (ii)    *Treatment:* Unless the holder and the Debtors, in consultation with the Ad Hoc Noteholder Group or, after the Effective Date, the Creditor Trustee, agree to a different treatment, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Claim, its Pro Rata share of the GUC Trust Interests, pursuant to which each holder shall be entitled to receive from the Creditor Trust its Pro Rata share of the GUC Trust Assets when and as such assets are available for distribution in accordance with the terms of the Creditor Trust Agreement.

    (iii)    *No Recovery on Account of Deficiency Claims:* Upon acceptance of this Plan by Class 3, Class 4 and Class 5, all holders of First Lien Note Claims and Second Lien Note Claims shall be deemed to have agreed to forgo any distribution from the GUC Trust Assets in respect of their Prepetition Noteholder Deficiency Claims.

    (iv)    *Voting*: Class 5 is Impaired. The holders of Class 5 General Unsecured Claims (other than holders of the Prepetition Noteholder Deficiency Claims) are entitled to vote to accept or reject this Plan.

(f)    <u>Class 6 (Equity Interests)</u>

    (i)    *Classification*: Class 6 consists of all Equity Interests.

    (ii)     *Treatment*: On the Effective Date, all Equity Interests shall be cancelled and extinguished and the holders of all Equity Interests shall not receive or retain any property or Assets on account of their Equity Interests.

    (iii)    *Voting*: Class 6 is Impaired and presumed to reject this Plan. The holders of Class 6 Equity Interests are not entitled to vote to accept or reject this Plan.

## Section 3.03.   Additional Provisions Regarding Unimpaired Claims

Except as otherwise explicitly provided in this Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims including, without limitation, all rights with respect to legal and equitable defenses to setoffs or recoupments asserted against Unimpaired Claims.

## Section 3.04.   Intercompany Claims

On the Effective Date, all Intercompany Claims shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distributions to any holder of Intercompany Claims.

## ARTICLE IV
## ACCEPTANCE OR REJECTION OF THIS PLAN

## Section 4.01.   Acceptance by an Impaired Class

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, Impaired Classes entitled to vote under this Plan shall have accepted this Plan if it is accepted by the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims that have timely and properly voted to accept or reject this Plan or if no holder of a Claim with respect to a specific Class for a particular Debtor timely submits a Ballot that complies with the Disclosure Statement Order indicating acceptance or rejection of this Plan.

## Section 4.02.   Elimination of Vacant Classes

Any Class of Claims or Equity Interests that is not populated as of the commencement of the Confirmation Hearing by an Allowed Claim or Equity Interest, or a Claim or Equity Interest that is temporarily allowed under Bankruptcy Rule 3018, shall be deemed eliminated from this Plan for purposes of: (a) voting to accept or reject this Plan; and (b) determining the acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## Section 4.03.   Nonconsensual Confirmation

The Debtors may request confirmation under section 1129(b) of the Bankruptcy Code with respect to (a) any Impaired Class of Claims and Equity Interests that have not accepted this Plan in accordance with sections 1126 and 1129(a)(8) of the Bankruptcy Code and (b) any Class that is deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code or the terms of this Plan or otherwise.

# ARTICLE V
# IMPLEMENTATION OF THIS PLAN

The transactions required to implement this Plan shall be implemented in accordance with this ARTICLE V.

## Section 5.01.  Deemed Consolidation

The Estates of the Debtors have not been substantively consolidated; provided, however that for purposes of voting and determining distributions under this Plan, the Debtors will be deemed consolidated and treated as equivalent to a single legal entity. This "deemed" consolidation means that Claims filed against the Debtors will be considered to be a single Claim against the consolidated Debtors. The Debtors believe that this Plan structure is beneficial to Creditors as a whole and accomplishes a fairer distribution of value among Creditors. Likewise, this structure will minimize costly disputes over which Debtors owned what property. It will also facilitate the compromise reached among the Debtors, the Creditors Committee and the Ad Hoc Noteholder Group as embodied in this Plan. The Ad Hoc Noteholder Group, whose members hold Liens on the majority of the Debtors' Assets, as well as the Creditors Committee, have agreed to this treatment. Consolidation of the Debtors' Estates is for the limited purpose of making distributions to holders of Allowed Claims to ease an administrative burden on the Debtors, their Estates, and the Creditor Trustee or a Distribution Agent, as applicable.

For the avoidance of doubt, no holder of an Allowed Claim shall receive more favorable treatment on account of such Claims under this Plan had consolidation not been effected. Without limiting the foregoing, recoveries by holders of Allowed Other Secured Claims shall be limited by the Liens and the value of the Collateral securing such Allowed Claims, without recourse to any other Assets not encumbered by such Liens or included in such Collateral. This deemed consolidation will not affect (other than for purposes related to funding distributions under this Plan) the legal and organizational structure of the Debtors or pre- and post-Petition Date guaranties, Liens, and security interests, or distributions out of any insurance policies or proceeds of policies.

The Debtors, in consultation with the Creditors Committee and the Ad Hoc Noteholder Group, reserve the right to withdraw this Plan with respect to one or more Debtors as they may reasonably determine, including as may be appropriate or necessary to effectuate the terms of this Plan as described in this Section 5.01.

## Section 5.02.  Operations Between Confirmation Date and Effective Date

During the period from the Confirmation Date through and including the Effective Date, the Debtors may continue to operate their businesses in the ordinary course as debtors in possession, subject to all applicable orders of the Bankruptcy Court, the Bankruptcy Code and the limitations set forth herein.

**Section 5.03.  Creditor Trust**[2]

(a)   <u>Creation of the Creditor Trust</u>

On or before the Effective Date, the Debtors shall take all necessary steps to establish the Creditor Trust for the benefit of the holders of Allowed Claims (the "<u>Creditor Trust Beneficiaries</u>") by the execution and delivery of the Creditor Trust Agreement.

(b)   <u>Transfer of the Creditor Trust Assets</u>

On the Effective Date, all property of each Estate, including, without limitation, all then-owned Assets of each Debtor, all Causes of Action and any remaining Cash (following distributions as set forth herein) shall vest in the Creditor Trust free and clear of all Liens, Claims, charges and encumbrances. The Creditor Trust Assets shall be deemed irrevocably transferred to the Creditor Trust free and clear of all Liens, claims and encumbrances pursuant to the Creditor Trust Agreement. For all U.S. federal income tax purposes, all Persons (including, without limitation, the Debtors and the Creditor Trustee and the Creditor Trust Beneficiaries) shall treat the transfer and assignment of the Creditor Trust Assets to the Creditor Trust for the benefit of the Creditor Trust Beneficiaries as (i) a transfer of the Creditor Trust Assets directly to the Creditor Trust Beneficiaries followed by (ii) the transfer by the Creditor Trust Beneficiaries to the Creditor Trust of the Creditor Trust Assets. The Creditor Trust will be treated as a grantor trust for U.S. federal tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes. The Creditor Trust Beneficiaries will be treated as the grantors and owners of their Pro Rata (by Class or category of Claim) portion of the Creditor Trust Assets for U.S. federal income tax purposes. On and after the Effective Date, the Creditor Trustee may use, acquire and dispose of property and compromise or settle any Claims, without the supervision of or approval by the Bankruptcy Court, and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than the restrictions expressly imposed by this Plan, the Confirmation Order or the Creditor Trust Agreement.

