**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **LINC USA GP.,** *et al.* | ) | Case No. 16-32689 (DRJ) |
| | ) | |
| **Debtors.**[1] | ) | (Jointly Administered) |

**[PROPOSED] DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**BRACEWELL LLP**

Jason G. Cohen
Texas Bar No. 24050435
Jason.Cohen@bracewelllaw.com
William A. (Trey) Wood III
Texas Bar No. 21916050
Trey.Wood@bracewelllaw.com
711 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713) 223-2300
Facsimile: (713) 221-1212

*Counsel to Debtors and Debtors in Possession*

Dated: December 19, 2016

THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. ACCORDINGLY, THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.

---

[1] The debtors in possession in these chapter 11 cases, along with the last four digits of each debtor in possession's federal tax identification number, are: Linc Energy Finance (USA), Inc. (6684); Linc USA GP (5234); Linc Energy Resources, Inc. (9613); Linc Gulf Coast Petroleum, Inc. (6790); Linc Energy Petroleum (Louisiana), LLC (1074); Linc Alaska Resources, LLC (2362); Paen Insula Holdings, LLC (1681); Linc Energy Petroleum (Wyoming), Inc. (9859); Diasu Holdings, LLC (9626); Diasu Oil & Gas Company, Inc. (8926); and Linc Energy Operations, Inc. (5806).

#5373182

THIS DISCLOSURE STATEMENT IS BEING DISTRIBUTED FOR SOLICITING ACCEPTANCES OF THE PLAN FROM THE PARTIES ENTITLED TO VOTE ON THE PLAN. A COPY OF THE PLAN IS ATTACHED HERETO AS **EXHIBIT A**.[2] EACH DEBTOR IS A PROPONENT OF THE PLAN WITHIN THE MEANING OF SECTION 1129 OF THE BANKRUPTCY CODE IN ITS RESPECTIVE CHAPTER 11 CASE.

**THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING TO COMMENCE ON [•], 2017 PREVAILING CENTRAL TIME BEFORE THE HONORABLE DAVID R. JONES UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION, 515 RUSK STREET, HOUSTON, TEXAS 77002. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR ANY ADJOURNMENT OF THE CONFIRMATION HEARING. TO BE COUNTED, THE BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE VOTING AGENT FOR THE DEBTORS IN THESE CHAPTER 11 CASES, NO LATER THAN [•], 2017. OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE [•], 2017. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE ORDER APPROVING THIS DISCLOSURE STATEMENT, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NONBANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER REVIEWED NOR APPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY OTHER SUCH STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE INFORMATION INCLUDED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND

---

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code*, attached hereto as **Exhibit A**.

SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS WHICH ARE ATTACHED TO, OR INCORPORATED BY REFERENCE IN, THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS AND THE STATEMENTS REFLECTED HEREIN OR THEREIN, RESPECTIVELY. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN, OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED IN THIS DISCLOSURE STATEMENT BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE LIQUIDATION ANALYSIS ATTACHED HERETO AS **EXHIBIT B** (THE "LIQUIDATION ANALYSIS") HAS BEEN OR WILL BE PREPARED BY THE MANAGEMENT IN CONSULTATION WITH THEIR ADVISORS. THE ESTIMATES AND ANALYSES, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, NECESSARILY ARE BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY UNCERTAIN AND MAY BE BEYOND THE CONTROL OF THE DEBTORS' MANAGEMENT. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE ESTIMATES OR ANALYSES. THEREFORE, THE ESTIMATES AND ANALYSES MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE THAT THE ACTUAL RESULTS WILL OCCUR.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THE DISCLOSURE STATEMENT SINCE THE DATE OF THIS DISCLOSURE STATEMENT OR THE DATES OTHERWISE NOTED.

EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ENTITIES DESIRING SUCH ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION.

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

ARTICLE I BACKGROUND ....................................................................................4
    1.1          The Debtors' Business and Assets ............................................4
    1.2          Debtors' Corporate Structure ...................................................5
    1.3          The Debtors' Pre-Petition Indebtedness....................................5
    1.4          Events Precipitating the Chapter 11 Cases ...............................6

ARTICLE II THE CHAPTER 11 CASES ..................................................................8
    2.1          Overview of Chapter 11 ...........................................................8
    2.2          Administration of the Chapter 11 Cases ..................................8

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
               INTERESTS ...............................................................14
    3.1          Introduction..............................................................................14
    3.2          Voting; Acceptance by Impaired Classes .................................15
    3.3          Unclassified Claims ..................................................................15
    3.4          Classified Claims and Equity Interests .....................................16
    3.5          Intercompany Claims ................................................................18

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN............................18
    4.1          Deemed Consolidation ..............................................................18
    4.2          Operations Between Confirmation Date and Effective Date ...............19
    4.3          Creditor Trust ...........................................................................19
    4.4          Sources of Cash for Plan Distributions.....................................20
    4.5          Sale of Debtors' Assets .............................................................20
    4.6          Miscellaneous Alaska Assets ....................................................21
    4.7          Release of Bonds.......................................................................21
    4.8          Claims Reserve Holdback..........................................................21
    4.9          Corporate Existence; Officers and Directors .......................................22
    4.10        Corporate Action.......................................................................22
    4.11        Preservation of Causes of Action Not Expressly Released.................23
    4.12        Release of Liens.........................................................................24
    4.13        Cancellation of Securities and Notes Against the Debtors .................24
    4.14        General Settlement of Claims....................................................24
    4.15        Section 1146(a) Exemption.......................................................25

ARTICLE V THE SOLICITATION; VOTING PROCEDURES ..............................25
    5.1          Solicitation Package..................................................................25
    5.2          Voting Instructions ....................................................................25
    5.3          Voting Tabulation .....................................................................26
    5.4          Agreements Upon Furnishing Ballots........................................27

ARTICLE VI FEASIBILITY AND BEST INTEREST OF THE CREDITORS............27
    6.1          Feasibility of the Plan ...............................................................27
    6.2          Best Interest of Creditors Test....................................................27

ARTICLE VII CONFIRMATION PROCEDURES ..............................................29
    7.1          The Confirmation Hearing ..............................................29
    7.2          Statutory Requirements for Confirmation of the Plan .......................29

ARTICLE VIII CERTAIN RISK FACTORS AFFECTING CERTAIN OF THE
              DEBTORS ..............................................32
    8.1          Certain Plan and Bankruptcy Law Considerations ............................32

ARTICLE IX ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
              THE PLAN ..............................................34
    9.1          Liquidation Under Chapter 7 ..............................................34
    9.2          Alternative Plan ..............................................34

ARTICLE X EXECUTORY CONTRACTS, UNEXPIRED LEASES, AND OTHER
              AGREEMENTS..............................................35
    10.1        Rejection of Executory Contracts and Unexpired Leases....................35
    10.2        Treatment of Assumed Executory Contracts and Unexpired
              Leases; Assignment..............................................35
    10.3        Effect of Confirmation Order on Assumption/Rejection ....................35
    10.4        Cure of Defaults and Objections to Assumption..............................36
    10.5        Rejection Damages Claims and Objections to Rejection ....................36
    10.6        Preexisting Obligations Under Executory Contracts and
              Unexpired Leases ..............................................37
    10.7        Modifications, Amendments, Supplements, Restatements or
              Other Agreements ..............................................37
    10.8        Reservation of Rights..............................................37

ARTICLE XI PROCEDURES FOR RESOLVING DISPUTED CLAIMS ....................37
    11.1        Objections to Claims..............................................37
    11.2        Objection Deadline ..............................................38
    11.3        Estimation of Claims..............................................38
    11.4        No Distributions on Disputed Claims ..............................................38
    11.5        Disputed Claims Reserves from GUC Trust Assets.........................39
    11.6        Reduction of Claims ..............................................39
    11.7        Recoupment ..............................................39

ARTICLE XII CONDITIONS PRECEDENT TO CONFIRMATION  AND
              CONSUMMATION OF THE PLAN..............................................39
    12.1        Conditions Precedent to Confirmation..............................................39
    12.2        Conditions Precedent to Effective Date ..............................................40
    12.3        Effect of Non-Occurrence of Conditions to Confirmation or
              Conditions Precedent to the Effective Date .......................40
    12.4        Waiver of Conditions Precedent ..............................................41

ARTICLE XIII MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN.........41
    13.1        Modification of the Plan ..............................................41
    13.2        Revocation or Withdrawal of the Plan ..............................................41

ARTICLE XIV RETENTION OF JURISDICTION ....................................................42

ARTICLE XV MISCELLANEOUS PROVISIONS .....................................................43
    15.1        Bar Dates for Certain Actions .................................................43
    15.2        U.S. Trustee Fees ....................................................................44
    15.3        Certain Releases by the Debtors .............................................44
    15.4        Certain Voluntary Releases by Holders of Claims ................46
    15.5        Exculpation .............................................................................47
    15.6        Permanent Injunction .............................................................47
    15.7        Term of Injunctions or Stay ....................................................48
    15.8        Integral to Plan.......................................................................48
    15.9        Binding Effect.........................................................................48
    15.10      Asset Purchase Agreements ....................................................48
    15.11      Creditors Committee Challenge Rights ..................................49
    15.12      Tax Returns .............................................................................49
    15.13      Compliance with Tax Requirements .......................................49
    15.14      Allocations .............................................................................49
    15.15      Additional Documents ............................................................50
    15.16      Successors and Assigns...........................................................50
    15.17      Reservation of Rights..............................................................50
    15.18      Exclusivity Period ..................................................................50
    15.19      Notices ....................................................................................50
    15.20      Entire Agreement ...................................................................51
    15.21      Plan Supplement Exhibits.......................................................51
    15.22      Severability ............................................................................51
    15.23      Request for Expedited Tax Review .........................................52
    15.24      No Admissions ........................................................................52
    15.25      Substantial Consummation .....................................................52
    15.26      Governing Law .......................................................................52

ARTICLE XVI CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE
        PLAN ......................................................................................52
    16.1        Certain Material U.S. Federal Income Tax Consequences of the
                Plan ........................................................................................52
    16.2        Consequences to U.S. Holders of Certain Claims ................54
    16.3        Tax Treatment of Creditor Trust and Its Beneficial Holders................57
    16.4        Tax Reporting for Assets Allocable to Disputed Claims and
                Distributions from the Disputed Claims Reserve ..................58
    16.5        Information Reporting and Withholding..................................59
    16.6        Importance of Obtaining Professional Tax Assistance .......................60

ARTICLE XVII CONCLUSION AND RECOMMENDATION ..................................60

<u>TABLE OF EXHIBITS</u>

| <u>Exhibit</u> | <u>Name</u> |
| --- | --- |
| A | Plan |
| B | Liquidation Analysis |
| C | Prepetition Organizational Chart |

## INTRODUCTION

Linc USA GP; Linc Energy Finance (USA), Inc.; Linc Energy Operations, Inc.; Linc Energy Resources, Inc.; Linc Gulf Coast Petroleum, Inc.; Linc Energy Petroleum (Wyoming), Inc.; Paen Insula Holdings, LLC; Linc Alaska Resources, LLC; and Linc Energy Petroleum (Louisiana), LLC propose the *Joint Plan of Liquidation under Chapter 11 of the Bankruptcy Code* (as may be amended or supplemented from time to time, the "Plan"), attached hereto as **Exhibit A** and described below. The Debtors submit this Disclosure Statement pursuant to section 1125(b) of the Bankruptcy Code to provide holders of Claims entitled to vote on the Plan with adequate information to make an informed decision as to whether to accept or reject the Plan. This Disclosure Statement describes certain aspects of the Plan, including the treatment of holders of Claims and Equity Interests, and describes certain aspects of the Debtors' operations and other related matters.

On May 29, 2016 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

Shortly after the Petition Date, the Debtors initiated a broad-based marketing process under which the Debtors sought competing bids for the sale of all or substantially all of the Debtors' assets. The Debtors have sold their Gulf Coast Assets to Torrent Gulf Coast, LLC, pursuant to the *Asset Purchase Agreement, Dated as of August 27, 2016, by and among Linc USA GP, Linc Energy Operations, Inc., and Linc Gulf Coast Petroleum, Inc., as Sellers, and Torrent Gulf Coast LLC, as Buyer* [Dkt. No. 347] (the "Gulf Coast APA"), for a purchase price of $37,500,000. The Bankruptcy Court entered an order approving the sale of the Gulf Coast Assets on August 31, 2016 and the sale was consummated on September 14, 2016 (the "Gulf Coast Sale Order"). The Debtors have sold their Wyoming Assets to Big Muddy Opportunities, LLC, pursuant to the *Asset Purchase Agreement, Dated as of August 29, 2016, by and among Linc Energy Operations, Inc., and Linc Energy Petroleum (Wyoming), Inc., as Sellers, and Big Muddy Opportunities, LLC, as Buyer, and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent under the Pre-Petition First Lien Senior Indenture* [Dkt. No. 348] (the "Wyoming APA") for a purchase price of $1,900,000. The Bankruptcy Court entered an order approving the sale of the Wyoming Assets on August 31, 2016 and the sale was consummated on October 14, 2016. The Debtors have sold their Alaska Assets to Arctic Acquisition, Inc., pursuant to the *Asset Purchase Agreement Dated as of August 29, 2016, by and among Linc Alaska Resources, LLC as Seller, and Arctic Acquisition, Inc., as Buyer* [Dkt. No. 349] (the "Alaska APA" and, together with the Gulf Coast APA and the Wyoming APA, the "Asset Purchase Agreements") for a credit bid of $80,000,000. The Bankruptcy Court entered an order approving the sale of the Alaska Assets on August 31, 2016, and the sale was consummated on November 22, 2016.

Following the Bankruptcy Court's approval of the sales of the Debtors' assets, the ad hoc group of First Lien Noteholders (the "Ad Hoc Noteholder Group") and the Creditors Committee engaged in extensive negotiations regarding a fair and equitable distribution of the sale proceeds and the Debtors' remaining Assets among the Debtors' Creditors. At the conclusion of these negotiations, the Ad Hoc Noteholder Group and the Creditors Committee agreed to support a plan that embodied the following compromises:

(a)     the First Lien Noteholders are entitled to receive (i) 100% of the Gulf Coast Sale Proceeds less the Claims Reserve Holdback to the extent not previously distributed to the First Lien Noteholders pursuant to the Stipulation, and (ii) 100% of the Wyoming Sale Proceeds, no later than the Effective Date of the Plan;

(b)     a Creditor Trust will be formed for the benefit of the Prepetition Noteholders and holders of General Unsecured Claims, and all of the Debtors' remaining Assets, including litigation rights and Cash but excluding the Asset Sale proceeds, will be transferred to the Creditor Trust. The Creditor Trustee will be responsible for monetizing those remaining Assets and distributing them to Creditors in accordance with the Creditor Trust Agreement and the Confirmation Order. The Creditor Trustee may also serve as Distribution Agent concerning other Claims against the Estates, and will, at its option, reserve amounts necessary to pay Allowed Claims in accordance with the Plan;

(c)     of the Assets transferred to the Creditor Trust, $950,000 in Cash will be earmarked solely for distribution to holders of Allowed non-Prepetition Noteholder General Unsecured Claims. Similarly, the Debtors' performance bonds naming a Debtor other than Linc Energy Operations Inc. ("LEO") as principal, and the Cash securing such bonds, shall be treated as Collateral of the Prepetition Noteholders, and therefore earmarked solely for distribution to the Prepetition Noteholders;

(d)     the balance of the Creditor Trust Assets will be allocated among the Prepetition Noteholders and the non-Prepetition Noteholder unsecured Creditors as follows:

    (i)     the Prepetition Noteholders and the non-Prepetition Noteholder unsecured Creditors each collectively shall receive 50% of the proceeds of the Cash securing performance bonds naming LEO as the principal once those funds are refunded to LEO (such bonds, the "LEO Bonds"); and

    (ii)     the Prepetition Noteholders will receive 60% of all other Assets (or proceeds therefrom), and non-Prepetition Noteholder unsecured Creditors will receive the remaining 40%;

(e)     the Creditor Trust will initially be funded with $100,000 from the Prepetition Noteholders' share of the proceeds of the LEO Bonds. The Prepetition Noteholders will then be entitled to the first $100,000 of proceeds from Creditor Trust Assets other than the LEO Bonds, as repayment of that initial funding;

(f)     the Creditor Trust will be governed by a three-member Creditor Trust Advisory Board, comprised of one member appointed by the Prepetition

Noteholders, one member appointed by the Creditors Committee, and the Creditor Trust (selected by the Prepetition Noteholders);

(g)    at the option of the Prepetition Noteholders, any Assets related to the Debtors' Alaska oil and gas business that were not purchased through the Alaska Asset sale and relevant Alaska APA may be transferred to the entity formed by the Prepetition Noteholders as part of the Alaska Asset sale on the Effective Date of the Plan; and

(h)    provided that the parties are pursing and ultimately obtain Confirmation of a plan that includes these agreed-upon terms, the Creditors Committee will not challenge the validity, enforceability, priority or amount of the Liens and security interests securing the claims of the Prepetition Noteholders.

In connection with Plan negotiations, the Creditors Committee and the Ad Hoc Noteholder Group also reached agreement with the Debtors concerning funding for the remainder of the Chapter 11 Cases. Specifically, the Debtors will be authorized to continue to utilize the Prepetition Noteholders' Cash Collateral for the balance of the Chapter 11 Cases. The use of Cash Collateral was previously negotiated by the parties and approved by the Bankruptcy Court in connection with approval of the DIP Facility; however, upon the consummation of all of the Asset sales described above, the DIP Facility terminated, thus necessitating a supplemental order concerning use of Cash Collateral. On November 22, 2016, the Debtors filed an expedited motion for approval of the agreed Cash Collateral Stipulation [Dkt. No. 429], which Stipulation was approved by the Bankruptcy Court on December 5, 2016 [Dkt. No. 442]. The Cash Collateral Stipulation generally permits the continued use of Cash Collateral, subject to a revised budget and the imposition of new milestones governing the plan process. The Cash Collateral Stipulation also approves the immediate distribution by the Debtors of the proceeds of the Gulf Coast Sale Proceeds (minus certain holdbacks, including the funds necessary to wind down the Estates and Consummate the Chapter 11 Cases), consistent with the agreed-upon terms described above.

The proposed Plan described in this Disclosure Statement embodies these terms, and is supported by the Ad Hoc Noteholder Group. The table below summarizes the estimated Distributions to be made on account of prepetition Claims and Equity Interests under the Plan.

| Class | Type of Claim | Est. Range of Allowed Claims[3] | Est. Percentage of Recovery |
|-------|---------------|----------------------------------|------------------------------|
| 1 | Other Priority Claims | $300,000-$600,000 | 100% |
| 2 | Other Secured Claims | $360,000-$2,603,000 | 100% |

---

[3] Except as otherwise specifically provided in the Confirmation Order or Stipulation, all Cash required for the payments to be made under the Plan shall be obtained from the Creditor Trust. For the avoidance of doubt, Cash will be set aside in the Claims Reserve Holdback for satisfaction of the estimated range of Allowed Claims.

| 3 | **First Lien Note Claims** | **$132,136,032-$132,136,032** | **93.5%-96.7%** |
|---|---|---|---|
| 4 | **Second Lien Note Claims** | **$283,550,000-$283,550,000** | **0%** |
| 5 | **General Unsecured Claims** | **$8,876,000-$34,512,000** | **5.4%-37.0%** |
| 6 | **Equity Interests** | **($205,763,677) – ($205,763,677)** | **0%** |

**THE DEBTORS BELIEVE THAT THESE RECOVERIES, AND THE RELATED COMPROMISES UNDER THE PLAN, ARE FAIR AND EQUITABLE, MAXIMIZE THE REMAINING VALUE OF THE DEBTORS' ESTATES AND PROVIDE THE BEST RECOVERY TO CREDITORS UNDER THE CIRCUMSTANCES. THE DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.**

| |
|---|
| **RECOMMENDATION:**<br>**THE DEBTORS STRONGLY URGE CREDITORS**<br>**TO VOTE TO ACCEPT THE PLAN.** |

## ARTICLE I
## BACKGROUND

1.1 **The Debtors' Business and Assets**

As described in more detail below, as of the Petition Date the Debtors operated an independent oil and gas exploration and production business with a primary focus on conventional onshore and shallow state water properties along the Gulf Coast of Texas and properties in the Powder River Basin of Wyoming. The Debtors, through their majority owned subsidiary, non-Debtor Renaissance Umiat, LLC ("Renaissance Umiat"), also owned oil and gas properties in the Umiat field on Alaska's North Slope.

### 1.1.1 *Alaska Assets*

As of the Petition Date, Linc Alaska Resources, LLC ("Linc Alaska") owned shares of Renaissance Umiat, which owns approximately 18,540 net acres within the National Petroleum Reserve of Alaska near Umiat, Alaska (the "Alaska Assets"). Based on a reserve report dated December 7, 2015, Linc Alaska's acreage was estimated to contain probable reserves of 99 million barrels of oil. The Umiat field is considered to be one of the few remaining undeveloped light oil reservoirs in North America. Once developed, the Alaska Assets could provide peak production of 30,000 barrels of oil per day. Prior to the Petition Date, the Debtors drilled and completed two test wells in the Umiat field. As further described herein, the Debtors have sold their Alaska Assets to Arctic Acquisition, Inc., which sale closed on November 22, 2016.

4

### 1.1.2 *Wyoming Assets*

As of the Petition Date, Linc Energy Petroleum (Wyoming), Inc. ("Linc Wyoming") owned 27,821 net acres and 31 wells across three (3) fields in the Powder River Basin (the "Wyoming Assets"). Based on a reserve report as of June 30, 2015, Linc Wyoming had estimated proved reserves of 551,000 barrels of oil. As further described herein, the Debtors have sold their Wyoming Assets to Big Muddy Opportunities, LLC, which sale closed on October 14, 2016.

### 1.1.3 *Gulf Coast Assets*

As of the Petition Date, Linc Gulf Coast Petroleum, Inc. owned approximately 15,521 net acres and 150 producing wells over 13 active fields (the "Gulf Coast Assets"). The Gulf Coast assets are conventional oil plays, characterized by salt domes or geological structures related to deep-seated salt movement that has been a significant source of oil production since the turn of the twentieth century. Pursuant to a reserve report as of January 1, 2016, the Gulf Coast Assets had estimated proved reserves of 5.6 million barrels of oil and 3.4 billion cubic feet of natural gas. For the month ending April 30, 2016, the Gulf Coast Assets were producing an average of 2,200 gross barrels of oil equivalent per day. As further described herein, the Debtors have sold their Gulf Coast Assets to Torrent Gulf Coast, LLC, which sale closed on September 14, 2016.

## 1.2   Debtors' Corporate Structure

As of the Petition Date, Linc USA GP was ultimately owned by non-Debtor Linc Energy Ltd., an Australian corporation established October 29, 1996, shares of which were listed on the Singapore Stock Exchange.[4] Each of the other Debtors was a wholly owned subsidiary of Linc USA GP. An organizational chart showing the legal structure as of the Petition Date is attached hereto as **Exhibit C**.

As of the Petition Date, LEO operated the Debtors' oil and gas properties on behalf of each of the Debtors. Accordingly, pursuant to a prepetition management agreement between the Debtors and LEO (the "Management Agreement"), LEO employed personnel involved in operations, contracted with vendors and other third parties, paid taxes and was generally responsible for operation of the Debtors' businesses. The Debtors collected revenues for such operations and reimbursed LEO for the operating expenditures from those revenues.

## 1.3   The Debtors' Pre-Petition Indebtedness

As of the Petition Date, Linc USA GP and Linc Energy Finance (USA), Inc. were the issuers (the "Issuers") of prepetition secured notes under two indentures, as follows:

> (i)     the Indenture dated as of August 13, 2014, among the Issuers, the non-Issuer Debtors other than Linc Energy Operations (the "Guarantors") and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent (the "First Lien Indenture Trustee"), as amended and

---

[4]  Linc Energy Ltd. entered into voluntary administration in Australia on April 15, 2016.

supplemented by the Supplemental Indenture dated as of June 30, 2015 (such Indenture, as so amended and supplemented, the "<u>First Lien Indenture</u>") pursuant to which were issued $125,000,000 aggregate principal amount of 9⅝% First Lien Senior Secured Notes due 2017 (the "<u>First Lien Notes</u>"), and

(j)       the Indenture dated as of October 12, 2012, among the Issuers, the Guarantors and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent (the "<u>Second Lien Indenture Trustee</u>" and, together with the First Lien Indenture Trustee, the "<u>Indenture Trustees</u>"), as amended and supplemented by the Supplemental Indenture dated as of August 13, 2014 and the Second Supplemental Indenture dated as of June 30, 2015 (such Indenture, as so amended and supplemented, the "<u>Second Lien Indenture</u>" and, together with the First Lien Indenture, the "<u>Indentures</u>") pursuant to which were issued $265,000,000 aggregate principal amount of 12½% Senior Secured Notes due 2017, which principal amount was later increased by $18,550,000 in connection with the October 2015 interest payment (the $265,000,000 in notes, together with the $18,550,000 increase in principal amount, are referred to as the "<u>Second Lien Notes</u>" and, together with the First Lien Notes, the "<u>Notes</u>").

The entire principal amount—$408,550,000—was outstanding under the Indentures on the Petition Date. The obligations under the First Lien Indenture and First Lien Notes and the Second Lien Indenture and Second Lien Notes are secured by a first and second lien, respectively, on substantially all of the assets of the Debtors (other than Linc Energy Operations, which is not a Guarantor), including (i) all oil and gas leases and interests owned by the Debtors (other than Linc Energy Operations) (ii) all liquid or gaseous hydrocarbons accruing to or produced from the leases and interests described in the foregoing clause, (iii) all proceeds of the foregoing, and (iv) the membership interests of Renaissance Umiat held on the Petition Date by Linc Alaska.

### 1.4     Events Precipitating the Chapter 11 Cases

Prior to the Petition Date, the Debtors expended significant capital conducting an aggressive drilling program on their Gulf Coast properties prior to 2015, drilling 21 wells in 2012, 33 wells in 2013, and 12 wells in 2014.

In addition, between 2013 and 2014, Linc Alaska expended approximately $120 million in conducting an appraisal program at its Umiat field, which included drilling two wells for the purposes of demonstrating the potential of the Alaska properties and securing a joint venture partner. However, beginning in 2014, prices of crude oil and natural gas began to decline dramatically, with the price of oil on the NYMEX-WTI[5] declining from a high of more than $107/Bbl in July 2014 to below $45/Bbl in the first quarter of 2015. Although the results of the

---

[5]   The NYMEX-WTI or New York Mercantile Exchange-West Texas Intermediate is a commonly used benchmark for oil prices in the United States.

appraisal program were favorable, due to the economic downturn the Debtors were unable to locate a suitable partner and have since been unable to recover any of the expended drill costs, other than the costs recovered through the State of Alaska's tax rebate program. These expenditures, combined with lower production revenues, significantly affected the Debtors' financial position.

The Debtors actively tried to offset the impact of this downturn in the months leading up to the Petition Date by adjusting their priorities in late 2014. First, the Debtors discontinued their drilling program and initiated a low capital expenditure program by which they sought to minimize capital expenditures by selecting well reworks, well recompletions and new well drilling based on a rigorous economic analysis. Second, the Debtors set out to improve operating efficiencies, which resulted in a 44% reduction in lease operating expenses and a total operating cost below $30.00/net barrel of oil equivalent. Third, during 2015 the Debtors selected wells for their limited three-well drilling program on a risked economic analysis. Unfortunately, the wells drilled by the Debtors were not as successful as anticipated, and in one case, geologic conditions were encountered which considerably added to the cost of the operation.

As 2015 progressed, the decline in oil prices continued and, following an in-depth strategic review of their assets and operations, the Debtors concluded that they would need to rationalize their asset portfolio and add new assets with better economic profiles. However, notwithstanding these initiatives, and with interest payments totaling approximately $22,000,000 due on the Notes at the end of April 2015, it became clear that the Debtors' capital structure prevented them from rationalizing their portfolio through sales and acquisitions and that, under the circumstances, the Debtors' capital structure was unsustainable. In response, the Debtors retained Bracewell LLP to help chart a path forward.

In May 2015, the Debtors sought and obtained the support of the Prepetition Noteholders (via a support agreement) to amend the Indentures to: (i) make the April 2015 interest payments on the Notes prior to the expiration of the applicable grace period under the Indentures; (ii) permit the Issuers to pay all or part of the interest on the Second Lien Notes due on October 31, 2015 and, subject to certain conditions, April 30, 2016, by issuing additional Second Lien Notes in a principal amount equal to such interest or increasing the principal amount of the outstanding Second Lien Notes rather than paying such interest in Cash; and (iii) provide for application of net proceeds of any assets sales to the mandatory redemption of the First Lien Notes and, thereafter, to the mandatory redemption of the Second Lien Notes (collectively, the "Amendments"). The Amendments became effective on June 30, 2015. The Debtors later satisfied the October 31, 2015 interest payments on the Second Lien Notes by increasing the principal amount of the outstanding Second Lien Notes by $16,562,500.

By making the interest payments, the Debtors gained the opportunity to negotiate a broader restructuring and recapitalization in a coordinated manner that would best maximize value and avoid the filing of a chapter 11 case without a developed restructuring framework in hand. To facilitate that restructuring, the Debtors contacted their major Noteholders and engaged in negotiations. The Debtors engaged Sandler O'Neill + Partners, L.P. to assist in this process. The Debtors proposed various restructuring alternatives based on a significant deleveraging, together with the infusion of new capital from Linc Energy, Ltd. in the form of debt or equity, which would permit the parent company to sustain the reorganized business through a potentially

prolonged period of depressed oil and gas prices. Unfortunately, after months of diligence and negotiations, this proposal did not come to fruition and on April 15, 2016, the Debtors' ultimate parent, Linc Energy Ltd., entered into voluntary administration in Australia.

The Debtors continued in discussions with their lenders, while also exploring third party alternatives to restructure their balance sheets. Eventually, an ad hoc group of holders of First Lien Notes formed and, through negotiations, proposed to support Cash Collateral use and debtor in possession financing in furtherance of a coordinated sale process within a chapter 11 proceeding. With no other options, and facing expiration of the grace period related to their missed April 30, 2016 interest payments on the Notes, the Debtors filed the Chapter 11 Cases in order to preserve the value of businesses and potential value to all creditors.