(c)   <u>Purpose of the Creditor Trust</u>

The Creditor Trust, duly organized under the laws of Texas, shall be established for the purpose of liquidating and distributing the Creditor Trust Assets in accordance with Treasury Regulation Section 301.7701-4(d) and shall be governed by the Creditor Trust Agreement.

(d)   <u>Administration of the Creditor Trust; Funding</u>

The Creditor Trust shall be administered by the Creditor Trustee pursuant to the Creditor Trust Agreement and, as detailed therein, shall be overseen by a three-member advisory board, consisting of one (1) representative appointed by the Creditors Committee, one (1) representative appointed by the Ad Hoc Noteholder Group, and the Creditor Trustee. The administrative costs and expenses of the Creditor Trust shall initially be funded by the Creditor Trust Initial Administrative Funding and the Wind Down Costs, which shall be transferred to the Creditor

---

[2]  This Section 5.03 is a general description of the Creditor Trust and its provisions. The Creditor Trust Agreement shall be included in the Plan Supplement. To the extent this Section 5.03 is inconsistent with the Creditor Trust Agreement, the Creditor Trust Agreement shall control for all purposes.

Trust on or as soon as practicable after the Effective Date. Thereafter, the costs and expenses of administering the Creditor Trust shall be funded by the Creditor Trust Assets as designated in the Creditor Trust Agreement. Additionally, subject to the terms of the Creditor Trust Agreement, the Creditor Trust may borrow against, pledge, hypothecate, otherwise encumber, or convey Creditor Trust Assets as needed to accomplish the goals of the Creditor Trust such as, as an example, pledging litigation recoveries to a contingency fee counsel or litigation funding lender. The Creditor Trust may also borrow on an unsecured basis, subject to the terms of the Creditor Trust Agreement.

    (e)    <u>Powers and Duties of the Creditor Trustee</u>

The Creditor Trustee shall be appointed by the Ad Hoc Noteholder Group. The Creditor Trustee shall retain and have all the rights, powers and duties necessary to carry out its responsibilities under this Plan and the Creditor Trust Agreement, and as otherwise provided in the Confirmation Order, subject to the advice of the Creditor Trust Advisory Board. The Creditor Trustee shall be the exclusive trustee of the Creditor Trust Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as a representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. Without limiting the foregoing, the Creditor Trustee shall succeed to all of the Debtors' rights, including in respect of the Asset Purchase Agreements. The Creditor Trustee's liability may be limited by the Creditor Trust Agreement to include limitations of liability for negligence and any actions except for willful misconduct or fraud.

## Section 5.04. Sources of Cash for Plan Distributions

Except as otherwise specifically provided herein or in the Confirmation Order or Stipulation, all Cash required for the payments to be made hereunder shall be obtained from the Creditor Trust.

## Section 5.05. Miscellaneous Alaska Assets

On or as soon as practicable after the Effective Date, as part of the global settlement and consensual agreement of the Ad Hoc Noteholder Group and the Creditors Committee as set forth herein, and in exchange for the consideration and agreements made by the Ad Hoc Noteholder Group herein, the Miscellaneous Alaska Assets shall be transferred and assigned free and clear of all Liens, claims, encumbrances and interests, to Malamute Energy, LLC. For the avoidance of doubt, the Miscellaneous Alaska Assets shall not be transferred to the Creditor Trust or be considered to be part of the Miscellaneous Assets or the Creditor Trust Assets.

## Section 5.06. Release of Bonds

On the Effective Date, the Debtors' rights under any bonds that have not been released as of the date thereof, including the right to receive the proceeds therefrom, shall be transferred to the Creditor Trust as Creditor Trust Assets. Prior to the Effective Date, the Debtors shall use reasonable efforts to cause the bonds to be released and, if released, the proceeds therefrom shall revert back to the respective Debtor listed as the principal therefor. Pursuant to Section 3.02(c) and Section 3.02(e) herein, on the Effective Date or as soon as practicable thereafter upon release of bonds, the proceeds from the Non-LEO Bonds and the LEO Bonds when released shall be

distributed to holders of Allowed First Lien Note Claims and Allowed General Unsecured Claims, as applicable, as the First Lien LEO Bond Distribution and the GUC LEO Bond Distribution, respectively.

## Section 5.07.   Claims Reserve Holdback

Pursuant to the Stipulation, the Debtors made an initial distribution of $22,315,759 of the Gulf Coast Sale Proceeds to the First Lien Indenture Trustee for the benefit of the First Lien Noteholders prior to Confirmation. As set forth in the Stipulation, the parties further agreed to withhold $8,901,224 from that initial distribution of Gulf Coast Sale Proceeds to meet various other expenses. On the Effective Date, the remaining portion of that holdback – i.e., the Claims Reserve Holdback, shall be transferred to the Creditor Trust and used to satisfy Allowed Holdback Claims as provided in ARTICLE II and Section 3.02(a) and Section 3.02(b) herein and to fund the Wind Down Costs. After satisfaction of all such Allowed Holdback Claims and payment of the Wind Down Costs, any funds remaining in the Claims Reserve Holdback shall become part of the Remaining Claims Holdback and shall be distributed in accordance with Section 3.02(c) herein.

## Section 5.08.   Corporate Existence; Officers and Directors

On the later of the Effective Date or the transfer of the Debtors' Assets to the Creditor Trust as provided herein, except to the extent that the Debtors, in consultation with the Ad Hoc Noteholder Group and the Creditors Committee determine otherwise, each of the Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided, however, that each Debtor shall file with the Office of the Secretary of State for the state of its incorporation, a certificate of dissolution which may be executed by an officer of such Debtor without the need for approval by the board of directors or shareholders. From and after the Effective Date, the Debtors shall not be required to file any document, or take any other action, or obtain any approval from any Debtor's board of directors or shareholders, to withdraw their business operations from any states in which the Debtors previously conducted their business operations.

On the Effective Date, (a) the positions of the current directors, or in the case of a governing body created by a partnership agreement, limited liability company agreement or similar agreement, the members of such governing body (such persons and the corporate directors collectively, the "Governors") of each Debtor shall be eliminated, and each Governor shall be terminated (without the necessity of further action), (b) to the fullest extent permitted by applicable law, the rights, powers, and duties of the Governors of any Debtor that remains in existence after the Effective Date and that has a Governor shall vest in the Creditor Trustee and the Creditor Trustee or its designee shall be the presiding officer and the sole Governor of each such Debtor. The Creditor Trustee shall make all determinations with respect to employment of any other directors, officers, managers and employees of any such Debtor on and after the Effective Date.