## ARTICLE II
## THE CHAPTER 11 CASES

### 2.1    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Chapter 11 authorizes a debtor to reorganize its business for the benefit of its creditors, equity interest holders, and other parties in interest. Commencing a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The principal objective of a chapter 11 case is to consummate a plan. A plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by a bankruptcy court binds a debtor, any issuer of securities thereunder, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity bound by such plan. Chapter 11 requires that a plan treat similarly situated creditors and similarly situated equity interest holders equally, subject to the priority provisions of the Bankruptcy Code.

Subject to certain limited exceptions, the bankruptcy court order confirming a plan provides for the treatment of such debt that arose prior to the date of confirmation of the plan in accordance with the terms of the confirmed plan.

Prior to soliciting acceptances of a proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan. The Debtors submit this Disclosure Statement in accordance with section 1125 of the Bankruptcy Code.

### 2.2    Administration of the Chapter 11 Cases

#### 2.2.1    *First-day Motions*

On the Petition Date, or soon thereafter, the Debtors filed numerous first-day motions, the object of which was to streamline the transition to operating under chapter 11, to stabilize

operations, and to preserve their relationships with vendors, customers, employees and utility providers. By these first-day motions, the Debtors requested, among other things, authority to procedurally consolidate the cases, designate these bankruptcies as "complex" under the local rules, pay prepetition taxes and employee wages, remit payments to royalty and working interest owners, and use Cash Collateral to fund operations. The first-day motions and all orders for relief granted in the Chapter 11 Cases are available free of charge at http://www.kccllc.net/linc.

### 2.2.1   *Debtor in Possession Financing*

Prior to the Petition Date, the Debtors understood their immediate need (a) to use the Prepetition Noteholders' Cash Collateral and (b) for postpetition financing. The Debtors and certain noteholders under the First Lien Indenture (the "DIP Lenders") negotiated a $10 million postpetition financing (the "DIP Facility"), on a priming and superpriority basis, which enabled the Debtors to pay costs and expenses of operating their businesses. The Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)*, seeking approval of their use of Cash Collateral and authorizing entry into the DIP Facility on an interim and final basis on the Petition Date. *See* Dkt. No. 11. The Court entered an order granting the relief requested therein on an interim basis on June 1, 2016 (Dkt. No. 26), and again on June 21, 2016 (Dkt. No. 134), in order to give the Creditors Committee more time to review the relief requested. After minor negotiations and revisions from discussions with the Creditors Committee, the Bankruptcy Court entered an order granting the relief requested on a final basis on July 11, 2016. *See* Dkt. No. 196.

Consistent with the terms of the DIP Facility and order approving same, upon the closing of the sale of the Gulf Coast Assets the Debtors utilized Gulf Coast Sale Proceeds to repay all advances the outstanding under the DIP Facility.  On December 5, 2016, the Debtors paid all remaining obligations under the DIP Facility in full and the DIP Lenders and DIP Agent confirmed that all indebtedness and other obligations of the Debtors under the DIP Facility were fully paid and discharged.

### 2.2.2   *Appointment of Committee*

The U.S. Trustee appointed the Creditors Committee on June 17, 2016. The Creditors Committee is composed of Crain Brothers, Inc.; New Tech Global Ventures, LLC; and Natural Gas Compression Systems, Inc.

### 2.2.3   *Retention of Professionals*

The Debtors retained Bracewell LLP, as their general bankruptcy and restructuring counsel, Sandler O'Neill & Partners, L.P. as their financial advisor, and Parkman Whaling LLC as their investment banker. Additionally, the Creditors Committee has retained Pillsbury Winthrop Shaw Pittman as its counsel and Carl Marks Advisory Group LLC as its financial advisor.

As of the date hereof, the Debtors estimate that, as of the Effective Date, the total amount of Allowed Administrative Claims will be approximately $1.5 million. The Debtors further estimate that approximately $1.4 million of the total amount of Allowed Administrative Claims will consist of unpaid Professional Fees (which includes $0.3 million for Professional Fees of the Creditors Committee) and the remaining $0.1 million will constitute unpaid ordinary course accounts payable.

### 2.2.4  *Bidding Procedures Motion and Sale of Substantially All Assets*

On April 6, 2015, the Debtors filed the *Debtors' Motion for (A) Entry of an Order (I) Approving Bidding Procedures; (II) Scheduling Bidding Deadline, Auction Date, and Sale Hearing Date; (III) Approving Form and Notice Thereof; (B) Entry of an Order After the Sale Hearing (I) Authorizing the Debtors to Sell Their Assets; and (II) Authorizing the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief*, seeking competing bids for the sale of all or substantially all of the Debtors' assets (the "Bidding Procedures and Sale Motion"). *See* Dkt. No. 129. By the Bidding Procedures and Sale Motion, the Debtors contemplated a bidding process (the "Bidding Procedures") by which interested parties could conduct due diligence on the Debtors' assets and be granted access to material information upon execution of a confidentiality agreement. To facilitate this process, the Debtors negotiated and signed a purchase agreement with a proposed purchaser for an amount of no less than $60,500,000 by credit bid for the Debtors' assets.

The Bankruptcy Court entered an order approving the Bidding Procedures on May 11, 2015. *See* Dkt. No. 205. The Debtors received nine (9) proposals on the bidding deadline, four (4) of which were qualifying Cash offer bids for the Debtors' assets in piecemeal fashion. The Debtors held an auction on August 23, 2016 at Bracewell LLP's office in Houston. After multiple rounds of competitive bidding, the Debtors determined that the following offers for the Debtors' assets were the highest and best offers:

- Torrent Gulf Coast LLC's Cash bid of $37,500,000 for the Debtors' Gulf Coast Assets [Dkt. No. 307];

- Big Muddy Opportunities, LLC's Cash bid of $1,900,000 for the Debtors' Wyoming Assets [Dkt. No. 308]; and

- Arctic Acquisition, Inc.'s credit bid of $80,000,000 for the Debtors' Alaska Assets [Dkt. No. 310].

On August 31, 2016, the Bankruptcy Court entered orders approving the sales of the Debtors' assets to the highest bidders, thereby reducing the First Lien Noteholders' claims by $80,000,000 and bringing $39,400,000 (gross) of Cash into the Debtors' Estates. *See* Dkt. Nos. 347, 348 and 349.

### 2.2.5  *Order Granting Authority to Assert Estate Causes of Action*

On November 14, 2016, the Creditors Committee filed its *Expedited Motion for Authority to Assert Estate Causes of Action* [Dkt. No. 415] (the "Standing Motion"), seeking authority to

assert the Estates' Causes of Action, among other things, to preserve insurance coverage for claims of the Debtors' Estates against one or more of the Debtors' officers, directors, managers or Persons in control of the Debtors or their Affiliates, or their respective agents, and to investigate, pursue and/or assert any and all such claims, whether as representatives of the Estates, Creditors of the Estates, or shareholders of the Debtors, whether sounding in negligence, error or omission, mismanagement, intentional or unintentional wrongful acts, breaches of fiduciary duties, alter ego, self-dealing, misappropriation, misstatement, misleading statement, breach of warranty of authority or any other claim (collectively, the "D&O Claims").

The Creditors Committee alleges such claims may arise from acts or omissions, including, but not limited to, failure to properly account for and maintain accurate records of the Assets and liabilities of the Debtors, their direct and indirect Affiliates and parent, intercompany accounts and transfers that were undertaken without due consideration of whether such transfers were fair to the Debtors, or each of them, and operating as a single "Linc" enterprise without regard to the respective Assets and liabilities of the various Debtor and non-Debtor affiliated entities, all to the damage of the Debtors, their creditors and shareholders. On November 16, 2016, the Court entered its *Order Granting the Committee's Expedited Motion for Authority to Assert Estate Causes of Action* [Dkt. No. 419] (the "Standing Order").

It is contemplated that the Confirmation Order will transfer all claims that can be asserted pursuant to the Standing Order (including D&O Claims) to the Creditor Trust.

All of the claims the Creditors Committee alleges, as described below, are based on the Creditors Committee's investigation and the Creditor Committee's analysis and belief. Each of the parties below affirmatively deny any wrongly conduct alleged. The Creditors Committee alleges Claims against the Debtors and their insiders and Affiliates and agents, among others, stemming from the following factual allegations contained in the Standing Motion:

> … Jude Rolfes, the Debtors' Vice President, testified at the meeting as the officer of each Debtor, and as the individual who signed each of the Debtors' schedules. During that testimony (some of which changed over time), he testified that Debtors maintained "debt" on the books to affiliates that was not really debt. Amounts were not represented by promissory notes and had no interest rates or maturity dates. Amounts advanced by the Australian parent to the Debtors were made with no expectation they would ever be repaid. If the Debtors had properly stated the assets and liabilities to present the financial condition of the Debtors, the creditors would have had a more realistic set of choices other than an asset liquidation.

> 13.    All these intercompany transactions (and others) were authorized by the boards of the various entities, all of whom were aware of the financial condition of the entities. The boards also were aware that the transactions were between affiliates. The affiliates were not all on equal financial footing, however.

11

14.     Some Debtors were obligors on the $400,000,000 (USD) in senior secured debt, others were not. However, a "Management Agreement" was executed between the non-obligor Debtors and obligor Debtors to pay money between them. No third party fairness opinion was obtained by the boards of the related parties in determining whether the transactions were ultimately fair.   As a result, over $17 Million (USD) was transferred between the companies. The transfers included payments for rent, though no rental agreement existed between the entities affected. The transfers included payments for dozens of employees, though an outsourcing agreement was not executed (other than the "management agreement").

15.     Based on Mr. Rolfe's testimony and the subsequent documents produced by the Debtors, it appears the Debtors cannot specifically account for the ownership of millions of dollars of equipment. This issue arose when the Debtors filed amended schedules reallocating equipment among Debtor entities in variance from the original schedules. When asked at the section 341 meeting to explain the reallocation of assets, Mr. Rolfes offered to produce documentation explaining the title to equipment. However, a purchase and sale agreement eventually produced to explain ownership listed "all equipment" of the seller—no schedules described what equipment was sold. As a result, the Debtors rely on anecdotal stories for their conclusions as to the ownership of millions of dollars of these assets by the obligor Debtors. Since there is no documentation, and since the original schedules first filed under oath described assets as being owned by a non-obligor Debtor, there is confusion, even among the Debtors, over these assets.

16.     Because many records were kept by the Australian parent, some Debtors owned subsidiaries whose true assets and liabilities remain unknown. As a result, those subsidiaries' assets have not been made readily available to the Debtors' creditors. Specifically, the Debtors have not been able to provide details of assets of the subsidiaries of Linc Clean Energy, Linc Energy (Wyoming), Inc., and Linc Energy (Alaska), Inc..

17.     Further complicating this is that, based on the proofs of claim filed to date, and on the Creditors Committee's discussions with creditors, it appears that the Debtors seemed to operate as a single "Linc", receiving and paying bills for affiliates with funds for other affiliates.   It appears that suppliers, vendors, and contractual

counterparties were often ignorant about which entity within the Linc family was on the other side of their business dealings. If all entities were obligors on the $400 Million (USD) debt, that lack of distinction might not have mattered. However, some trade creditors dealt with LEO (a non-obligor) and some dealt with other Linc entities that owed $400 Million in secured debt, so this difference matters—especially in an asset liquidation.

18.    The directors and officers of the Debtors ought to have known about this confusion and the need for distinction among creditors of obligor and non-obligor entities. The officers either knew or should have known of the financial condition and the importance of acting without clouded loyalties. Yet, while the bulk of the Debtors were insolvent, they allowed the transactions to continue under the Management Agreement.[6]

In accordance with Section 5.11 of the Plan, the Debtors also expressly reserve all Causes of Action against any directors of any of the Debtors that the Creditors Committee identifies in any notice or notices of such Causes of Action that the Creditors Committee may send to the Debtors by February 1, 2017. All directors are hereby notified that such Causes of Action, including based on acts or omissions of the directors, are preserved in full.

### 2.2.6    *Dissolution of the Creditors Committee*

On the Effective Date, the Creditors Committee shall dissolve and the members of the Creditors Committee shall be released and discharged from all authority, duties, responsibilities and obligations related to and arising from and in connection with the these Chapter 11 Cases. Neither the Debtors nor the Creditor Trust nor any other party shall be responsible for fees and expenses incurred by the Creditors Committee after the Effective Date; provided, however that, following the Effective Date, the Creditors Committee shall continue to have standing and a right to be heard with respect to (a) Claims and/or applications for compensation by Professionals and requests for allowance of Administrative Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code, and (b) any appeals of the Confirmation Order that remain pending as of the Effective Date to which the Creditors Committee is a party.

### 2.2.7    *Schedules of Assets and Liabilities and Statements of Financial Affairs*

On June 13, 2016, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs [Dkt. Nos. 80-101] (the "Bankruptcy Schedules"), which include, *inter alia*, a list of potentially preferential transfers made within the preference period. The Debtors have amended the Bankruptcy Schedules from time to time. *See* Dkt. Nos. 235 – 237, 244 – 246, 275 – 278, 281, 289 and 290.

---

[6] Standing Motion at p. 5-8.

### 2.2.8   *Preference Analysis and Other Potential Avoidance Actions*

The Bankruptcy Code preserves the Debtors' rights to prosecute claims and causes of action, including claims to avoid and recover preferential transfers and fraudulent conveyances. Unless otherwise released, the Plan preserves all of the Debtors' rights in respect of all Causes of Action (including Avoidance Actions), transfers the Debtors' rights in respect of such Causes of Action to the Creditor Trust, and empowers the Creditor Trustee to prosecute, collect, or settle such Causes of Action as it may deem appropriate. To date, the Debtors and other parties have not conclusively identified or investigated any potential Avoidance Actions.

**IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN, HOLDERS OF CLAIMS (INCLUDING PARTIES THAT RECEIVED PAYMENTS FROM THE DEBTORS WITHIN NINETY (90) DAYS PRIOR TO THE PETITION DATE) SHOULD CONSIDER THAT A CAUSE OF ACTION MAY EXIST AGAINST THEM, THAT THE PLAN PRESERVES ALL CAUSES OF ACTION, AND THAT THE PLAN AUTHORIZES THE CREDITOR TRUSTEE TO PROSECUTE THE SAME.**

### 2.2.9   *Establishment of the Bar Date*

On June 29, 2016, the Debtors filed the *Notice of Deadlines for the Filing of Proofs of Claim, Including Requests for Payment Pursuant to Section 503(b)(9) of the Bankruptcy Code* [Dkt. No. 158], which established October 24, 2016 as the deadline for all entities other than governmental units to file Proofs of Claim against the Debtors, and November 28, 2016 as the date by which governmental units are required to file Proofs of Claim against the Debtors.

### 2.2.10   *Exclusivity*

The Debtors currently have the exclusive right to file a plan in the Chapter 11 Cases until September 26, 2016, and the exclusive right to solicit acceptances on such a plan until November 25, 2016. The Debtors have filed the *Debtors' Motion for an Order Extending the Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Pursuant to Section 1121 of the Bankruptcy Code* [Dkt. No. 370] requesting an extension of the exclusive right to file a plan until December 26, 2016 and the exclusive right to solicit acceptances until February 24, 2017. On November 21, 2016, the Bankruptcy Court entered an order approving the requested relief [Dkt. No. 427]. Although there is always a possibility that Confirmation of the Plan will not occur, at this time, the Debtors do not contemplate the need to further extend these dates.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### 3.1   **Introduction**

The Plan is styled as a joint plan among all Debtors. The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that

Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

### 3.2    Voting; Acceptance by Impaired Classes

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, Impaired Classes entitled to vote under the Plan shall have accepted the Plan if it is accepted by the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims that have timely and properly voted to accept or reject the Plan or if no holder of a Claim with respect to a specific Class for a particular Debtor timely submits a Ballot that complies with the Disclosure Statement Order indicating acceptance or rejection of the Plan.

### 3.3    Unclassified Claims

#### 3.3.1    *Administrative Claims*

Unless the holder and the Debtors, in consultation with the Ad Hoc Noteholder Group or, after the Effective Date, the Creditor Trustee agree to a different treatment, each holder of an Administrative Claim (other than an Administrative Claim that is a Professional Claim or a Claim for fees payable pursuant to 28 U.S.C. § 1930(a)) as of the Effective Date shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, the amount of such Allowed Administrative Claim, in Cash from the Claims Reserve Holdback on or as soon as practicable after the latest of (i) the Effective Date, (ii) the date that is fourteen (14) days after the date such Claim is Allowed, (iii) the date such Allowed Administrative Claim becomes due and payable in the ordinary course of business in accordance with the terms, and subject to the conditions, of any agreements governing, instruments evidencing, or other documents relating to, the applicable transaction giving rise to such Allowed Administrative Claim, if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business, or (iv) such other date as may be agreed upon in writing by the holder of such Claim and the Debtors.

#### 3.3.2    *Priority Tax Claims*

To the extent not previously paid during the Chapter 11 Cases, unless the holder agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release and discharge of such Claim, payment in full in Cash from the Claims Reserve Holdback on or as soon as practicable after the latest of the (i) the Effective Date; (ii) the date that is fourteen (14) days after the date such Claim is Allowed; or (iii) such other date as may be agreed upon in writing by the holder of such Claim and the Debtors, or, after the Effective Date, the Creditor Trustee.

### 3.4 Classified Claims and Equity Interests

#### 3.4.1 *Other Priority Claims*

Unless the holder and the Debtors, in consultation with the Ad Hoc Noteholder Group or, after the Effective Date, the Creditor Trustee agree to a different treatment, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Claim, the amount of such Allowed Other Priority Claim in Cash from the Claims Reserve Holdback on or as soon as practicable after the latest of (i) the Effective Date, (ii) the date that is fourteen (14) days after the date such Claim is Allowed, or (iii) such other date as may be agreed upon in writing by the holder of such Claim.

#### 3.4.2 *Other Secured Claims*

Unless the holder and the Debtors, in consultation with the Ad Hoc Noteholder Group or, after the Effective Date, the Creditor Trustee agree to a different treatment, each holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Claim, either (i) the amount of such Allowed Other Secured Claim in Cash from the Claims Reserve Holdback on or as soon as practicable after the latest of (a) the Effective Date; (b) the date that is fourteen (14) days after the date such Claim is Allowed; or (c) such other date as may be agreed upon in writing by the holder of such Claim, or (ii) the return of the applicable Collateral in satisfaction of the Allowed amount of such Other Secured Claim.

#### 3.4.3 *First Lien Note Claims*

The First Lien Note Claims shall be Allowed in the aggregate principal amount of $125,000,000 plus accrued and unpaid interest of $7,041,142.85 as of the Petition Date, plus, to the extent the following are payable in accordance with the First Lien Indenture, fees and expenses (including any prepayment fees and professional fees and expenses), penalties, premiums and other obligations incurred in connection with the First Lien Note Claims, plus, to the extent applicable, any adequate protection claims or other claims as provided for in the Stipulation; provided, however, that upon the occurrence of the Effective Date, the First Lien Adequate Protection Claim (as defined in the DIP Facility) shall be deemed waived pursuant to the Plan. Prior to the Effective Date, the outstanding amount of the Allowed First Lien Note Claims was reduced by (i) a partial payment in the amount of $22,315,759 made in respect of such claims pursuant to the Stipulation and (ii) a credit bid of $80,000,000 to purchase the Alaska Assets pursuant to the applicable Asset Purchase Agreement.

Unless the holder agrees to a different treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, the remaining balance of such Claim, each holder of an Allowed First Lien Note Claim, on or as soon as practicable after the Effective Date, shall receive its Pro Rata share of: (a) 100% of the Gulf Coast Sale Proceeds less the Claims Reserve Holdback, to the extent not previously distributed to the First Lien Noteholders pursuant to the Stipulation; (b) 100% of the Wyoming Sale Proceeds; and (c) the Noteholder Trust Interests, pursuant to which each holder shall be entitled to receive from the Creditor Trust its Pro Rata share of the Noteholder Trust Assets when and as such assets are available for distribution in

accordance with the terms of the Creditor Trust Agreement; provided that the Debtors shall distribute as much of the Noteholder Trust Assets to such holders on the Effective Date as is monetized and available for distribution, except for the Creditor Trust Initial Administrative Funding. The Noteholder Trust Assets consist of: (v) 50% of the proceeds of the performance bonds for which Linc Energy Operations is the principal, net of the $100,000 Creditor Trust Initial Administrative Funding (such bonds and proceeds therefrom the "LEO Bonds" and such distribution, the "First Lien LEO Bond Distribution");[7] (w) the first $100,000 in proceeds distributed from the Creditor Trust Assets (other than proceeds from the LEO Bonds), to be paid as reimbursement of the Creditor Trust Initial Administrative Funding (the "First Lien Trust Initial Distribution"); (x) 100% of the proceeds of the Debtors' performance bonds for which the principal is a Debtor *other than* LEO (the "Non-LEO Bonds" and such distribution, the "Non-LEO Bond Distribution"); (y) the Remaining Claims Holdback (defined below); and (e) 60% of the proceeds of the Creditor Trust Assets, if any, other than (a) Cash required to pay Allowed Holdback Claims, (b) the First Lien LEO Bond Distribution, (c) the First Lien Trust Initial Distribution, (d) the GUC Earmarked Funds, (e) the GUC LEO Bond Distribution, (f) the Non-LEO Bond Distribution, (g) the Remaining Claims Holdback and (h) and the Wind Down Costs (such remaining assets, the "Remaining Creditor Trust Assets").[8]

### 3.4.4    *Second Lien Note Claims*

In exchange for the compromises reflected in the Plan, including recoveries provided to holders of First Lien Note Claims, each Allowed Second Lien Note Claim is deemed satisfied, compromised, settled, and released in full on the Effective Date.

### 3.4.5    *General Unsecured Claims*

Unless the holder and the Debtors, in consultation with the Ad Hoc Noteholder Group or, after the Effective Date, the Creditor Trustee agree to a different treatment, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for such Claim, its Pro Rata share of the GUC Trust Interests, pursuant to which each holder shall be entitled to receive from the Creditor Trust its Pro Rata share of the GUC Trust Assets when and as such assets are available for distribution in accordance with the terms of the Creditor Trust Agreement. The GUC Trust Assets consist of: (a) an initial distribution of $950,000 to be funded from the Creditor Trust Assets on or as soon as practicable after the Effective Date (the "GUC Earmarked Funds"); (b) 50% of the proceeds recovered from the LEO Bonds (the "GUC LEO Bond Distribution"); and (c) 40% of the proceeds of the Remaining Creditor Trust Assets.

---

[7]  For the avoidance of doubt, the LEO Bonds shall not include the proceeds held by Linc Energy Operations, Inc. related to the Performance Bond No. RLB0007036, dated March 30, 2004, by and between Diasu Oil & Gas Company, Inc. as "Principal," RLI as "Surety," and Amoco Production Company as "Obligee."

[8]  For the purpose of distribution pursuant to the treatment described in this Section 3.4.3, the Pro Rata share for each holder of an Allowed First Lien Note Claim will be a fraction, expressed as a percentage, (x) the numerator of which is the outstanding principal amount of First Lien Notes held by such holder, and (y) the denominator of which is the aggregate outstanding principal amount of all outstanding First Lien Notes.

Upon acceptance, by Class, of the Plan by holders of First Lien Note Claims, Second Lien Note Claims and General Unsecured Claims, all holders of Allowed First Lien Note Claims and Allowed Second Lien Note Claims shall be deemed to have agreed to forgo any distribution from the GUC Trust Assets in respect of their their deficiency claims (the "Prepetition Noteholder Deficiency Claims").

### 3.4.6   *Equity Interests*

On the Effective Date, all Equity Interests shall be cancelled and extinguished, and the holders of all Equity Interests shall not receive or retain any property or Assets on account of their Equity Interests.

### 3.5   **Intercompany Claims**

On the Effective Date, all Intercompany Claims shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distributions to any holder of Intercompany Claims.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THE PLAN

### 4.1   **Deemed Consolidation**

The Estates of the Debtors have not been substantively consolidated; provided, however that for purposes of voting and determining distributions under the Plan, the Debtors will be deemed consolidated and treated as equivalent to a single legal entity. This "deemed" consolidation means that Claims filed against the Debtors will be considered to be a single Claim against the consolidated Debtors. The Debtors believe that the Plan structure is beneficial to Creditors as a whole and accomplishes a fairer distribution of value among Creditors. Likewise, this structure will minimize costly disputes over which Debtors owned what property. It will also facilitate the compromise reached among the Debtors, the Creditors Committee and the Ad Hoc Noteholder Group as embodied in the Plan. The Ad Hoc Noteholder Group, whose members hold Liens on the majority of the Debtors' Assets, as well as the Creditors Committee, have agreed to this treatment. Consolidation of the Debtors' Estates is for the limited purpose of making distributions to holders of Allowed Claims to ease an administrative burden on the Debtors, their Estates, and the Creditor Trustee or a Distribution Agent, as applicable.

For the avoidance of doubt, no holder of an Allowed Claim shall receive more favorable treatment on account of such Claims under the Plan had consolidation not been effected. Without limiting the foregoing, recoveries by holders of Allowed Other Secured Claims shall be limited by the Liens and the value of the Collateral securing such Allowed Claims, without recourse to any other Assets not encumbered by such Liens or included in such Collateral. This deemed consolidation will not affect (other than for purposes related to funding distributions under the Plan) the legal and organizational structure of the Debtors or pre- and post-Petition Date guaranties, Liens, and security interests, or distributions out of any insurance policies or proceeds of policies.

The Debtors, in consultation with the Creditors Committee and the Ad Hoc Noteholder Group, reserve the right to withdraw the Plan with respect to one or more Debtors as they may reasonably determine, including as may be appropriate or necessary to effectuate the terms of the Plan as described in Section 5.01 of the Plan.

### 4.2 Operations Between Confirmation Date and Effective Date

During the period from the Confirmation Date through and including the Effective Date, the Debtors may continue to operate their businesses in the ordinary course as debtors in possession, subject to all applicable orders of the Bankruptcy Court, the Bankruptcy Code and the limitations set forth in the Plan.

### 4.3 Creditor Trust

#### 4.3.1 *Creation of the Creditor Trust*

On or before the Effective Date, the Debtors shall take all necessary steps to establish the Creditor Trust for the benefit of the holders of Allowed Claims (the "Creditor Trust Beneficiaries") by the execution and delivery of the Creditor Trust Agreement.

#### 4.3.2 *Transfer of the Creditor Trust Assets*

On the Effective Date, all property of each Estate, including, without limitation, all then-owned Assets of each Debtor, all Causes of Action and any remaining Cash (following distributions as set forth in the Plan) shall vest in the Creditor Trust free and clear of all Liens, Claims, charges and encumbrances. The Creditor Trust Assets shall be deemed irrevocably transferred to the Creditor Trust free and clear of all Liens, claims and encumbrances pursuant to the Creditor Trust Agreement. For all U.S. federal income tax purposes, all Persons (including, without limitation, the Debtors and the Creditor Trustee and the Creditor Trust Beneficiaries) shall treat the transfer and assignment of the Creditor Trust Assets to the Creditor Trust for the benefit of the Creditor Trust Beneficiaries as (a) a transfer of the Creditor Trust Assets directly to the Creditor Trust Beneficiaries followed by (b) the transfer by the Creditor Trust Beneficiaries to the Creditor Trust of the Creditor Trust Assets. The Creditor Trust will be treated as a grantor trust for U.S. federal tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes. The Creditor Trust Beneficiaries will be treated as the grantors and owners of their Pro Rata (by Class or category of Claim) portion of the Creditor Trust Assets for U.S. federal income tax purposes. On and after the Effective Date, the Creditor Trustee may use, acquire and dispose of property and compromise or settle any Claims, without the supervision of or approval by the Bankruptcy Court, and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than the restrictions expressly imposed by the Plan, the Confirmation Order or the Creditor Trust Agreement.

#### 4.3.3 *Purpose of the Creditor Trust*

The Creditor Trust, duly organized under the laws of Texas, shall be established for the purpose of liquidating and distributing the Creditor Trust Assets in accordance with Treasury Regulation Section 301.7701-4(d) and shall be governed by the Creditor Trust Agreement.

### 4.3.4   *Administration of the Creditor Trust; Funding*

The Creditor Trust shall be administered by the Creditor Trustee pursuant to the Creditor Trust Agreement and, as detailed therein, shall be overseen by a three-member advisory board, consisting of one (1) representative appointed by the Creditors Committee, one (1) representative appointed by the Ad Hoc Noteholder Group, and the Creditor Trustee. The administrative costs and expenses of the Creditor Trust shall initially be funded by the Creditor Trust Initial Administrative Funding and the Wind Down Costs, which shall be transferred to the Creditor Trust on or as soon as practicable after the Effective Date. Thereafter, the costs and expenses of administering the Creditor Trust shall be funded by the Creditor Trust Assets as designated in the Creditor Trust Agreement. Additionally, subject to the terms of the Creditor Trust Agreement, the Creditor Trust may borrow against, pledge, hypothecate, otherwise encumber, or convey Creditor Trust Assets as needed to accomplish the goals of the Creditor Trust such as, as an example, pledging litigation recoveries to a contingency fee counsel or litigation funding lender. The Creditor Trust may also borrow on an unsecured basis, subject to the terms of the Creditor Trust Agreement.

### 4.3.5   *Powers and Duties of the Creditor Trustee*

The Creditor Trustee shall be appointed by the Ad Hoc Noteholder Group. The Creditor Trustee shall retain and have all the rights, powers and duties necessary to carry out its responsibilities under the Plan and the Creditor Trust Agreement, and as otherwise provided in the Confirmation Order, subject to the advice of the Creditor Trust Advisory Board. The Creditor Trustee shall be the exclusive trustee of the Creditor Trust Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as a representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. Without limiting the foregoing, the Creditor Trustee shall succeed to all of the Debtors' rights, including in respect of the Asset Purchase Agreements. The Creditor Trustee's liability may be limited by the Creditor Trust Agreement to include limitations of liability for negligence and any actions except for willful misconduct or fraud.