**Section 5.09.   Corporate Action**

On the Effective Date, all actions contemplated by this Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Equity Interests, directors, managers or officers of the Debtors, the Creditor Trustee, or any other Entity or Person, as applicable, including, without limitation: (a) the execution and delivery of all appropriate agreements or other documents of dissolution or liquidation containing terms that are consistent with the terms of this Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any Asset, property, right, liability, debt or obligation on terms consistent with the terms of this Plan and having other terms for which the applicable parties agree; (c) rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases; and (d) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. All matters provided for in this Plan involving the company structure of the Debtors, and any company action required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons or officers of the Debtors. The authorizations and approvals contemplated by this Section 5.09 shall be effective notwithstanding any requirements under nonbankruptcy law.

**Section 5.10.   Preservation of Causes of Action Not Expressly Released**

Except as otherwise provided in this Plan or in any contract, instrument, release, indenture or other agreement entered into in connection with this Plan, in accordance with section 1123(b)(3) of the Bankruptcy Code, any claims, rights, and Causes of Action that the Debtors may hold against any Person, shall vest in the Creditor Trust, and the Creditor Trust and the Creditor Trustee, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such claims, rights or Causes of Action. In addition, the Creditor Trustee, and its successor entities under this Plan expressly reserve the right to pursue or adopt any rights and/or claims asserted and/or alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Person or Entity (including, in each case and without limitation, the other Debtors), including, without limitation, the other parties in such lawsuits. The Creditor Trust shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, and Causes of Action without the consent or approval of any third party and without any further order of the Bankruptcy Court. Unless a Cause of Action is expressly waived, relinquished, released or compromised in this Plan or an order of the Bankruptcy Court, the Creditor Trustee expressly reserves such Cause of Action for later adjudication and, accordingly, no doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches or other preclusion doctrine shall apply to such Cause of Action as a consequence of Confirmation, the vesting of such Cause of Action in the Creditor Trust, any order of the Bankruptcy Court or these Chapter 11 Cases.

Without limiting the foregoing, the Causes of Action reserved by the Debtors and contributed to the Creditor Trust include, without limitation, any claims the Debtors, their

25

Estates, or any Creditor (whether claiming directly, or by, through or on behalf of the Debtors) could assert against any Person who is or was an officer or director or otherwise in control of any Debtor or Affiliate, including, without limitation, claims for negligence, mismanagement, intentional or unintentional wrongful acts, breaches of fiduciary duties, self-dealing, misappropriation, fraud, concealment of assets, and any other claim, whether arising in law, equity, tort, contract, statute or common law.

Delivery (by any means) of this Plan or Disclosure Statement to any Person to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors, or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors, shall constitute actual notice that such obligation, transfer, or transaction may be reviewed by the Creditor Trustee subsequent to the Effective Date and may, if appropriate, be the subject of an action after the Effective Date, whether or not: (a) such Person has filed a Proof of Claim against the Debtors in their Chapter 11 Cases; (b) such Person's Proof of Claim has been objected to by the Debtors or the Creditor Trustee, as applicable; (c) such Person's Claim was included in Debtors' Schedules; (d) such Person's scheduled Claim has been objected to by the Debtors or the Creditor Trustee, as applicable, or has been identified by the Debtors or the Creditor Trustee, as applicable, as a Disputed Claim; or (e) such action falls within the list of affirmative Causes of Action in the Plan Supplement. No Person may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any Cause of Action against them as an indication that the Debtors or the Creditor Trustee, as applicable, will not pursue such Cause of Action.

### Section 5.11.  Release of Liens

On the Effective Date, except as otherwise specifically provided for in this Plan, in the Confirmation Order, or in any contract, instrument, release or other agreement or document created pursuant to or as contemplated under this Plan, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Debtors' Estates shall be fully released, settled and discharged, and all of the rights, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Debtors or the Creditor Trust, as applicable.

### Section 5.12.    Cancellation of Securities and Notes Against the Debtors

On the Effective Date, except as otherwise specifically provided for in this Plan, in the Confirmation Order, or in any contract, instrument, release or other agreement or document created pursuant to or as contemplated under this Plan, each of (a) the First Lien Notes, (b) the Second Lien Notes, (c) the Equity Interests in the Debtors and (d) any other notes, bonds, indentures, certificates or other instruments or documents evidencing or creating any indebtedness of or ownership interest in the Debtors or giving rise to any Claims or Equity Interests shall be cancelled and deemed terminated and satisfied and discharged solely with respect to the Debtors, and the holders thereof shall have no further rights or entitlements in respect thereof against the Debtors or their Estates, except the rights to receive the distributions, if any, to which the holders thereof are entitled under this Plan. Notwithstanding anything herein to the contrary, the applicable provisions of the First Lien Indenture shall continue in effect

solely for the purposes of permitting the First Lien Indenture Trustee to: (i) make the distributions to be made to holders of Allowed First Lien Note Claims as contemplated by Section 3.02(c) herein; and (ii) maintain any rights the First Lien Indenture Trustee may have for any fees, costs, expenses, and indemnification under the Indentures or other agreements until all such fees, costs, and expenses are paid.

## Section 5.13.   General Settlement of Claims

Unless otherwise set forth in this Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, on the Effective Date, the provisions of this Plan constitute a good-faith compromise and settlement of all Claims against and Equity Interests in the Debtors relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim, or any Distribution to be made on account of such Allowed Claim. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors and their Estates and is fair, equitable and reasonable. In the event that, for any reason, the Confirmation Order is not entered or the Effective Date does not occur, the Debtors, the Creditors Committee and the Prepetition Noteholders reserve all of their respective rights with respect to all disputes resolved and settled under this Plan.

## Section 5.14.   Section 1146(a) Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, all transfers of property under this Plan shall not be subject to any stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment. The Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax, fee, or governmental assessment.

## ARTICLE VI
## TREATMENT OF EXECUTORY CONTRACTS AND LEASES

## Section 6.01.   Rejection of Executory Contracts and Unexpired Leases

Except as otherwise expressly provided in (a) this Plan, (b) the Schedule of Assumed Executory Contracts and Unexpired Leases or (c) any other filing made before the Confirmation Hearing, including, without limitation, the Asset Purchase Agreements, all Executory Contracts and Unexpired Leases shall be deemed automatically rejected as of the Effective Date in accordance with, and subject to the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code; provided, however, that this Section 6.01 shall not apply to any Executory Contract or Unexpired Lease that expired or was terminated prior to the Petition Date pursuant to its terms.