### 4.4   **Sources of Cash for Plan Distributions**

Except as otherwise specifically provided in the Plan or in the Confirmation Order or Stipulation, all Cash required for the payments to be made hereunder shall be obtained from the Creditor Trust.

### 4.5   **Sale of Debtors' Assets**

The Debtors have sold their Gulf Coast Assets to Torrent Gulf Coast, LLC, pursuant to the *Asset Purchase Agreement, Dated as of August 27, 2016, by and among Linc USA GP, Linc Energy Operations, Inc., and Linc Gulf Coast Petroleum, Inc., as Sellers, and Torrent Gulf Coast LLC, as Buyer* [Dkt. No. 347] (the "Gulf Coast APA"), for a purchase price of $37,500,000. The Bankruptcy Court entered an order approving the sale of the Gulf Coast Assets on August 31, 2016 and the sale was consummated on September 14, 2016 (the "Gulf Coast Sale Order").

The Debtors have sold their Wyoming Assets to Big Muddy Opportunities, LLC, pursuant to the *Asset Purchase Agreement, Dated as of August 29, 2016, by and among Linc*

*Energy Operations, Inc., and Linc Energy Petroleum (Wyoming), Inc., as Sellers, and Big Muddy Opportunities, LLC, as Buyer, and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent under the Pre-Petition First Lien Senior Indenture* [Dkt. No. 348] (the "Wyoming APA") for a purchase price of $1,900,000. The Bankruptcy Court entered an order approving the sale of the Wyoming Assets on August 31, 2016 and the sale was consummated on October 14, 2016.

The Debtors have sold their Alaska Assets to Arctic Acquisition, Inc., pursuant to the *Asset Purchase Agreement Dated as of August 29, 2016, by and among Linc Alaska Resources, LLC as Seller, and Arctic Acquisition, Inc., as Buyer* [Dkt. No. 349] (the "Alaska APA" and, together with the Gulf Coast APA and the Wyoming APA, the "Asset Purchase Agreements") for a credit bid of $80,000,000. The Bankruptcy Court entered an order approving the sale of the Alaska Assets on August 31, 2016 and the sale was consummated on November 22, 2016.

### 4.6    Miscellaneous Alaska Assets

On or as soon as practicable after the Effective Date, as part of the global settlement and consensual agreement of the Ad Hoc Noteholder Group and the Creditors Committee as set forth in the Plan, and in exchange for the consideration and agreements made by the Ad Hoc Noteholder Group in the Plan, the unencumbered assets owned by LEO and used in the operations of Linc Alaska, which assets were not transferred to Arctic Acquisition, Inc., (the "Miscellaneous Alaska Assets") shall be transferred and assigned free and clear of all Liens, claims, encumbrances and interests, to Malamute Energy, LLC. For the avoidance of doubt, the Miscellaneous Alaska Assets shall not be transferred to the Creditor Trust or be considered to be part of the Miscellaneous Assets or the Creditor Trust Assets.

### 4.7    Release of Bonds

On the Effective Date, the Debtors' rights under any bonds that have not been released as of the date thereof, including the right to receive the proceeds therefrom, shall be transferred to the Creditor Trust as Creditor Trust Assets. Prior to the Effective Date, the Debtors shall use reasonable efforts to cause the bonds to be released and, if released, the proceeds therefrom shall revert back to the respective Debtor listed as the principal therefor. Pursuant to Section 3.02(c) and Section 3.02(e) of the Plan, on the Effective Date or as soon as practicable thereafter upon release of bonds, the proceeds from the Non-LEO Bonds and the LEO Bonds when released shall be distributed to holders of Allowed First Lien Note Claims and Allowed General Unsecured Claims, as applicable, as the First Lien LEO Bond Distribution and the GUC LEO Bond Distribution, respectively.

### 4.8    Claims Reserve Holdback

Pursuant to the Stipulation, the Debtors made an initial distribution of $22,315,759 of the Gulf Coast Sale Proceeds to the First Lien Indenture Trustee for the benefit of the First Lien Noteholders prior to Confirmation. As set forth in the Stipulation, the parties further agreed to withhold $8,901,224 from that initial distribution of Gulf Coast Sale Proceeds to meet various other expenses. On the Effective Date, the remaining portion of that holdback – i.e., the Claims Reserve Holdback, shall be transferred to the Creditor Trust and used to satisfy Allowed

Holdback Claims as provided in ARTICLE II and Section 3.02(a) and Section 3.02(b) of the Plan and to fund the Wind Down Costs. After satisfaction of all such Allowed Holdback Claims and payment of the Wind Down Costs, any funds remaining in the Claims Reserve Holdback shall become part of the Remaining Claims Holdback and shall be distributed in accordance with Section 3.02(c) of the Plan.

### 4.9    Corporate Existence; Officers and Directors

On the later of the Effective Date or the transfer of the Debtors' Assets to the Creditor Trust as provided in the Plan, except to the extent that the Debtors, in consultation with the Ad Hoc Noteholder Group and the Creditors Committee determine otherwise, each of the Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided, however, that each Debtor shall file with the Office of the Secretary of State for the state of its incorporation, a certificate of dissolution which may be executed by an officer of such Debtor without the need for approval by the board of directors or shareholders. From and after the Effective Date, the Debtors shall not be required to file any document, or take any other action, or obtain any approval from any Debtor's board of directors or shareholders, to withdraw their business operations from any states in which the Debtors previously conducted their business operations.

On the Effective Date, (a) the positions of the current directors, or in the case of a governing body created by a partnership agreement, limited liability company agreement or similar agreement, the members of such governing body (such persons and the corporate directors collectively, the "Governors") of each Debtor shall be eliminated, and each Governor shall be terminated (without the necessity of further action), (b) to the fullest extent permitted by applicable law, the rights, powers, and duties of the Governors of any Debtor that remains in existence after the Effective Date and that has a Governor shall vest in the Creditor Trustee and the Creditor Trustee or its designee shall be the presiding officer and the sole Governor of each such Debtor. The Creditor Trustee shall make all determinations with respect to employment of any other directors, officers, managers and employees of any such Debtor on and after the Effective Date.

### 4.10    Corporate Action

On the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Equity Interests, directors, managers or officers of the Debtors, the Creditor Trustee, or any other Entity or Person, as applicable, including, without limitation: (a) the execution and delivery of all appropriate agreements or other documents of dissolution or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any Asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases; and (d) all other actions that the applicable Entities determine to be necessary or appropriate,

including making filings or recordings that may be required by applicable law. All matters provided for in the Plan involving the company structure of the Debtors, and any company action required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons or officers of the Debtors. The authorizations and approvals contemplated by Section 5.09 of the Plan shall be effective notwithstanding any requirements under nonbankruptcy law.

### 4.11    Preservation of Causes of Action Not Expressly Released

Except as otherwise provided in the Plan or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with section 1123(b)(3) of the Bankruptcy Code, any claims, rights, and Causes of Action that the Debtors may hold against any Person, shall vest in the Creditor Trust, and the Creditor Trust and the Creditor Trustee, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such claims, rights or Causes of Action. In addition, the Creditor Trustee, and its successor entities under the Plan expressly reserve the right to pursue or adopt any rights and/or claims asserted and/or alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Person or Entity (including, in each case and without limitation, the other Debtors), including, without limitation, the other parties in such lawsuits. The Creditor Trust shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, and Causes of Action without the consent or approval of any third party and without any further order of the Bankruptcy Court. Unless a Cause of Action is expressly waived, relinquished, released or compromised in the Plan or an order of the Bankruptcy Court, the Creditor Trustee expressly reserves such Cause of Action for later adjudication and, accordingly, no doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches or other preclusion doctrine shall apply to such Cause of Action as a consequence of Confirmation, the vesting of such Cause of Action in the Creditor Trust, any order of the Bankruptcy Court or these Chapter 11 Cases.

Without limiting the foregoing, the Causes of Action reserved by the Debtors and contributed to the Creditor Trust include, without limitation, any claims the Debtors, their Estates, or any Creditor (whether claiming directly, or by, through or on behalf of the Debtors) could assert against any Person who is or was an officer or director or otherwise in control of any Debtor or Affiliate, including, without limitation, claims for negligence, mismanagement, intentional or unintentional wrongful acts, breaches of fiduciary duties, self-dealing, misappropriation, fraud, concealment of assets, and any other claim, whether arising in law, equity, tort, contract, statute or common law.

Delivery (by any means) of the Plan or this Disclosure Statement to any Person to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors, or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors, shall constitute actual notice that such obligation, transfer, or transaction may be reviewed by the Creditor Trustee subsequent to the Effective Date and may, if appropriate, be the subject of an action after the Effective Date, whether or not: (a) such Person

has filed a Proof of Claim against the Debtors in their Chapter 11 Cases; (b) such Person's Proof of Claim has been objected to by the Debtors or the Creditor Trustee, as applicable; (c) such Person's Claim was included in Debtors' Schedules; (d) such Person's scheduled Claim has been objected to by the Debtors or the Creditor Trustee, as applicable, or has been identified by the Debtors or the Creditor Trustee, as applicable, as a Disputed Claim; or (e) such action falls within the list of affirmative Causes of Action in the Plan Supplement. No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as an indication that the Debtors or the Creditor Trustee, as applicable, will not pursue such Cause of Action.

### 4.12   Release of Liens

Upon satisfaction of Allowed Claims as set forth in the Plan, except as otherwise specifically provided for in the Plan, in the Confirmation Order, or in any contract, instrument, release or other agreement or document created pursuant to or as contemplated under the Plan, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Debtors' Estates shall be fully released, settled and discharged, and all of the rights, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Debtors or the Creditor Trust, as applicable.

### 4.13   Cancellation of Securities and Notes Against the Debtors

On the Effective Date, except as otherwise specifically provided for in the Plan, in the Confirmation Order, or in any contract, instrument, release or other agreement or document created pursuant to or as contemplated under the Plan, each of (a) the First Lien Notes, (b) the Second Lien Notes, (c) the Equity Interests in the Debtors and (d) any other notes, bonds, indentures, certificates or other instruments or documents evidencing or creating any indebtedness of or ownership interest in the Debtors or giving rise to any Claims or Equity Interests shall be cancelled and deemed terminated and satisfied and discharged solely with respect to the Debtors, and the holders thereof shall have no further rights or entitlements in respect thereof against the Debtors or their Estates, except the rights to receive the distributions, if any, to which the holders thereof are entitled under the Plan. Notwithstanding anything in the Plan to the contrary, the applicable provisions of the First Lien Indenture shall continue in effect solely for the purposes of permitting the First Lien Indenture Trustee to: (i) make the distributions to be made to holders of Allowed First Lien Note Claims as contemplated by Section 3.02(c) of the Plan; and (ii) maintain any rights the First Lien Indenture Trustee may have for any fees, costs, expenses, and indemnification under the Indentures or other agreements until all such fees, costs, and expenses are paid.

### 4.14   General Settlement of Claims

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan constitute a good-faith compromise and settlement of all Claims against and Equity Interests in the Debtors relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim, or any Distribution to be made on account of such

Allowed Claim. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors and their Estates and is fair, equitable and reasonable. In the event that, for any reason, the Confirmation Order is not entered or the Effective Date does not occur, the Debtors, the Creditors Committee and the Prepetition Noteholders reserve all of their respective rights with respect to all disputes resolved and settled under the Plan.

4.15    **Section 1146(a) Exemption**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, all transfers of property under the Plan shall not be subject to any stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment. The Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax, fee, or governmental assessment.

## ARTICLE V
## THE SOLICITATION; VOTING PROCEDURES

5.1    **Solicitation Package**

Accompanying this Disclosure Statement for the purpose of soliciting votes on the Plan are copies of: (a) notice of the combined final Disclosure Statement hearing and Confirmation Hearing and objection deadline; (b) this Disclosure Statement; (c) the Plan (appended to this Disclosure Statement); (d) an appropriate Ballot; (e) a postage pre-addressed return envelope; and (f) such other information as the Bankruptcy Court may direct or approve (collectively, the "Solicitation Package"). Only holders eligible to vote in favor of or against the Plan will receive a Ballot as part of their Solicitation Package. If you did not receive a Ballot and believe you should have, please contact the Debtors' counsel at the address or telephone number set forth herein.

5.2    **Voting Instructions**

After carefully reviewing the Plan and this Disclosure Statement, and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot. Please complete and sign your Ballot and return it in the envelope provided so that it is RECEIVED by the Claims and Solicitation Agent on or before the Plan Voting Deadline set forth on the Ballot: (a) at the address listed below; (b) by electronic mail at lincenergyinfo@kccllc.com; or (c) by submission through the case website, www.kccllc.net/linc.

Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

If you have any questions about the procedure for voting your eligible Claim or with respect to the Solicitation Package that you have received, please contact the Claims and Solicitation Agent:

Linc Energy Ballot Processing Center
c/o Kurtzman Carson Consultants, LLC
2335 Alaska Avenue
El Segundo, CA 90245
lincenergyinfo@kccllc.com

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND SOLICITATION AGENT FOR THE DEBTORS ON OR BEFORE [•], 2017, AT THE ABOVE ADDRESS. EXCEPT TO THE EXTENT ALLOWED BY THE BANKRUPTCY COURT OR DETERMINED OTHERWISE BY THE DEBTORS, BALLOTS RECEIVED AFTER THE PLAN VOTING DEADLINE WILL NOT BE ACCEPTED OR USED IN CONNECTION WITH THE DEBTORS' REQUEST FOR CONFIRMATION OF THE PLAN OR ANY MODIFICATION THEREOF.**

**ONLY BALLOTS WITH ORIGINAL SIGNATURES WILL BE COUNTED. BALLOTS WITH COPIED SIGNATURES WILL <u>NOT</u> BE ACCEPTED OR COUNTED. YOU <u>MAY NOT</u> SUBMIT A BALLOT BY FACSIMILE. ONLY ORIGINAL BALLOTS RECEIVED BY THE CLAIMS AND SOLICITATION AGENT BY THE PLAN VOTING DEADLINE WILL BE COUNTED.**

### 5.3    Voting Tabulation

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only holders who actually vote will be counted. The failure of a holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Debtors, in their sole discretion, may request that the Claims and Solicitation Agent attempt to contact such voters to cure any such defects in the Ballots.

Except as provided below, unless the applicable Ballot is timely submitted to the Claims and Solicitation Agent before the Plan Voting Deadline, together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid and decline to utilize it in connection with seeking Confirmation of the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(c) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another person acting in a fiduciary or representative capacity, such Person should indicate such capacity when signing and, unless otherwise determined by the Debtors, must submit proper evidence satisfactory to the Debtors of authority to so act.

The period during which Ballots with respect to the Plan will be accepted by the Debtors will terminate on the Plan Voting Deadline. Except to the extent permitted by the Bankruptcy Court, Ballots that are received after the Plan Voting Deadline will not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof). IN NO CASE SHOULD A BALLOT BE DELIVERED TO ANY ENTITY OTHER THAN THE VOTING AGENT.

5.4     **Agreements Upon Furnishing Ballots**

The delivery of an accepting Ballot to the Claims and Solicitation Agent by a holder pursuant to one of the procedures set forth above will constitute the agreement of such holder to accept (a) all of the terms of, and conditions to, the solicitation and voting procedures and (b) the terms of the Plan; provided, however, all parties in interest retain their right to object to Confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

## ARTICLE VI
## FEASIBILITY AND BEST INTEREST OF THE CREDITORS

6.1     **Feasibility of the Plan**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successors to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. The Plan proposed by the Debtors provides for a liquidation of the Debtors' remaining assets and a distribution of Cash to creditors in accordance with the priority scheme of the Bankruptcy Code and the terms of the Plan. The ability of the Creditor Trustee to make the Distributions described in the Plan does not depend on future earnings of the Debtors. Accordingly, the Debtors believe that the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

6.2     **Best Interest of Creditors Test**

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each holder of a Claim or Equity Interest in such Class either: (a) has accepted the Plan; or (b) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors liquidated under chapter 7 of the Bankruptcy Code. In chapter 7 liquidation cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for:

- Secured creditors (to the extent of the value of their collateral);

- Administrative and other priority creditors;

- Unsecured creditors;

- Debt expressly subordinated by its terms or by order of the Bankruptcy Court; and

- Interest holders.

To determine if the Plan is in the best interests of each Impaired Class, the value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the foregoing claims, are then compared with the value of the property offered to such Classes of Claims and Equity Interests under the Plan. After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to the holders of Claims and Equity Interests in the Chapter 11 Cases, including (i) the increased costs and expenses of a liquidation under chapter 7 of the Bankruptcy Code arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the likely erosion in value of assets in a chapter 7 case in the context of an expeditious liquidation and the "forced sale" atmosphere that would prevail under a chapter 7 liquidation and (iii) the substantial increases in Claims which would be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases, the Debtors have determined that Confirmation of the Plan will provide each holder of an Allowed Claim or Equity Interest with a recovery that is not less than such holder would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

The Liquidation Analysis is attached hereto as **Exhibit B**. The information set forth in **Exhibit B** provides a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' Estates. The Liquidation Analysis was prepared by the Debtors' financial advisor. Underlying the Liquidation Analysis is a number of estimates and assumptions that, although developed and considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected might not be realized if the Debtors were, in fact, to undergo such a chapter 7 liquidation. The chapter 7 liquidation period is assumed to be a period of six (6) months, allowing for, among other things, the (i) discontinuation of the Debtors' operations, (ii) sale of assets, and (iii) collection of receivables.

The Debtors believe that the value of any distributions in a chapter 7 case would be less than the value of Distributions under the Plan because, among other reasons, distributions in a chapter 7 case may not occur for a longer period of time, thereby reducing the present value of such distributions. In this regard, the distribution of the proceeds of a chapter 7 liquidation would be delayed until a chapter 7 trustee and its professionals became knowledgeable about the Chapter 11 Cases and the Claims against the Debtors. In addition, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale, and the Debtors' Estates would have to pay the fees and expenses of a chapter 7 trustee in addition to

the Professionals' pre-conversion fees and expenses (thereby further reducing Cash available for distribution).

## ARTICLE VII
## CONFIRMATION PROCEDURES

### 7.1   The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan. Pursuant to section 105(d)(2)(B)(vi) of the Bankruptcy Code, the hearing on Confirmation of the Plan may be combined with the hearing on approval of this Disclosure Statement under section 1125 of the Bankruptcy Code. The Bankruptcy Court has entered *Order (A) Granting Conditional Approval of Adequacy of Disclosure Statement, (B) Approving Solicitation Materials and Procedures, (C) Approving Plan Confirmation Schedule, (D) Setting a Consolidated Hearing on Final Approval of Disclosure Statement and Confirmation of Debtors' Joint Chapter 11 Plan of Liquidation and (E) Granting Related Relief* (the "Disclosure Statement Order"), that, among other things, granted the Debtors' request to combine the hearings on approval of this Disclosure Statement and confirmation of the Plan, as permitted by section 105(d)(2)(B)(vi) of the Bankruptcy Code (combined, the "Confirmation Hearing").

The Bankruptcy Court has scheduled the Confirmation Hearing for [•], 2017 at [•] prevailing Central Time, before the Honorable David R. Jones, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of Texas at 515 Rusk Street, Houston, TX 77002, Courtroom 400.

Objections to Confirmation of the Plan must be filed and served on the Debtors and the other parties set forth in the Disclosure Statement Order, and certain other parties, by no later than [•], 2017 in accordance with the Disclosure Statement Order. THE BANKRUPTCY COURT MAY NOT CONSIDER OBJECTIONS TO CONFIRMATION OF THE PLAN IF ANY SUCH OBJECTIONS HAVE NOT BEEN TIMELY SERVED AND FILED IN COMPLIANCE WITH THE ORDER APPROVING THIS DISCLOSURE STATEMENT.

The notice of the Confirmation Hearing will contain, among other things, the deadline to object to Confirmation of the Plan, the Plan Voting Deadline, and the date and time of the Confirmation Hearing.

### 7.2   Statutory Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied. The Debtors believe that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtors, as Plan proponents, have or will have complied with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (a) made before the Confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after the Confirmation of the Plan;

- The Debtors, as Plan proponents, have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an Affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy;

- The Debtors, as Plan proponents, have disclosed the identity of any insider (as defined in section 101 of the Bankruptcy Code) that will be employed or retained by the Creditor Trust, and the nature of any compensation for such insider;

- The Plan does not propose any rate change that is subject to approval by a governmental regulatory commission;

- Either each holder of an Impaired Claim or Equity Interest has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code;

- Each Class of Claims that is entitled to vote on the Plan either has accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims will be paid in full, in Cash, on the Effective Date, or as soon thereafter as practicable;

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that Class;

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan unless such a liquidation or reorganization is proposed in the Plan;

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date; and

- The Debtors have no retirement benefit obligations except for 401(k) plans, which will be terminated but provide for rollover distributions to current participants.

The Debtors believe that: (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) the Debtors have complied or will have complied with all of the requirements of chapter 11; and (c) the Plan has been proposed in good faith.

### 7.2.1   *Acceptance by Impaired Classes*

The Bankruptcy Code requires, as a condition to Confirmation, that, except as described in the following section, each Class of Claims or Equity Interests that is Impaired under the Plan accept the Plan. A class that is not impaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is impaired unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of that claim or equity interest; or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest after the occurrence of a default—(1) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured; (2) reinstates the maturity of such claim or interest as such maturity existed before such default; (3) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (4) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(l)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure*;* and (5) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

### 7.2.2   *Confirmation Without Acceptance by All Impaired Classes*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan, even if an Impaired class entitled to vote on the plan has not accepted it, provided that the plan has been accepted by at least one Impaired Class. If any Impaired Class does not accept the Plan, the Debtors intend to seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code states that, notwithstanding an Impaired class's failure to accept a plan, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is Impaired under, and has not accepted, the Plan.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of secured creditors includes the following requirements that either: (a) the plan provides that

31

holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims and that each holder of a claim of such class receive on account of such claims deferred Cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the Estate's interest in such property; (b) the plan provides for the sale, subject to 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under (a) or (c) of this paragraph; or (c) the plan provides for the realization by such holders of the indubitable equivalent of such claims.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or equity interest any property.

## ARTICLE VIII
## CERTAIN RISK FACTORS AFFECTING
## CERTAIN OF THE DEBTORS

ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN.

### 8.1    Certain Plan and Bankruptcy Law Considerations

#### 8.1.1    *General*

Although the Plan is designed to implement the liquidation of the Debtors' remaining assets and provide distributions to creditors in an expedient and efficient manner, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis because of a challenge to Confirmation of the Plan or a failure to satisfy the conditions precedent to Consummation of the Plan, they may be forced to operate in bankruptcy for an extended period while they try to develop a different chapter 11 plan that can be confirmed. Such a scenario could result in a material deterioration in the Debtors' assets and likely would diminish recoveries under any subsequent chapter 11 plan. Further, in such event, the Debtors may not have sufficient Cash to fund their operations in bankruptcy for such an extended period.

#### 8.1.2    *Failure to Receive Requisite Acceptances*

Claims in Classes 3 and 5 are the only Claims entitled to vote to accept or reject the Plan. Although the Debtors believe they will receive the requisite acceptances, the Debtors cannot provide assurances that the requisite acceptances to confirm the Plan will be received. If neither

Class accepts the Plan, the Debtors will not be able to seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code In such a circumstances, the Debtors may seek to obtain acceptances of an alternative chapter 11 plan, or otherwise, that may not have sufficient support from their necessary creditors for confirmation of a plan, or may be required to liquidated these Estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative plan would be similar to, or as favorable to, the Debtors' creditors.

### 8.1.3   *Failure to Secure Confirmation*

Even if the requisite acceptances are received, the Debtors cannot provide assurances that the Bankruptcy Court will confirm the Plan. A party in interest might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or the Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. If the Plan is not confirmed, the Plan will need to be revised and it is unclear whether a chapter 11 liquidation of the Debtors' remaining assets could be implemented and what distribution holders of Claims ultimately would receive with respect to their Claims. If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their remaining assets in chapter 7, in which case it is likely that holders of Claims would receive substantially less favorable treatment than they would receive under the Plan. There can be no assurance that the terms of any such alternative would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

### 8.1.4   *Failure to Consummate the Plan*

The Plan contains various conditions to Consummation of the Plan. As of the date hereof, there can be no assurance that these or the other conditions to Consummation will be satisfied or waived. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

### 8.1.5   *Reductions to Estimated Creditor Recoveries*

The Allowed amount of Claims in each Class could be greater than projected. The amount of Cash realized for the liquidation of the Debtors' remaining assets could be less than anticipated. In either case, the amount of Distributions to Creditors could be reduced substantially.

### 8.1.6   *Objection to the Amount or Classification of Claims*

The Creditor Trustee, for and on behalf of the Creditor Trust, reserves the right to object to the amount or classification of any Claim. It is the Debtors' position that the estimates set forth in this Disclosure Statement cannot be relied on by any Creditor whose Claim or Equity Interest is subject to an objection. Any such Claim holder may not receive its specified share of the estimated Distributions described in this Disclosure Statement.

### 8.1.7   *Administrative, Plan Wind-Down and Creditor Trust Expenses*

The ultimate amount of Cash available to make Distributions through the Creditor Trust depends, in part, on the manner in which the Creditor Trustee operates the Creditor Trust, the expenses the Creditor Trustee incurs and the reasonable administrative and Plan wind-down expenses. Such expenses will be given priority over Distributions to the Creditor Trust Beneficiaries. As a result, if the Creditor Trustee incurs professional or other expenses in excess of current expectations, the amount of Distributions to the Creditor Trust Beneficiaries will decrease.

### 8.1.8   *Claims and Causes of Action*

The ultimate amount of Cash available for distributions to the Creditor Trust Beneficiaries also will be affected by the performance and relative success of the Creditor Trustee in pursuing Causes of Action. The less successful the Creditor Trustee is in pursuing such matters, if any, the less Cash there will be available for distribution to the Creditor Trust Beneficiaries.

## ARTICLE IX
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include: (a) liquidation of the Debtors under chapter 7 of the Bankruptcy Code; and (b) an alternative plan.

### 9.1   **Liquidation Under Chapter 7**

If the Plan is not Confirmed and Consummated, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed (or elected) to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Equity Interests is set forth below. The Debtors believe that liquidation under chapter 7 would result in smaller Distributions to Creditors than those provided for in the Plan because: (a) additional administrative expenses involved in the appointment of a trustee would be incurred; and (b) additional expenses and claims, some of which would be entitled to priority, would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

### 9.2   **Alternative Plan**

If the Plan is not confirmed, the Bankruptcy Court could confirm a different plan. A different plan might involve a reorganization or an orderly liquidation of the Debtors' assets, or some combination of the two. The Debtors believe that the Plan, as described herein, enables holders of Claims and Equity Interests to realize the highest and best value under the circumstances. The Debtors believe that any alternative form of chapter 11 plan is a much less attractive alternative to creditors than the Plan because of the greater returns and certainty

provided by the Plan. Other alternatives could involve diminished recoveries, significant delay, uncertainty, and substantial additional administrative costs.

## ARTICLE X

## EXECUTORY CONTRACTS, UNEXPIRED LEASES, AND OTHER AGREEMENTS

### 10.1    Rejection of Executory Contracts and Unexpired Leases

Except as otherwise expressly provided in (a) the Plan, (b) the Schedule of Assumed Executory Contracts and Unexpired Leases or (c) any other filing made before the Confirmation Hearing, including, without limitation, the Asset Purchase Agreements, all Executory Contracts and Unexpired Leases shall be deemed automatically rejected as of the Effective Date in accordance with, and subject to the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code; provided, however, that Section 6.01 of the Plan shall not apply to any Executory Contract or Unexpired Lease that expired or was terminated prior to the Petition Date pursuant to its terms.

### 10.2    Treatment of Assumed Executory Contracts and Unexpired Leases; Assignment

Except as otherwise expressly provided in (a) the Plan Supplement, or (b) any other filing made before the Confirmation Hearing, all Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Executory Contracts and Unexpired Leases shall be assumed by the applicable Debtor(s) as of the Effective Date in accordance with, and subject to the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code and assigned to the Creditor Trust; provided, however, that Section 6.02 of the Plan shall not apply to any Executory Contract and Unexpired Lease of a Debtor that expired or terminated pursuant to its own terms prior to the Petition Date.

Any Executory Contract or Unexpired Lease that is assumed by any of the Debtors or the Creditor Trustee, if not expressly assigned to a third party previously in these Chapter 11 Cases, will be deemed assigned to the Creditor Trust pursuant to section 365 of the Bankruptcy Code. If an objection to a proposed assumption, assumption or assignment, or Cure Cost is not resolved in favor of the Debtors or Creditor Trust before the Effective Date, the applicable executory contract may be designated by the Debtors or the Creditor Trust for rejection within five (5) days after the entry of the order of the Bankruptcy Court resolving the matter against the Debtors or Creditor Trust. Such rejection shall be deemed effective as of the Effective Date.

### 10.3    Effect of Confirmation Order on Assumption/Rejection

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order of the Bankruptcy Court pursuant to sections 365 and 1123(b) of the Bankruptcy Code approving the assumption or rejection, as applicable, of the Executory Contracts and Unexpired Leases as of the Effective Date and determining that: (a) with respect to such rejections, such rejected Executory Contracts and Unexpired Leases are burdensome and that the rejection therein is in the best interests of the Estates; and (b) with respect to such assumptions, to the extent necessary, that the applicable Debtor has (i) cured any default, (ii) compensated the counterparty for any

actual pecuniary loss resulting from any default, and (iii) provided adequate assurance of future performance under such Executory Contract or Unexpired Lease of the applicable Debtor. Assumption of any Executory Contract or Unexpired Lease of any Debtor, and satisfaction of the Cure Costs, shall result in the full discharge, release and satisfaction of any claims or defaults, whether monetary or nonmonetary, arising under any assumed Executory Contract or Unexpired Lease of such Debtor at any time before the date such Executory Contract or Unexpired Lease is assumed. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or Bankruptcy Court order shall vest in and be fully enforceable by the applicable Debtor. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

### 10.4   Cure of Defaults and Objections to Assumption

Except as may be otherwise agreed to by the parties, within seven (7) days after the Effective Date, the Creditor Trustee shall pay any undisputed Cure Costs to the counterparties to any assumed Executory Contracts and Unexpired Leases. The Cure Costs for the contracts to be assumed will be included in the Schedule of Assumed Executory Contracts and Unexpired Leases. If there are no Cure Costs listed for an Executory Contract or Unexpired Lease, then the proposed Cure Costs shall be $0.00. Such amount shall be deemed full payment of such obligations under section 365(b) of the Bankruptcy Code, unless, on or before the Voting Deadline, the contract counter-party files an objection disputing: (a) the amount of any Cure Costs, (b) the ability of the Debtors or any assignee to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (c) any other matter pertaining to assumption. The disputed Cure Costs required by section 365(b)(1) of the Bankruptcy Code shall be made only after entry of a Final Order resolving the dispute and approving the assumption.