**Section 6.02.  Treatment of Assumed Executory Contracts and Unexpired Leases; Assignment**

Except as otherwise expressly provided in (a) the Plan Supplement, or (b) any other filing made before the Confirmation Hearing, all Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Executory Contracts and Unexpired Leases shall be assumed by the applicable Debtor(s) as of the Effective Date in accordance with, and subject to the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code and assigned to the Creditor Trust; provided, however, that this Section 6.02 shall not apply to any Executory Contract and Unexpired Lease of a Debtor that expired or terminated pursuant to its own terms prior to the Petition Date.

Any Executory Contract or Unexpired Lease that is assumed by any of the Debtors or the Creditor Trustee, if not expressly assigned to a third party previously in these Chapter 11 Cases, will be deemed assigned to the Creditor Trust pursuant to section 365 of the Bankruptcy Code. If an objection to a proposed assumption, assumption or assignment, or Cure Cost is not resolved in favor of the Debtors or Creditor Trust before the Effective Date, the applicable executory contract may be designated by the Debtors or the Creditor Trust for rejection within five (5) days after the entry of the order of the Bankruptcy Court resolving the matter against the Debtors or Creditor Trust. Such rejection shall be deemed effective as of the Effective Date.

**Section 6.03.  Effect of Confirmation Order on Assumption/Rejection**

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order of the Bankruptcy Court pursuant to sections 365 and 1123(b) of the Bankruptcy Code approving the assumption or rejection, as applicable, of the Executory Contracts and Unexpired Leases as of the Effective Date and determining that: (a) with respect to such rejections, such rejected Executory Contracts and Unexpired Leases are burdensome and that the rejection therein is in the best interests of the Estates; and (b) with respect to such assumptions, to the extent necessary, that the applicable Debtor has (i) cured any default, (ii) compensated the counterparty for any actual pecuniary loss resulting from any default, and (iii) provided adequate assurance of future performance under such Executory Contract or Unexpired Lease of the applicable Debtor. Assumption of any Executory Contract or Unexpired Lease of any Debtor, and satisfaction of the Cure Costs, shall result in the full discharge, release and satisfaction of any claims or defaults, whether monetary or nonmonetary, arising under any assumed Executory Contract or Unexpired Lease of such Debtor at any time before the date such Executory Contract or Unexpired Lease is assumed. Each Executory Contract and Unexpired Lease assumed pursuant to this Plan or Bankruptcy Court order shall vest in and be fully enforceable by the applicable Debtor. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

28

**Section 6.04.   Cure of Defaults and Objections to Assumption**

Except as may be otherwise agreed to by the parties, within seven (7) days after the Effective Date, the Creditor Trustee shall pay any undisputed Cure Costs to the counterparties to any assumed Executory Contracts and Unexpired Leases. The Cure Costs for the contracts to be assumed will be included in the Schedule of Assumed Executory Contracts and Unexpired Leases. If there are no Cure Costs listed for an Executory Contract or Unexpired Lease, then the proposed Cure Costs shall be $0.00. Such amount shall be deemed full payment of such obligations under section 365(b) of the Bankruptcy Code, unless, on or before the Voting Deadline, the contract counter-party files an objection disputing: (a) the amount of any Cure Costs, (b) the ability of the Debtors or any assignee to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (c) any other matter pertaining to assumption. The disputed Cure Costs required by section 365(b)(1) of the Bankruptcy Code shall be made only after entry of a Final Order resolving the dispute and approving the assumption.

**Section 6.05.   Rejection Damages Claims and Objections to Rejection**

Claims arising out of the rejection of Executory Contract or Unexpired Leases pursuant to this Plan must be filed and served pursuant to the procedures specified in the Bar Date Notice, or another order of the Bankruptcy Court, no later than thirty (30) days after the Effective Date. Holders of any Claim not filed within such time will be forever barred from asserting such Claim against the Debtors, their Estates, or their respective successors or their respective properties. Unless otherwise ordered by the Bankruptcy Court or specified in this Plan, all Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be treated as General Unsecured Claims under this Plan; provided, however, if the holder of an Allowed Claim for rejection damages has an unavoidable security interest in any Collateral to secure obligations under such rejected contract or lease, the Allowed Claim for rejection damages shall be treated as an Other Secured Claim against the particular Debtor in question to the extent of the value of such holder's interest in the Collateral, with the deficiency, if any, treated as a General Unsecured Claim against the particular Debtor in question.

**Section 6.06.   Preexisting Obligations Under Executory Contracts and Unexpired Leases**

The Debtors or the Creditor Trustee, as applicable, reserve the right to assert that rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of obligations owed to the Debtors or the Creditor Trust, as applicable, under such contracts or leases, prior to the rejection of such contracts or leases. Notwithstanding any nonbankruptcy law to the contrary, the Debtors or the Creditor Trustee, as applicable, expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors or Creditor Trustee, as applicable, from counterparties to rejected Executory Contracts and Unexpired Leases.

**Section 6.07. Modifications, Amendments, Supplements, Restatements or Other Agreements**

Unless otherwise provided in this Plan, each assumed or assumed and assigned Executory Contract and Unexpired Lease shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under this Plan or otherwise.

Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

**Section 6.08.   Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors or the Creditor Trustee, as applicable, that any such contract or lease is in fact an Executory Contract or Unexpired Lease, or that the Debtors or the Creditor Trustee, as applicable, have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of rejection, the Debtors or the Creditor Trustee, as applicable, shall have ninety (90) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided herein.

## ARTICLE VII
## PROVISIONS GOVERNING DISTRIBUTIONS

**Section 7.01.   Method of Distributions**

The Creditor Trustee shall act as Distribution Agent or, in its sole discretion, enter into an agreement with a third party Distribution Agent to facilitate the distributions required hereunder. The Debtors or, after the Effective Date the Creditor Trustee shall make all distributions required to be made under this Plan to holders of Allowed Claims. The Creditor Trustee or, if applicable, the Debtors shall establish reserves for Disputed Claims, or defer or delay distributions to holders of Allowed Claims to ensure an equitable and ratable distribution to holders in accordance with the terms of this Plan.

To the extent the Creditor Trustee does determine to utilize a Distribution Agent to facilitate the distributions under this Plan to holders of Allowed Claims, any such Distribution Agent would first be required to: (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under this Plan; and (c) waive any right or ability to setoff, deduct from or assert any Lien or encumbrance against the distributions required under this Plan to be distributed by such Distribution Agent.

The Creditor Trustee shall pay to the Distribution Agent all reasonable and documented fees and expenses of the Distribution Agent without the need for any approvals, authorizations, actions, or consents. The Distribution Agent shall submit detailed invoices to the Creditor Trustee for all fees and expenses for which the Distribution Agent seeks reimbursement and the Creditor Trustee shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Creditor Trustee deems to be unreasonable. In the event that the Creditor Trustee objects to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Creditor Trustee and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees or expenses. In the event that the Creditor Trustee and the Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

## Section 7.02.   Delivery of Distributions

Distributions to holders of Allowed Claims shall be made at the address of the holder of such Claim as indicated in the Claims Register as of the Distribution Record Date. A Distribution Agent shall have no obligation to recognize the transfer of or sale of any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those holders of Allowed Claims who are holders as of the close of business on the Distribution Record Date.