### 10.5   Rejection Damages Claims and Objections to Rejection

Claims arising out of the rejection of Executory Contract or Unexpired Leases pursuant to the Plan must be filed and served pursuant to the procedures specified in the Bar Date Notice, or another order of the Bankruptcy Court, no later than thirty (30) days after the Effective Date. Holders of any Claim not filed within such time will be forever barred from asserting such Claim against the Debtors, their Estates, or their respective successors or their respective properties. Unless otherwise ordered by the Bankruptcy Court or specified in the Plan, all Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be treated as General Unsecured Claims under the Plan; provided, however, if the holder of an Allowed Claim for rejection damages has an unavoidable security interest in any Collateral to secure obligations under such rejected contract or lease, the Allowed Claim for rejection damages shall be treated as an Other Secured Claim against the particular Debtor in question to the extent of the value of such holder's interest in the Collateral, with the deficiency, if any, treated as a General Unsecured Claim against the particular Debtor in question.

### 10.6    Preexisting Obligations Under Executory Contracts and Unexpired Leases

The Debtors or the Creditor Trustee, as applicable, reserve the right to assert that rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of obligations owed to the Debtors or the Creditor Trust, as applicable, under such contracts or leases, prior to the rejection of such contracts or leases. Notwithstanding any nonbankruptcy law to the contrary, the Debtors or the Creditor Trustee, as applicable, expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors or Creditor Trustee, as applicable, from counterparties to rejected Executory Contracts and Unexpired Leases.

### 10.7    Modifications, Amendments, Supplements, Restatements or Other Agreements

Unless otherwise provided in the Plan, each assumed or assumed and assigned Executory Contract and Unexpired Lease shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under the Plan or otherwise.

Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

### 10.8    Reservation of Rights

Any Executory Contract to be held by any of the Debtors or the Creditor Trustee and assumed hereunder or otherwise in these Chapter 11 Cases, if not expressly assigned to a third party previously in these Chapter 11 Cases, will be deemed assigned to the Creditor Trust pursuant to section 365 of the Bankruptcy Code. If an objection to a proposed assumption, assumption or assignment, or Cure Cost is not resolved in favor of the Debtors or Creditor Trust before the Effective Date, the applicable executory contract may be designated by the Debtors or the Creditor Trust for rejection within five (5) days after the entry of the order of the Bankruptcy Court resolving the matter against the Debtors or Creditor Trust. Such rejection shall be deemed effective as of the Effective Date.

## ARTICLE XI
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

### 11.1    Objections to Claims

After the Effective Date, the Creditor Trustee shall have the exclusive authority to file objections to all Claims, and the exclusive authority to settle, compromise, or litigate to

judgment any objections to Claims that he or she files. Subject to the terms of the Creditor Trust Agreement, the Creditor Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Creditor Trustee also shall have the right to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

11.2   **Objection Deadline**

As soon as practicable, but no later than the Claims Objection Deadline, the Creditor Trustee may file objections with the Bankruptcy Court and serve such objections on the Creditors holding the Claims to which such objections are made. Nothing contained in the Plan, however, shall limit the right of the Creditor Trustee to object to Claims, if any, filed or amended after the Claims Objection Deadline. The Claims Objection Deadline may be extended by the Bankruptcy Court upon motion by the Debtors or Creditor Trustee, without notice or hearing.

For the avoidance of doubt, no Claim is or shall be deemed Allowed until the later of the Claims Objection Deadline of the expiration of some other applicable period of limitation fixed by the Bankruptcy Code, Bankruptcy Rules, or Bankruptcy Court, unless otherwise ordered by a Final Order of the Bankruptcy Court.

11.3   **Estimation of Claims**

The Creditor Trustee or, if applicable, the Debtors may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Bankruptcy Code section 502(c), regardless of whether the Creditor Trustee or any Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Creditor Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.

11.4   **No Distributions on Disputed Claims**

Notwithstanding any provision in the Plan to the contrary, no distributions, partial or otherwise, shall be made with respect to a Disputed Claim until such Claim becomes an Allowed Claim. Subject to the provisions of the Plan, after a Disputed Claim becomes an Allowed Claim, the holder of such an Allowed Claim will receive all distributions to which such holder is then entitled under the Plan on the next scheduled distribution date or as the Creditor Trustee otherwise determines in its reasonable discretion. No post-Effective Date interest shall be paid on distributions hereunder. If a Creditor incorporates more than one Claim in a Proof of Claim then: (a) such Claims will be considered one Claim for purposes of the Plan, and (b) no such Claim will be bifurcated into an Allowed portion and a Disputed portion.

11.5    **Disputed Claims Reserves from GUC Trust Assets**

On the Effective Date, one or more reserves may be established from the GUC Trust Assets for the benefit of holders of General Unsecured Claims that are Disputed, if any. As the Disputed Claims are resolved, the Creditor Trustee or the Distribution Agent, as applicable, shall make distributions to holders of any portion of such Claims that are Allowed. Following the completion of all such distributions, any funds remaining in any reserve(s) shall become a GUC Trust Asset and distributed in accordance with Section 3.02(e) of the Plan; provided, however, that to the extent such distributions would result in total recoveries of holders of Allowed General Unsecured Claims in excess of the total amount of such Claims, the excess shall become a Noteholder Trust Asset and distributed in accordance with Section 3.02(c) of the Plan.

11.6    **Reduction of Claims**

Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtors prior to the Effective Date, including pursuant to orders of the Bankruptcy Court. To the extent such payments are not reflected in the Schedules, such Schedules will be deemed amended and reduced to reflect that such payments were made. Nothing in the Plan shall preclude the Creditor Trustee from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Effective Date.

11.7    **Recoupment**

Any holder of a Claim shall not be entitled to recoup any Claim against any claim, right, or cause of action of the Debtors or the Creditor Trustee, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, or intends to preserve any right of recoupment.

**ARTICLE XII**
**CONDITIONS PRECEDENT TO CONFIRMATION**
**AND CONSUMMATION OF THE PLAN**

12.1    **Conditions Precedent to Confirmation**

It shall be a condition to Confirmation that the following conditions have been satisfied or waived pursuant to Section 9.04 of the Plan:

(i)     the Disclosure Statement Order, in form and substance acceptable to the Debtors, the Creditors Committee and the Ad Hoc Noteholder Group, shall have been entered by the Bankruptcy Court on the docket of the Chapter 11 Cases, and such order shall not be subject to a stay;

(ii)    the Confirmation Order shall be in form and substance reasonably acceptable to the Debtors, the Creditors Committee and the Ad Hoc Noteholder Group, which order shall include a finding of fact that the Debtors, and their respective present members, officers, managers,

employees, advisors, attorneys and agents, acted in good faith within the meaning of and with respect to all of the actions described in section 1125(e) of the Bankruptcy Code and are therefore not liable for the violation of any applicable law, rule, or regulation governing such actions; and

(iii)    the Plan, including any modifications or alterations thereof, and all documents and agreements related to the Plan, including the Plan Supplement, shall be filed in form and substance reasonably acceptable to the Debtors, the Creditors Committee and the Ad Hoc Noteholder Group.

For the avoidance of doubt, the Disclosure Statement Order and the Confirmation Order may be combined and entered concurrently.

## 12.2    Conditions Precedent to Effective Date

It shall be a condition to occurrence of the Effective Date that the following conditions shall have been satisfied or waived pursuant to Section 9.04 of the Plan:

(i)    all conditions precedent to Confirmation have been satisfied or waived;

(ii)    the Confirmation Order shall have been entered by the Bankruptcy Court on the docket of the Chapter 11 Cases, and such order shall not be subject to a stay;

(iii)    any modifications or alterations to the Plan or Plan Supplement shall be reasonably acceptable to the Creditors Committee and the Ad Hoc Noteholder Group;

(iv)    the Creditor Trust shall have been formed, and the Creditor Trust Agreement shall have been executed and become enforceable;

(v)    the appointment of the Creditor Trustee shall have been confirmed pursuant to an order of the Bankruptcy Court, which may be the Confirmation Order, and such order shall not be subject to a stay; and

(vi)    any outstanding fees or expenses incurred by the Ad Hoc Noteholder Group or the First Lien Indenture Trustee in connection with the Chapter 11 Cases, the Plan, the creation of the Creditor Trust, or Confirmation, including fees and expenses contemplated in the Stipulation, shall have been paid in full.

## 12.3    Effect of Non-Occurrence of Conditions to Confirmation or Conditions Precedent to the Effective Date

If the conditions in Section 9.01 and Section 9.02 of the Plan are not satisfied for the Plan, or if the Confirmation Order is vacated, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release

of any Claims by or against, or any Equity Interests in, the Debtors; (b) prejudice in any manner the rights of the Debtors, or any other Person or Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors or any other Person or Entity in any respects.

### 12.4    Waiver of Conditions Precedent

The Debtors, with the prior written consent of the Ad Hoc Noteholder Group, may waive any of the conditions precedent set forth in Section 9.01 and Section 9.02 of the Plan in whole or in part at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.

### ARTICLE XIII
### MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

### 13.1    Modification of the Plan

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order, subject to the limitations set forth in the Plan, including that any such modifications must be reasonably acceptable to the Creditors Committee and the Ad Hoc Noteholder Group. Subject to the foregoing limitations, after entry of the Confirmation Order, the Debtors may amend or modify the Plan, and in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 13.2    Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw this Plan with respect to any Debtor(s) before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw this Plan with respect to any Debtor(s), or if Confirmation or Consummation does not occur, then: (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto shall be null and void in all respects; and (c) nothing contained in the Plan or this Disclosure Statement shall: (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors; (ii) prejudice in any manner the rights of the Debtors or any other Entity (including, without limitation, the other Debtors); or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtors or any other Entity (including, without limitation, the other Debtors) in any respects.

## ARTICLE XIV
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date for the Plan, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases after the Effective Date as legally permissible, including jurisdiction to:

(i)     allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim  and the resolution of any and all objections to the allowance or priority of Claims;

(ii)    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(iii)   resolve any matters related to the assumption or rejection of any Executory Contract or Unexpired Lease;

(iv)    resolve any disputes that may arise between the Creditor Trustee and the Distribution Agent, if one is appointed;

(v)     ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(vi)    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors;

(vii)   enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan and this Disclosure Statement;

(viii)  enter and enforce any order related to or otherwise in connection with any sale of property by the Debtors pursuant to sections 363 or 1123 of the Bankruptcy Code;

(ix)    decide or resolve any Causes of Action arising under the Bankruptcy Code, including, without limitation, Avoidance Actions and Claims under sections 362, 510, 542 and 543 of the Bankruptcy Code;

(x)     resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan, or any Person's or Entity's obligations incurred in connection with the Plan;

(xi)     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity (including, in each case and without limitation, the other Debtors) with Consummation or enforcement of the Plan, except as otherwise provided in the Plan;

(xii)    resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in ARTICLE X of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunction and other provisions;

(xiii)   enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(xiv)    determine any other matters that may arise in connection with or relate to the Plan, this Disclosure Statement and the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or this Disclosure Statement;

(xv)     enter order(s) or Final Decree(s) concluding the Chapter 11 Cases;

(xvi)    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(xvii)   consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order; and

(xviii)  hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XV
## MISCELLANEOUS PROVISIONS

### 15.1     Bar Dates for Certain Actions

#### 15.1.1   *Administrative Claims*

Holders of Administrative Claims (other than Professional Claims or Claims for fees payable pursuant to 28 U.S.C. § 1930(a)) shall file any request for allowance and payment of Administrative Claims no later than thirty (30) days after the Effective Date or otherwise be forever barred, estopped, and enjoined from asserting such Claims against the Debtors' respective Estates and property, the Creditor Trust, a Distribution Agent, or otherwise, and such Administrative Claims shall be deemed discharged and released as of the Effective Date. The Creditor Trustee shall have thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Administrative Claims Bar Date to review and object to such Administrative Claims before a hearing for determination of allowance of such Administrative Claims.

### 15.1.2  *Professional Claims*

The Bankruptcy Court shall determine the Allowed amounts of the Professional Claims after notice and hearing in accordance with the procedures established by the Bankruptcy Code and any order of the Bankruptcy Court in the Chapter 11 Cases. The Creditor Trust shall pay Professional Claims in full, in Cash from the Claims Reserve Holdback in the amount Allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) fourteen (14) days following the date on which the order related to any such Allowed Professional Claim is entered, or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Professional Claim and the Creditor Trustee.

Holders of Professional Claims shall file with the Bankruptcy Court any request for allowance and payment of such Professional Claims no later than thirty (30) days after the Effective Date or otherwise be forever barred, estopped, and enjoined from asserting such Claims against the Debtors, their respective Estates and property, the Creditor Trust, a Distribution Agent, or otherwise, and such Professional Claims shall be deemed discharged as of the Effective Date. The Creditor Trustee and other parties in interest shall have thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Professional Claims Bar Date to review and object to such Professional Claims before a hearing for determination of allowance of such Professional Claims.

Notwithstanding anything to the contrary in the Plan, Section 2.02 of the Plan shall not apply to any fees and expenses (including attorney's fees and fees for other retained professionals, advisors and consultants) of the Ad Hoc Noteholder Group and the First Lien Indenture Trustee, which shall be paid pursuant to the Stipulation and the First Lien Indenture.

### 15.2   **U.S. Trustee Fees**

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid in full in Cash by the Debtors (before the Effective Date) or the Creditor Trustee (on and after the Effective Date) for each quarter (including any fraction therein) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

### 15.3   **Certain Releases by the Debtors**

**Except as otherwise expressly provided in the Plan or the Confirmation Order, and to the fullest extent authorized by applicable law, for good and valuable consideration, the adequacy of which is hereby confirmed, the Released Parties[9] are deemed released and**

---

[9]  "Released Parties" means each of: (a) the Debtors; (b) the Creditor Trustee; (c) the Creditors Committee; (d) the Ad Hoc Noteholder Group and its members; (e) the Prepetition Noteholders; (f) the Indenture Trustees; (g) the DIP Agent; (h) the DIP Lenders; and (j) in each case, their predecessors, successors and assigns, professionals, advisors, accountants, attorneys, investment bankers, and consultants, and in the case of (b) through (h), their current and former affiliates, subsidiaries, funds, portfolio companies, management companies, employees, agents, directors and officers, and other representatives (each solely in their capacity as such). For the avoidance of doubt, the Debtors' directors and officers are not included in the definition of "Released Parties."

discharged by the Releasing Parties[10] from any and all claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative claims, asserted or that could possibly have been asserted directly or indirectly on behalf of the Releasing Parties or their Affiliates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted on behalf of the Releasing Parties or their Affiliates (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, their Estates or their Affiliates, the conduct of the Debtors' businesses, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Disclosure Statement or Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the Disclosure Statement, or the Plan, the filing and prosecution of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtors, their Estates or their Affiliates, on the one hand, and any Released Party, on the other hand, prepetition contracts and agreements with one or both Debtors, or any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date; <u>provided</u> that to the extent that a claim or Cause of Action is determined by a Final Order to have resulted from fraud, gross negligence or willful misconduct of a Released Party, such claim or Cause of Action shall not be so released against such Released Party. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release (i) any obligations arising on or after the Effective Date of any party under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; and (ii) the right of the Debtors or the Creditor Trustee to object to Claims filed by any Person against any Debtor or an Estate, or to assert counterclaims or defenses in respect of such Claims, including rights of setoff, refund, recoupment or other adjustments as provided for under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in Section 10.01 of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by Section 10.01 of the Plan; (c) in the best interests of the Debtors, their Estates and all holders of Claims and Equity Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and

---

[10] "<u>Releasing Parties</u>" means each holder of a Claim against the Debtors that (a) is Unimpaired pursuant to the Plan and therefore is deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (b) receives and returns a Ballot indicating an election not to opt out of the releases provided in Section 10.02 of the Plan.

opportunity for hearing; and (f) a bar to any Entity asserting any claim or Cause of Action released by Section 10.01 of the Plan.

15.4    **Certain Voluntary Releases by Holders of Claims**

Except as otherwise expressly provided in the Plan or the Confirmation Order, and to the fullest extent authorized by applicable law, for good and valuable consideration, the adequacy of which is hereby confirmed, the Released Parties are deemed released and discharged by (a) each other Released Party and (b) the Releasing Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative claims, asserted or that could possibly have been asserted directly or indirectly on behalf of the Releasing Parties or their Affiliates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted on behalf of a Released Party or a Releasing Party or any of its Affiliates (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, their Estates or their Affiliates, the conduct of the Debtors' businesses, the formulation, preparation, solicitation, dissemination, negotiation, or filing of this Disclosure Statement or the Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to this Disclosure Statement, or the Plan, the filing and prosecution of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtors, their Estates or their Affiliates, on the one hand, and any Released Party, on the other hand, prepetition contracts and agreements with one or both Debtors, or any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date; provided that to the extent that a claim or Cause of Action is determined by a Final Order to have resulted from fraud, gross negligence or willful misconduct of a Released Party, such claim or Cause of Action shall not be so released against such Released Party. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release (i) any obligations arising on or after the Effective Date of any party under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; and (ii) the right of the Debtors or the Creditor Trustee to object to Claims filed by any Person against any Debtor or an Estate, or to assert counterclaims or defenses in respect of such Claims, including rights of setoff, refund, recoupment or other adjustments as provided for in the Plan. Notwithstanding anything in the above and in the Plan, nothing in the above paragraph or the Plan shall impair the Creditor Trust in bringing any claim or asserting any cause of action against any former officers, directors, managers, agents, employees, or fiduciaries of any of the Debtors.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in Section 10.02 of the Plan,

which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by Section 10.02 of the Plan; (c) in the best interests of the Debtors, their Estates and all holders of Claims and Equity Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity asserting any claim or Cause of Action released by Section 10.02 of the Plan.

15.5    **Exculpation**

The Exculpated Parties[11] SHALL NOT BE LIABLE FOR ANY Cause of Action arising in connection with or out of the good faith solicitation of acceptances of the Plan in accordance with section 1125(e) of the Bankruptcy Code. All holders of Claims and Equity Interests are enjoined from asserting or prosecuting any Claim or Cause of Action against the Exculpated Parties as to which the Exculpated Parties have been exculpated pursuant to the preceding sentence.

15.6    **Permanent Injunction**

Except as otherwise expressly provided in the Plan or the Confirmation Order, and to the fullest extent authorized by applicable law, for good and valuable consideration, the adequacy of which is hereby confirmed, all Persons who have held, hold or may hold Claims or Causes of Action against, or Equity Interests in, the Debtors are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claims or Causes of Action in any venue other than the Bankruptcy Court, (b) the enforcement, attachment, collection, or recovery by any manner or means of judgment, award, decree or order against the Debtors, the Creditor Trust, or their assets on account of any such Claims or Causes of Action in any venue other than the Bankruptcy Court; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Creditor Trust or their assets on account of any such Claims or Causes of Action in any venue other than the Bankruptcy Court; and (d) asserting any right of setoff, recoupment or subrogation of any kind against any obligation due from the Debtors, the Creditor Trust, or their assets on account of any such Claims or Causes of Action in any venue other than the Bankruptcy Court. The foregoing injunction will extend to successors of the Debtors and the Creditor Trust, and their respective property and interests in property.

In addition, except as otherwise provided in the Plan or in the Confirmation Order, from and after the Effective Date and to the fullest extent authorized by applicable law, all

---

[11] "Exculpated Parties" means each of: (a) the Debtors; (b) the Creditor Trustee; (c) the Creditors Committee; (d) the Ad Hoc Noteholder Group and its members; (e) the Prepetition Noteholders; (f) the Indenture Trustees; (g) the DIP Agent; (h) the DIP Lenders; and (j) in each case, their predecessors, successors and assigns, current and former affiliates, subsidiaries, funds, portfolio companies, management companies, current and former officers, directors, professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents and other representatives (each solely in their capacity as such).

**Entities are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined and forever barred from taking any of the following actions against, as applicable, the Released Parties or the Exculpated Parties and their respective properties and Assets: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Claims; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order on account of or in connection with or with respect to any such Claims; (c) creating, perfecting, or enforcing any encumbrance of any kind on account of or in connection with or with respect to any such Claims; (d) asserting any right of setoff, subrogation, or recoupment of any kind on account of or in connection with or with respect to any such Claims unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Claims, Causes of Action or the like that are released, exculpated or settled pursuant to the Plan.**

15.7    **Term of Injunctions or Stay**

**Unless otherwise provided in the Plan or Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code sections 105 or 362 or otherwise, and in existence on the Confirmation Date (excluding any injunctions or stays contained in the Plan or Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or Confirmation Order shall remain in full force and effect in accordance with their terms.**

15.8    **Integral to Plan**

Each of the injunctions provided in the Plan is an integral part of the Plan and is essential to its implementation. Each of the Persons protected by the injunctions set forth in the Plan shall have the right to seek the enforcement of such injunctions.

15.9    **Binding Effect**

Notwithstanding Bankruptcy Rule 3020(e), 6004(g) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Creditor Trustee and any and all holders of Claims and Equity Interests (irrespective of whether holders of such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

15.10    **Asset Purchase Agreements**

Notwithstanding anything to the contrary contained in the Plan, the terms of the Asset Purchase Agreements shall remain unaffected. Notwithstanding anything to the contrary contained herein, the Creditor Trust shall succeed to all rights of the Debtors as set forth in the Asset Purchase Agreements and the related sale orders entered by the Bankruptcy Court.

### 15.11  Creditors Committee Challenge Rights

Consistent with the Stipulation, the Creditors Committees' rights under the Final Order approving the DIP Credit Agreement regarding challenges specified in paragraph 17(b) of the Final DIP Order or paragraph 2 of the Stipulation and other actions against the Prepetition Noteholders are released as part of the Plan.

### 15.12  Tax Returns

Within ninety (90) days following the end of each calendar year, the Creditor Trustee shall submit to each Creditor Trust Beneficiary appearing on its records during such year a separate statement setting forth the information necessary for such Creditor Trust Beneficiary to determine its share of items of income, gain, loss, deduction, or credit. The Creditor Trustee will in good faith value the Creditor Trust Assets. The Creditor Trustee shall make the respective values available from time to time, to the extent relevant, and such values shall be used consistently by all parties for U.S. federal income tax purposes.

### 15.13  Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Creditor Trustee shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant thereto shall be subject to such withholding and reporting requirements. Any amounts so withheld from any payment made under the Plan shall be deemed paid to the holder of the Allowed Claim subject to withholding. The Creditor Trustee or the Distribution Agent may require that each holder complete the appropriate Internal Revenue Service Form W-8BEN, Internal Revenue Service Form W-8BEN-E, or Internal Revenue Service Form W-9, or successor form as applicable, to each holder provided, however, that the sole remedy in the event a holder fails to comply with such a request within six months shall be to make a proper withholding of tax to the extent required by applicable law. Notwithstanding any provision in the Plan to the contrary, the Creditor Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of a distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes with respect to such distribution, or establishing any other mechanisms it believes are reasonable or appropriate. If the Creditor Trustee or the Distribution Agent fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse the Creditor Trustee or Distribution Agent. The Creditor Trust reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens and encumbrances.

### 15.14  Allocations

Unless otherwise provided in the Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount (as determined for U.S. federal income tax purposes) of such Allowed Claims, and then, to the extent the consideration exceeds the principal amount of such Allowed Claims, to any portion of such Allowed Claims for accrued but unpaid interest.

### 15.15   Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and all holders of Claims and Equity Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan. The Debtors are authorized to perform their outstanding obligations, if any, under the Asset Purchase Agreements.

### 15.16   Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### 15.17   Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor or the Creditor Trustee, with respect to the Plan, the Disclosure Statement, the Confirmation Order or the Plan Supplement, shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or the Creditor Trust, as applicable, with respect to the holders of Claims or Equity Interests prior to the Effective Date.

### 15.18   Exclusivity Period

The Debtors shall retain the exclusive right to amend or modify the Plan, and to solicit acceptances of any amendments to or modifications of the Plan, through and until the earlier of (i) the Effective Date or (ii) the expiration of the Debtors' exclusive period to solicit acceptances of the Plan under section 1121(d) of the Bankruptcy Code.

### 15.19   Notices

Except as otherwise set forth in the Plan, all notices or requests in connection with this Disclosure Statement or the Plan shall be in writing and will be deemed to have been given when received by personal delivery, overnight courier or first class mail and addressed to:

| **If to the Debtors:** | Bracewell LLP<br>711 Louisiana Street, Suite 2300<br>Houston, TX 77002<br>Attn: Jason Cohen |
|---|---|
| **If to the Creditor Trustee:** | [address]<br>Attn: [name] |

| | |
|---|---|
| **If to the Creditors Committee:** | Pillsbury Winthrop Shaw Pittman<br>909 Fannin St.<br>Suite 2000<br>Houston, TX 77010<br>Attn: Hugh Massey Ray, III |
| **If to the Ad Hoc Noteholder Group:** | Paul, Weiss, Rifkind, Wharton &<br>Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019<br>Attn: Brian S. Hermann and Lauren<br>Shumejda |

### 15.20   Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan. To the extent the Confirmation Order is inconsistent with the Plan, the Confirmation Order shall control for all purposes.

### 15.21   Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors'' counsel at the address above or by downloading such exhibits and documents from the Claims and Solicitation Agent's website at www.kccllc.net or the Bankruptcy Court's electronic filing website at https://ecf.txsb.uscourts.gov (account required).

### 15.22   Severability

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to the Plan; and (c) non-severable and mutually dependent.

### 15.23   Request for Expedited Tax Review

The Creditor Trustee shall have the right to request an expedited determination under Bankruptcy Code section 505(b) with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

### 15.24   No Admissions

Notwithstanding anything in the Plan to the contrary, nothing in the Plan shall be deemed as an admission by the Debtors with respect to any matter set forth in the Plan, including liability on any Claim.

### 15.25   Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 15.26   Governing Law

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to conflict-of-laws principles; provided that the corporate or limited liability company governance matters shall be governed by the laws of the state of incorporation or formation of the applicable Entity.

## ARTICLE XVI
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### 16.1   Certain Material U.S. Federal Income Tax Consequences of the Plan

The following discussion summarizes certain material U.S. federal income tax consequences of the implementation of the Plan to certain holders of Allowed First Lien Note Claims, Allowed Second Lien Note Claims and Allowed General Unsecured Claims. For the avoidance of doubt, Allowed Claims include any Disputed Claim when such Claim becomes Allowed under the Plan. This summary does not address the U.S. federal income tax consequences to (i) holders of Claims or Equity Interests who are deemed to have rejected a Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code (i.e., holders of Equity Interests), (ii) holders whose Claims are entitled to payment in full in Cash or are otherwise unimpaired under the Plan (i.e., holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims and Allowed Other Secured Claims), or (iii) holders whose Claims are extinguished without distribution in exchange therefore that are not entitled to vote to accept or reject the Plan.

This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), existing and proposed Treasury regulations promulgated thereunder ("Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the

Internal Revenue Service ("IRS") as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. The discussion below is not binding upon the IRS or the courts. Thus, no assurance can be given the IRS would not assert, or that a court would not sustain, a different position than any position discussed in this Disclosure Statement.

The following discussion does not address the U.S. federal income tax consequences to holders of Allowed Claims that are not U.S. Holders. For purposes of this discussion, a "U.S. Holder" is a holder that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof, or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more U.S. persons have authority to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain holders of Allowed Claims in light of their individual circumstances, nor does it purport to address the U.S. federal income tax consequences of the Plan to holders that are subject to special treatment under U.S. federal income tax laws (including, without limitation, non-U.S. Holders, brokers, dealers and traders in securities, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, tax-exempt organizations, certain expatriates, or former long term residents of the United States, pass-through entities or investors in pass-through entities, and those holding Claims as part of a hedge, straddle, conversion, constructive sale or conversion transaction). This discussion assumes, except where otherwise indicated, that such Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code. In addition, this summary does not address state, local or foreign income or other tax consequences of the Plan.

If a holder is a partnership, other pass-through entity or a disregarded entity for U.S. federal income tax purposes, the tax treatment of a partner in or owner of such entity generally will depend upon the status of the partner or owner, and the activities of the entity. Partners or owners of other pass-through entities as well as non-U.S. Holders and other holders that are subject to special treatment under U.S. federal income tax law should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A**

**CLAIM. EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.**

    16.2    **Consequences to U.S. Holders of Certain Claims**

The U.S. federal income tax consequences of the Plan to U.S. Holders of Claims, including the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan, generally will depend upon, among other things, (i) the manner in which a holder acquired a Claim; (ii) the length of time a Claim has been held; (iii) whether the Claim was acquired at a discount; (iv) whether the holder has taken a bad debt deduction in the current or prior years; (v) whether the holder has previously included accrued but unpaid interest with respect to a Claim; (vi) the holder's method of tax accounting; (vii) whether the holder will realize foreign currency exchange gain or loss with respect to a Claim; (viii) whether a Claim is an installment obligation for U.S. federal income tax purposes; and (ix) whether the transaction is treated as a "closed transaction." Therefore, U.S. Holders of Claims are urged to consult their tax advisors for information that may be relevant to their particular situation and circumstances and the particular tax consequences to such holders as a result thereof.