## Section 7.03.   Amount of Distributions

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim to the extent payable in accordance with this Plan. The Creditor Trustee will not make distributions upon a Claim held by a party against whom the Creditor Trustee asserts any avoidance action until resolution of the avoidance action by settlement or judgment or as otherwise provided by Bankruptcy Court order.

## Section 7.04.   Special Provision Relating to Distributions to Holders of Allowed First Lien Note Claims

Notwithstanding any provision of this Plan or Creditor Trust Agreement to the contrary, all Distributions to holders of Allowed First Lien Note Claims, whether pursuant to this Plan or Creditor Trust Agreement, shall be made to the First Lien Indenture Trustee, who in turn shall distribute the same pursuant to the First Lien Indenture to the holders of First Lien Notes as of the Distribution Record Date, after paying or reserving for any fees, costs, expenses and indemnification to which the First Lien Indenture Trustee is entitled under the First Lien Indenture.

## Section 7.05.   No Fractional or De Minimis Distributions

Notwithstanding anything contained herein to the contrary, payments of fractional dollars will not be made. Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, the actual payment made will reflect a rounding down of such fractions.

The Creditor Trustee or the Distribution Agent, as applicable, shall not be required to make any payment of less than $20.00 on any distribution.

**Section 7.06.   Undeliverable Distributions**

      (a)      <u>Holding of Undeliverable Distributions</u>

If any distribution, including a partial or interim distribution, to a holder of an Allowed Claim is returned to the Creditor Trustee or the Distribution Agent as undeliverable, no further distributions shall be made to such holder unless and until such the Creditor Trustee or Distribution Agent is notified in writing of such holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such holder as soon as practicable. Undeliverable Distributions shall remain in the possession of the Creditor Trustee or Distribution Agent until such time as a distribution becomes deliverable, and shall not be supplemented with any interest, dividends or other accruals of any kind.

      (b)      <u>Failure to Claim Undeliverable Distributions</u>

Any holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an Undeliverable Distribution within one hundred eighty (180) days after the distribution is distributed shall be deemed to have waived its Claim for such Undeliverable Distribution and shall be forever barred from asserting any such Claim against the Debtors' Estates or their property. In such cases, notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary, any Cash held for distribution on account of such Undeliverable Distribution shall be property of the Creditor Trust, free of any restrictions thereon, and shall be used for the administration of the Creditor Trust or otherwise re-distributed as a Remaining Creditor Trust Asset. Nothing contained in this Plan shall require the Debtors, the Creditor Trustee or the Distribution Agent to attempt to locate any holder of an Allowed Claim following one hundred eighty (180) days after the distribution is distributed.

**Section 7.07.   Time Bar to Cash Payments**

Checks issued on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance therein. Requests for reissuance of any check shall be made in writing directly to the Creditor Trustee or the Distribution Agent, as applicable, by the holder of the Allowed Claim with respect to which such check originally was issued. Any Claim in respect of such a voided check shall be made in writing on or before the later of one hundred eighty (180) days after the Effective Date or ninety (90) days after the date of issuance of such check. After such date, all Claims in respect of void checks shall be discharged and forever barred and the distribution on account of such Claims shall be treated in accordance with Section 7.06 herein.

**Section 7.08.   Means of Cash Payments**

Any Cash payment to be made pursuant to this Plan will be made in U.S. dollars by checks drawn on or by wire transfer from a domestic bank selected by the Creditor Trustee or the Distribution Agent, as applicable. No post-Effective Date interest shall be paid on Cash distributions hereunder.

**Section 7.09.   Foreign Currency Exchange Rates**

As of the Effective Date, any Claim asserted in currency(ies) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the mid-range spot rate of exchange for the applicable currency as published in *The Wall Street Journal*, National Edition, the day after the Petition Date.

**Section 7.10.   Setoffs**

The Creditor Trustee or the Distribution Agent, as applicable, may, pursuant to section 553 of the Bankruptcy Code and applicable non-bankruptcy law, set off against any Allowed Claim against the Debtors and the distributions to be made pursuant to this Plan on account of such Claim (before any distribution is made on account of such Claim), the claims, rights and Causes of Action of any nature that the Debtors or the Creditor Trust, as applicable, may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release of any such claims, rights and Causes of Action that the Debtors or the Creditor Trust may possess against such holder.

**Section 7.11.   Claims Paid or Payable by Third Parties**

A Claim shall be reduced in full and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to, or action, order or approval of, the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Creditor Trust, as applicable, or a Distribution Agent. To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Creditor Trust, as applicable, or a Distribution Agent on account of such Claim, such holder shall repay, return or deliver any distribution held by or transferred to the holder to the Creditor Trust to the extent the holder's total recovery on account of such Claim from the third party and under this Plan exceeds the total amount of such Claim as of the date of any such distribution under this Plan.

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim, then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**ARTICLE VIII**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

**Section 8.01.   Objections to Claims**

After the Effective Date, the Creditor Trustee shall have the exclusive authority to file objections to all Claims, and the exclusive authority to settle, compromise, or litigate to judgment any objections to Claims that he or she files. Subject to the terms of the Creditor Trust

Agreement, the Creditor Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Creditor Trustee also shall have the right to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

## Section 8.02.   Objection Deadline

As soon as practicable, but no later than the Claims Objection Deadline, the Creditor Trustee may file objections with the Bankruptcy Court and serve such objections on the Creditors holding the Claims to which such objections are made. Nothing contained herein, however, shall limit the right of the Creditor Trustee to object to Claims, if any, filed or amended after the Claims Objection Deadline. The Claims Objection Deadline may be extended by the Bankruptcy Court upon motion by the Debtors or Creditor Trustee, without notice or hearing.

For the avoidance of doubt, no Claim is or shall be deemed Allowed until the later of the Claims Objection Deadline of the expiration of some other applicable period of limitation fixed by the Bankruptcy Code, Bankruptcy Rules, or Bankruptcy Court, unless otherwise ordered by a Final Order of the Bankruptcy Court.

## Section 8.03.   Estimation of Claims

The Creditor Trustee or, if applicable, the Debtors may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Bankruptcy Code section 502(c), regardless of whether the Creditor Trustee or any Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Creditor Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.

## Section 8.04.   No Distributions on Disputed Claims

Notwithstanding any provision in this Plan to the contrary, no distributions, partial or otherwise, shall be made with respect to a Disputed Claim until such Claim becomes an Allowed Claim. Subject to the provisions of this Plan, after a Disputed Claim becomes an Allowed Claim, the holder of such an Allowed Claim will receive all distributions to which such holder is then entitled under this Plan on the next scheduled distribution date or as the Creditor Trustee otherwise determines in its reasonable discretion. No post-Effective Date interest shall be paid on distributions hereunder. If a Creditor incorporates more than one Claim in a Proof of Claim then: (a) such Claims will be considered one Claim for purposes of this Plan, and (b) no such Claim will be bifurcated into an Allowed portion and a Disputed portion.