Pursuant to the Plan, unless the holder agrees to a different treatment, a holder of an Allowed First Lien Note Claim will receive its Pro Rata share of: (a) 100% of the Gulf Coast Sale Proceeds less the Claims Reserve Holdback, to the extent not previously distributed to the First Lien Noteholders pursuant to the Stipulation; (b) 100% of the Wyoming Sale Proceeds; and (c) the Noteholder Trust Interests, pursuant to which each holder shall be entitled to receive from the Creditor Trust its Pro Rata share of the Noteholder Trust Assets when and as such assets are available for distribution in accordance with the terms of the Creditor Trust Agreement; provided that the Debtors shall distribute as much of the Noteholder Trust Assets to such holders on the Effective Date as is monetized and available for distribution, except for the Creditor Trust Initial Administrative Funding. Upon acceptance of the Plan by Class 4 and Class 5, all holders of First Lien Note Claims shall be deemed to have agreed to forgo any distribution in respect of their Prepetition Noteholder Deficiency Claims.

Pursuant to the Plan, unless the holder and the Debtors, in consultation with the Ad Hoc Noteholder Group or, after the Effective Date, the Creditor Trustee agree to a different treatment, a holder of an Allowed General Unsecured Claim will receive its Pro Rata share of the GUC Trust Interests, pursuant to which each holder shall be entitled to receive from the Creditor Trust its Pro Rata share of the GUC Trust Assets when and as such assets are available for distribution in accordance with the terms of the Creditor Trust Agreement. The GUC Trust Assets consist of: (a) the GUC Earmarked Funds; (b) the GUC LEO Bond Distribution; and (c) 40% of the proceeds of the Remaining Creditor Trust Assets.

Pursuant to the Plan, each Allowed Second Lien Note Claim is deemed satisfied, compromised, settled, and released in full on the Effective Date. Accordingly, each holder of an Allowed Second Lien Note Claim will receive no consideration in respect of such Claim. In general, if an Allowed Second Lien Note Claim is a "security" under Section 165 of the Tax Code, the holder of such Claim generally should recognize a loss from a worthless security

deduction pursuant to such Section, which generally is treated as a loss from the sale or exchange of a capital asset on the last day of the taxable year. The ability to deduct capital losses is subject to certain limitations. If the Allowed Second Lien Note Claim is not a "security," but is a business bad debt, a holder may be entitled to claim an ordinary loss deduction for a wholly worthless debt under Section 166(a) of the Tax Code, If the Allowed Second Lien Note Claim is neither a security nor a business bad debt, the loss resulting from the debt becoming worthless within the taxable year shall be considered a loss from the sale or exchange of a capital asset not held for more than one year (i.e., a short-term capital loss). Holders of Allowed Second Lien Note Claims are urged to contact their own advisors regarding their ability to utilize any loss resulting from the treatment of such Claims pursuant to the Plan.

As discussed below, the Creditor Trust has been or will be structured to qualify as a "grantor trust" for U.S. federal income tax purposes. Accordingly, each U.S. Holder of an Allowed Claim (excluding for the avoidance of doubt an Allowed Second Lien Note Claim) receiving a beneficial interest in the Creditor Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Creditor Trust Assets (consistent with its economic rights in the trust) (other than any assets allocated to the Disputed Claims Reserve, to the extent established, as discussed below). Pursuant to the Plan, the Debtors or the Creditor Trustee will in good faith value the assets transferred to the Creditor Trust, and all parties to the Creditor Trust (including holders of General Unsecured Claims receiving interests in the Creditor Trust)  must consistently use such valuation for all U.S. federal income tax purposes.

After the Effective Date, a holder's share of any collections received on the assets of the Creditor Trust (other than as a result of the subsequent disallowance of Disputed Claims, or the redistribution among holders of Allowed Claims of undeliverable distributions from the Disputed Claims Reserve, to the extent established, as discussed below) should not be included, for U.S. federal income tax purposes, in the holder's amount realized in respect of its Claim but should be separately treated as amounts realized in respect of such holder's ownership interest in the underlying assets of the Creditor Trust. See Section 16.3, "*Tax Treatment of Creditors Trust and Its Beneficial Holders*," below.

### 16.2.1   *Gain or Loss – Generally.*

In general, each U.S. Holder of an Allowed First Lien Note Claim or Allowed General Unsecured Claim will recognize gain or loss (although any loss with respect to such a Claim might be deferred until all Disputed Claims are resolved) in an amount equal to the difference, between (i) such holder's "amount realized" in respect of its Claim (other than any amounts received in respect of any Claim for accrued but unpaid interest), which is (A) the amount of Cash received, if any, and (B) its Pro Rata share, if any of the fair market value of the assets transferred to the Creditor Trust that are attributable to its Class and (ii) the holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest). Where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction. See the

discussions of "accrued interest" and "market discount" below. Holders of Allowed First Lien Note Claims and Allowed General Unsecured Claims are urged to consult their tax advisors to determine the character of any gain or loss recognized in connection with the implementation of the Plan.

### 16.2.2   *Accrued Interest.*

A portion of the consideration received by the U.S. Holders of Allowed Claims may be attributable to accrued interest on such Allowed Claims. Such amount may be taxable to that holder as interest income if such accrued interest has not been previously included in such U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Allowed Claims may be able to recognize a deductible loss to the extent any accrued interest on the Allowed Claims was previously included in such U.S. Holder's gross income but was not paid in full.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims (other than, for purposes of this paragraph, Allowed Second Lien Note Claims), the extent to which such consideration will be attributable to accrued interest is unclear. The aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to accrued but unpaid interest on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for U.S. federal income tax purposes, however, the applicable Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest and then as a payment of principal. The IRS could take the position that the consideration received by the U.S. Holder should be allocated other than as provided in the Plan. U.S. Holders of Allowed Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 16.2.3   *Market Discount.*

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of an Allowed Claim (other than an Allowed Second Lien Note Claim) may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" constituting the Allowed Claim. In general, a debt instrument is considered to have been acquired by a U.S. Holder with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

### 16.3     Tax Treatment of Creditor Trust and Its Beneficial Holders

#### 16.3.1  *Classification of the Creditor Trust*

The Creditor Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (i.e., a pass-through type entity). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS has issued guidelines that set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Creditor Trust has been or will be structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with such IRS guidance, all parties (including, without limitation, the Debtors, the Creditor Trustee, and the beneficiaries of the Creditor Trust) are required to treat, for U.S. federal income tax purposes, the Creditor Trust as a grantor trust of which the beneficiaries of the Creditor Trust are the owners and grantors (this treatment may differ from the treatment of the Disputed Claims Reserve, to the extent established, as discussed below). This discussion assumes that the Creditor Trust will be so respected for U.S. federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Creditor Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully the classification of the Creditor Trust, the U.S. federal income tax consequences to the Creditor Trust and its beneficiaries could vary from those discussed herein (including the potential for an entity-level tax on income of the Creditor Trust).

#### 16.3.2  *General Tax Reporting by the Creditor Trust and its Beneficiaries*

For U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Creditor Trustee, and the beneficiaries of the Creditor Trust) must treat the transfer of the Creditor Trust Assets to the Creditor Trust in accordance with the terms of the Plan. Pursuant to the Plan, the Creditor Trust Assets (other than any assets allocated to the Disputed Claims Reserve, to the extent established as discussed below) are treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the holders of the respective Claims in satisfaction of their Claims (with each holder receiving an undivided interest in such assets in accord with their economic interests in such assets), followed by the transfer by the holders to the Creditor Trust of such assets in exchange for interests in the Creditor Trust. Accordingly, all parties must treat the Creditor Trust as a grantor trust of which the holders of the interests in the Creditor Trust are the owners and grantors, and the direct owners of an undivided interest in the Creditor Trust Assets (other than any assets allocated to the Disputed Claims Reserve), consistent with their economic interests therein, for all U.S. federal income tax purposes.

Pursuant to the Plan the Creditor Trustee, will in good faith value the Creditor Trust Assets. The Creditor Trustee shall make the respective values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Creditor Trust (including, without limitation, the Debtors, the Creditor Trustee, and the beneficiaries of the Creditor Trust) for all U.S. federal income tax purposes.

Allocations of taxable income of the Creditor Trust (other than income allocable to the Disputed Claims Reserve, to the extent established as discussed below) among the beneficiaries of the Creditor Trust shall be determined by reference to the manner in which an amount of Cash equal to such income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Creditor Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to the Disputed Claims Reserve, to the extent established as discussed below) to the beneficiaries of the Creditor Trust, adjusted for prior income and loss and taking into account all prior and concurrent distributions from such Creditor Trust. Similarly, taxable loss of the Creditor Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets of the Creditor Trust. The tax book value of the assets of the Creditor Trust for this purpose shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. The effect of the above described allocation is to allocate taxable income or loss (i.e., the tax impact of receipts and expenditures) in a partnership-type fashion, due to the varying tiers of beneficiaries in the Creditor Trust.

Taxable income or loss allocated to each beneficiary of the Creditor Trust will be treated as income or loss with respect to such beneficiary's undivided interest in the Creditor Trust Assets, and not as income or loss with respect to its prior Allowed Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of such beneficiary.

The Creditor Trustee will file with the IRS returns for the Creditor Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a). Except as discussed below with respect to the Disputed Claims Reserve, the Creditor Trustee will send annually to the holders of record of interests in the Creditor Trust a separate statement regarding the receipts and expenditures of the Creditor Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

The Creditor Trustee will comply with all applicable governmental withholding requirements. Thus, in the case of any beneficiary of the Creditor Trust that is *not* a U.S. Holder, the Creditor Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons. *As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders; accordingly, such holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the Creditor Trust.*

### 16.4    Tax Reporting for Assets Allocable to Disputed Claims and Distributions from the Disputed Claims Reserve

The Creditor Trustee may, in accordance with the Plan, establish one or more reserves for the benefit of holders of Disputed Claims, if any (the "Disputed Claims Reserve"). If such Disputed Claims Reserve is established, subject to definitive guidance from the IRS or a court of

competent jurisdiction to the contrary (including the receipt by either of the Creditor Trustee of an IRS private letter ruling if the Creditor Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Creditor Trustee), the Creditor Trustee will (A) elect to treat any assets allocable to, or retained on account of, Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. In such case, all parties (including, without limitation, the Debtors, the Creditor Trustee, and the beneficiaries of the Creditor Trust) will be required to report for all U.S. federal income tax and other applicable purposes consistently with such treatment.

If treated as a "disputed ownership fund" for U.S. federal income tax purposes the Disputed Claims Reserve will be subject to tax annually on a separate entity basis on any net income earned after the Effective Date with respect to assets allocated to the Disputed Claims Reserve, and all actual and constructive distributions from such Disputed Claims Reserve (which distributions will be net of the related expenses of the reserve) will be treated as received by holders in respect of their Claims as if distributed by the Debtors. In such case, any actual or constructive distributions from the Disputed Claims Reserve to holders of Allowed Claims (including to previously Allowed Claims in the event a Disputed Claim is disallowed) will be treated for U.S. federal income tax purposes as if received directly from the Debtors on the original Claim in respect of which the interest in the Creditor Trust was issued. Thus, a holder must be careful to differentiate between the tax treatment of actual or constructive distributions from the Disputed Claims Reserve and the tax treatment of distributions out of assets of the Creditor Trust to which the holder is already considered the direct owner for U.S. federal income tax purposes (discussed above).

Holders should consult their own tax advisors with respect to the U.S. federal income tax consequences of the Plan to them based on their own circumstances if the Disputed Claims Reserve is established.

### 16.5    Information Reporting and Withholding

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

16.6    **Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**ARTICLE XVII**
**CONCLUSION AND RECOMMENDATION**

The Debtors believe that the Plan is in the best interests of all Holders of Claims, and urge those Holders of Claims entitled to vote to accept the Plan. If the Plan is not confirmed, or if Holders in those Classes do not vote to accept the Plan, the Holders in those Classes may not receive a distribution.

*(Signature Pages Immediately Follows)*

Dated: December 19, 2016                    Respectfully submitted,
Houston, Texas

**LINC USA GP**


By:      _____
Name:    Michael Mapp
Title:   President


**LINC ENERGY FINANCE (USA) INC**


By:      _____
Name:    Michael Mapp
Title:   President


**LINC GULF COAST PETROLEUM, INC.**


By:      _____
Name:    Michael Mapp
Title:   President


**LINC ENERGY PETROLEUM (LOUISIANA), LLC**


By:      _____
Name:    Michael Mapp
Title:   President


**LINC ALASKA RESOURCES, LLC**


By:      _____
Name:    Michael Mapp
Title:   President

**PAEN INSULA HOLDINGS, LLC**


By: _____
Name: Michael Mapp
Title: President


**LINC ENERGY PETROLEUM (WYOMING), INC.**


By: _____
Name: Michael Mapp
Title: President

## Exhibit A

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **LINC USA GP.,** *et al.* | ) | Case No. 16-32689 (DRJ) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |

## JOINT PLAN OF LIQUIDATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**BRACEWELL LLP**

Jason G. Cohen
Texas Bar No. 24050435
Jason.Cohen@bracewelllaw.com
William A. (Trey) Wood III
Texas Bar No. 21916050
Trey.Wood@bracewelllaw.com
711 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713) 223-2300
Facsimile: (713) 221-1212

*Counsel to Debtors and Debtors in Possession*

Dated: December 19, 2016

---

[1]  The debtors in possession in these chapter cases, along with the last four digits of each debtor in possession's federal tax identification number, are: Linc Energy Finance (USA), Inc. (6684); Linc USA GP (5234); Linc Energy Resources, Inc. (9613); Linc Gulf Coast Petroleum, Inc. (6790); Linc Energy Petroleum (Louisiana), LLC (1074); Linc Alaska Resources, LLC (2362); Paen Insula Holdings, LLC (1681); Linc Energy Petroleum (Wyoming), Inc. (9859); Diasu Holdings, LLC (9626); Diasu Oil & Gas Company, Inc. (8926); and Linc Energy Operations, Inc. (5806).

# **TABLE OF CONTENTS**

**Page**

**ARTICLE I**
  **DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND OTHER REFERENCES................................1**
  Section 1.01.        Defined Terms ..............................................................1
  Section 1.02.        Rules of Interpretation ................................................13
  Section 1.03.        Computation of Time ...................................................14
  Section 1.04.        Governing Law ............................................................14
  Section 1.05.        Reference to Monetary Figures.....................................14
  Section 1.06.        Reference to the Debtors...............................................14

**ARTICLE II**
  **TREATMENT OF UNCLASSIFIED CLAIMS ..............................................14**
  Section 2.01.        Administrative Claims .................................................14
  Section 2.02.        Professional Claims .....................................................15
  Section 2.03.        U.S. Trustee Fees ........................................................16
  Section 2.04.        Priority Tax Claims......................................................16

**ARTICLE III**
  **CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS ......................................................................................16**
  Section 3.01.        Classification................................................................16
  Section 3.02.        Treatment.....................................................................17
  Section 3.03.        Additional Provisions Regarding Unimpaired Claims .................20
  Section 3.04.        Intercompany Claims ...................................................20

**ARTICLE IV**
  **ACCEPTANCE OR REJECTION OF THIS PLAN ...................................20**
  Section 4.01.        Acceptance by an Impaired Class ................................20
  Section 4.02.        Elimination of Vacant Classes .....................................20
  Section 4.03.        Nonconsensual Confirmation.......................................20

**ARTICLE V**
  **IMPLEMENTATION OF THIS PLAN ....................................................21**
  Section 5.01.        Deemed Consolidation.................................................21
  Section 5.02.        Operations Between Confirmation Date and Effective Date........21
  Section 5.03.        Creditor Trust...............................................................22
  Section 5.04.        Sources of Cash for Plan Distributions.........................23
  Section 5.05.        Miscellaneous Alaska Assets.......................................23
  Section 5.06.        Release of Bonds..........................................................23
  Section 5.07.        Claims Reserve Holdback.............................................24
  Section 5.08.        Corporate Existence; Officers and Directors ................24
  Section 5.09.        Corporate Action..........................................................25
  Section 5.10.        Preservation of Causes of Action Not Expressly Released .....25
  Section 5.11.        Release of Liens...........................................................26
  Section 5.12.        Cancellation of Securities and Notes Against the Debtors ............26

i

**TABLE OF CONTENTS (CONT'D)**

Page

Section 5.13.    General Settlement of Claims ......................................................27
Section 5.14.    Section 1146(a) Exemption.........................................................27

**ARTICLE VI**
**TREATMENT OF EXECUTORY CONTRACTS AND LEASES............................27**
Section 6.01.    Rejection of Executory Contracts and Unexpired Leases.............27
Section 6.02.    Treatment of Assumed Executory Contracts and Unexpired
Leases; Assignment .................................................................28
Section 6.03.    Effect of Confirmation Order on Assumption/Rejection..............28
Section 6.04.    Cure of Defaults and Objections to Assumption .........................29
Section 6.05.    Rejection Damages Claims and Objections to Rejection .............29
Section 6.06.    Preexisting Obligations Under Executory Contracts and
Unexpired Leases......................................................................29
Section 6.07.    Modifications, Amendments, Supplements, Restatements
or Other Agreements.................................................................30
Section 6.08.    Reservation of Rights.................................................................30

**ARTICLE VII**
**PROVISIONS GOVERNING DISTRIBUTIONS.............................................30**
Section 7.01.    Method of Distributions..............................................................30
Section 7.02.    Delivery of Distributions ...........................................................31
Section 7.03.    Amount of Distributions .............................................................31
Section 7.04.    Special Provision Relating to Distributions to Holders of
Allowed First Lien Note Claims ................................................31
Section 7.05.    No Fractional or De Minimis Distributions ..................................31
Section 7.06.    Undeliverable Distributions........................................................32
Section 7.07.    Time Bar to Cash Payments........................................................32
Section 7.08.    Means of Cash Payments ............................................................32
Section 7.09.    Foreign Currency Exchange Rates...............................................33
Section 7.10.    Setoffs ......................................................................................33
Section 7.11.    Claims Paid or Payable by Third Parties ......................................33

**ARTICLE VIII**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS ........................................33**
Section 8.01.    Objections to Claims..................................................................33
Section 8.02.    Objection Deadline ....................................................................34
Section 8.03.    Estimation of Claims..................................................................34
Section 8.04.    No Distributions on Disputed Claims...........................................34
Section 8.05.    Disputed Claims Reserves from GUC Trust Assets ......................35
Section 8.06.    Reduction of Claims...................................................................35
Section 8.07.    Recoupment ..............................................................................35

**ARTICLE IX**
**CONDITIONS PRECEDENT TO CONFIRMATION AND**
**CONSUMMATION OF THIS PLAN...............................................................35**

ii

## TABLE OF CONTENTS (CONT'D)

**Page**

Section 9.01.            Conditions Precedent to Confirmation...........................................35
Section 9.02.            Conditions Precedent to the Effective Date...................................36
Section 9.03.            Effect of Non-Occurrence of Conditions to Confirmation or
        Conditions Precedent to the Effective Date.......................................36
Section 9.04.            Waiver of Conditions Precedent ...................................................37

**ARTICLE X**
        **EFFECT OF CONFIRMATION OF THIS PLAN........................................37**
Section 10.01.            Certain Releases by the Debtors...................................................37
Section 10.02.            Certain Voluntary Releases by Holders of Claims .......................38
Section 10.03.            Exculpation ..................................................................................39
Section 10.04.            Permanent Injunction ...................................................................39
Section 10.05.            Term of Injunctions or Stay .........................................................40
Section 10.06.            Integral to Plan.............................................................................40
Section 10.07.            Binding Effect...............................................................................40
Section 10.08.            Asset Purchase Agreements..........................................................41
Section 10.09.            Creditors Committee Challenge Rights ........................................41

**ARTICLE XI**
        **MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN ............41**
Section 11.01.            Modification of this Plan ..............................................................41
Section 11.02.            Revocation or Withdrawal this Plan .............................................41

**ARTICLE XII**
        **RETENTION OF JURISDICTION .................................................................42**
**ARTICLE XIII**
        **MISCELLANEOUS PROVISIONS................................................................43**
Section 13.01.            Tax Returns...................................................................................43
Section 13.02.            Compliance with Tax Requirements.............................................44
Section 13.03.            Allocations....................................................................................44
Section 13.04.            Additional Documents ..................................................................44
Section 13.05.            Successors and Assigns..................................................................45
Section 13.06.            Reservation of Rights....................................................................45
Section 13.07.            Exclusivity Period.........................................................................45
Section 13.08.            Notices ..........................................................................................45
Section 13.09.            Entire Agreement ..........................................................................46
Section 13.10.            Plan Supplement Exhibits .............................................................46
Section 13.11.            Severability ...................................................................................46
Section 13.12.            Request for Expedited Tax Review ...............................................46
Section 13.13.            Dissolution of the Creditors Committee .......................................46
Section 13.14.            No Admissions...............................................................................47
Section 13.15.            Substantial Consummation ...........................................................47

Linc USA GP; Linc Energy Finance (USA), Inc.; Linc Energy Operations, Inc.; Linc Energy Resources, Inc.; Linc Gulf Coast Petroleum, Inc.; Linc Energy Petroleum (Wyoming), Inc.; Paen Insula Holdings, LLC; Linc Alaska Resources, LLC; and Linc Energy Petroleum (Louisiana), LLC hereby respectfully propose the following joint plan of liquidation. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of this Plan, and certain related matters. There are other agreements and documents, which have been or will be filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as exhibits, the Plan Supplement or otherwise. All such agreements, documents, exhibits and the Plan Supplement are incorporated into and are made a part herein as if fully set forth herein.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND OTHER REFERENCES

### Section 1.01.  Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form in this Plan:

1.     "Ad Hoc Noteholder Group" means the *ad hoc* group of First Lien Noteholders, as identified in that certain *Verified Statement of the Ad Hoc Group of First Lien Noteholders pursuant to Bankruptcy Rule 2019*, filed on June 14, 2016 [Dkt. No. 103], as the same may be amended from time to time.

2.     "Administrative Claim" means a Claim under section 503(b) of the Bankruptcy Code, and referred to in section 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) Claim(s) under section 503(b)(9) of the Bankruptcy Code, (b) any actual and necessary costs and expenses of preserving the Estate(s), (c) any actual and necessary costs and expenses of operating the Debtors' businesses after the Petition Date, (d) all Professional Claims, (e) any fees or charges assessed against the Estates under section 1930 of chapter 123 of title 28 of the United States Code, (f) all postpetition taxes of the Debtors, and (g) all other Claim(s) entitled to administrative expense status pursuant to a Final Order of the Bankruptcy Court, in each case relating to the period from the Petition Date through and including the Effective Date but not beyond (but excluding any Intercompany Claims).

3.     "Administrative Claims Bar Date" means the first day that is thirty (30) days after the Effective Date (or such date(s) otherwise ordered by the Bankruptcy Court).

4.     "Affiliate" (and, with a correlative meaning "affiliated") means, with respect to any Person, any Person who would be an "affiliate" pursuant to section 101(2) of the Bankruptcy Code, as well as any direct or indirect subsidiary of such Person, and any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with such first Person. As used in this definition, "control" (including with correlative meanings, "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies

1

of such Person (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

5.     "Alaska Assets" means Linc Alaska Resources, LLC's 97.5% ownership of Renaissance Umiat, LLC as of the Petition Date, including Renaissance Umiat, LLC's ownership of oil and gas leases covering approximately 18,450 net acres within the National Petroleum Reserve of Alaska.

6.     "Allowed" means, as to a Claim, or applicable portion thereof, (a) that has been listed in the Schedules (and thereafter continues to be listed in any subsequently filed amended versions of such Schedules) as liquidated in amount and not Disputed or contingent and for which no contrary Proof of Claim has been filed, (b) where a Proof of Claim was timely and properly filed by the applicable deadline under the Bar Date Notice as to which (i) such Claim is not Disputed, or (ii) an objection has been interposed and such Claim has been allowed, in whole or in part, by a Final Order or by the agreement of the holder of such Claim, on the one hand, and the Debtors or the Creditor Trust, as applicable, on the other, or (c) that has been allowed under any Final Order, whether or not such Claim was scheduled or is the subject of a filed Proof of Claim; provided, however, that any Claims allowed solely for the purpose of voting to accept or reject this Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed" hereunder. Unless otherwise specified herein or pursuant to a Final Order of the Bankruptcy Court, "Allowed" shall not include interest, fees, or charges for the period on and after the Petition Date. When used in this Plan or the Disclosure Statement with respect to the timing of distributions, "Allowed" means on the date a Claim has been allowed or as soon as reasonably practicable thereafter.

7.     "Archrock Lien Escrow" means Cash in the amount of $170,000.00 held in trust for the benefit of Archrock Partners Operating, L.L.C. in accordance with the Gulf Coast Sale Order.

8.     "Asset Purchase Agreements" means: (a) the *Asset Purchase Agreement Dated as of August 27, 2016, By and Among Linc USA GP, Linc Energy Operations, Inc. and Linc Gulf Coast Petroleum, Inc., as Sellers, and Torrent Gulf Coast LLC, as Buyer*; (b) the *Asset Purchase Agreement, Dated as of August 29, 2016, By and Among Linc Energy Operations, Inc. and Linc Energy Petroleum (Wyoming), Inc., as Sellers, and Big Muddy Opportunities, LLC, as Buyer*; and (c) the *Asset Purchase Agreement Dated as of August 29, 2016 By and Among Linc Alaska Resources, LLC as Seller, and Arctic Acquisition, Inc., as Buyer, and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent Under the Pre-Petition First Lien Senior Indenture*.

9.     "Assets" means all tangible and intangible assets of every kind and nature of the Debtors and their respective Estates, including, without limitation, all Causes of Action (except those released by this Plan, the Confirmation Order or other Final Order) and all proceeds thereof, existing as of the Effective Date.

10.     "Avoidance Actions" means any and all Causes of Action that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under Chapter 5 of the Bankruptcy Code, including under sections 502, 510, 542, 544, 545, and 547 through and

including 553 of the Bankruptcy Code, or similar avoidance or fraudulent transfer actions under applicable non-bankruptcy law.

11.    "<u>Ballot</u>" means each of the ballots distributed to each holder of an Impaired Claim that is entitled to vote to accept or reject this Plan and on which such holder is to indicate, among other things, acceptance or rejection of this Plan.

12.    "<u>Bankruptcy Code</u>" means the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the Petition Date, together with all amendments and modifications thereto that are subsequently made applicable to the Chapter 11 Cases.

13.    "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or such other court having jurisdiction over the Chapter 11 Cases.

14.    "<u>Bankruptcy Rules</u>" means: (a) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under section 2075 of title 28 of the United States Code; (b) the applicable Local Rules of Bankruptcy Practice and Procedure of the Bankruptcy Court; and (c) any general or specific chamber rules or procedures, or standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, and each of the foregoing together with all amendments and modifications thereto that are subsequently made and as applicable to the Chapter 11 Cases.

15.    "<u>Bar Date Notice</u>" means the *Notice of Deadlines for the Filing of Proofs of Claim, Including Requests for Payment Pursuant to Section 503(b)(9) of the Bankruptcy Code* [Dkt. No. 158].

16.    "<u>Cash</u>" means the legal tender of the U.S. or the equivalent thereof, including bank deposits and checks.

17.    "<u>Causes of Action</u>" means any and all claims, actions, causes of action (including Avoidance Actions), suits, debts, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims of the Debtors and their Estates, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, that are or may be pending on the Effective Date or commenced after the Effective Date against any Entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order, unless otherwise waived or released pursuant to this Plan, the Confirmation Order, a Final Order or by the Debtors.

18.    "<u>Chapter 11 Cases</u>" means the chapter 11 cases of the Debtors pending before the Bankruptcy Court as Case Nos. 16-32689 (DRJ) through 16-32699 (DRJ), jointly administered for procedural purposes only under the lead Case No. 16-32689 (DRJ).

19.     "Claim" means any "claim" against the Debtors as defined in section 101(5) of the Bankruptcy Code.

20.     "Claims and Solicitation Agent" means Kurtzman Carson Consultants, LLC.

21.     "Claims Objection Deadline" means the last day for filing objections to Claims, other than Administrative Claims and Professional Claims, which day shall be: (a) the later of one hundred eighty (180) days after the (i) Effective Date or (ii) filing of a Proof of Claim; or (b) such other date as the Bankruptcy Court may order. The filing of a motion to extend the Claims Objection Deadline shall automatically extend the Claims Objection Deadline until a Final Order is entered on such motion. In the event that such motion to extend the Claims Objection Deadline is denied, the Claims Objection Deadline shall be the later of the then-current Claims Objection Deadline (as previously extended, if applicable) or forty-five (45) days after the Bankruptcy Court's entry of an order denying the motion to extend the Claims Objection Deadline.

22.     "Claims Register" means the official register of Claims maintained by the Claims and Solicitation Agent.

23.     "Claims Reserve Holdback" means the portion of Gulf Coast Sale Proceeds held back from the initial distribution of Gulf Coast Sale Proceeds made to the Prepetition Noteholders (which amount includes the Archrock Lien Escrow), as detailed in the Stipulation, that remains as of the Effective Date and from which Allowed Holdback Claims and pre-Effective Date U.S. Trustee fees shall be paid, and from which the Wind Down Costs shall be funded. In the event the funds deposited in the Claims Reserve Holdback are insufficient to fund the amounts required pursuant to this Plan, the Prepetition Noteholders shall fund any shortfall from the initial distribution of Gulf Coast Sale Proceeds in accordance with the Stipulation, from the Wyoming Sale Proceeds, or from such other source as the Prepetition Noteholders determine.

24.     "Class" means a category of holders of Claims or Equity Interests under section 1122(a) of the Bankruptcy Code.

25.     "Collateral" means any property or interest in property of the Estates subject to a Lien, not otherwise subject to avoidance under the Bankruptcy Code, to secure the payment or performance of a Claim.

26.     "Confirmation" means entry by the Bankruptcy Court of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021

27.     "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

28.     "Confirmation Hearing" means the hearing before the Bankruptcy Court under section 1128 of the Bankruptcy Code.

29.     "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and

4

substance acceptable to the Debtors, the Creditors Committee and the Ad Hoc Noteholder Group, and which may be combined with the Disclosure Statement Order.

30.     "<u>Consummation</u>" means the occurrence of the Effective Date.

31.     "<u>Creditor</u>" means "creditor" as defined in section 101(10) of the Bankruptcy Code.