**Section 8.05.   Disputed Claims Reserves from GUC Trust Assets**

On the Effective Date, one or more reserves may be established from the GUC Trust Assets for the benefit of holders of General Unsecured Claims that are Disputed, if any. As the Disputed Claims are resolved, the Creditor Trustee or the Distribution Agent, as applicable, shall make distributions to holders of any portion of such Claims that are Allowed. Following the completion of all such distributions in full, any funds remaining in any reserve(s) shall become a GUC Trust Asset and distributed in accordance with Section 3.02(e) herein; provided, however, that to the extent such distributions would result in total recoveries of holders of Allowed General Unsecured Claims in excess of the total amount of such Claims, the excess shall become a Noteholder Trust Asset and distributed in accordance with Section 3.02(c) herein.

**Section 8.06.   Reduction of Claims**

Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtors prior to the Effective Date, including pursuant to orders of the Bankruptcy Court. To the extent such payments are not reflected in the Schedules, such Schedules will be deemed amended and reduced to reflect that such payments were made. Nothing in this Plan shall preclude the Creditor Trustee from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Effective Date.

**Section 8.07.   Recoupment**

Any holder of a Claim shall not be entitled to recoup any Claim against any claim, right, or cause of action of the Debtors or the Creditor Trustee, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, or intends to preserve any right of recoupment.

## ARTICLE IX
## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THIS PLAN

**Section 9.01.   Conditions Precedent to Confirmation**

It shall be a condition to Confirmation that the following conditions have been satisfied or waived pursuant to Section 9.04 herein:

    (i)    the Disclosure Statement Order, in form and substance acceptable to the Debtors, the Creditors Committee and the Ad Hoc Noteholder Group, shall have been entered by the Bankruptcy Court on the docket of the Chapter 11 Cases, and such order shall not be subject to a stay;

    (ii)    the Confirmation Order shall be in form and substance reasonably acceptable to the Debtors, the Creditors Committee and the Ad Hoc Noteholder Group, which order shall include a finding of fact that the

Debtors, and their respective present members, officers, managers, employees, advisors, attorneys and agents, acted in good faith within the meaning of and with respect to all of the actions described in section 1125(e) of the Bankruptcy Code and are therefore not liable for the violation of any applicable law, rule, or regulation governing such actions; and

(iii)   this Plan, including any modifications or alterations thereof, and all documents and agreements related to this Plan, including the Plan Supplement, shall be filed in form and substance reasonably acceptable to the Debtors, the Creditors Committee and the Ad Hoc Noteholder Group.

For the avoidance of doubt, the Disclosure Statement Order and the Confirmation Order may be combined and entered concurrently.

**Section 9.02.   Conditions Precedent to the Effective Date**

It shall be a condition to occurrence of the Effective Date that the following conditions shall have been satisfied or waived pursuant to Section 9.04 herein:

(i)     all conditions precedent to Confirmation have been satisfied or waived;

(ii)    the Confirmation Order shall have been entered by the Bankruptcy Court on the docket of the Chapter 11 Cases, and such order shall not be subject to a stay;

(iii)   any modifications or alterations to this Plan or Plan Supplement shall be reasonably acceptable to the Creditors Committee and the Ad Hoc Noteholder Group;

(iv)    the Creditor Trust shall have been formed, and the Creditor Trust Agreement shall have been executed and become enforceable;

(v)     the appointment of the Creditor Trustee shall have been confirmed pursuant to an order of the Bankruptcy Court, which may be the Confirmation Order, and such order shall not be subject to a stay; and

(vi)    any outstanding fees or expenses incurred by the Ad Hoc Noteholder Group or the First Lien Indenture Trustee in connection with the Chapter 11 Cases, this Plan, the creation of the Creditor Trust, or Confirmation, including fees and expenses contemplated in the Stipulation, shall have been paid in full.

**Section 9.03.   Effect of Non-Occurrence of Conditions to Confirmation or Conditions Precedent to the Effective Date**

If the conditions in Section 9.01 and Section 9.02 herein are not satisfied for this Plan, or if the Confirmation Order is vacated, this Plan shall be null and void in all respects and nothing

contained in this Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors; (b) prejudice in any manner the rights of the Debtors, or any other Person or Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors or any other Person or Entity in any respects.

**Section 9.04.  Waiver of Conditions Precedent**

The Debtors, with the prior written consent of the Ad Hoc Noteholder Group, may waive any of the conditions precedent set forth in Section 9.01 and Section 9.02 herein in whole or in part at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate this Plan.

**ARTICLE X**
**EFFECT OF CONFIRMATION OF THIS PLAN**

**Section 10.01. Certain Releases by the Debtors**

**Except as otherwise expressly provided in this Plan or the Confirmation Order, and to the fullest extent authorized by applicable law, for good and valuable consideration, the adequacy of which is hereby confirmed, the Released Parties are deemed released and discharged by the Debtors, their Estates and any Person or Entity seeking to exercise the rights of the Debtors or their Estates from any and all claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative claims, asserted or that could possibly have been asserted directly or indirectly on behalf of the Debtors, their Estates or their Affiliates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted on behalf of the Debtors, their Estates or their Affiliates (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, their Estates or their Affiliates, the conduct of the Debtors' businesses, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Disclosure Statement or Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the Disclosure Statement, or this Plan, the filing and prosecution of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, the business or contractual arrangements between the Debtors, their Estates or their Affiliates, on the one hand, and any Released Party, on the other hand, prepetition contracts and agreements with one or both Debtors, or any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date; _provided_ that to the extent that a claim or Cause of Action is determined by a Final Order to have resulted from fraud, gross negligence or willful misconduct of a Released Party, such claim or Cause of Action shall**

not be so released against such Released Party. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release (i) any obligations arising on or after the Effective Date of any party under this Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan; and (ii) the right of the Debtors or the Creditor Trustee to object to Claims filed by any Person against any Debtor or an Estate, or to assert counterclaims or defenses in respect of such Claims, including rights of setoff, refund, recoupment or other adjustments as provided for herein.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this Section 10.01, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by this Section 10.01; (c) in the best interests of the Debtors, their Estates and all holders of Claims and Equity Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity asserting any claim or Cause of Action released by this Section 10.01.