32.     "<u>Creditor Trust</u>" means the trust established under Section 5.03 herein.

33.     "<u>Creditor Trust Agreement</u>" means the agreement setting forth the terms and conditions governing the Creditor Trust, in substantially the form included in the Plan Supplement.

34.     "<u>Creditor Trust Assets</u>" means all of the Assets transferred to the Creditor Trust on the Effective Date, including, without limitation: (a) the GUC Trust Assets; (b) the Noteholder Trust Assets; (c) the Causes of Action; (d) the Miscellaneous Assets; (e) the Claims Reserve Holdback; and (f) all other Cash of the Debtors, including the Unencumbered Cash.

35.     "<u>Creditor Trust Beneficiaries</u>" has the meaning set forth in Section 5.03 herein.

36.     "<u>Creditor Trust Initial Administrative Funding</u>" means the first $100,000 from the First Lien LEO Bond Distribution, which $100,000 may be used to fund administrative expenses of the Creditor Trust.

37.     "<u>Creditor Trustee</u>" means the Person selected by the Ad Hoc Noteholder Group and designated in the Creditor Trust Agreement to administer the Creditor Trust, whose identity shall be disclosed in the Plan Supplement. For the avoidance of doubt, the Creditor Trustee may serve as the Distribution Agent.

38.     "<u>Creditors Committee</u>" means the statutory official committee of unsecured creditors appointed in the Chapter 11 Cases from time to time.

39.     "<u>Cure Costs</u>" means any and all amounts, costs or expenses that must be paid or actions that must be performed pursuant to sections 365 and 1123 of the Bankruptcy Code in connection with the assumption or assignment of each of the Executory Contracts and Unexpired Leases pursuant to the Confirmation Order.

40.     "<u>Debtors</u>" means: Linc USA GP; Linc Energy Finance (USA), Inc.; Linc Energy Operations, Inc.; Linc Energy Resources, Inc.; Linc Gulf Coast Petroleum, Inc.; Linc Energy Petroleum (Wyoming), Inc.; Paen Insula Holdings, LLC; Linc Alaska Resources, LLC; and Linc Energy Petroleum (Louisiana), LLC.  Diasu Holdings, LLC and Diasu Oil & Gas Company, Inc. are not proponents of this Plan and consequently are not included in the definition of "Debtors."

41.     "<u>DIP Agent</u>" means Cantor Fitzgerald Securities, as DIP Agent under the DIP Credit Agreement.

42.     "<u>DIP Credit Agreement</u>" means that certain $10 million Superpriority Debtor in Possession Credit and Guaranty Agreement dated as of May 31, 2016, as approved by the Bankruptcy Court by Final Order dated July 11, 2016 [Dkt. No. 196].

43.     "<u>DIP Lenders</u>" means the lenders under the DIP Credit Agreement.

44.     "<u>Disclosure Statement</u>" means the *[Proposed] Disclosure Statement for the Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code*, dated December [19], 2016 [Dkt. No. [•]], including all exhibits and schedules thereto, as the same may be altered, amended, modified or supplemented from time to time.

45.     "<u>Disclosure Statement Order</u>" means the *Order (A) Granting Conditional Approval of Adequacy of Disclosure Statement (B) Approving Solicitation Materials and Procedures, (C) Approving Plan Confirmation Schedule, (D) Setting a Consolidated Hearing on Final Approval of Disclosure Statement and Confirmation of Debtors' Joint Chapter 11 Plan of Liquidation and (E) Granting Related Relief*, entered by the Bankruptcy Court on [•], 2017 [Dkt. No. [•]], which order shall be in form and substance acceptable to the Debtors, the Creditors Committee and the First Lien Noteholders and which may be combined with the Confirmation Order.

46.     "<u>Disputed</u>" means any Claim, or any portion thereof, that: (a) is listed on the Schedules as unliquidated, disputed, or contingent, which dispute has not been withdrawn, resolved or overruled by a Final Order; (b) is the subject of an objection or request for estimation filed in the Bankruptcy Court and which objection or request for estimation has not been withdrawn, resolved or overruled by a Final Order of the Bankruptcy Court; or (c) is otherwise disputed by the Debtors or the Creditor Trustee, as applicable, in accordance with applicable law; <u>provided</u>, <u>however</u>, that for purposes of determining the status (i.e., Allowed or Disputed) of a particular Claim prior to the Claims Objection Deadline, any such Claim that has not been previously allowed or disallowed by Final Order of the Bankruptcy Court or Plan shall be deemed a Disputed Claim unless such Claim is specifically identified hereunder or otherwise by the Debtors or the Creditor Trustee, as applicable, as being an Allowed Claim.

47.     "<u>Distribution Agent</u>" means the Creditor Trustee, or any Entity(ies) chosen by the Debtors or the Creditor Trustee, as applicable, which Entity(ies) may include the Claims and Solicitation Agent, to make or to facilitate distributions required by this Plan.

48.     "<u>Distribution Record Date</u>" means the record date for purposes of making distributions under this Plan on account of Allowed Claims, which date shall be the Confirmation Date or such other date designated in the Confirmation Order.

49.     "<u>Effective Date</u>" means the date on which all conditions precedent to the occurrence of the Effective Date set forth in Section 9.02 herein have been satisfied or waived in accordance with Section 9.04 herein. When used in this Plan or the Disclosure Statement with respect to the timing of distributions, "Effective Date" means "on the Effective Date or as soon as reasonably practicable thereafter."

50.     "<u>Entity</u>" means a natural person, corporation, limited liability company, association, partnership (whether general or limited), joint venture, proprietorship, estate, trust,

Governmental Unit or any other individual or entity, whether acting in an individual, fiduciary, representative or other capacity, including the U.S. Trustee, within the meaning of section 101(15) of the Bankruptcy Code.

51.     "Equity Interest" means all issued, unissued, authorized, or outstanding shares of stock, membership interests, and other ownership interests of an Entity, together with any warrants, options, or contract rights to purchase or acquire such interests at any time.

52.     "Estate(s)" means the bankruptcy estate(s) of the Debtors created on the Petition Date pursuant to sections 301 and 541 of the Bankruptcy Code.

53.     "Exculpated Parties" means each of: (a) the Debtors; (b) the Creditor Trustee; (c) the Creditors Committee; (d) the Ad Hoc Noteholder Group and its members; (e) the Prepetition Noteholders; (f) the Indenture Trustees; (g) the DIP Agent; (h) the DIP Lenders; and (j) in each case, their predecessors, successors and assigns, current and former affiliates, subsidiaries, funds, portfolio companies, management companies, current and former officers, directors, professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents and other representatives (each solely in their capacity as such).

54.     "Executory Contract" means a contract to which one or more of the Debtors are party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

55.     "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

56.     "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, which has been entered on the docket, and that has not been stayed, reversed, modified or amended and as to which the time to file an appeal, a motion for re-hearing, re-argument or reconsideration or a petition for writ of certiorari has expired or been waived by the Debtors or the Creditor Trustee, as applicable, and as to which no appeal, petition for certiorari, or other proceedings for re-argument, reconsideration or re-hearing are then pending; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

57.     "First Lien Indenture" means the Indenture dated as of August 30, 2014, among the Issuers, the non-Issuer Debtors other than Linc Energy Operations, Inc. and the Bank of New York Mellon Trust Company, N.A. as trustee and collateral agent, as amended and supplemented by the Supplemental Indenture, dated as of June 30, 2015, pursuant to which were issued $125,000,000 aggregate principal amount of 9.625% First Lien Notes.

58.     "First Lien Indenture Trustee" means The Bank of New York Mellon Trust Company, N.A. as indenture trustee pursuant to the First Lien Indenture.

59.     "First Lien LEO Bond Distribution" means 50% of the proceeds recovered from the LEO Bonds, from which the Creditor Trust Initial Administrative Funding will be funded.

60.     "First Lien Note Claim" means any Claim arising from or related to the First Lien Indenture.

61.     "First Lien Notes" means those 9.625% first lien senior secured notes due 2017 issued pursuant to the First Lien Indenture.

62.     "First Lien Noteholders" means those "Noteholders" under (and as defined in) the First Lien Indenture.

63.     "First Lien Trust Initial Distribution" means the initial $100,000 distributed from the proceeds of the Creditor Trust Assets (other than proceeds from the LEO Bonds), to be paid to holders of Allowed First Lien Note Claims as reimbursement of the Creditor Trust Initial Administrative Funding.

64.     "General Unsecured Claim" means a Claim that is not an Administrative Claim, Allowed First Lien Note Claim, Allowed Second Lien Note Claim, Intercompany Claim, Other Priority Claim, Other Secured Claim, Priority Tax Claim or Professional Claim.

65.     "Governmental Unit" has the meaning set forth in section 101(27) of the Bankruptcy Code.

66.     "GUC Earmarked Funds" means the $950,000 Cash distribution to holders of Allowed General Unsecured Claims, to be paid from the Cash proceeds of the Creditor Trust Assets on or as soon as practicable after the Effective Date.

67.     "GUC LEO Bond Distribution" means 50% of the proceeds recovered from the LEO Bonds.

68.     "GUC Trust Assets" means, collectively: (a) the GUC Earmarked Funds; (b) the GUC LEO Bond Distribution; and (c) 40% of the proceeds of the Remaining Creditor Trust Assets.

69.     "GUC Trust Interests" means the interests of holders of Allowed General Unsecured Claims in the Creditor Trust, specifically the right to the GUC Trust Assets.

70.     "Gulf Coast Assets" means the leases previously owned by Linc Gulf Coast Petroleum, Inc. as of the Petition Date, covering approximately 15,521 net acres and including 150 producing wells in 13 active fields.

71.     "Gulf Coast Sale Order" means the *Order (A) Authorizing and Approving (I) the Asset Purchase Agreement for the Gulf Coast Assets; (II) the Sale of the Debtors' Gulf Coast Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (III) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (B) Granting Related Relief* [Dkt. No. 347].

72.     "Gulf Coast Sale Proceeds" means the net proceeds from the sale of the Gulf Coast Assets.

73. "<u>Holdback Claims</u>" mean, collectively, all Administrative Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims and Professionals Claims, which Claims, to the extent Allowed, shall be paid with Cash in the Claims Reserve Holdback.

74. "<u>Impaired</u>" means "impaired" within the meaning of section 1124 of the Bankruptcy Code.

75. "<u>Indenture Trustees</u>" means the First Lien Indenture Trustee and the Second Lien Indenture Trustee.

76. "<u>Intercompany Claim</u>" means any Claim(s) held by a Debtor against another Debtor.

77. "<u>Issuers</u>" means Linc USA GP and Linc Energy Finance (USA) Inc., as issuers of the First Lien Notes and Second Lien Notes.

78. "<u>LEO Bonds</u>" means those performance bonds, and the proceeds of such bonds, for which Linc Energy Operations, Inc. is the principal. For the avoidance of doubt, the LEO Bonds shall not include the proceeds held by Linc Energy Operations, Inc. related to the Performance Bond No. RLB0007036, dated March 30, 2004, by and between Diasu Oil & Gas Company, Inc. as "Principal," RLI as "Surety," and Amoco Production Company as "Obligee."

79. "<u>Lien</u>" means "lien" within the meaning of section 101(37) of the Bankruptcy Code.

80. "<u>Miscellaneous Alaska Assets</u>" means the unencumbered Assets owned by Linc Energy Operations, Inc. and used in the operations of Linc Alaska Resources, LLC, which Assets were not transferred to Arctic Acquisition, Inc. pursuant to the *Asset Purchase Agreement Dated as of August 29, 2016 By and Among Linc Alaska Resources, LLC as Seller, and Arctic Acquisition, Inc., as Buyer, and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent Under the Pre-Petition First Lien Senior Indenture*, but that the Ad Hoc Noteholder Group has identified for transfer to Malamute.

81. "<u>Miscellaneous Assets</u>" means the Debtors' remaining non-Cash Assets, including, without limitation, certain underground coal gasification equipment located in Alaska and Wyoming, certain unencumbered miscellaneous equipment relating to the Debtors' oil and gas operations, and Equity Interests owned by Linc USA GP in the non-Debtor Linc Clean Energy, Inc. For the avoidance of doubt, the Miscellaneous Assets shall not include the Miscellaneous Alaska Assets.

82. "<u>Non-LEO Bond Distribution</u>" means 100% of the distribution of proceeds of Non-LEO Bonds.

83. "<u>Non-LEO Bonds</u>" means those certain performance bonds for which the principal is a Debtor other than Linc Energy Operations, Inc., which performance bonds shall be released and the proceeds thereof treated as the Assets of the relevant Debtor principal.

84.    "Noteholder Trust Assets" means, collectively: (a) the First Lien LEO Bond Distribution, (b) the First Lien Trust Initial Distribution, (c) the Non-LEO Bond Distribution, (d) the Remaining Claims Holdback, and (e) 60% of the proceeds of the Remaining Creditor Trust Assets.

85.    "Noteholder Trust Interests" means the interests of holders of Allowed First Lien Note Claims in the Creditor Trust, specifically the right to the Noteholder Trust Assets.

86.    "Other Priority Claim" means a Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code (other than an Administrative Claim or a Priority Tax Claim).

87.    "Other Secured Claim" means a Secured Claim that is senior in priority to the First Lien Note Claims and Second Lien Note Claims.

88.    "Person" means "person" within the meaning of section 101(41) of the Bankruptcy Code.

89.    "Petition Date" means May 29, 2016, the date on which each of the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

90.    "Plan" means this *Debtors' Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code* (as it may be altered, amended, modified or supplemented from time to time).

91.    "Plan Supplement" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan, which shall be in form and substance acceptable to the Debtors, the Creditors Committee and the Ad Hoc Noteholder Group, and which shall be filed in the Chapter 11 Cases no later than ten (10) days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, as may be amended or supplemented by additional documents filed in the Chapter 11 Cases prior to the Effective Date.

92.    "Prepetition Noteholder Deficiency Claims" means the deficiency claims, classified as General Unsecured Claims, of the holders of Allowed First Lien Note Claims and Allowed Second Lien Note Claims.

93.    "Prepetition Noteholders" means the First Lien Noteholders and the Second Lien Noteholders.

94.    "Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

95.    "Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in that Class.

96.    "Professional" means a Person or Entity: (a) employed in the Chapter 11 Cases in accordance with sections 327, 328 or 1103 of the Bankruptcy Code pursuant to a Final Order and to be compensated for services rendered from the Petition Date through and including the

Effective Date, but not beyond, pursuant to sections 327 through 331 or 1103 of the Bankruptcy Code; or (b) for which compensation and reimbursement of expenses has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

97.     "Professional Claim" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation and reimbursement of expenses incurred from the Petition Date through and including the Effective Date under sections 327, 328, 330, 331, 503(b), 1103 or 1129(a)(4) of the Bankruptcy Code.

98.     "Professional Claims Bar Date" means the date that is thirty (30) days after the Effective Date.

99.     "Proof of Claim" means a proof of Claim filed in Chapter 11 Cases in a manner consistent with the Bar Date Notice.

100.     "Rejection Damages Claim" means a Claim for damages arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to sections 365 or 1123 of the Bankruptcy Code.

101.     "Released Parties" means each of: (a) the Debtors; (b) the Creditor Trustee; (c) the Creditors Committee; (d) the Ad Hoc Noteholder Group and its members; (e) the Prepetition Noteholders; (f) the Indenture Trustees; (g) the DIP Agent; (h) the DIP Lenders; and (j) in each case, their predecessors, successors and assigns, professionals, advisors, accountants, attorneys, investment bankers, and consultants, and in the case of (b) through (h), their current and former affiliates, subsidiaries, funds, portfolio companies, management companies, employees, agents, directors and officers, and other representatives (each solely in their capacity as such). For the avoidance of doubt, the Debtors' directors and officers are not included in the definition of "Released Parties."

102.     "Releasing Parties" means each holder of a Claim against the Debtors that (a) is Unimpaired pursuant to this Plan and therefore is deemed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code, or (b) receives and returns a Ballot indicating an election not to opt out of the releases provided in Section 10.02 herein.

103.     "Remaining Claims Holdback" means the funds remaining from the Claims Reserve Holdback, if any, after final distributions have been made to all Allowed Holdback Claims.

104.     "Remaining Creditor Trust Assets" means the Creditor Trust Assets, if any, other than (a) Cash required to pay Allowed Holdback Claims, (b) the First Lien LEO Bond Distribution, (c) the First Lien Trust Initial Distribution, (d) the GUC Earmarked Funds, (e) the GUC LEO Bond Distribution, (f) the Non-LEO Bond Distribution, (g) the Remaining Claims Holdback; and (h) the Wind Down Costs.

105.     "Schedule of Assumed Executory Contracts and Unexpired Leases" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors and assigned to the Creditor Trust pursuant to this Plan, including any Cure Costs related thereto, in

the form filed as part of the Plan Supplement, as the same may be amended, modified or supplemented from time to time.

106.     "Schedules" means the schedules of assets and liabilities, the list of holders of Equity Interests and the statements of financial affairs and such other documents filed by the Debtors under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments pursuant to Bankruptcy Rule 1009 and modifications thereto through the Confirmation Date.

107.     "Second Lien Indenture" means that indenture dated as of October 12, 2012, among the Issuers, the non-Issuer Debtors other than Linc Energy Operations, Inc., and the Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent, as amended and supplemented by the Supplemental Indenture dated as of August 13, 2014 and the Second Supplemental Indenture dated as of June 30, 2015, pursuant to which were issued $265,000,000 aggregate principal amount 12.50% Second Lien Notes, which principal amount was later increased by $18,550,000 in connection with the October 2015 interest payment.

108.     "Second Lien Indenture Trustee" means Delaware Trust Company as trustee under the Second Lien Indenture.

109.     "Second Lien Note Claim" means any Claim arising from or related to the Second Lien Indenture.

110.     "Second Lien Notes" means the 12.50% senior secured notes due 2017 issued pursuant to the Second Lien Indenture.

111.     "Second Lien Noteholders" means those "Noteholders" under (and as defined in) the Second Lien Indenture.

112.     "Secured Claim" means a Claim: (a) secured by a Lien on property of the Estate to the extent of the value of such property; or (b) subject to a valid right of setoff to the extent of the amount subject to valid setoff pursuant to section 553 of the Bankruptcy Code.

113.     "Stipulation" means the *So Ordered Stipulation Amending Final DIP Order* filed with the Bankruptcy Court on November 22, 2016 [Dkt. No. 428], and subsequently entered by the Bankruptcy Court on December 5, 2016 [Dkt. No. 442].

114.     "U.S." means the United States of America.

115.     "U.S. Trustee" means the United States Trustee for the Southern District of Texas.

116.     "Undeliverable Distribution" means any distribution under this Plan on account of an Allowed Claim to a holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Distribution Agent of an intent to accept a particular distribution; (c) responded to the Distribution Agent's requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

117.    "<u>Unencumbered Cash</u>" means the Debtors' Cash or Cash equivalents that are not subject to any Lien, claim or encumbrance.

118.    "<u>Unexpired Lease</u>" means an unexpired lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

119.    "<u>Unimpaired</u>" means a Class of Claims in a Debtor that is not Impaired.

120.    "<u>Voting Deadline</u>" means 4:00 p.m. CST on [•], 2017, or such other date approved by the Bankruptcy Court.

121.    "<u>Wind Down Costs</u>" means the reasonable expenses necessary to fund post-Effective Date professional fees and U.S. Trustee fees pursuant to Sections 2.02(c) and 2.03 herein, wind down the Chapter 11 Cases, and dissolve the Debtors, as agreed among the Debtors, the Creditors Committee and the Ad Hoc Noteholder Group.

122.    "<u>Wyoming Assets</u>" means the oil and gas leases previously owned by Linc Energy Petroleum (Wyoming), Inc. as of the Petition Date, covering 27,821 net acres and 31 wells across 3 fields in the Powder River Basin.

123.    "<u>Wyoming Sale Proceeds</u>" means the net proceeds from the sale of the Wyoming Assets.

**Section 1.02.   Rules of Interpretation**

For purposes herein, the following rules of interpretation apply: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections herein or hereto; (e) the words "herein" and "hereto" refer to this Plan in its entirety rather than to any particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of, or to affect, the interpretation herein; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

**Section 1.03.  Computation of Time**

Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed herein.

**Section 1.04.  Governing Law**

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to conflict-of-laws principles; provided that the corporate or limited liability company governance matters shall be governed by the laws of the state of incorporation or formation of the applicable Entity.

**Section 1.05.  Reference to Monetary Figures**

All references in this Plan to monetary figures refer to currency of the U.S.

**Section 1.06.  Reference to the Debtors**

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors mean the Debtors or specific Debtor, as applicable, to the extent context requires.

**ARTICLE II**
**TREATMENT OF UNCLASSIFIED CLAIMS**

In accordance with section 1123(a)(l) of the Bankruptcy Code, Administrative Claims (including Professional Claims) and Priority Tax Claims are not classified and thus are excluded from the Classes of Claims and Equity Interests set forth in ARTICLE III herein. These unclassified Claims are treated as follows:

**Section 2.01.  Administrative Claims**

(a)   Treatment

Unless the holder and the Debtors, in consultation with the Ad Hoc Noteholder Group or, after the Effective Date, the Creditor Trustee agree to a different treatment, each holder of an Administrative Claim (other than an Administrative Claim that is a Professional Claim or a Claim for fees payable pursuant to 28 U.S.C. § 1930(a)) as of the Effective Date shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, the amount of such Allowed Administrative Claim, in Cash from the Claims Reserve Holdback on or as soon as practicable after the latest of (i) the Effective Date, (ii) the date that is fourteen (14) days after the date such Claim is Allowed, (iii) the date such Allowed Administrative Claim becomes due and payable in the ordinary course of business in accordance with the terms, and subject to the conditions, of any agreements governing, instruments evidencing, or other documents relating to, the applicable transaction giving rise to such Allowed Administrative

14

Claim, if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business, or (iv) such other date as may be agreed upon in writing by the holder of such Claim and the Debtors.

      (b)    <u>Administrative Claims Bar Date</u>

Holders of Administrative Claims (other than Professional Claims or Claims for fees payable pursuant to 28 U.S.C. § 1930(a)) shall file any request for allowance and payment of Administrative Claims no later than thirty (30) days after the Effective Date or otherwise be forever barred, estopped, and enjoined from asserting such Claims against the Debtors' respective Estates and property, the Creditor Trust, a Distribution Agent, or otherwise, and such Administrative Claims shall be deemed discharged and released as of the Effective Date. The Creditor Trustee shall have thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Administrative Claims Bar Date to review and object to such Administrative Claims before a hearing for determination of allowance of such Administrative Claims.

## Section 2.02.  Professional Claims

      (a)    <u>Treatment</u>

The Bankruptcy Court shall determine the Allowed amounts of the Professional Claims after notice and hearing in accordance with the procedures established by the Bankruptcy Code and any order of the Bankruptcy Court in the Chapter 11 Cases. The Creditor Trust shall pay Professional Claims in full, in Cash from the Claims Reserve Holdback in the amount Allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) fourteen (14) days following the date on which the order related to any such Allowed Professional Claim is entered, or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Professional Claim and the Creditor Trustee.

      (b)    <u>Professional Claims Bar Date</u>

Holders of Professional Claims shall file with the Bankruptcy Court any request for allowance and payment of such Professional Claims no later than thirty (30) days after the Effective Date or otherwise be forever barred, estopped, and enjoined from asserting such Claims against the Debtors, their respective Estates and property, the Creditor Trust, a Distribution Agent, or otherwise, and such Professional Claims shall be deemed discharged as of the Effective Date. The Creditor Trustee and other parties in interest shall have thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) following the Professional Claims Bar Date to review and object to such Professional Claims before a hearing for determination of allowance of such Professional Claims.

Notwithstanding anything to the contrary herein, this Section 2.02 shall not apply to any fees and expenses (including attorney's fees and fees for other retained professionals, advisors and consultants) of the Ad Hoc Noteholder Group and the First Lien Indenture Trustee, which shall be paid pursuant to the Stipulation and the First Lien Indenture.

(c)      Post-Effective Date Professional Fees

From and after the Effective Date, the Creditor Trust shall pay in Cash the reasonable legal fees and expenses incurred by the Creditor Trust's professionals incurred in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court. For the avoidance of doubt, following the Effective Date any requirement that a professional comply with sections 327 through 331 of the Bankruptcy Code in seeking compensation for services rendered after such date shall terminate.

## Section 2.03.  U.S. Trustee Fees

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid in full in Cash by the Debtors (before the Effective Date) or the Creditor Trustee (on and after the Effective Date) for each quarter (including any fraction therein) until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

## Section 2.04.  Priority Tax Claims

To the extent not previously paid during the Chapter 11 Cases, unless the holder agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release and discharge of such Claim, payment in full in Cash from the Claims Reserve Holdback on or as soon as practicable after the latest of the (a) the Effective Date; (b) the date that is fourteen (14) days after the date such Claim is Allowed; or (c) such other date as may be agreed upon in writing by the holder of such Claim and the Debtors, or, after the Effective Date, the Creditor Trustee.

# ARTICLE III
# CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

## Section 3.01.  Classification

This Plan is styled as a joint plan among all Debtors. The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, Confirmation and distribution pursuant to this Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

Claims (other than those listed in ARTICLE II herein, which are not required to be classified pursuant to section 1123(a)(1) of the Bankruptcy Code) against and Equity Interests in each of the Debtors are classified as follows:

| Class | Claim or Equity Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |

16

| Class | Claim or Equity Interest | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | First Lien Note Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Note Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Equity Interests | Impaired | Deemed to Reject |

**Section 3.02.   Treatment**

(a)    Class 1 (Other Priority Claims)

    (i)    *Classification*: Class 1 consists of Other Priority Claims.

    (ii)    *Treatment*: Unless the holder and the Debtors, in consultation with the Ad Hoc Noteholder Group or, after the Effective Date, the Creditor Trustee agree to a different treatment, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Claim, the amount of such Allowed Other Priority Claim in Cash from the Claims Reserve Holdback on or as soon as practicable after the latest of (a) the Effective Date, (b) the date that is fourteen (14) days after the date such Claim is Allowed, or (c) such other date as may be agreed upon in writing by the holder of such Claim.

    (iii)    *Voting*: Class 1 is Unimpaired and presumed to accept this Plan. The holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject this Plan.

(b)    Class 2 (Other Secured Claims)

    (i)    *Classification*: Class 2 consists of Other Secured Claims.

    (ii)    *Treatment*: Unless the holder and the Debtors, in consultation with the Ad Hoc Noteholder Group or, after the Effective Date, the Creditor Trustee agree to a different treatment, each holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Claim, either (A) the amount of such Allowed Other Secured Claim in Cash from the Claims Reserve Holdback on or as soon as practicable after the latest of (x) the Effective Date; (y) the date that is fourteen (14) days after the date such Claim is Allowed; or (z) such other date as may be agreed upon in writing by the holder of such Claim, or (B) the return of the applicable Collateral in satisfaction of the Allowed amount of such Other Secured Claim. Upon satisfaction of such Allowed Claim as set forth herein, the Liens securing such Other Secured Claim shall be deemed released.

      (iii)    *Voting*: Class 2 is Unimpaired and presumed to accept this Plan. The holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject this Plan.

(c)    <u>Class 3 (First Lien Note Claims)</u>

      (i)    *Classification*: Class 3 consists of First Lien Note Claims.

      (ii)    *Treatment*: The First Lien Note Claims shall be Allowed in the aggregate principal amount of $125,000,000 plus accrued and unpaid interest as of the Petition Date, plus, to the extent the following are payable in accordance with the First Lien Indenture, fees and expenses (including any prepayment fees and professional fees and expenses), penalties, premiums and other obligations incurred in connection with the First Lien Note Claims, plus, to the extent applicable, any adequate protection claims or other claims as provided for in the Stipulation; <u>provided</u>, <u>however</u>, that upon the occurrence of the Effective Date, the First Lien Adequate Protection Claim (as defined in the DIP Facility) shall be deemed waived pursuant to this Plan. Prior to the Effective Date, the outstanding amount of the Allowed First Lien Note Claims was reduced by (i) a partial payment in the amount of $22,315,759 made in respect of such claims pursuant to the Stipulation and (ii) a credit bid of $80,000,000 to purchase the Alaska Assets pursuant to the applicable Asset Purchase Agreement. Unless the holder agrees to a different treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, the remaining balance of such Claim, each holder of an Allowed First Lien Note Claim, on or as soon as practicable after the Effective Date, shall receive its Pro Rata share of:

      a.    100% of the Gulf Coast Sale Proceeds less the Claims Reserve Holdback, to the extent not previously distributed to the First Lien Noteholders pursuant to the Stipulation;

      b.    100% of the Wyoming Sale Proceeds; and

      c.    the Noteholder Trust Interests, pursuant to which each holder shall be entitled to receive from the Creditor Trust its Pro Rata share of the Noteholder Trust Assets when and as such assets are available for distribution in accordance with the terms of the Creditor Trust Agreement; <u>provided</u> <u>that</u> the Debtors shall distribute as much of the Noteholder Trust Assets to such holders on the Effective Date as is monetized and available for distribution, except for the Creditor Trust Initial Administrative Funding.

For the purpose of distribution pursuant to the treatment described in this Section 3.02(c)(ii), the Pro Rata share for each holder of an Allowed First Lien Note Claim will be a fraction, expressed as a percentage, (x) the

numerator of which is the outstanding principal amount of First Lien Notes held by such holder, and (y) the denominator of which is the aggregate outstanding principal amount of all outstanding First Lien Notes.

(iii) *Voting*: Class 3 is Impaired. The holders of Class 3 First Lien Note Claims are entitled to vote to accept or reject this Plan.

(d) <u>Class 4 (Second Lien Note Claims)</u>

(i) *Classification*: Class 4 consists of Second Lien Note Claims.

(ii) *Treatment*: In exchange for the compromises reflected herein, including recoveries provided to holders of Class 3 First Lien Note Claims, each Allowed Second Lien Note Claim is deemed satisfied, compromised, settled, and released in full on the Effective Date.

(iii) *Voting*: Class 4 is Impaired. The holders of Class 4 Second Lien Note Claims are entitled to vote to accept or reject this Plan.