### Section 10.02. Certain Voluntary Releases by Holders of Claims

Except as otherwise expressly provided in this Plan or the Confirmation Order, and to the fullest extent authorized by applicable law, for good and valuable consideration, the adequacy of which is hereby confirmed, the Released Parties are deemed released and discharged by (a) each other Released Party and (b) the Releasing Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative claims, asserted or that could possibly have been asserted directly or indirectly on behalf of the Releasing Parties or their Affiliates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted on behalf of a Released Party or a Releasing Party or any of its Affiliates (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, their Estates or their Affiliates, the conduct of the Debtors' businesses, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Disclosure Statement or Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the Disclosure Statement, or this Plan, the filing and prosecution of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, the business or contractual arrangements between the Debtors, their Estates or their Affiliates, on the one hand, and any Released Party, on the other hand, prepetition contracts and agreements with one or both Debtors, or any other act or

omission, transaction, agreement, event, or other occurrence taking place before the Effective Date; **provided** that to the extent that a claim or Cause of Action is determined by a Final Order to have resulted from fraud, gross negligence or willful misconduct of a Released Party, such claim or Cause of Action shall not be so released against such Released Party. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release (i) any obligations arising on or after the Effective Date of any party under this Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan; and (ii) the right of the Debtors or the Creditor Trustee to object to Claims filed by any Person against any Debtor or an Estate, or to assert counterclaims or defenses in respect of such Claims, including rights of setoff, refund, recoupment or other adjustments as provided for herein. Notwithstanding anything in the above and in this Plan, nothing in the above paragraph or this Plan shall impair the Creditor Trust in bringing any claim or asserting any cause of action against any former officers, directors, managers, agents, employees, or fiduciaries of any of the Debtors.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this Section 10.02, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by this Section 10.02; (c) in the best interests of the Debtors, their Estates and all holders of Claims and Equity Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity asserting any claim or Cause of Action released by this Section 10.02.

Section 10.03. Exculpation

The Exculpated Parties SHALL NOT BE LIABLE FOR ANY Cause of Action arising in connection with or out of the good faith solicitation of acceptances of this Plan in accordance with section 1125(e) of the Bankruptcy Code. All holders of Claims and Equity Interests are enjoined from asserting or prosecuting any Claim or Cause of Action against the Exculpated Parties as to which the Exculpated Parties have been exculpated pursuant to the preceding sentence.

Section 10.04. Permanent Injunction

Except as otherwise expressly provided in this Plan or the Confirmation Order, and to the fullest extent authorized by applicable law, for good and valuable consideration, the adequacy of which is hereby confirmed, all Persons who have held, hold or may hold Claims or Causes of Action against, or Equity Interests in, the Debtors are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claims or Causes of Action in any venue other than the Bankruptcy Court, (b) the enforcement, attachment, collection, or recovery by any manner or means of judgment, award, decree or order against the Debtors, the Creditor Trust, or their assets on account of any such

**Claims or Causes of Action in any venue other than the Bankruptcy Court; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Creditor Trust or their assets on account of any such Claims or Causes of Action in any venue other than the Bankruptcy Court; and (d) asserting any right of setoff, recoupment or subrogation of any kind against any obligation due from the Debtors, the Creditor Trust, or their assets on account of any such Claims or Causes of Action in any venue other than the Bankruptcy Court. The foregoing injunction will extend to successors of the Debtors and the Creditor Trust, and their respective property and interests in property.**

**In addition, except as otherwise provided herein or in the Confirmation Order, from and after the Effective Date and to the fullest extent authorized by applicable law, all Entities are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined and forever barred from taking any of the following actions against, as applicable, the Released Parties or the Exculpated Parties and their respective properties and Assets: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Claims; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order on account of or in connection with or with respect to any such Claims; (c) creating, perfecting, or enforcing any encumbrance of any kind on account of or in connection with or with respect to any such Claims; (d) asserting any right of setoff, subrogation, or recoupment of any kind on account of or in connection with or with respect to any such Claims unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Claims, Causes of Action or the like that are released, exculpated or settled pursuant to this Plan.**

Section 10.05.   Term of Injunctions or Stay

**Unless otherwise provided in this Plan or Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code sections 105 or 362 or otherwise, and in existence on the Confirmation Date (excluding any injunctions or stays contained in this Plan or Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or Confirmation Order shall remain in full force and effect in accordance with their terms.**

Section 10.06.   Integral to Plan

Each of the injunctions provided in this Plan is an integral part of this Plan and is essential to its implementation. Each of the other Persons protected by the injunctions set forth in this Plan shall have the right to seek the enforcement of such injunctions.

Section 10.07.   Binding Effect

Notwithstanding Bankruptcy Rule 3020(e), 6004(g) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Creditor

Trustee and any and all holders of Claims and Equity Interests (irrespective of whether holders of such Claims or Equity Interests are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

**Section 10.08.  Asset Purchase Agreements**

Notwithstanding anything to the contrary contained herein, the terms of the Asset Purchase Agreements shall remain unaffected. Notwithstanding anything to the contrary contained herein, the Creditor Trust shall succeed to all rights of the Debtors as set forth in the Asset Purchase Agreements and the related sale orders entered by the Bankruptcy Court.

**Section 10.09. Creditors Committee Challenge Rights**

Consistent with the Stipulation, the Creditors Committees' rights under the Final Order approving the DIP Credit Agreement regarding challenges specified in paragraph 17(b) of the Final DIP Order or paragraph 2 of the Stipulation and other actions against the Prepetition Noteholders are released as part of this Plan.

## ARTICLE XI
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN

**Section 11.01.  Modification of this Plan**

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan before the entry of the Confirmation Order, subject to the limitations set forth herein, including that any such modifications must be reasonably acceptable to the Creditors Committee and the Ad Hoc Noteholder Group. Subject to the foregoing limitations, after entry of the Confirmation Order, the Debtors may amend or modify this Plan, and in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

Entry of a Confirmation Order shall mean that all modifications or amendments to this Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**Section 11.02.  Revocation or Withdrawal this Plan**

The Debtors reserve the right to revoke or withdraw this Plan with respect to any Debtor(s) before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw this Plan with respect to any Debtor(s), or if Confirmation or Consummation does not occur, then: (a) this Plan will be null and void in all respects; (b) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant hereto shall be

null and void in all respects; and (c) nothing contained in this Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors; (ii) prejudice in any manner the rights of the Debtors or any other Entity (including, without limitation, the other Debtors); or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtors or any other Entity (including, without limitation, the other Debtors) in any respects.