(e) <u>Class 5 (General Unsecured Claims)</u>

(i) *Classification:* Class 5 consists of General Unsecured Claims.

(ii) *Treatment:* Unless the holder and the Debtors, in consultation with the Ad Hoc Noteholder Group or, after the Effective Date, the Creditor Trustee, agree to a different treatment, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Claim, its Pro Rata share of the GUC Trust Interests, pursuant to which each holder shall be entitled to receive from the Creditor Trust its Pro Rata share of the GUC Trust Assets when and as such assets are available for distribution in accordance with the terms of the Creditor Trust Agreement.

(iii) *No Recovery on Account of Deficiency Claims:* Upon acceptance of this Plan by Class 3, Class 4 and Class 5, all holders of First Lien Note Claims and Second Lien Note Claims shall be deemed to have agreed to forgo any distribution from the GUC Trust Assets in respect of their Prepetition Noteholder Deficiency Claims.

(iv) *Voting*: Class 5 is Impaired. The holders of Class 5 General Unsecured Claims (other than holders of the Prepetition Noteholder Deficiency Claims) are entitled to vote to accept or reject this Plan.

(f) <u>Class 6 (Equity Interests)</u>

(i) *Classification*: Class 6 consists of all Equity Interests.

19

(ii)    *Treatment*: On the Effective Date, all Equity Interests shall be cancelled and extinguished and the holders of all Equity Interests shall not receive or retain any property or Assets on account of their Equity Interests.

(iii)    *Voting*: Class 6 is Impaired and presumed to reject this Plan. The holders of Class 6 Equity Interests are not entitled to vote to accept or reject this Plan.

## Section 3.03.  Additional Provisions Regarding Unimpaired Claims

Except as otherwise explicitly provided in this Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims including, without limitation, all rights with respect to legal and equitable defenses to setoffs or recoupments asserted against Unimpaired Claims.

## Section 3.04.  Intercompany Claims

On the Effective Date, all Intercompany Claims shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distributions to any holder of Intercompany Claims.

## ARTICLE IV
## ACCEPTANCE OR REJECTION OF THIS PLAN

## Section 4.01.  Acceptance by an Impaired Class

In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, Impaired Classes entitled to vote under this Plan shall have accepted this Plan if it is accepted by the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims that have timely and properly voted to accept or reject this Plan or if no holder of a Claim with respect to a specific Class for a particular Debtor timely submits a Ballot that complies with the Disclosure Statement Order indicating acceptance or rejection of this Plan.

## Section 4.02.  Elimination of Vacant Classes

Any Class of Claims or Equity Interests that is not populated as of the commencement of the Confirmation Hearing by an Allowed Claim or Equity Interest, or a Claim or Equity Interest that is temporarily allowed under Bankruptcy Rule 3018, shall be deemed eliminated from this Plan for purposes of: (a) voting to accept or reject this Plan; and (b) determining the acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## Section 4.03.  Nonconsensual Confirmation

The Debtors may request confirmation under section 1129(b) of the Bankruptcy Code with respect to (a) any Impaired Class of Claims and Equity Interest, or a Claim or Equity Interest that is deemed to reject this Plan pursuant to section 1126(g) of the Bankruptcy Code or the terms of this Plan or otherwise.

## ARTICLE V
## IMPLEMENTATION OF THIS PLAN

The transactions required to implement this Plan shall be implemented in accordance with this ARTICLE V.

### Section 5.01.   Deemed Consolidation

The Estates of the Debtors have not been substantively consolidated; provided, however that for purposes of voting and determining distributions under this Plan, the Debtors will be deemed consolidated and treated as equivalent to a single legal entity. This "deemed" consolidation means that Claims filed against the Debtors will be considered to be a single Claim against the consolidated Debtors. The Debtors believe that this Plan structure is beneficial to Creditors as a whole and accomplishes a fairer distribution of value among Creditors. Likewise, this structure will minimize costly disputes over which Debtors owned what property. It will also facilitate the compromise reached among the Debtors, the Creditors Committee and the Ad Hoc Noteholder Group as embodied in this Plan. The Ad Hoc Noteholder Group, whose members hold Liens on the majority of the Debtors' Assets, as well as the Creditors Committee, have agreed to this treatment. Consolidation of the Debtors' Estates is for the limited purpose of making distributions to holders of Allowed Claims to ease an administrative burden on the Debtors, their Estates, and the Creditor Trustee or a Distribution Agent, as applicable.

For the avoidance of doubt, no holder of an Allowed Claim shall receive more favorable treatment on account of such Claims under this Plan had consolidation not been effected. Without limiting the foregoing, recoveries by holders of Allowed Other Secured Claims shall be limited by the Liens and the value of the Collateral securing such Allowed Claims, without recourse to any other Assets not encumbered by such Liens or included in such Collateral. This deemed consolidation will not affect (other than for purposes related to funding distributions under this Plan) the legal and organizational structure of the Debtors or pre- and post-Petition Date guaranties, Liens, and security interests, or distributions out of any insurance policies or proceeds of policies.

The Debtors, in consultation with the Creditors Committee and the Ad Hoc Noteholder Group, reserve the right to withdraw this Plan with respect to one or more Debtors as they may reasonably determine, including as may be appropriate or necessary to effectuate the terms of this Plan as described in this Section 5.01.

### Section 5.02.   Operations Between Confirmation Date and Effective Date

During the period from the Confirmation Date through and including the Effective Date, the Debtors may continue to operate their businesses in the ordinary course as debtors in possession, subject to all applicable orders of the Bankruptcy Court, the Bankruptcy Code and the limitations set forth herein.

**Section 5.03.   Creditor Trust**[2]

     (a)     <u>Creation of the Creditor Trust</u>

On or before the Effective Date, the Debtors shall take all necessary steps to establish the Creditor Trust for the benefit of the holders of Allowed Claims (the "<u>Creditor Trust Beneficiaries</u>") by the execution and delivery of the Creditor Trust Agreement.

     (b)     <u>Transfer of the Creditor Trust Assets</u>

On the Effective Date, all property of each Estate, including, without limitation, all then-owned Assets of each Debtor, all Causes of Action and any remaining Cash (following distributions as set forth herein) shall vest in the Creditor Trust free and clear of all Liens, Claims, charges and encumbrances. The Creditor Trust Assets shall be deemed irrevocably transferred to the Creditor Trust free and clear of all Liens, claims and encumbrances pursuant to the Creditor Trust Agreement. For all U.S. federal income tax purposes, all Persons (including, without limitation, the Debtors and the Creditor Trustee and the Creditor Trust Beneficiaries) shall treat the transfer and assignment of the Creditor Trust Assets to the Creditor Trust for the benefit of the Creditor Trust Beneficiaries as (i) a transfer of the Creditor Trust Assets directly to the Creditor Trust Beneficiaries followed by (ii) the transfer by the Creditor Trust Beneficiaries to the Creditor Trust of the Creditor Trust Assets. The Creditor Trust will be treated as a grantor trust for U.S. federal tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes. The Creditor Trust Beneficiaries will be treated as the grantors and owners of their Pro Rata (by Class or category of Claim) portion of the Creditor Trust Assets for U.S. federal income tax purposes. On and after the Effective Date, the Creditor Trustee may use, acquire and dispose of property and compromise or settle any Claims, without the supervision of or approval by the Bankruptcy Court, and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than the restrictions expressly imposed by this Plan, the Confirmation Order or the Creditor Trust Agreement.

     (c)     <u>Purpose of the Creditor Trust</u>

The Creditor Trust, duly organized under the laws of Texas, shall be established for the purpose of liquidating and distributing the Creditor Trust Assets in accordance with Treasury Regulation Section 301.7701-4(d) and shall be governed by the Creditor Trust Agreement.

     (d)     <u>Administration of the Creditor Trust; Funding</u>

The Creditor Trust shall be administered by the Creditor Trustee pursuant to the Creditor Trust Agreement and, as detailed therein, shall be overseen by a three-member advisory board, consisting of one (1) representative appointed by the Creditors Committee, one (1) representative appointed by the Ad Hoc Noteholder Group, and the Creditor Trustee. The administrative costs and expenses of the Creditor Trust shall initially be funded by the Creditor Trust Initial Administrative Funding and the Wind Down Costs, which shall be transferred to the Creditor

---

[2] This Section 5.03 is a general description of the Creditor Trust and its provisions. The Creditor Trust Agreement shall be included in the Plan Supplement. To the extent this Section 5.03 is inconsistent with the Creditor Trust Agreement, the Creditor Trust Agreement shall control for all purposes.

Trust on or as soon as practicable after the Effective Date. Thereafter, the costs and expenses of administering the Creditor Trust shall be funded by the Creditor Trust Assets as designated in the Creditor Trust Agreement. Additionally, subject to the terms of the Creditor Trust Agreement, the Creditor Trust may borrow against, pledge, hypothecate, otherwise encumber, or convey Creditor Trust Assets as needed to accomplish the goals of the Creditor Trust such as, as an example, pledging litigation recoveries to a contingency fee counsel or litigation funding lender. The Creditor Trust may also borrow on an unsecured basis, subject to the terms of the Creditor Trust Agreement.

(e)     Powers and Duties of the Creditor Trustee

The Creditor Trustee shall be appointed by the Ad Hoc Noteholder Group. The Creditor Trustee shall retain and have all the rights, powers and duties necessary to carry out its responsibilities under this Plan and the Creditor Trust Agreement, and as otherwise provided in the Confirmation Order, subject to the advice of the Creditor Trust Advisory Board. The Creditor Trustee shall be the exclusive trustee of the Creditor Trust Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as a representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. Without limiting the foregoing, the Creditor Trustee shall succeed to all of the Debtors' rights, including in respect of the Asset Purchase Agreements. The Creditor Trustee's liability may be limited by the Creditor Trust Agreement to include limitations of liability for negligence and any actions except for willful misconduct or fraud.

**Section 5.04.   Sources of Cash for Plan Distributions**

Except as otherwise specifically provided herein or in the Confirmation Order or Stipulation, all Cash required for the payments to be made hereunder shall be obtained from the Creditor Trust.

**Section 5.05.   Miscellaneous Alaska Assets**

On or as soon as practicable after the Effective Date, as part of the global settlement and consensual agreement of the Ad Hoc Noteholder Group and the Creditors Committee as set forth herein, and in exchange for the consideration and agreements made by the Ad Hoc Noteholder Group herein, the Miscellaneous Alaska Assets shall be transferred and assigned free and clear of all Liens, claims, encumbrances and interests, to Malamute Energy, LLC. For the avoidance of doubt, the Miscellaneous Alaska Assets shall not be transferred to the Creditor Trust or be considered to be part of the Miscellaneous Assets or the Creditor Trust Assets.

**Section 5.06.   Release of Bonds**

On the Effective Date, the Debtors' rights under any bonds that have not been released as of the date thereof, including the right to receive the proceeds therefrom, shall be transferred to the Creditor Trust as Creditor Trust Assets. Prior to the Effective Date, the Debtors shall use reasonable efforts to cause the bonds to be released and, if released, the proceeds therefrom shall revert back to the respective Debtor listed as the principal therefor. Pursuant to Section 3.02(c) and Section 3.02(e) herein, on the Effective Date or as soon as practicable thereafter upon release of bonds, the proceeds from the Non-LEO Bonds and the LEO Bonds when released shall be

distributed to holders of Allowed First Lien Note Claims and Allowed General Unsecured Claims, as applicable, as the First Lien LEO Bond Distribution and the GUC LEO Bond Distribution, respectively.

**Section 5.07.   Claims Reserve Holdback**

Pursuant to the Stipulation, the Debtors made an initial distribution of $22,315,759 of the Gulf Coast Sale Proceeds to the First Lien Indenture Trustee for the benefit of the First Lien Noteholders prior to Confirmation. As set forth in the Stipulation, the parties further agreed to withhold $8,901,224 from that initial distribution of Gulf Coast Sale Proceeds to meet various other expenses. On the Effective Date, the remaining portion of that holdback – i.e., the Claims Reserve Holdback, shall be transferred to the Creditor Trust and used to satisfy Allowed Holdback Claims as provided in ARTICLE II and Section 3.02(a) and Section 3.02(b) herein and to fund the Wind Down Costs. After satisfaction of all such Allowed Holdback Claims and payment of the Wind Down Costs, any funds remaining in the Claims Reserve Holdback shall become part of the Remaining Claims Holdback and shall be distributed in accordance with Section 3.02(c) herein.

**Section 5.08.   Corporate Existence**; **Officers and Directors**

On the later of the Effective Date or the transfer of the Debtors' Assets to the Creditor Trust as provided herein, except to the extent that the Debtors, in consultation with the Ad Hoc Noteholder Group and the Creditors Committee determine otherwise, each of the Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided, however, that each Debtor shall file with the Office of the Secretary of State for the state of its incorporation, a certificate of dissolution which may be executed by an officer of such Debtor without the need for approval by the board of directors or shareholders. From and after the Effective Date, the Debtors shall not be required to file any document, or take any other action, or obtain any approval from any Debtor's board of directors or shareholders, to withdraw their business operations from any states in which the Debtors previously conducted their business operations.

On the Effective Date, (a) the positions of the current directors, or in the case of a governing body created by a partnership agreement, limited liability company agreement or similar agreement, the members of such governing body (such persons and the corporate directors collectively, the "Governors") of each Debtor shall be eliminated, and each Governor shall be terminated (without the necessity of further action), (b) to the fullest extent permitted by applicable law, the rights, powers, and duties of the Governors of any Debtor that remains in existence after the Effective Date and that has a Governor shall vest in the Creditor Trustee and the Creditor Trustee or its designee shall be the presiding officer and the sole Governor of each such Debtor. The Creditor Trustee shall make all determinations with respect to employment of any other directors, officers, managers and employees of any such Debtor on and after the Effective Date.

**Section 5.09.   Corporate Action**

On the Effective Date, all actions contemplated by this Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Equity Interests, directors, managers or officers of the Debtors, the Creditor Trustee, or any other Entity or Person, as applicable, including, without limitation: (a) the execution and delivery of all appropriate agreements or other documents of dissolution or liquidation containing terms that are consistent with the terms of this Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any Asset, property, right, liability, debt or obligation on terms consistent with the terms of this Plan and having other terms for which the applicable parties agree; (c) rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases; and (d) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. All matters provided for in this Plan involving the company structure of the Debtors, and any company action required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons or officers of the Debtors. The authorizations and approvals contemplated by this Section 5.09 shall be effective notwithstanding any requirements under nonbankruptcy law.

**Section 5.10.   Preservation of Causes of Action Not Expressly Released**

Except as otherwise provided in this Plan or in any contract, instrument, release, indenture or other agreement entered into in connection with this Plan, in accordance with section 1123(b)(3) of the Bankruptcy Code, any claims, rights, and Causes of Action that the Debtors may hold against any Person, shall vest in the Creditor Trust, and the Creditor Trust and the Creditor Trustee, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such claims, rights or Causes of Action. In addition, the Creditor Trustee, and its successor entities under this Plan expressly reserve the right to pursue or adopt any rights and/or claims asserted and/or alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Person or Entity (including, in each case and without limitation, the other Debtors), including, without limitation, the other parties in such lawsuits. The Creditor Trust shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, and Causes of Action without the consent or approval of any third party and without any further order of the Bankruptcy Court. Unless a Cause of Action is expressly waived, relinquished, released or compromised in this Plan or an order of the Bankruptcy Court, the Creditor Trustee expressly reserves such Cause of Action for later adjudication and, accordingly, no doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches or other preclusion doctrine shall apply to such Cause of Action as a consequence of Confirmation, the vesting of such Cause of Action in the Creditor Trust, any order of the Bankruptcy Court or these Chapter 11 Cases.

Without limiting the foregoing, the Causes of Action reserved by the Debtors and contributed to the Creditor Trust include, without limitation, any claims the Debtors, their

25

Estates, or any Creditor (whether claiming directly, or by, through or on behalf of the Debtors) could assert against any Person who is or was an officer or director or otherwise in control of any Debtor or Affiliate, including, without limitation, claims for negligence, mismanagement, intentional or unintentional wrongful acts, breaches of fiduciary duties, self-dealing, misappropriation, fraud, concealment of assets, and any other claim, whether arising in law, equity, tort, contract, statute or common law.

Delivery (by any means) of this Plan or Disclosure Statement to any Person to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors, or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors, shall constitute actual notice that such obligation, transfer, or transaction may be reviewed by the Creditor Trustee subsequent to the Effective Date and may, if appropriate, be the subject of an action after the Effective Date, whether or not: (a) such Person has filed a Proof of Claim against the Debtors in their Chapter 11 Cases; (b) such Person's Proof of Claim has been objected to by the Debtors or the Creditor Trustee, as applicable; (c) such Person's Claim was included in Debtors' Schedules; (d) such Person's scheduled Claim has been objected to by the Debtors or the Creditor Trustee, as applicable, or has been identified by the Debtors or the Creditor Trustee, as applicable, as a Disputed Claim; or (e) such action falls within the list of affirmative Causes of Action in the Plan Supplement. No Person may rely on the absence of a specific reference in this Plan or the Disclosure Statement to any Cause of Action against them as an indication that the Debtors or the Creditor Trustee, as applicable, will not pursue such Cause of Action.

### Section 5.11.  Release of Liens

On the Effective Date, except as otherwise specifically provided for in this Plan, in the Confirmation Order, or in any contract, instrument, release or other agreement or document created pursuant to or as contemplated under this Plan, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Debtors' Estates shall be fully released, settled and discharged, and all of the rights, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Debtors or the Creditor Trust, as applicable.

### Section 5.12.    Cancellation of Securities and Notes Against the Debtors

On the Effective Date, except as otherwise specifically provided for in this Plan, in the Confirmation Order, or in any contract, instrument, release or other agreement or document created pursuant to or as contemplated under this Plan, each of (a) the First Lien Notes, (b) the Second Lien Notes, (c) the Equity Interests in the Debtors and (d) any other notes, bonds, indentures, certificates or other instruments or documents evidencing or creating any indebtedness of or ownership interest in the Debtors or giving rise to any Claims or Equity Interests shall be cancelled and deemed terminated and satisfied and discharged solely with respect to the Debtors, and the holders thereof shall have no further rights or entitlements in respect thereof against the Debtors or their Estates, except the rights to receive the distributions, if any, to which the holders thereof are entitled under this Plan. Notwithstanding anything herein to the contrary, the applicable provisions of the First Lien Indenture shall continue in effect

solely for the purposes of permitting the First Lien Indenture Trustee to: (i) make the distributions to be made to holders of Allowed First Lien Note Claims as contemplated by Section 3.02(c) herein; and (ii) maintain any rights the First Lien Indenture Trustee may have for any fees, costs, expenses, and indemnification under the Indentures or other agreements until all such fees, costs, and expenses are paid.

## Section 5.13.   General Settlement of Claims

Unless otherwise set forth in this Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, on the Effective Date, the provisions of this Plan constitute a good-faith compromise and settlement of all Claims against and Equity Interests in the Debtors relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim, or any Distribution to be made on account of such Allowed Claim. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors and their Estates and is fair, equitable and reasonable. In the event that, for any reason, the Confirmation Order is not entered or the Effective Date does not occur, the Debtors, the Creditors Committee and the Prepetition Noteholders reserve all of their respective rights with respect to all disputes resolved and settled under this Plan.

## Section 5.14.   Section 1146(a) Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, all transfers of property under this Plan shall not be subject to any stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment. The Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax, fee, or governmental assessment.

## ARTICLE VI
## TREATMENT OF EXECUTORY CONTRACTS AND LEASES

## Section 6.01.   Rejection of Executory Contracts and Unexpired Leases

Except as otherwise expressly provided in (a) this Plan, (b) the Schedule of Assumed Executory Contracts and Unexpired Leases or (c) any other filing made before the Confirmation Hearing, including, without limitation, the Asset Purchase Agreements, all Executory Contracts and Unexpired Leases shall be deemed automatically rejected as of the Effective Date in accordance with, and subject to the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code; provided, however, that this Section 6.01 shall not apply to any Executory Contract or Unexpired Lease that expired or was terminated prior to the Petition Date pursuant to its terms.

**Section 6.02. Treatment of Assumed Executory Contracts and Unexpired Leases; Assignment**

Except as otherwise expressly provided in (a) the Plan Supplement, or (b) any other filing made before the Confirmation Hearing, all Executory Contracts and Unexpired Leases listed on the Schedule of Assumed Executory Contracts and Unexpired Leases shall be assumed by the applicable Debtor(s) as of the Effective Date in accordance with, and subject to the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code and assigned to the Creditor Trust; provided, however, that this Section 6.02 shall not apply to any Executory Contract and Unexpired Lease of a Debtor that expired or terminated pursuant to its own terms prior to the Petition Date.

Any Executory Contract or Unexpired Lease that is assumed by any of the Debtors or the Creditor Trustee, if not expressly assigned to a third party previously in these Chapter 11 Cases, will be deemed assigned to the Creditor Trust pursuant to section 365 of the Bankruptcy Code. If an objection to a proposed assumption, assumption or assignment, or Cure Cost is not resolved in favor of the Debtors or Creditor Trust before the Effective Date, the applicable executory contract may be designated by the Debtors or the Creditor Trust for rejection within five (5) days after the entry of the order of the Bankruptcy Court resolving the matter against the Debtors or Creditor Trust. Such rejection shall be deemed effective as of the Effective Date.

**Section 6.03.  Effect of Confirmation Order on Assumption/Rejection**

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order of the Bankruptcy Court pursuant to sections 365 and 1123(b) of the Bankruptcy Code approving the assumption or rejection, as applicable, of the Executory Contracts and Unexpired Leases as of the Effective Date and determining that: (a) with respect to such rejections, such rejected Executory Contracts and Unexpired Leases are burdensome and that the rejection therein is in the best interests of the Estates; and (b) with respect to such assumptions, to the extent necessary, that the applicable Debtor has (i) cured any default, (ii) compensated the counterparty for any actual pecuniary loss resulting from any default, and (iii) provided adequate assurance of future performance under such Executory Contract or Unexpired Lease of the applicable Debtor. Assumption of any Executory Contract or Unexpired Lease of any Debtor, and satisfaction of the Cure Costs, shall result in the full discharge, release and satisfaction of any claims or defaults, whether monetary or nonmonetary, arising under any assumed Executory Contract or Unexpired Lease of such Debtor at any time before the date such Executory Contract or Unexpired Lease is assumed. Each Executory Contract and Unexpired Lease assumed pursuant to this Plan or Bankruptcy Court order shall vest in and be fully enforceable by the applicable Debtor. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

## Section 6.04.   Cure of Defaults and Objections to Assumption

Except as may be otherwise agreed to by the parties, within seven (7) days after the Effective Date, the Creditor Trustee shall pay any undisputed Cure Costs to the counterparties to any assumed Executory Contracts and Unexpired Leases. The Cure Costs for the contracts to be assumed will be included in the Schedule of Assumed Executory Contracts and Unexpired Leases. If there are no Cure Costs listed for an Executory Contract or Unexpired Lease, then the proposed Cure Costs shall be $0.00. Such amount shall be deemed full payment of such obligations under section 365(b) of the Bankruptcy Code, unless, on or before the Voting Deadline, the contract counter-party files an objection disputing: (a) the amount of any Cure Costs, (b) the ability of the Debtors or any assignee to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (c) any other matter pertaining to assumption. The disputed Cure Costs required by section 365(b)(1) of the Bankruptcy Code shall be made only after entry of a Final Order resolving the dispute and approving the assumption.

## Section 6.05.   Rejection Damages Claims and Objections to Rejection

Claims arising out of the rejection of Executory Contract or Unexpired Leases pursuant to this Plan must be filed and served pursuant to the procedures specified in the Bar Date Notice, or another order of the Bankruptcy Court, no later than thirty (30) days after the Effective Date. Holders of any Claim not filed within such time will be forever barred from asserting such Claim against the Debtors, their Estates, or their respective successors or their respective properties. Unless otherwise ordered by the Bankruptcy Court or specified in this Plan, all Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be treated as General Unsecured Claims under this Plan; provided, however, if the holder of an Allowed Claim for rejection damages has an unavoidable security interest in any Collateral to secure obligations under such rejected contract or lease, the Allowed Claim for rejection damages shall be treated as an Other Secured Claim against the particular Debtor in question to the extent of the value of such holder's interest in the Collateral, with the deficiency, if any, treated as a General Unsecured Claim against the particular Debtor in question.

## Section 6.06.   Preexisting Obligations Under Executory Contracts and Unexpired Leases

The Debtors or the Creditor Trustee, as applicable, reserve the right to assert that rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of obligations owed to the Debtors or the Creditor Trust, as applicable, under such contracts or leases, prior to the rejection of such contracts or leases. Notwithstanding any nonbankruptcy law to the contrary, the Debtors or the Creditor Trustee, as applicable, expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors or Creditor Trustee, as applicable, from counterparties to rejected Executory Contracts and Unexpired Leases.

**Section 6.07.   Modifications, Amendments, Supplements, Restatements or Other Agreements**

Unless otherwise provided in this Plan, each assumed or assumed and assigned Executory Contract and Unexpired Lease shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under this Plan or otherwise.

Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

**Section 6.08.   Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors or the Creditor Trustee, as applicable, that any such contract or lease is in fact an Executory Contract or Unexpired Lease, or that the Debtors or the Creditor Trustee, as applicable, have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of rejection, the Debtors or the Creditor Trustee, as applicable, shall have ninety (90) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided herein.

# ARTICLE VII
# PROVISIONS GOVERNING DISTRIBUTIONS

**Section 7.01.   Method of Distributions**

The Creditor Trustee shall act as Distribution Agent or, in its sole discretion, enter into an agreement with a third party Distribution Agent to facilitate the distributions required hereunder. The Debtors or, after the Effective Date the Creditor Trustee shall make all distributions required to be made under this Plan to holders of Allowed Claims. The Creditor Trustee or, if applicable, the Debtors shall establish reserves for Disputed Claims, or defer or delay distributions to holders of Allowed Claims to ensure an equitable and ratable distribution to holders in accordance with the terms of this Plan.

To the extent the Creditor Trustee does determine to utilize a Distribution Agent to facilitate the distributions under this Plan to holders of Allowed Claims, any such Distribution Agent would first be required to: (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under this Plan; and (c) waive any right or ability to setoff, deduct from or assert any Lien or encumbrance against the distributions required under this Plan to be distributed by such Distribution Agent.

The Creditor Trustee shall pay to the Distribution Agent all reasonable and documented fees and expenses of the Distribution Agent without the need for any approvals, authorizations, actions, or consents. The Distribution Agent shall submit detailed invoices to the Creditor Trustee for all fees and expenses for which the Distribution Agent seeks reimbursement and the Creditor Trustee shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Creditor Trustee deems to be unreasonable. In the event that the Creditor Trustee objects to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Creditor Trustee and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees or expenses. In the event that the Creditor Trustee and the Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

## Section 7.02.   Delivery of Distributions

Distributions to holders of Allowed Claims shall be made at the address of the holder of such Claim as indicated in the Claims Register as of the Distribution Record Date. A Distribution Agent shall have no obligation to recognize the transfer of or sale of any Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute only to those holders of Allowed Claims who are holders as of the close of business on the Distribution Record Date.

## Section 7.03.   Amount of Distributions

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim to the extent payable in accordance with this Plan. The Creditor Trustee will not make distributions upon a Claim held by a party against whom the Creditor Trustee asserts any avoidance action until resolution of the avoidance action by settlement or judgment or as otherwise provided by Bankruptcy Court order.

## Section 7.04.   Special Provision Relating to Distributions to Holders of Allowed First Lien Note Claims

Notwithstanding any provision of this Plan or Creditor Trust Agreement to the contrary, all Distributions to holders of Allowed First Lien Note Claims, whether pursuant to this Plan or Creditor Trust Agreement, shall be made to the First Lien Indenture Trustee, who in turn shall distribute the same pursuant to the First Lien Indenture to the holders of First Lien Notes as of the Distribution Record Date, after paying or reserving for any fees, costs, expenses and indemnification to which the First Lien Indenture Trustee is entitled to under the First Lien Indenture.

## Section 7.05.   No Fractional or De Minimis Distributions

Notwithstanding anything contained herein to the contrary, payments of fractional dollars will not be made. Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, the actual payment made will reflect a rounding down of such fractions.

The Creditor Trustee or the Distribution Agent, as applicable, shall not be required to make any payment of less than $20.00 on any distribution.

**Section 7.06.   Undeliverable Distributions**

      (a)      <u>Holding of Undeliverable Distributions</u>

If any distribution, including a partial or interim distribution, to a holder of an Allowed Claim is returned to the Creditor Trustee or the Distribution Agent as undeliverable, no further distributions shall be made to such holder unless and until such the Creditor Trustee or Distribution Agent is notified in writing of such holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such holder as soon as practicable. Undeliverable Distributions shall remain in the possession of the Creditor Trustee or Distribution Agent until such time as a distribution becomes deliverable, and shall not be supplemented with any interest, dividends or other accruals of any kind.

      (b)      <u>Failure to Claim Undeliverable Distributions</u>

Any holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an Undeliverable Distribution within one hundred eighty (180) days after the distribution is distributed shall be deemed to have waived its Claim for such Undeliverable Distribution and shall be forever barred from asserting any such Claim against the Debtors' Estates or their property. In such cases, notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary, any Cash held for distribution on account of such Undeliverable Distribution shall be property of the Creditor Trust, free of any restrictions thereon, and shall be used for the administration of the Creditor Trust or otherwise re-distributed as a Remaining Creditor Trust Asset. Nothing contained in this Plan shall require the Debtors, the Creditor Trustee or the Distribution Agent to attempt to locate any holder of an Allowed Claim following one hundred eighty (180) days after the distribution is distributed.

**Section 7.07.   Time Bar to Cash Payments**

Checks issued on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance therein. Requests for reissuance of any check shall be made in writing directly to the Creditor Trustee or the Distribution Agent, as applicable, by the holder of the Allowed Claim with respect to which such check originally was issued. Any Claim in respect of such a voided check shall be made in writing on or before the later of one hundred eighty (180) days after the Effective Date or ninety (90) days after the date of issuance of such check. After such date, all Claims in respect of void checks shall be discharged and forever barred and the distribution on account of such Claims shall be treated in accordance with Section 7.06 herein.