## ARTICLE XII
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date for this Plan, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases after the Effective Date as legally permissible, including jurisdiction to:

(i)     allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim  and the resolution of any and all objections to the allowance or priority of Claims;

(ii)    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date;

(iii)   resolve any matters related to the assumption or rejection of any Executory Contract or Unexpired Lease;

(iv)    resolve any disputes that may arise between the Creditor Trustee and the Distribution Agent, if one is appointed;

(v)     ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(vi)    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors;

(vii)   enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with this Plan and the Disclosure Statement;

(viii)  enter and enforce any order related to or otherwise in connection with any sale of property by the Debtors pursuant to sections 363 or 1123 of the Bankruptcy Code;

(ix)    decide or resolve any Causes of Action arising under the Bankruptcy Code, including, without limitation, Avoidance Actions and Claims under sections 362, 510, 542 and 543 of the Bankruptcy Code;

(x)    resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan, or any Person's or Entity's obligations incurred in connection with this Plan;

(xi)    issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity (including, in each case and without limitation, the other Debtors) with Consummation or enforcement of this Plan, except as otherwise provided herein;

(xii)    resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in ARTICLE X of this Plan and enter such orders as may be necessary or appropriate to implement such releases, injunction and other provisions;

(xiii)    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(xiv)    determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement and the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document created in connection with this Plan or the Disclosure Statement;

(xv)    enter order(s) or Final Decree(s) concluding the Chapter 11 Cases;

(xvi)    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(xvii)    consider any modifications of this Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order; and

(xviii)  hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

**Section 13.01. Tax Returns**

Within ninety (90) days following the end of each calendar year, the Creditor Trustee shall submit to each Creditor Trust Beneficiary appearing on its records during such year a separate statement setting forth the information necessary for such Creditor Trust Beneficiary to

43

determine its share of items of income, gain, loss, deduction, or credit. The Creditor Trustee will in good faith value the Creditor Trust Assets. The Creditor Trustee shall make the respective values available from time to time, to the extent relevant, and such values shall be used consistently by all parties for U.S. federal income tax purposes.

**Section 13.02. Compliance with Tax Requirements**

In connection with this Plan, to the extent applicable, the Creditor Trustee shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant thereto shall be subject to such withholding and reporting requirements. Any amounts so withheld from any payment made under this Plan shall be deemed paid to the holder of the Allowed Claim subject to withholding. The Creditor Trustee or the Distribution Agent may require that each holder complete the appropriate Internal Revenue Service Form W-8BEN, Internal Revenue Service Form W-8BEN-E, or Internal Revenue Service Form W-9, or successor form as applicable, to each holder provided, however, that the sole remedy in the event a holder fails to comply with such a request within six months shall be to make a proper withholding of tax to the extent required by applicable law. Notwithstanding any provision in this Plan to the contrary, the Creditor Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of a distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes with respect to such distribution, or establishing any other mechanisms it believes are reasonable or appropriate. If the Creditor Trustee or the Distribution Agent fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse the Creditor Trustee or Distribution Agent. The Creditor Trust reserves the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens and encumbrances.

**Section 13.03. Allocations**

Unless otherwise provided in this Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount (as determined for U.S. federal income tax purposes) of such Allowed Claims, and then, to the extent the consideration exceeds the principal amount of such Allowed Claims, to any portion of such Allowed Claims for accrued but unpaid interest.

**Section 13.04. Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan. The Debtors and all holders of Claims and Equity Interests receiving distributions pursuant to this Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan. The Debtors are authorized to perform their outstanding obligations, if any, under the Asset Purchase Agreements.

**Section 13.05. Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**Section 13.06.   Reservation of Rights**

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order. Neither this Plan, any statement or provision contained in this Plan, nor any action taken or not taken by any Debtor or the Creditor Trustee, with respect to this Plan, the Disclosure Statement, the Confirmation Order or the Plan Supplement, shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or the Creditor Trust, as applicable, with respect to the holders of Claims or Equity Interests prior to the Effective Date.

**Section 13.07. Exclusivity Period**

The Debtors shall retain the exclusive right to amend or modify this Plan, and to solicit acceptances of any amendments to or modifications of this Plan, through and until the earlier of (a) the Effective Date or (b) the expiration of the Debtors' exclusive period to solicit acceptances of this Plan under Bankruptcy Code section 1121(d).

**Section 13.08.   Notices**

Except as otherwise set forth in this Plan, all notices or requests in connection with this Plan shall be in writing and will be deemed to have been given when received by personal delivery, overnight courier or first class mail and addressed to:

| | |
|---|---|
| **If to the Debtors:** | Bracewell LLP<br>711 Louisiana Street<br>Suite 2300<br>Houston, Texas  77002<br>Attn: Jason Cohen |
| **If to the Creditor Trustee** | [address]<br>Attn: [name] |
| **If to the Creditors Committee:** | Pillsbury Winthrop Shaw Pittman<br>909 Fannin St.<br>Suite 2000<br>Houston, TX 77010<br>Attn: Hugh Massey Ray, III |
| **If to the Ad Hoc Noteholder Group:** | Paul, Weiss, Rifkind, Wharton &<br>Garrison LLP<br>1285 Avenue of the Americas |

45

| | New York, NY 10019<br>Attn: Brian S. Hermann and Lauren Shumejda |
|---|---|

## Section 13.09. Entire Agreement

Except as otherwise indicated, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan. To the extent the Confirmation Order is inconsistent with this Plan, the Confirmation Order shall control for all purposes.

## Section 13.10.   Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Claims and Solicitation Agent's website at www.kccllc.net or the Bankruptcy Court's electronic filing website at https://ecf.txsb.uscourts.gov (account required).

## Section 13.11.   Severability

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to this Plan; and (c) non-severable and mutually dependent.

## Section 13.12.   Request for Expedited Tax Review

The Creditor Trustee shall have the right to request an expedited determination under Bankruptcy Code section 505(b) with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

## Section 13.13.   Dissolution of the Creditors Committee

On the Effective Date, the Creditors Committee shall dissolve and the members of the Creditors Committee shall be released and discharged from all authority, duties, responsibilities and obligations related to and arising from and in connection with these Chapter 11 Cases.

Neither the Debtors nor the Creditor Trust nor any other party shall be responsible for fees and expenses incurred by the Creditors Committee after the Effective Date.

**Section 13.14.   No Admissions**

Notwithstanding anything herein to the contrary, nothing in this Plan shall be deemed as an admission by the Debtors with respect to any matter set forth herein, including liability on any Claim.

**Section 13.15.   Substantial Consummation**

On the Effective Date, this Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

Dated: December 19, 2016          Respectfully submitted,
Houston, Texas

**LINC USA GP**


By: _____
Name: Michael Mapp
Title: President

**LINC ENERGY FINANCE (USA) INC.**


By: _____
Name: Michael Mapp
Title: President

**LINC GULF COAST PETROLEUM, INC.**


By: _____
Name: Michael Mapp
Title: President

**LINC ENERGY PETROLEUM (LOUISIANA), LLC**


By: _____
Name: Michael Mapp
Title: President

**LINC ALASKA RESOURCES, LLC**


By: _____
Name: Michael Mapp
Title: President

*[Signature Page to Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code]*

**PAEN INSULA HOLDINGS, LLC**

By: _____
Name: Michael Mapp
Title: President

**LINC ENERGY PETROLEUM (WYOMING), INC.**

By: _____
Name: Michael Mapp
Title: President

*[Signature Page to Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code]*