**Section 7.08.   Means of Cash Payments**

Any Cash payment to be made pursuant to this Plan will be made in U.S. dollars by checks drawn on or by wire transfer from a domestic bank selected by the Creditor Trustee or the Distribution Agent, as applicable. No post-Effective Date interest shall be paid on Cash distributions hereunder.

**Section 7.09.   Foreign Currency Exchange Rates**

As of the Effective Date, any Claim asserted in currency(ies) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the mid-range spot rate of exchange for the applicable currency as published in *The Wall Street Journal*, National Edition, the day after the Petition Date.

**Section 7.10.   Setoffs**

The Creditor Trustee or the Distribution Agent, as applicable, may, pursuant to section 553 of the Bankruptcy Code and applicable non-bankruptcy law, set off against any Allowed Claim against the Debtors and the distributions to be made pursuant to this Plan on account of such Claim (before any distribution is made on account of such Claim), the claims, rights and Causes of Action of any nature that the Debtors or the Creditor Trust, as applicable, may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release of any such claims, rights and Causes of Action that the Debtors or the Creditor Trust may possess against such holder.

**Section 7.11.   Claims Paid or Payable by Third Parties**

A Claim shall be reduced in full and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to, or action, order or approval of, the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Creditor Trust, as applicable, or a Distribution Agent. To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Creditor Trust, as applicable, or a Distribution Agent on account of such Claim, such holder shall repay, return or deliver any distribution held by or transferred to the holder to the Creditor Trust to the extent the holder's total recovery on account of such Claim from the third party and under this Plan exceeds the total amount of such Claim as of the date of any such distribution under this Plan.

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim, then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VIII
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

**Section 8.01.   Objections to Claims**

After the Effective Date, the Creditor Trustee shall have the exclusive authority to file objections to all Claims, and the exclusive authority to settle, compromise, or litigate to judgment any objections to Claims that he or she files. Subject to the terms of the Creditor Trust

Agreement, the Creditor Trustee may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Creditor Trustee also shall have the right to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

**Section 8.02.   Objection Deadline**

As soon as practicable, but no later than the Claims Objection Deadline, the Creditor Trustee may file objections with the Bankruptcy Court and serve such objections on the Creditors holding the Claims to which such objections are made. Nothing contained herein, however, shall limit the right of the Creditor Trustee to object to Claims, if any, filed or amended after the Claims Objection Deadline. The Claims Objection Deadline may be extended by the Bankruptcy Court upon motion by the Debtors or Creditor Trustee, without notice or hearing.

For the avoidance of doubt, no Claim is or shall be deemed Allowed until the later of the Claims Objection Deadline of the expiration of some other applicable period of limitation fixed by the Bankruptcy Code, Bankruptcy Rules, or Bankruptcy Court, unless otherwise ordered by a Final Order of the Bankruptcy Court.

**Section 8.03.   Estimation of Claims**

The Creditor Trustee or, if applicable, the Debtors may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Bankruptcy Code section 502(c), regardless of whether the Creditor Trustee or any Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Creditor Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.

**Section 8.04.   No Distributions on Disputed Claims**

Notwithstanding any provision in this Plan to the contrary, no distributions, partial or otherwise, shall be made with respect to a Disputed Claim until such Claim becomes an Allowed Claim. Subject to the provisions of this Plan, after a Disputed Claim becomes an Allowed Claim, the holder of such an Allowed Claim will receive all distributions to which such holder is then entitled under this Plan on the next scheduled distribution date or as the Creditor Trustee otherwise determines in its reasonable discretion. No post-Effective Date interest shall be paid on distributions hereunder. If a Creditor incorporates more than one Claim in a Proof of Claim then: (a) such Claims will be considered one Claim for purposes of this Plan, and (b) no such Claim will be bifurcated into an Allowed portion and a Disputed portion.

**Section 8.05.   Disputed Claims Reserves from GUC Trust Assets**

On the Effective Date, one or more reserves may be established from the GUC Trust Assets for the benefit of holders of General Unsecured Claims that are Disputed, if any. As the Disputed Claims are resolved, the Creditor Trustee or the Distribution Agent, as applicable, shall make distributions to holders of any portion of such Claims that are Allowed. Following the completion of all such distributions in full, any funds remaining in any reserve(s) shall become a GUC Trust Asset and distributed in accordance with Section 3.02(e) herein; provided, however, that to the extent such distributions would result in total recoveries of holders of Allowed General Unsecured Claims in excess of the total amount of such Claims, the excess shall become a Noteholder Trust Asset and distributed in accordance with Section 3.02(c) herein.

**Section 8.06.   Reduction of Claims**

Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtors prior to the Effective Date, including pursuant to orders of the Bankruptcy Court. To the extent such payments are not reflected in the Schedules, such Schedules will be deemed amended and reduced to reflect that such payments were made. Nothing in this Plan shall preclude the Creditor Trustee from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Effective Date.

**Section 8.07.   Recoupment**

Any holder of a Claim shall not be entitled to recoup any Claim against any claim, right, or cause of action of the Debtors or the Creditor Trustee, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, or intends to preserve any right of recoupment.

## ARTICLE IX
## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THIS PLAN

**Section 9.01.   Conditions Precedent to Confirmation**

It shall be a condition to Confirmation that the following conditions have been satisfied or waived pursuant to Section 9.04 herein:

(i)     the Disclosure Statement Order, in form and substance acceptable to the Debtors, the Creditors Committee and the Ad Hoc Noteholder Group, shall have been entered by the Bankruptcy Court on the docket of the Chapter 11 Cases, and such order shall not be subject to a stay;

(ii)    the Confirmation Order shall be in form and substance reasonably acceptable to the Debtors, the Creditors Committee and the Ad Hoc Noteholder Group, which order shall include a finding of fact that the

Debtors, and their respective present members, officers, managers, employees, advisors, attorneys and agents, acted in good faith within the meaning of and with respect to all of the actions described in section 1125(e) of the Bankruptcy Code and are therefore not liable for the violation of any applicable law, rule, or regulation governing such actions; and

(iii)    this Plan, including any modifications or alterations thereof, and all documents and agreements related to this Plan, including the Plan Supplement, shall be filed in form and substance reasonably acceptable to the Debtors, the Creditors Committee and the Ad Hoc Noteholder Group.

For the avoidance of doubt, the Disclosure Statement Order and the Confirmation Order may be combined and entered concurrently.

## Section 9.02.  Conditions Precedent to the Effective Date

It shall be a condition to occurrence of the Effective Date that the following conditions shall have been satisfied or waived pursuant to Section 9.04 herein:

(i)    all conditions precedent to Confirmation have been satisfied or waived;

(ii)    the Confirmation Order shall have been entered by the Bankruptcy Court on the docket of the Chapter 11 Cases, and such order shall not be subject to a stay;

(iii)    any modifications or alterations to this Plan or Plan Supplement shall be reasonably acceptable to the Creditors Committee and the Ad Hoc Noteholder Group;

(iv)    the Creditor Trust shall have been formed, and the Creditor Trust Agreement shall have been executed and become enforceable;

(v)    the appointment of the Creditor Trustee shall have been confirmed pursuant to an order of the Bankruptcy Court, which may be the Confirmation Order, and such order shall not be subject to a stay; and

(vi)    any outstanding fees or expenses incurred by the Ad Hoc Noteholder Group or the First Lien Indenture Trustee in connection with the Chapter 11 Cases, this Plan, the creation of the Creditor Trust, or Confirmation, including fees and expenses contemplated in the Stipulation, shall have been paid in full.

## Section 9.03.  Effect of Non-Occurrence of Conditions to Confirmation or Conditions Precedent to the Effective Date

If the conditions in Section 9.01 and Section 9.02 herein are not satisfied for this Plan, or if the Confirmation Order is vacated, this Plan shall be null and void in all respects and nothing

contained in this Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors; (b) prejudice in any manner the rights of the Debtors, or any other Person or Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors or any other Person or Entity in any respects.

**Section 9.04.  Waiver of Conditions Precedent**

The Debtors, with the prior written consent of the Ad Hoc Noteholder Group, may waive any of the conditions precedent set forth in Section 9.01 and Section 9.02 herein in whole or in part at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate this Plan.

**ARTICLE X**
**EFFECT OF CONFIRMATION OF THIS PLAN**

**Section 10.01. Certain Releases by the Debtors**

**Except as otherwise expressly provided in this Plan or the Confirmation Order, and to the fullest extent authorized by applicable law, for good and valuable consideration, the adequacy of which is hereby confirmed, the Released Parties are deemed released and discharged by the Debtors, their Estates and any Person or Entity seeking to exercise the rights of the Debtors or their Estates from any and all claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative claims, asserted or that could possibly have been asserted directly or indirectly on behalf of the Debtors, their Estates or their Affiliates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted on behalf of the Debtors, their Estates or their Affiliates (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, their Estates or their Affiliates, the conduct of the Debtors' businesses, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Disclosure Statement or Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the Disclosure Statement, or this Plan, the filing and prosecution of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, the business or contractual arrangements between the Debtors, their Estates or their Affiliates, on the one hand, and any Released Party, on the other hand, prepetition contracts and agreements with one or both Debtors, or any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date; provided that to the extent that a claim or Cause of Action is determined by a Final Order to have resulted from fraud, gross negligence or willful misconduct of a Released Party, such claim or Cause of Action shall**

37

not be so released against such Released Party. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release (i) any obligations arising on or after the Effective Date of any party under this Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan; and (ii) the right of the Debtors or the Creditor Trustee to object to Claims filed by any Person against any Debtor or an Estate, or to assert counterclaims or defenses in respect of such Claims, including rights of setoff, refund, recoupment or other adjustments as provided for herein.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this Section 10.01, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by this Section 10.01; (c) in the best interests of the Debtors, their Estates and all holders of Claims and Equity Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity asserting any claim or Cause of Action released by this Section 10.01.

Section 10.02. Certain Voluntary Releases by Holders of Claims

Except as otherwise expressly provided in this Plan or the Confirmation Order, and to the fullest extent authorized by applicable law, for good and valuable consideration, the adequacy of which is hereby confirmed, the Released Parties are deemed released and discharged by (a) each other Released Party and (b) the Releasing Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative claims, asserted or that could possibly have been asserted directly or indirectly on behalf of the Releasing Parties or their Affiliates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted on behalf of a Released Party or a Releasing Party or any of its Affiliates (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or other Entity, based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, their Estates or their Affiliates, the conduct of the Debtors' businesses, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Disclosure Statement or Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the Disclosure Statement, or this Plan, the filing and prosecution of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, the business or contractual arrangements between the Debtors, their Estates or their Affiliates, on the one hand, and any Released Party, on the other hand, prepetition contracts and agreements with one or both Debtors, or any other act or

omission, transaction, agreement, event, or other occurrence taking place before the Effective Date; **provided** that to the extent that a claim or Cause of Action is determined by a Final Order to have resulted from fraud, gross negligence or willful misconduct of a Released Party, such claim or Cause of Action shall not be so released against such Released Party. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release (i) any obligations arising on or after the Effective Date of any party under this Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan; and (ii) the right of the Debtors or the Creditor Trustee to object to Claims filed by any Person against any Debtor or an Estate, or to assert counterclaims or defenses in respect of such Claims, including rights of setoff, refund, recoupment or other adjustments as provided for herein. Notwithstanding anything in the above and in this Plan, nothing in the above paragraph or this Plan shall impair the Creditor Trust in bringing any claim or asserting any cause of action against any former officers, directors, managers, agents, employees, or fiduciaries of any of the Debtors.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in this Section 10.02, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by this Section 10.02; (c) in the best interests of the Debtors, their Estates and all holders of Claims and Equity Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity asserting any claim or Cause of Action released by this Section 10.02.

Section 10.03. Exculpation

The Exculpated Parties SHALL NOT BE LIABLE FOR ANY Cause of Action arising in connection with or out of the good faith solicitation of acceptances of this Plan in accordance with section 1125(e) of the Bankruptcy Code. All holders of Claims and Equity Interests are enjoined from asserting or prosecuting any Claim or Cause of Action against the Exculpated Parties as to which the Exculpated Parties have been exculpated pursuant to the preceding sentence.

Section 10.04. Permanent Injunction

Except as otherwise expressly provided in this Plan or the Confirmation Order, and to the fullest extent authorized by applicable law, for good and valuable consideration, the adequacy of which is hereby confirmed, all Persons who have held, hold or may hold Claims or Causes of Action against, or Equity Interests in, the Debtors are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claims or Causes of Action in any venue other than the Bankruptcy Court, (b) the enforcement, attachment, collection, or recovery by any manner or means of judgment, award, decree or order against the Debtors, the Creditor Trust, or their assets on account of any such

Claims or Causes of Action in any venue other than the Bankruptcy Court; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Creditor Trust or their assets on account of any such Claims or Causes of Action in any venue other than the Bankruptcy Court; and (d) asserting any right of setoff, recoupment or subrogation of any kind against any obligation due from the Debtors, the Creditor Trust, or their assets on account of any such Claims or Causes of Action in any venue other than the Bankruptcy Court. The foregoing injunction will extend to successors of the Debtors and the Creditor Trust, and their respective property and interests in property.

In addition, except as otherwise provided herein or in the Confirmation Order, from and after the Effective Date and to the fullest extent authorized by applicable law, all Entities are, to the fullest extent provided under section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined and forever barred from taking any of the following actions against, as applicable, the Released Parties or the Exculpated Parties and their respective properties and Assets: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Claims; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order on account of or in connection with or with respect to any such Claims; (c) creating, perfecting, or enforcing any encumbrance of any kind on account of or in connection with or with respect to any such Claims; (d) asserting any right of setoff, subrogation, or recoupment of any kind on account of or in connection with or with respect to any such Claims unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Claims, Causes of Action or the like that are released, exculpated or settled pursuant to this Plan.

Section 10.05.  Term of Injunctions or Stay

Unless otherwise provided in this Plan or Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code sections 105 or 362 or otherwise, and in existence on the Confirmation Date (excluding any injunctions or stays contained in this Plan or Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or Confirmation Order shall remain in full force and effect in accordance with their terms.

Section 10.06.  Integral to Plan

Each of the injunctions provided in this Plan is an integral part of this Plan and is essential to its implementation. Each of the other Persons protected by the injunctions set forth in this Plan shall have the right to seek the enforcement of such injunctions.

Section 10.07.  Binding Effect

Notwithstanding Bankruptcy Rule 3020(e), 6004(g) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Creditor

Trustee and any and all holders of Claims and Equity Interests (irrespective of whether holders of such Claims or Equity Interests are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

**Section 10.08.  Asset Purchase Agreements**

Notwithstanding anything to the contrary contained herein, the terms of the Asset Purchase Agreements shall remain unaffected. Notwithstanding anything to the contrary contained herein, the Creditor Trust shall succeed to all rights of the Debtors as set forth in the Asset Purchase Agreements and the related sale orders entered by the Bankruptcy Court.

**Section 10.09. Creditors Committee Challenge Rights**

Consistent with the Stipulation, the Creditors Committees' rights under the Final Order approving the DIP Credit Agreement regarding challenges specified in paragraph 17(b) of the Final DIP Order or paragraph 2 of the Stipulation and other actions against the Prepetition Noteholders are released as part of this Plan.

## ARTICLE XI
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THIS PLAN

**Section 11.01.  Modification of this Plan**

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan before the entry of the Confirmation Order, subject to the limitations set forth herein, including that any such modifications must be reasonably acceptable to the Creditors Committee and the Ad Hoc Noteholder Group. Subject to the foregoing limitations, after entry of the Confirmation Order, the Debtors may amend or modify this Plan, and in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

Entry of a Confirmation Order shall mean that all modifications or amendments to this Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**Section 11.02.  Revocation or Withdrawal this Plan**

The Debtors reserve the right to revoke or withdraw this Plan with respect to any Debtor(s) before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw this Plan with respect to any Debtor(s), or if Confirmation or Consummation does not occur, then: (a) this Plan will be null and void in all respects; (b) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant hereto shall be

null and void in all respects; and (c) nothing contained in this Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors; (ii) prejudice in any manner the rights of the Debtors or any other Entity (including, without limitation, the other Debtors); or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtors or any other Entity (including, without limitation, the other Debtors) in any respects.

**ARTICLE XII**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date for this Plan, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases after the Effective Date as legally permissible, including jurisdiction to:

(i)     allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim  and the resolution of any and all objections to the allowance or priority of Claims;

(ii)    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date;

(iii)   resolve any matters related to the assumption or rejection of any Executory Contract or Unexpired Lease;

(iv)    resolve any disputes that may arise between the Creditor Trustee and the Distribution Agent, if one is appointed;

(v)     ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(vi)    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors;

(vii)   enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with this Plan and the Disclosure Statement;

(viii)  enter and enforce any order related to or otherwise in connection with any sale of property by the Debtors pursuant to sections 363 or 1123 of the Bankruptcy Code;

(ix)    decide or resolve any Causes of Action arising under the Bankruptcy Code, including, without limitation, Avoidance Actions and Claims under sections 362, 510, 542 and 543 of the Bankruptcy Code;

(x)    resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan, or any Person's or Entity's obligations incurred in connection with this Plan;

(xi)    issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity (including, in each case and without limitation, the other Debtors) with Consummation or enforcement of this Plan, except as otherwise provided herein;

(xii)    resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in ARTICLE X of this Plan and enter such orders as may be necessary or appropriate to implement such releases, injunction and other provisions;

(xiii)    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(xiv)    determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement and the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document created in connection with this Plan or the Disclosure Statement;

(xv)    enter order(s) or Final Decree(s) concluding the Chapter 11 Cases;

(xvi)    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(xvii)    consider any modifications of this Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order; and

(xviii)    hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

**Section 13.01. Tax Returns**

Within ninety (90) days following the end of each calendar year, the Creditor Trustee shall submit to each Creditor Trust Beneficiary appearing on its records during such year a separate statement setting forth the information necessary for such Creditor Trust Beneficiary to

determine its share of items of income, gain, loss, deduction, or credit. The Creditor Trustee will in good faith value the Creditor Trust Assets. The Creditor Trustee shall make the respective values available from time to time, to the extent relevant, and such values shall be used consistently by all parties for U.S. federal income tax purposes.

## Section 13.02. Compliance with Tax Requirements

In connection with this Plan, to the extent applicable, the Creditor Trustee shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant thereto shall be subject to such withholding and reporting requirements. Any amounts so withheld from any payment made under this Plan shall be deemed paid to the holder of the Allowed Claim subject to withholding. The Creditor Trustee or the Distribution Agent may require that each holder complete the appropriate Internal Revenue Service Form W-8BEN, Internal Revenue Service Form W-8BEN-E, or Internal Revenue Service Form W-9, or successor form as applicable, to each holder provided, however, that the sole remedy in the event a holder fails to comply with such a request within six months shall be to make a proper withholding of tax to the extent required by applicable law. Notwithstanding any provision in this Plan to the contrary, the Creditor Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of a distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes with respect to such distribution, or establishing any other mechanisms it believes are reasonable or appropriate. If the Creditor Trustee or the Distribution Agent fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse the Creditor Trustee or Distribution Agent. The Creditor Trust reserves the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens and encumbrances.

## Section 13.03. Allocations

Unless otherwise provided in this Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount (as determined for U.S. federal income tax purposes) of such Allowed Claims, and then, to the extent the consideration exceeds the principal amount of such Allowed Claims, to any portion of such Allowed Claims for accrued but unpaid interest.

## Section 13.04. Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan. The Debtors and all holders of Claims and Equity Interests receiving distributions pursuant to this Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan. The Debtors are authorized to perform their outstanding obligations, if any, under the Asset Purchase Agreements.

**Section 13.05. Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**Section 13.06.   Reservation of Rights**

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order. Neither this Plan, any statement or provision contained in this Plan, nor any action taken or not taken by any Debtor or the Creditor Trustee, with respect to this Plan, the Disclosure Statement, the Confirmation Order or the Plan Supplement, shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or the Creditor Trust, as applicable, with respect to the holders of Claims or Equity Interests prior to the Effective Date.

**Section 13.07. Exclusivity Period**

The Debtors shall retain the exclusive right to amend or modify this Plan, and to solicit acceptances of any amendments to or modifications of this Plan, through and until the earlier of (a) the Effective Date or (b) the expiration of the Debtors' exclusive period to solicit acceptances of this Plan under Bankruptcy Code section 1121(d).

**Section 13.08.   Notices**

Except as otherwise set forth in this Plan, all notices or requests in connection with this Plan shall be in writing and will be deemed to have been given when received by personal delivery, overnight courier or first class mail and addressed to:

| | |
|---|---|
| **If to the Debtors:** | Bracewell LLP<br>711 Louisiana Street<br>Suite 2300<br>Houston, Texas  77002<br>Attn: Jason Cohen |
| **If to the Creditor Trustee** | [address]<br>Attn: [name] |
| **If to the Creditors Committee:** | Pillsbury Winthrop Shaw Pittman<br>909 Fannin St.<br>Suite 2000<br>Houston, TX 77010<br>Attn: Hugh Massey Ray, III |
| **If to the Ad Hoc Noteholder Group:** | Paul, Weiss, Rifkind, Wharton &<br>Garrison LLP<br>1285 Avenue of the Americas |

45

|  | New York, NY 10019<br>Attn: Brian S. Hermann and Lauren<br>Shumejda |
|--|--|

## Section 13.09. Entire Agreement

Except as otherwise indicated, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan. To the extent the Confirmation Order is inconsistent with this Plan, the Confirmation Order shall control for all purposes.

## Section 13.10.   Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Claims and Solicitation Agent's website at www.kccllc.net or the Bankruptcy Court's electronic filing website at https://ecf.txsb.uscourts.gov (account required).

## Section 13.11.   Severability

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to this Plan; and (c) non-severable and mutually dependent.

## Section 13.12.   Request for Expedited Tax Review

The Creditor Trustee shall have the right to request an expedited determination under Bankruptcy Code section 505(b) with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

## Section 13.13.   Dissolution of the Creditors Committee

On the Effective Date, the Creditors Committee shall dissolve and the members of the Creditors Committee shall be released and discharged from all authority, duties, responsibilities and obligations related to and arising from and in connection with these Chapter 11 Cases.

Neither the Debtors nor the Creditor Trust nor any other party shall be responsible for fees and expenses incurred by the Creditors Committee after the Effective Date.

**Section 13.14.   No Admissions**

Notwithstanding anything herein to the contrary, nothing in this Plan shall be deemed as an admission by the Debtors with respect to any matter set forth herein, including liability on any Claim.

**Section 13.15.   Substantial Consummation**

On the Effective Date, this Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

Dated: December 19, 2016
Houston, Texas

Respectfully submitted,

**LINC USA GP**

By: _____
Name:  Michael Mapp
Title:  President

**LINC ENERGY FINANCE (USA) INC.**

By: _____
Name:  Michael Mapp
Title:  President

**LINC GULF COAST PETROLEUM, INC.**

By: _____
Name:  Michael Mapp
Title:  President

**LINC ENERGY PETROLEUM (LOUISIANA), LLC**

By: _____
Name:  Michael Mapp
Title:  President

**LINC ALASKA RESOURCES, LLC**

By: _____
Name:  Michael Mapp
Title:  President

**PAEN INSULA HOLDINGS, LLC**

By: _____
Name: Michael Mapp
Title: President

**LINC ENERGY PETROLEUM (WYOMING), INC.**

By: _____
Name: Michael Mapp
Title: President

**Exhibit B**

**Liquidation Analysis**

| | Notes | Net Book Value | As of January 31, 2017 Percentage Recovery Low Case | High Case | Estimated Recovery Low Case | High Case |
|---|---|---|---|---|---|---|
| **Cash and Bonding** | | | | | | |
| Cash and cash equivalents | 1 | 7.50 | 100% | 100% | 7.50 | 7.50 |
| Cash Collateral Held by Sureties | 2 | 10.00 | 80% | 100% | 8.00 | 10.00 |
| **Total Cash and Bonding** | | 17.50 | | | 15.50 | 17.50 |
| **Properties** | | | | | | |
| Gulf Coast Properties | 3 | 125.46 | 27% | 27% | 34.30 | 34.30 |
| Wyoming Properties | 4 | 17.57 | 8% | 8% | 1.41 | 1.41 |
| Alaska Properties | 5 | 121.11 | 66% | 66% | 80.00 | 80.00 |
| **Total Properties** | | 264.14 | | | 115.70 | 115.70 |
| **Equipment and Other Assets** | | | | | | |
| Buffalo Rig | 6 | 1.87 | 6% | 16% | 0.10 | 0.30 |
| Misc casing/pipes | 7 | 0.03 | 741% | 1019% | 0.20 | 0.28 |
| Office furniture and equipment | 8 | 0.08 | 2% | 10% | 0.00 | 0.01 |
| **Total Equipment and Other Assets** | | 1.97 | | | 0.31 | 0.58 |
| **Total assets** | | **283.61** | | | | |
| **Estimated Gross Proceeds from Liquidation of Assets** | | | | | $   131.51 | $   133.79 |

**Recovery Analysis**

| | | Chapter 7 | | | Chapter 11 | | | Notes |
|---|---|---|---|---|---|---|---|---|
| | | Low Case | High Case | | Low Case | High Case | | |
| **Estimated Gross Proceeds from Liquidation of Assets** | | **131.51** | **133.79** | | **131.51** | **133.79** | | |
| | | | | | | | | |
| **Liquidation Costs** | | | | | | | | |
| Wind Down Costs | | 0.50 | 0.40 | | 0.50 | 0.40 | | 9 |
| Legal and Professional Fees | | 2.50 | 2.00 | | 0.50 | 0.25 | | 10 |
| Chapter 7 Trustee Fees | | 3.95 | 2.68 | | - | - | | 11 |
| Total Liquidation Costs | | 6.95 | 5.08 | | 1.00 | 0.65 | | |
| Estimated Proceeds After Wind Down and Trustee Expenses | | 124.56 | 128.71 | | 130.51 | 133.14 | | |
| | | | | | | | | |
| **Priority and Administrative Claims** | | | | | | | | |
| Debtor-In-Possession Credit Facility | | - | - | | - | - | | 12 |
| Other Priority Claims | | 0.60 | 0.30 | | 0.60 | 0.30 | | 13 |
| Estimated Tax Claims | | 0.10 | 0.10 | | 0.10 | 0.10 | | 14 |
| Administrative Claims | | 1.78 | 1.38 | | 1.78 | 1.38 | | 15 |
| Total Priority and Admin | | 2.48 | 1.78 | | 2.48 | 1.78 | | |
| | | | | | | | | |
| Estimated Proceeds After DIP, Priority and Admin Claims | | 122.08 | 126.93 | | 128.03 | 131.36 | | |

| | | Recovery | % | Recovery | % | Recovery | % | Recovery | % |
|---|---|---|---|---|---|---|---|---|---|
| Secured Claims - As of Petition Date | | | | | | | | | |
| | | | | | | | | | |
| Other Secured Claims | | 2.60 | 100.0% | 0.36 | 100.0% | 2.60 | 100.0% | 0.36 | 100.0% |
| | | | | | | | | | |
| Estimated Proceeds After Other Secured Claims | | 119.48 | | 126.58 | | 125.43 | | 131.00 | |
| | | | | | | | | | |
| First Lien Note Claims | 132.14 | 119.48 | 90.4% | 126.58 | 95.8% | 123.57 | 93.5% | 127.71 | 96.7% |
| Second Lien Note Claims | 283.55 | - | 0.0% | - | 0.0% | - | 0.0% | - | 0.0% |
| | | | | | | | | | |
| Total Secured Claims | 415.69 | 119.48 | | 126.58 | | 123.57 | | 127.71 | |
| Estimated Proceeds after Administrative and Secured Claims | | - | | - | | 1.86 | | 3.29 | |
| | | | | | | | | | |
| General Unsecured Claims | | | | | | | | | |
| | | | | | | | | | |
| General Unsecured Claims | | 34.51 | | 6.53 | | 34.51 | | 6.53 | |
| Mechanic's & Materialman's Liens (If Deemed Unsecured) | | - | | 2.35 | | - | | 2.35 | |
| Total Unsecured Claims | | 34.51 | | 8.88 | | 34.51 | | 8.88 | |
| | | | | | | | | | |
| Recovery to General Unsecured Claims | | - | 0.0% | - | 0.0% | 1.86 | 5.4% | 3.29 | 37.0% |
| Residual Value Available for Distribution | | - | | - | | - | | - | |

**<u>Assets</u>**

| | | |
|---|---|---|
| 1 | Cash and cash equivalents | Consists of cash & cash equivalents readily convertible into cash |
| 2 | Cash Collateral Held by Sureties | Cash collateral held by various sureties related to Debtors bonding program |
| 3 | Gulf Coast Properties | Oil and gas properties in Texas |
| 4 | Wyoming Properties | Oil and gas properties in Wyoming |
| 5 | Alaska Properties | Oil and gas properties in Alaska |
| 6 | Buffalo Rig | Core drill rig owned by the Debtors located in Alaska |
| 7 | Misc casing/pipes | Miscellaneous casing, pipes, joints owned by the Debtors primarily located in Wyoming |
| 8 | Office furniture and equipment | Furniture, computers, and other miscellaneous equipment owned by the Debtors |

**<u>Wind Down Costs</u>**

| | | |
|---|---|---|
| 9 | Wind Down Costs | Based on historical monthly costs that wind down over 6 months |
| 10 | Legal and Professional Fees | Fees associated with professionals related to the wind down of Debtors assets |
| 11 | Chapter 7 Trustee Fees | Trustee fees are calculated based on 2.0% - 3.0% of the proceeds from asset sales |

**<u>Priority and Administrative Claims</u>**

| | | |
|---|---|---|
| 12 | Debtor-In-Possession Credit Facility | Amounts due under the Debtor-In-Possession Credit Facility |
| 13 | Other Priority Claims | Includes employee claims |
| 14 | Estimated Tax Claims | Priority tax claims |
| 15 | Administrative Claims | Includes accrued but unpaid professional fees and 503(b) claims |

**<u>Exhibit C</u>**

**Prepetition Organizational Chart**